IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DR. MUKUND VENGALATTORE | : | |
| | : | CIVIL ACTION NO.:   3:18-CV-1124 (GLS/DEP) |
| | : | |
| Plaintiff, | : | COMPLAINT |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| CORNELL UNIVERSITY | : | |
| | : | |
| & | : | |
| | : | |
| BETSY DEVOS | : | |
| SECRETARY OF EDUCATION | : | |
| U.S. DEPARTMENT OF EDUCATION | : | |
| | : | |
| & | : | |
| | : | |
| U.S. DEPARTMENT OF EDUCATION | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff, by his attorney Caleb Kruckenberg, Litigation Counsel, New Civil Liberties Alliance, hereby alleges the following:

## PARTIES

1.      Plaintiff, Dr. Mukund Vengalattore, is a natural person and resident of the State of New York.

2.      At all relevant times herein, Dr. Vengalattore was a member of the faculty at Cornell University (Cornell).

3.      Plaintiff is a male, of Indian descent.

4.      Plaintiff is a lawful permanent resident of the United States.

5.     Defendant Cornell University is an educational corporation organized and existing under the laws of the State of New York.

6.     Cornell is a federal land-grant university with its principal place of business located in Ithaca, New York.

7.     Cornell is organized into seven undergraduate colleges, three of which are state-supported statutory or contract colleges through the State University of New York (SUNY) system, and seven graduate divisions.

8.     Defendant United States Department of Education (ED) is an agency of the United States.

9.     Secretary of Education Betsy DeVos is the head of the ED and responsible for overseeing the ED's rulemaking activities.

10.     Secretary DeVos is sued in her official capacity.

## JURISDICTION AND VENUE

11.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claim arises under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

12.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Dr. Vengalattore resides in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

### I. DEPARTMENT OF EDUCATION ACTIONS

13.     Title IX says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

14.     Title VI says, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

15.     The ED is tasked with implementing and enforcing federal statutes pertaining to higher education, including Title IX and Title VI.

16.     The ED, through the Secretary of Education, has rulemaking authority. 20 U.S.C. § 1221e-3.

17.     The ED's Office of Civil Rights (OCR) is tasked with enforcing Title IX and Title VI.

18.     OCR does not have rulemaking authority.

### A. The 1997 Guidance

19.     ED issued a Guidance document titled "Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" on March 13, 1997 (the 1997 Guidance).

20.     The 1997 Guidance contained a lengthy section titled, "Prompt and Equitable Grievance Procedures," which spelled out requirements schools must satisfy in investigations and adjudications of allegations of sexual misconduct by either students or faculty.

21.     The 1997 Guidance did not mandate that sexual misconduct investigations take any particular form.

22.     The 1997 Guidance listed six "elements" OCR would use "in evaluating whether a school's grievance procedures are prompt and equitable," but ultimately left schools with the flexibility to shape their policies based on local needs: "Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience."

23.     None of the six "elements" identified in the 1997 Guidance was the preponderance of the evidence standard of proof, or any evidentiary standard, and the 1997 Guidance does not elsewhere require adoption of any particular evidentiary standard.

24.     The 1997 Guidance also cautioned schools to protect the rights of the accused.

25.     The 1997 Guidance noted that "a public school's employees may have certain due process rights under the United States Constitution," and the "rights established under Title IX must be interpreted consistently with any federally guaranteed rights involved in a complaint proceeding."

26.     The 1997 Guidance also cautioned that "procedures that ensure the Title IX rights of the complainant while at the same time according due process to both parties involved will lead to sound and supportable decisions."

### B. The 2001 Guidance

27.     On January 19, 2001, OCR published a notice entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (the 2001 Guidance).

28.     Its section on "Prompt and Equitable Grievance Procedures" mirrored, almost word for word, that same section from the 1997 Guidance.

29.     The 2001 Guidance addressed procedures for handling allegations raised by students against faculty "at every level of education."

30.     The 2001 Guidance warned every school that it might be held liable for failing to take adequate steps to prevent sexual discrimination or harassment "whether or not it knew or should have known about it, because the discrimination occurred as part of the school's undertaking to provide nondiscriminatory aid, benefits, and services to students."

31.     The 2001 Guidance advised schools that they should prevent unwelcome sexual advances by faculty toward students.

32.     The 2001 Guidance advised that "due to the power a professor or teacher has over a student," a professor's conduct would be more likely to be unwelcome and to create a hostile educational environment.

33.     The 2001 Guidance told schools that OCR would apply a "presumption" that any sexual conduct, even if otherwise consensual, between students and faculty, even involving postsecondary students, would be "not consensual."

34.     The 2001 Guidance required the school, if defending the faculty member, to "bear[] the burden of rebutting the presumption."

### C. The 2011 Dear Colleague Letter

35.     On April 4, 2011, OCR published a "Dear Colleague Letter" on sexual harassment (2011 DCL).

36. Although the DCL styled itself a "significant guidance document" and claimed that it "does not add requirements to applicable law," it in fact added numerous requirements to those contained in the 2001 Guidance.

37. The 2011 DCL was not subjected to notice-and-comment procedures before ED promulgated it.

38. The 2011 DCL directed schools to "take immediate action to eliminate harassment, prevent its recurrence, and address its effects."

39. The 2011 DCL expressly required, as part of schools' mandated efforts to publish and implement procedures for the "prompt and equitable resolution" of sexual misconduct claims, that schools adopt a preponderance of the evidence standard of proof in their investigations of allegations of sexual misconduct.

40. The 2011 DCL gave schools no leeway in that regard (with emphases added):

> Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school *must* use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. *Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.* Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

41. The 2011 DCL provided two bases for imposing the preponderance of evidence standard upon schools.

42. First, it noted that OCR uses that standard (a) "when it resolves complaints against recipients," i.e., educational institutions, alleging they have failed to establish a grievance regime which complies with Title IX, and (b) when it conducts "fund termination administrative hearings."

6

43.    The 2011 DCL never explained why the use of that standard in OCR actions related in any way to its appropriateness in determining whether an accused student, employee or third party assaulted or engaged in misconduct against a student.

44.    Second, it noted that the preponderance of the evidence standard is "the standard of proof established for violations of the civil rights laws."

45.    The 2011 DCL never explained why this aspect of federal civil rights lawsuits, but no other aspect of civil rights lawsuits (such as the right to discovery, the right to the protections of the rules of evidence, or the right to cross-examine other parties), had to be brought into campus sexual misconduct investigations.

46.    The 2011 DCL, in fact, "strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing," even though parties to federal civil rights lawsuits have that right.

47.    The 2011 DCL also warned that "[w]hen OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population."

48.    The 2011 DCL said, "When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding."

### D. The 2014 "Questions and Answers on Title IX"

49.    On April 29, 2014, OCR published a document titled, "Questions and Answers on Title IX and Sexual Violence" (the 2014 Q & A).

50.    That document, like the 2011 DCL, styled itself as a "significant guidance document."

51.     The 2014 Q & A confirmed that OCR understood schools' use of a preponderance of the evidence standard to be mandatory.

52.     In a section titled "Title IX Procedural Requirements," it names preponderance of the evidence as "the evidentiary standard that *must* be used … in resolving a complaint[.]" (emphasis added).

53.     The 2014 Q & A confirmed that, in OCR's view, the required use of the preponderance of the evidence standard is grounded in Title IX's requirement that grievance procedures provide for "prompt and equitable resolution" of allegations, saying that "any procedures used for sexual violence complaints, including disciplinary procedures, *must* meet the Title IX requirement of affording a complainant a prompt and equitable resolution … *including applying the preponderance of the evidence standard of review*." (emphases added.)

54.     The 2014 Q & A says that schools have no "flexibility" concerning the evidentiary standard: "*The school must use a preponderance-of-the-evidence (i.e., more likely than not) standard in any Title IX proceedings*, including any factfinding and hearings." (emphasis added.)

55.     The 2014 Q & A also applied all of these same standards to "employee-on-student sexual violence" and "[s]exual harassment."

56.     In fact, the 2014 Q & A said, "A school's Title IX obligations regarding sexual harassment by employees can, in some instances, be greater than those described in this document and the DCL."

57.     The 2014 Q & A continued, "With respect to sexual activity in particular, OCR will always view as unwelcome and nonconsensual sexual activity between an adult school employee and an elementary school student or any student below the legal age of consent in his

8

or her state. In cases involving a student who meets the legal age of consent in his or her state, there will still be a *strong presumption* that sexual activity between an adult school employee and a student is unwelcome and nonconsensual." (emphasis added).

58.     The 2014 Q & A also warned that "even if a school was not on notice [of misconduct], the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when the employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students[.]"

### E. OCR's Actions to Enforce the 2011 DCL

59.     OCR has taken unprecedented steps to ensure that schools adopt the mandatory requirements imposed by the 2011 DCL and the 2014 Q & A, even though those requirements were never subjected to notice-and-comment rulemaking and thus do not carry the force of law.

60.     OCR's enforcement has been so aggressive that most schools have adopted even those elements of the 2011 DCL that are not expressly styled as mandatory but for which OCR has expressed a clear preference.

61.     Just days after issuing the 2014 Q & A, OCR publicly identified colleges and universities it was then investigating for potential violations of their obligation to comply with Title IX in the implementation of prompt and equitable sexual misconduct grievance procedures.

62.     When OCR first published a list, there were 55 colleges and universities on it.

63.     By October 2014, the number of colleges and universities on OCR's public list had grown to 85 schools.

64.     In January 2015, it reached 94 schools.

65.     In May 2015, OCR added Cornell to the list.

66.    Since May 2015, Cornell has become the target of six more OCR investigations.

67.    In a final list published by OCR on January 17, 2017, Cornell was listed as one of 223 colleges and universities that were being investigated for being out of compliance with OCR guidelines.

68.    At the time of the 2011 DCL, at least 24 major universities, including Cornell, used a "clear and convincing evidence" standard of proof.

69.    Consistent with its dictate that only a preponderance of the evidence standard could allow for the "prompt and equitable resolution" of sexual misconduct claims, OCR has forced numerous schools that did not immediately comply with the 2011 DCL's mandate to replace more protective standards with the preponderance of the evidence standard.

70.    Princeton University, for instance, continued to use a "clear and persuasive evidence" standard after publication of the 2011 DCL.

71.    OCR informed Princeton, in a letter dated November 5, 2014, that its policy "did not provide for an adequate, reliable and impartial investigation" of sexual misconduct claims because, among other things, it "did not use the preponderance of the evidence standard."

72.    In a "Resolution Agreement" accompanying that letter, OCR required Princeton to adopt "the proper standard of review of allegations of sexual misconduct (preponderance of the evidence)."

73.    Similarly, in a letter dated December 30, 2014, OCR informed Harvard Law School (HLS) that the sexual misconduct policy it continued to use after publication of the 2011 DCL "*improperly* used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, *in violation of Title IX*." (emphases added.)

74.     The letter said, "This higher standard of proof was inconsistent with the preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence."

75.     In the Resolution Agreement made public with the letter, OCR ordered HLS "to submit to OCR," procedures "that comply with the applicable Title IX regulations and OCR policy," including "[a]n explicit statement that the preponderance of the evidence standard will be used for investigating allegations of sexual harassment or violence."

76.     In a letter dated October 31, 2013, OCR notified the State University of New York (SUNY) System that "[t]he grievance procedures used by" SUNY Buffalo State College "do not specify whether the arbitrator should use the preponderance of the evidence standard in investigating allegations of sexual harassment" and further that Morrisville State College "fail[ed] to … use the preponderance of the evidence standard to investigate allegations of sexual harassment."

77.     The letter ordered the SUNY System to "[r]evise the SUNY System grievance procedures to ensure that these comply with the *requirements* of Title IX; including using the preponderance of the evidence standard to investigate allegations of sexual harassment." (emphasis added.)

78.     OCR has also ordered two schools to adopt grievance procedures that expressly forbid parties from directly cross-examining each other in sexual misconduct disciplinary hearings.

79.     In a Resolution Agreement signed on April 24, 2015, OCR required Rockford University to present to OCR for review a draft Title IX policy that stated, among other things, that "the parties may not personally question or cross-examine each other during a hearing."

80.     Similarly, in a Resolution Agreement entered on or around December 23, 2014, OCR required Southern Virginia University to draft Title IX grievance procedures that say, "If cross-examination of parties is permitted … the parties will not be permitted to personally question or cross-examine each other."

81.     While Cornell did not enter a resolution agreement with OCR, this was only because it issued revised Policy 6.4 in 2012 in response to the DCL.

### F. The Rescission of the 2011 DCL and 2014 Q & A

82.     On September 7, 2017, in a prepared speech, Secretary DeVos said, "One person denied due process is one too many," and that "the system established by the prior administration has failed too many students."

83.     Secretary DeVos explained the "current reality" of Title IX adjudications were "kangaroo courts" where "a school administrator [] will act as the judge and jury."

84.     According to Secretary DeVos, "The accused may or may not be told of the allegations before a decision is rendered. If there is a hearing, both the survivor and the accused may or may not be allowed legal representation."

85.     Secretary DeVos continued, "Whatever evidence is presented may or may not be shown to all parties. Whatever witnesses—if allowed to be called—may or may not be cross-examined. And Washington dictated that schools must use the lowest standard of proof."

86.     Secretary DeVos explained that OCR had "terrified" schools and "run amok" by "weaponiz[ing] the Office of Civil Rights to work against schools and against students."

87.     Secretary DeVos said that OCR had "exert[ed] improper pressure upon universities to adopt procedures that do not afford fundamental fairness."

12

88.     Secretary DeVos said, "The failed system imposed policy by political letter, without even the most basic safeguards to test new ideas with those who know this issue all too well."

89.     Secretary DeVos declared, "The era of 'rule by letter' is over."

90.     On September 22, 2017, Secretary DeVos withdrew the 2011 DCL and the 2014 Q & A.

91.     In a press release, the ED said, "The withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness."

### G. The Replacement Guidance

92.     On September 22, 2017 OCR issued a new "Q&A on Campus Sexual Misconduct." (2017 Q & A).

93.     The 2017 Q & A provided a new definition for what constitutes an "equitable" investigation.

94.     The 2017 Q & A required, at a minimum: "In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation."

95.     The 2017 Q & A said, "Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms. Restricting the ability of either party to discuss the investigation (e.g., through 'gag orders') is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend

their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially."

96.    The 2017 Q & A said:

> Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident. Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.

97.    The 2017 Q & A also set forth necessary "procedures" a school should use before finding a party responsible for sexual misconduct.

98.    The 2017 Q & A said, "Any process made available to one party in the adjudication procedure should be made equally available to the other party[.]"

99.    The 2017 Q & A continued, "Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially."

100.    The 2017 Q & A also noted that variable standards for differing types of adjudication must be avoided, because "[w]hen a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided."

101.    The 2017 Q & A did not, however, require that a school use an evidentiary standard more rigorous than a preponderance.

102.   The 2017 Q & A also did not require that schools grant the accused a hearing, or that the school require separation of the investigatory and decision-making functions.

103.   Finally, the 2017 Q & A informed schools that "existing resolution agreements between OCR and schools" related to the 2011 DCL and 2014 Q & A were "still binding," and would continue to be enforced.

## II. CORNELL'S POLICIES

### A. Policies Related to Allegations of Bias, Discrimination, Harassment and Sexual and Related Misconduct

#### 1. Policies Before the 2011 DCL

104.   Prior to 2012, all complaints of sexual harassment and related misconduct made against students or faculty at Cornell were governed by the Campus Code of Conduct.

105.   The Code of Conduct provided many of the procedural protections set out in the United States Constitution.

106.   Generally, the Code of Conduct allowed investigations for complaints of alleged behavior that had occurred within one year of the complaint being filed.

107.   The Code established a judicial process for adjudicating such complaints.

108.   The Code ensured that when an accused appeared before any "University officials acting in a judicial capacity, the accused has the right to be advised and accompanied at every stage by an individual of the accused's choice."

109.   For suspension or dismissal to be imposed by the University officials, "such counsel or advisor must have had a reasonable opportunity to participate fully in the hearings."

110.   The Code required a "Judicial Administrator" to "promptly" investigate "non-employment related violation[s] by a faculty member."

111.   Prior to filing formal charges, the Judicial Administrator was only permitted to "interview the person involved" after informing the persons "in writing" "the matter to be discussed and the person's alleged relationship to it" and "the services of and contact information for the Office of the Judicial Codes Counselor" "[p]rior to any such interview[.]"

112.   After an initial investigation, the Judicial Administrator was required to determine if there was "reasonable cause to believe that a violation ha[d] been committed[.]"

113.   Only if so, the Judicial Administrator was required to "promptly refer the case to the University Hearing Board by filing charges with a Hearing Board Chair."

114.   The Judicial Administrator was required to "serve notice of the charges on the accused" "within seven calendar days of filing of charges."

115.   Such notice "shall contain" "the charges in the form of a formal accusation" and "notice of the nature of the evidence to be used against the accused," as well as procedural information about how to defend against the complaint.

116.   Prior to any hearing, the Judicial Administrator was required to provide the accused with "[n]ames and written statements of any witnesses to be called at the hearing," and "[c]opies of exhibits to be used at the hearing."

117.   The University Hearing Board then was required to hold a hearing on the accusation.

118.   The Hearing Board sat in a "five-person panel," "composed of three faculty members, one student and one nonfaculty employee[.]"

119.   Any decisions of the panel must have been by at least three votes.

120.   At the hearing, the Judicial Administrator was to serve as the prosecutor in the name of the complainant.

121.   The complainant was required to appear at the hearing.

16

122.   During the hearing, "[n]o accused person [was to] be denied the opportunity to question witnesses or to confront his or her accusers."

123.   "No accused person [was to] be denied the right to present evidence and witnesses in his or her own behalf" at the hearing.

124.   "No accused person [was to] be compelled to testify against himself or herself" at the hearing.

125.   "A verbatim record [was to] be kept of all hearings, but not of deliberations, and made available … to the accused at any time."

126.   After an adversarial hearing, the Hearing Panel was required to issue a written decision, "as expeditiously as possible," and include its rationale.

127.   "The burden of proof on violation [] rest[ed] on the complainant[.]"

128.   "The standard of proof on violation [was to] be clear and convincing evidence[.]"

### 2. Response to the 2011 DCL

129.   In April of 2012, in response to the DCL, Cornell promulgated new Policy 6.4.

130.   While advocating for new Policy 6.4 Cornell officials claimed that the changes were necessary to be in compliance with the DCL.

131.   Policy 6.4 as stated herein, was applicable during the 2014-2015 academic year.

132.   Policy 6.4 governed allegations of bias, discrimination, harassment and sexual and related misconduct whether allegedly committed by students or faculty, and displaced procedures outlined in the Code of Conduct for allegations falling under the new policy.

133.   The Code of Conduct was also amended in response to the Dear Colleague Letter.

134.   Appendix A was added to the Code of Conduct, which provided that Policy 6.4's procedures would be the exclusive means of adjudicating allegations of bias, discrimination,

17

harassment and sexual and related misconduct, even though such allegations were "still violations of the Campus Code of Conduct."

135.   This was because Cornell maintained that the Code of Conduct, with its heightened procedural protections, did not "fulfill requirements of Title IX."

136.   The University believed that the Code of Conduct would need to be "amended" to remove these procedural protections before it would comply with the ED's guidelines.

137.   Policy 6.4 eliminated many of the procedural protections provided by the Code of Conduct.

138.   Instead of an adversarial model, Policy 6.4 empowered a single investigator to both "conduct" a "formal investigation" into allegations, then make findings of fact, and recommend any appropriate sanction.

139.   The investigator was to complete the investigation within 60 days, unless good cause was shown for an extension.

140.   Policy 6.4 provided that "for students bringing a complaint against faculty in the context of a subordinate-supervisory relationship between the faculty member and the student … a student may file a complaint one year after no longer under the faculty[ member's] supervision or three years from the date of the alleged behavior[.]"

141.   Policy 6.4 did not require a preliminary finding by the investigator that a complaint was supported by reasonable cause.

142.   Policy 6.4 also did not establish limits on when an investigator could interview targets of the investigation, or require advance written notice of the nature of any interviews.

143.   Policy 6.4. provided that if the accused chose "not to discuss the matter with the investigator, the matter will proceed and could result in an adverse finding or determination."

18

144.   The accused could also face "disciplinary action" if the investigator determined that he had "relevant information" and had not cooperated with the investigation.

145.   Policy 6.4 also provided that "no one participating in the procedures under this policy may reveal any information learned in the course of so doing."

146.   Policy 6.4 did not require formal written notice of the charges to the accused.

147.   Instead, Policy 6.4. merely requires the investigator to notify the accused that he has been "named in a complaint" under the policy.

148.   Then, "[d]uring the first interview with the accused, [the investigator was required to] inform the accused of all of the charges being made, and remind the respondent of the university's policy against retaliation for making a complaint of discrimination or harassment."

149.   The investigator was required to "[d]etermine the frequency and type of the alleged discrimination or harassment and, if possible, the dates and locations where the alleged discrimination or harassment occurred."

150.   The investigator was required to "[p]resent to the accused all of the charges under investigation along with the evidence supporting them (and, if requested, a summary of the charges); ask for the accused's explanation of the alleged behavior; as appropriate, interview witnesses proposed by the accused; receive any other evidence that the accused wishes to present; and thoroughly examine and evaluate the rebuttals made by the accused."

151.   The investigator had a special obligation to the accuser under Policy 6.4 and was required to "[p]resent to the complainant additional information learned in the course of the investigation that will be germane to the outcome of the investigation."

152.   There was no corresponding duty to keep the accused so informed.

153.   The investigator was required to "[d]etermine whether the complainant informed other parties or supervisors of the situation and what response, if any, the complainant received from these individuals."

154.   Under Policy 6.4, "[a]dversarial hearings (including confrontation, cross-examination by the parties, and active advocacy by attorneys) [were] not permitted during the investigation process."

155.   Under Policy 6.4 the parties were allowed to "seek advice of personal attorneys and advisors" and "[s]uch representatives may attend their own clients' or advisees' investigative interview, but may not respond to questions for their clients or advisees, and may not pose questions."

156.   After completion of the investigation, the investigator was required to produce "a written report," which was to include: the scope of the investigation; a summary of the findings; recommendations for any corrective actions and/or sanctions; any non-punitive, preventative remedies for the complainant; and, if warranted, recommended action to restore the accused's reputation.

157.   The investigator was to make a determination of whether it was "more likely than not that prohibited discrimination or protected-status (including sexual) harassment or retaliation occurred."

158.   The investigator was to apply a preponderance of the evidence standard.

159.   No party had a burden of proof.

160.   Under Policy 6.4, "when a complaint ar[o]se[] out of the nature of a subordinate-supervisory relationship between [a] faculty member and [a] student" the Dean of Faculty was

required to "designate a faculty member to serve as a co-investigator, and state in writing to all concerned parties the reason for this selection."

161.   Following the investigation, the Dean of the appropriate school was tasked with reviewing the investigator's written report and recommendations and then determining whether to adopt the recommendation.

162.   The Dean did not hear live testimony or question witnesses before making her decision.

163.   Policy 6.4 did not require that the investigator disclose evidence favorable to the accused to anyone, at any stage in the investigation.

164.   Policy 6.4 did not permit the accused the right to question any witness.

165.   Policy 6.4 did not permit the accused the right to confront his accuser.

166.   Policy 6.4 did not guarantee the accused the right to present evidence and witnesses on his own behalf.

167.   Policy 6.4 did not permit the accused the privilege against self-incrimination.

168.   Policy 6.4 did not require that any interview, or other stage of the investigation, be recorded or transcribed and did not require that a transcript be made available to the accused.

169.   Policy 6.4 did not require that witness statements be made under oath.

### B. Policies for Adjudication of Other Issues

170.   Cornell's Policy 6.4 only applied to allegations of bias, discrimination, harassment and sexual and related misconduct.

171.   Policy 6.4 required that other allegations against faculty that might lead to discipline were to be investigated by the Standing Committee on Academic Freedom & Professional Status of the Faculty.

172.   The Committee was established by the Faculty Handbook.

173.   The Committee's jurisdiction included investigations of alleged violations of University Policies Applicable to Faculty.

174.   One such policy entitled, "Romantic and Sexual Relationships Between Students and Staff," was promulgated by the Faculty Council of Representatives.

175.   This policy generally provided that a faculty member "should" not "simultaneously be romantically or sexually involved with a student whom he or she teaches, advises, coaches, or supervises in any way" because a "conflict of interest arises when an individual evaluates the work or performance of a person with whom he or she is engaged in a romantic or sexual relationship."

176.   As described in a 2018 letter to the campus by Cornell President Martha Pollack, this provision was adopted "not as a formal part of the university policy library, but rather as a resolution adopted by what was then called the Faculty Council of Representatives, approved by the president and provost, and incorporated into the Faculty Handbook."

177.   The Committee on Professional Status was tasked with assessing complaints that faculty members had violated policies set out in the Faculty Handbook.

178.   The Committee had exclusive jurisdiction over the romantic relationships policy.

179.   The Committee was to be a group of faculty who could only issue recommendations as a full Committee.

180.   The Committee was required to establish review procedures, which "*must* comport with the basic precepts of due process." (emphasis in original).

181.   The Committee's procedures required, at a minimum, a "written complaint" be filed against the accused, which set out the nature of the allegations.

22

182.   The Committee was required to "conduct an investigation of the dispute by examining whatever appropriate written documents exist and interviewing the principal parties and any others it deems appropriate."

183.   The Committee also was required to issue a "final decision," in writing, on the complaint, "by a majority vote of the Committee members attending a meeting of the Committee called to review the complaint."

184.   Article XVI, Section 10, of the Cornell University Bylaws also set out a policy that was applicable in any setting related to the "dismissal/suspension" of "faculty members."

185.   These bylaws applied in addition to the Committee procedures.

186.   Section 10 provided that Cornell may suspend or dismiss a faculty member only "on reasonable notice and after giving such member an opportunity to be heard, for misconduct or failure to perform the duties required of the position he or she holds."

187.   Section 10 required the University to "inform the faculty member of the complaint against him," and the Dean was required to "investigate the case," when a "complaint from any source is made against a university professor."

188.   Section 10 required the Dean to "report to the provost the results of the investigation together with his or her recommendations."

189.   Section 10 required the provost to furnish the faculty member "with a written and detailed statement of the charges against him or her and the suggested disciplinary action if, after receiving the dean's report and making such independent investigation as may seem appropriate to the provost, it is the opinion of the provost that further proceedings are warranted."

190.   "If the faculty member desires a hearing," Section 10 required that the University provide him with "a hearing before a board appointed by the provost and consisting of five members of the University Faculty, of whom two shall be selected by the faculty member, two by the provost and the fifth by the other four."

191.   Section 10 said, "At such hearing the faculty member shall be entitled to be accompanied by an advisor or counsel of his or her own choice, to present witnesses in his or her own behalf and to confront and question the witnesses against him or her."

192.   Section 10 required that the faculty member "be furnished, without cost to him or her, a full report of the proceedings before the board, including the testimony taken, the evidence received, and the board's findings and recommendations."

193.   Section 10 required the board to "submit to the president a report of its findings and recommendations."

194.   Finally, Section 10 says, "In the case of suspension of less than one semester, or suspensions of any length of time of faculty other than university professor, professor, associate professor or assistant professor, a dean's determination to suspend a faculty member shall be subject to existing grievance procedures."

### III. FACTS SPECIFIC TO DR. VENGALATTORE

#### A. Dr. Vengalattore Begins Work at Cornell

195.   Dr. Vengalattore obtained his Ph.D from the Massachusetts Institute of Technology and completed a postdoctoral research fellowship at the University of California, Berkeley.

196.   Dr. Vengalattore became a tenure-track Assistant Professor of Physics at Cornell in 2009.

197.   The physics department was a part of the College of Arts and Sciences.

198.   Dr. Vengalattore was heavily recruited for the position at Cornell, because Cornell had been unsuccessfully searching for an expert in his field—atomic, molecular and orbital physics.

199.   In the Spring of 2009 Dr. Vengalattore began recruiting graduate student assistants to work in his lab on an experiment related to ultracold atomic gases.

200.   The first stage of his work required constructing an experiment in his lab.

201.   In the Spring of 2009 a Cornell graduate student, Jane Roe, became Dr. Vengalattore's first graduate student.[1]

202.   Roe worked on the experiment throughout 2009 under Dr. Vengalattore's guidance.

203.   While they made progress on the experiment, Dr. Vengalattore noticed that Roe struggled with certain aspects of the project.

204.   In October 2009 Roe told Dr. Vengalattore that she was having difficulty with the workload associated with the project.

205.   In early 2010 Roe grew frustrated with the project and told Dr. Vengalattore that she was considering leaving the project.

206.   Shannon Harvey was a female undergraduate student who began to work on the project in January 2010.

207.   Harvey became close to Roe and the two often talked in confidence.

208.   In March 2010 Dr. Vengalattore took on a second graduate student, Srivatsan Chakram Sundar, who was a male and an Indian National.

209.   The project progressed more quickly and Roe decided to stay on with the project.

210.   Despite the progress, Roe continued to struggle with the project.

211.   Roe also refused to work long hours in the lab.

---

[1] Jane Roe is a pseudonym, which is used in compliance with L.R. 8.1.

212.   In 2010, Dr. Swati Singh, a female who was of Indian descent, was collaborating with Dr. Vengalattore on a research project.

213.   In July, 2010, Dr. Singh visited the lab for two weeks and spoke to the students working on Dr. Vengalattore's project.

214.   Dr. Singh observed that all of the students other than Roe appeared "driven" and "friendly."

215.   However, Dr. Singh observed that Roe worked far fewer hours than even the undergraduate students, and appeared to be far less knowledgeable about the project than other students.

216.   Roe also often shared personal details of her life to Dr. Vengalattore and Chakram.

217.   Neither Dr. Vengalattore nor Chakram were comfortable learning these details.

218.   For example, Roe told both men about her romantic relationship with a fellow graduate student, Mohammad Hamidian.

219.   During this time Harvey also became concerned about Roe's behavior in the lab.

220.   Harvey believed that Roe was "not on the level," and had falsely accused another undergraduate student of "betray[ing] her trust."

221.   Roe had apparently accused a male undergraduate student who had been working in the lab of being a "stalker."

222.   The accused student had left the project as a result.

223.   Harvey knew the accused student and believed that "he was not any of the things that [Roe] said he was."

224.   Roe also failed to show deference to Dr. Vengalattore, who was her graduate advisor.

225.   Roe also referred to fellow students, graduate students, and Dr. Vengalattore by names like "honey," "hon," "darling," and "babe."

226.   Dr. Vengalattore believed it was improper for Roe to use such language in a professional setting and repeatedly informed Roe that she should stop.

227.   Other students, including Chakram, informed Roe that she should not use these names either because it was unwelcome and inappropriate.

228.   Roe continued to use these names in the lab.

229.   Roe insisted that she was from the American South, and so her use of these terms was appropriate.

230.   Roe also had difficulty working with Chakram.

231.   During the fall of 2010 Roe told Dr. Vengalattore that Chakram had smoked marijuana in the lab.

232.   Dr. Vengalattore confronted Chakram, who denied the accusation and offered to take a drug test.

233.   Dr. Vengalattore accepted Chakram's denial and did not pursue the matter further.

234.   In the fall of 2010 Katsuri Saha, a female who was an Indian National, who was also a graduate student at Cornell, asked Roe about her behavior.

235.   Saha asked Roe if she had a "crush" on Dr. Vengalattore.

236.   Saha had observed Dr. Vengalattore always behaving professionally toward Roe, but had also observed Roe's forward manner toward Dr. Vengalattore.

237.   Roe denied that she had any romantic interest in Dr. Vengalattore.

238.   Around November 2010 Roe informed both Dr. Vengalattore and Chakram that she had ended her relationship with Hamidian.

239.   Roe planned to travel to India with Saha in January 2011.

240.   Roe informed Dr. Vengalattore and Chakram of her plans.

241.   Roe also asked Dr. Vengalattore to watch her cat while she was in India and he agreed to do so.

242.   During the last week of the school year, December 13-17th, 2010, Dr. Vengalattore continued to work in the lab and was present in the lab every day.

243.   Lab records show that Dr. Vengalattore was in the lab all night on December 15th and into the morning of the 16th, returned midday on December 16th and stayed through that evening, and returned again on the morning of December 17th.

244.   Roe was not present in the lab between December 15, 2010, and January 24, 2011.

245.   Roe left Ithaca around December 17, 2010 to visit family.

246.   Roe returned to Ithaca on December 30, 2010 and dropped her cat at Dr. Vengalattore's house on the morning of December 31st.

247.   Roe then went to New York City for the New Year's holiday.

248.   On December 31, 2010, Roe wrote an e-mail to Harvey in which she wrote, "My life is always a mess, now I have a whole new hoard [sic] of interesting and complex problems... . Feel a little like lady Brett Ashley."

249.   Roe later told a friend that she was attempting to reunite with a former boyfriend after she ended her relationship with Hamidian.

250.   In late January 2011 Roe returned from India and told Dr. Vengalattore that she was sick with mononucleosis.

251.   Roe's work suffered even more during the spring of 2011.

28

252.   In the fall of 2011 Dr. Vengalattore took on two other graduate students, Yogesh Patil, an Indian national, and Collin Reynolds.

253.   Roe continued to be overly familiar with the students in the lab.

254.   Roe often called Dr. Vengalattore and Chakram "darling," and sometimes "pulled their cheeks."

255.   This behavior was unwelcome, and Dr. Vengalattore and Chakram again told Roe that it was inappropriate.

256.   Roe also would raise her voice to Dr. Vengalattore during meetings.

257.   During one meeting, Roe "flipped off" Dr. Vengalattore and left the lab.

258.   Roe also made inappropriate comments to Dr. Vengalattore and Patil about the racial composition of the lab.

259.   During a meeting in the lab Roe told Dr. Vengalattore, in front of the other students, "You are all Indians. Of course you stick together."

260.   Roe also told Patil that he, Dr. Vengalattore and Chakram could be expected to work long hours because "they are Indians, who are hardworking like Chinese."

261.   Patil considered Roe's statements inappropriate and racially biased.

262.   Patil repeatedly told Roe that her behavior was unwelcome and improper.

263.   During the fall of 2011 Roe also informed the lab that she was in a relationship with another student, Yariv Yanov.

264.   In December 2011, Dr. Vengalattore's status as a professor was subject to faculty review.

265.   In a letter submitted to the faculty on his behalf, Roe praised Dr. Vengalattore as an advisor, writing, in part, "Professor Vengalattore is an amazing advisor, teacher and mentor,"

"Overall, I think I made the best decision when I choose [sic] Prof Vengalattore as an advisor and mentor my first year".

266.    Following the review, Cornell elected to continue Dr. Vengalattore's academic appointment.

267.    Starting in 2012, Airlia Shaffer-Moag, an undergraduate student, also began working in the lab.

268.    Shaffer-Moag became friends with both Reynolds and Roe.

269.    During the fall of 2012 Reynolds told Shaffer-Moag that he had a romantic interest in Roe.

270.    During that same period, Roe told Shaffer-Moag that she was "sexist against men."

271.    Shaffer-Moag also saw Roe attempt to "deny undergraduate men the opportunity of joining the lab."

272.    In 2012 three undergraduates attempted to join the lab, two men and Shaffer-Moag, a woman.

273.    Even though none had taken a relevant class in electronic circuits, Roe attempted to bar the two male students from joining the lab.

274.    Shaffer-Moag, by her own reckoning, had a "much weaker background in physics than did the two men, so there was no reason to try to bar them from the lab without barring" her as well.

275.    Roe sent Dr. Vengalattore an e-mail in August 2012 where she apologized for "bouncing around" on projects in the lab, and expressed that she was feeling "overwhelmed" by her work in the lab.

276.    At the time Reynolds also was struggling with the workload associated with the project.

277.   Dr. Vengalattore assigned Roe and Reynolds to work jointly on a project in the hopes that they would succeed together.

278.   Unfortunately, both Roe and Reynolds continued to struggle, and toward the end of the fall semester Dr. Vengalattore assigned Chakram to assist Roe and Reynolds.

279.   Two days later Roe informed Dr. Vengalattore that she would leave his project.

280.   Dr. Vengalattore, Roe and Professor Lawrence Gibbons met to discuss her plans.

281.   Dr. Vengalattore wrote to Roe after the meeting that he would make sure that her work on the project would be credited in any forthcoming publications.

282.   Dr. Vengalattore wrote, "At this point, I am not sure of the remaining obstacles in this project. If these turn out to be negligible, [Roe] will once again be the first author of the published work."

283.   In November 2012 Roe formally withdrew from Dr. Vengalattore's project.

284.   Unbeknownst to Dr. Vengalattore Roe also sent an e-mail to Professor Gibbons alleging that Dr. Vengalattore had once become angry at her and "threw a power supply" in the lab.

285.   Also in November 2012 Roe contacted Professor Keith Schwab, a professor at CalTech who had previously collaborated with Dr. Vengalattore.

286.   Roe told Professor Schwab that she was leaving Dr. Vengalattore's project, and claimed that Dr. Vengalattore had "slid" a "piece of equipment" "toward her."

287.   Professor Schwab had witnessed Roe's interaction with Dr. Vengalattore in the lab, and felt that "she never displayed any sort of professional respect for" Dr. Vengalattore.

288.   Professor Schwab did not believe Roe's claim.

289.   Progress continued on the project in Roe's absence.

290.   After leaving the project, Roe joined a lab in Maryland while completing her graduate studies at Cornell.

291.   In April 2013 Roe called Dr. Singh to express her displeasure at having left the project.

292.   Roe told Dr. Singh that "if I have my way, [Dr. Vengalattore] will have a hard time getting tenure."

### B. Dr. Vengalattore is Considered for Tenure

293.   In the Spring of 2014, Dr. Vengalattore was set to be considered for promotion to tenured professor.

294.   Since joining Cornell in 2009, Dr. Vengalattore had built three lab experiments, two of which had produced scientific results by 2014.

295.   By 2014 Dr. Vengalattore had also published six academic papers from his time at Cornell.

296.   By 2014 Dr. Vengalattore had attracted nearly $4 million of funding for his research at Cornell.

297.   In February 2014, Roe approached Professor Ritchie Patterson, a member of the Physics faculty who would be reviewing Dr. Vengalattore's tenure application, and asked to discuss a "situation."

298.   Professor Patterson was married to Professor Gibbons.

299.   Roe told Professor Patterson that Dr. Vengalattore had thrown a power supply at her while they had been working in the lab.

300.   In April 2014 Dr. Vengalattore's project had progressed far enough that his group had prepared a publication.

301.   Since his 2012 e-mail to Roe, the project had changed significantly, and his other students had contributed a significant amount of work on the project.

302.   Dr. Vengalattore no longer believed that it was ethical or appropriate to list Roe as the first author of the publication.

303.   Dr. Vengalattore did, however, suggest that Roe should be listed as an author.

304.   Roe became upset when she learned that she would not be the lead author of the publication.

305.   In an e-mail Roe wrote to Dr. Vengalattore and Professor Gibbons that she was "requesting to remove [her] name from the author list."

306.   Dr. Vengalattore responded that he was "puzzled" by this request.

307.   Roe then replied that she was "comfortable being an author," without specifying the appropriate order.

308.   Roe was eventually listed as the third author of the article, which was published in September 2014.

309.   In May 2014 Roe sent a letter to the tenure review committee, which had been formed to consider Dr. Vengalattore's promotion.

310.   In the letter Roe wrote that at one point while working in the lab, "Prof. Vengalattore became so impatient with my position that he picked up the power supply in dispute—a metal box weighing five pounds—and threw it at me."

311.   Dr. Vengalattore only learned about this allegation during the tenure review process in an e-mail from Professor Gibbons.

312.   On August 11, 2014, Dr. Vengalattore responded formally to this accusation, submitting a written denial and several letters of support to the faculty committee.

33

313.    Professor Schwab wrote a letter concerning the accusation and said that when Roe had first made this claim to him in November 2012, "She had said that during a discussion where there was disagreement, you put down a small piece of electronics on a table or counter, with some force, which made a noise and slid in her general direction."

314.    Professor Schwab also wrote, that Roe's story had not originally suggested that Dr. Vengalattore "threw a piece of equipment at her."

315.    Professor Schwab continued, "[Roe] is someone who I me[]t a number of times over the years and I have to say, that I always felt that she did not treat Mukund with proper professionalism or respect. She often made unprofessional and disrespectful comments (and I also have to say, that I seriously doubt she would have behaved this way to a US-born, white, professor.)"

316.    Professor Singh also wrote a letter in which she described Roe's allegation as "unbelievable," based on her time working with the students in the lab.

317.    Professor Singh shared Roe's statement to her from 2013 that "if [she] ha[d] [her] way, [Dr. Vengalattore] will have a hard time getting tenure."

318.    Chakram also submitted a letter, writing that during her time in the lab Roe was "not honest about her contributions."

319.    Chakram also wrote that Roe had told him in June 2013 that Dr. Vengalattore "had thrown a power supply at her," but that he "did not believe her."

320.    In September 2014 the faculty committee voted to recommend that Dr. Vengalattore be granted tenure.

321.    The recommendation was forwarded to Gretchen Ritter, Dean of the College of Arts and Sciences, for her final determination.

322.   On September 22, 2014, Professor Jeevak Parpia, the Chair of the Physics Department, sent an e-mail to Roe informing her of the tenure review committee's conclusion.

323.   On September 24, 2014, Dean Ritter formed a faculty committee to make a recommendation regarding a final tenure decision.

### C. Roe Makes Her Accusation of Sexual Misconduct

324.   On or around September 24, 2014, Roe contacted Professor Patterson and, for the first time, accused Dr. Vengalattore of having committed sexual misconduct.

325.   Professor Patterson shared this accusation with Professor Julia Thom-Levy, also a member of the Physics faculty and Professor Yael Levitte, Associate Vice Provost for Faculty Development and Diversity.

326.   Professors Levitte, Patterson and Thom-Levy then contacted Alan Mittman, Director of the Office of Workforce Policy and Labor Relations, and repeated the accusation.

327.   Eventually Mittman contacted Roe, who had a series of unrecorded discussions with him.

328.   On November 23, 2014, Mittman contacted Dr. Vengalattore concerning an allegation that he had improperly listed Roe's name on a website concerning her authorship of a paper.

329.   Mittman explained that Roe's name had been listed without a middle initial, which could be construed as sexually suggestive.

330.   Dr. Vengalattore responded that Roe had requested her name to be listed in this fashion.

331.   Mittman responded that he considered the matter "closed," but warned Dr. Vengalattore that it would have been "inappropriate" for Dr. Vengalattore to have intentionally listed Roe's name in that fashion.

332.   Meanwhile, Mittman continued to correspond with Roe concerning her allegation that Dr. Vengalattore had been romantically involved with her.

333.   Mittman also shared Roe's allegations with Dean Ritter, pending her review of the tenure recommendation.

334.   In December 2014 Mittman contacted Roe via e-mail and wrote that Dean Ritter "has been apprised of our conversation and your concerns."

335.   Mittman also told Roe that Cornell was working "very aggressively to address issues of access, prevention and culture change" "under Title IX."

336.   Based on the new allegation, Dean Ritter recommended denying Dr. Vengalattore tenure.

337.   Following Dean Ritter's recommendation, yet another faculty committee, the Faculty Advisory Committee on Tenure Appointments (FACTA), was convened to review Dr. Vengalattore's tenure application.

338.   The FACTA committee then prepared a report, recommending denying Dr. Vengalattore's tenure application.

339.   In the FACTA report, Paulette Clancy a professor from the College of Engineering, wrote "I found [Dr. Vengalattore's] interactions with the graduate students to be unacceptable and unsupportable by a major research university like Cornell. *Clearly the only students who are prepared to take the abuse he dishes out are both men and they are both from the Indian sub-continent, where perhaps the culture between advisor and protégé is different*." (emphasis added).

340.   In February 2015, Mittman and Roe had a series of unrecorded conversations concerning her allegations.

341.   The substance of these conversations was shared with Dean Ritter.

342.   On February 13, 2015, Dean Ritter overruled the original faculty vote and denied Dr. Vengalattore's promotion to tenured professor.

### D. The Policy 6.4 Investigation Formally Begins

343.   On February 16, 2015, Mittman and Sarah Affel, Cornell's Title IX Coordinator, conducted a formal phone interview with Roe.

344.   During this interview, Roe alleged that she and Dr. Vengalattore had sex during the final week of the Fall 2010 semester.

345.   Roe claimed that, on one day during that week, Dr. Vengalattore had been absent from the lab all day.

346.   Roe claimed she then went to his house to check on him around 7:00 p.m.

347.   Roe claimed that Dr. Vengalattore invited her inside, and began kissing her.

348.   Roe said she initially resisted, but then agreed to have sex with Dr. Vengalattore.

349.   Roe considered this to be rape.

350.   Roe also claimed she spent the night at Dr. Vengalattore's house, and went with him to the lab the next morning.

351.   Roe further alleged that after that encounter, she had a secret consensual relationship with Dr. Vengalattore until December 2011.

352.   During the interview Roe also alleged that "9 people have left [Dr. Vengalattore's] lab because of his temper."

353.   During the interview Roe also alleged that Dr. Vengalattore "yelled at" Chakram "until he cried," and "there was a lot of yelling at" Chakram.

354.   Following the interview Roe forwarded a number of e-mails and other documents to Mittman and Affel concerning her allegations.

355.   On February 23, 2015, Mittman and Affel conducted a second telephone interview with Roe.

356.   During this interview, Roe added that in late 2010, around the time of the alleged assault, she had "just broken up with a long-term boyfriend and she was starting to see her high school boyfriend again some on the weekends."

357.   There is no indication in notes of the interview or investigation, that Mittman or Affel ever followed up on this statement, or made any effort to learn the identity of this boyfriend.

358.   Roe said that Dr. Vengalattore "sidelined" her and forced her off the project in 2012.

359.   Roe also alleged that Dr. Vengalattore had threatened Reynolds and Chakram that "he would sideline them like he had sidelined" Roe, if they displeased him.

360.   Roe admitted that she had not disclosed the alleged sexual assault or romantic relationship to any faculty, even when she attempted to derail Dr. Vengalattore's tenure review, and had only made her allegations "when Jeevak Parpia … informed her that the department voted to give [Dr. Vengalattore] tenure."

361.   On February 27, 2015, Dr. Vengalattore appealed the denial of tenure, still unaware of Roe's new allegations.

362.   On March 2, 2015, Mittman demanded that Dr. Vengalattore appear at the Title IX office the following day.

363.   Mittman informed Dr. Vengalattore that Dean Ritter had authorized him to "review [an] alleged romantic sexual relationship with a student under [Dr. Vengalattore's] supervision in or around the 2011 calendar year."

364.   The following day Dr. Vengalattore appeared at Mittman and Affel's office for a formal interview, which lasted more than three hours and was not recorded.

365.   Dr. Vengalattore was not represented by counsel.

366.   Dr. Vengalattore denied having had any romantic or sexual relationship with Roe.

367.   During the interview Dr. Vengalattore was not initially informed that Roe had accused him of having raped her.

368.   After several hours, Mittman and Affel informed Dr. Vengalattore that Roe had accused him of rape.

369.   Dr. Vengalattore responded by asking for the assistance of counsel.

370.   Mittman and Affel told Dr. Vengalattore that was not necessary and continued the interview.

371.   Dr. Vengalattore denied having ever had any sexual contact with Roe.

372.   Dr. Vengalattore also asked Mittman and Affel how the accusations were consistent, because he had told the interview would discuss an alleged consensual relationship.

373.   During the interview Affel offered that, while she had not said so directly, Roe "may claim" "that she was scared to say no."

374.   Following the interview on March 3, 2015, Dr. Vengalattore sent a series of emails to Mittman and Affel with further information, including the letter Professor Schwab had submitted on his behalf during the tenure review.

375.   In one email, Dr. Vengalattore asked the investigators to interview witnesses with first-hand knowledge of Roe's behavior in the lab, Chakram, Patil, Professor Schwab, Scott Flanz, Chandler Kemp, Seong Woo Oh, and Dr. Sunil Bhave.

376.   Each of these students were either students who had been in Dr. Vengalattore's group, or close collaborators with Dr. Vengalattore during the period under investigation.

377.   Dr. Vengalattore also posed a series of questions that he believed the investigators should ask Roe about her accusations, including, in substance:

    a.  Did she report or talk to anyone about her allegations when they allegedly occurred?

    b.  When Roe returned from India in 2011 what happened?

    c.  Did she report the alleged assault to anyone or talk to anyone about her allegations?

    d.  When did Roe first make her allegations?

    e.  How long did the alleged relationship last?

    f.  How and why did the alleged relationship end?

    g.  Why did Roe continue in an alleged relationship for a year if it began with an alleged sexual assault?

    h.  Why did Roe continue to work in the lab until 2012 if the relationship ended much earlier?

    i.  Why did Roe write a very positive third year review in 2011 if she had been the victim of this misconduct?

378.   Dr. Vengalattore informed Mittman and Affel that Roe had often used improper terms when communicating to him and other group members, including the terms "babe/darling."

379.   Mittman responded to these emails by saying the "questions/comments will be taken into account," but did not agree to ask the questions directly to Roe or promise any action.

380.   On or before March 11, 2015, Roe was connected with M. Karns, an attorney and Senior Lecturer at Cornell, who describes the "economic consequences of sexual assault and harassment," and "harassment prevention," as areas of expertise.

381.   On information and belief, Mittman and Affel arranged for Karns to serve as Roe's personal representative and victim advocate during the investigation.

382.   On information and belief, Karns was provided at Cornell's expense to assist and advocate for Roe during the investigation.

383.   No advisory assistance was provided to Dr. Vengalattore by Cornell at any point during the investigation.

384.   On March 11, 2015, Roe sent an email to Mittman and Affel, with Karns' assistance, with information related to the investigation.

385.   On March 11, 2015, Dr. Vengalattore sent Mittman and Affel another email, telling them that both Professor Singh and Harvey had witnessed Roe using inappropriate language in the lab.

386.   In the same email, Dr. Vengalattore reminded Mittman and Affel that Roe had made different allegations during the tenure review process, which a faculty panel had determined were unfounded.

387.   Dr. Vengalattore reminded Mittman of his November 2014 investigation into the allegedly offensive listing of Roe's name as an author.

388.   Dr. Vengalattore also informed the investigators about Roe's positive third year review of his performance, which she submitted in 2011 to Professor Patterson.

389.   On March 20, 2015, Mittman and Affel conducted an unrecorded interview of Professor Patterson.

390.   During the interview Professor Patterson said that Roe's first allegation that Dr. Vengalattore had a sexual relationship with her was on September 24, 2015, after Professor Patterson informed Roe that Dr. Vengalattore's tenure review was too far along to challenge.

391.   Professor Patterson was not asked about Roe's positive 2011 review of Dr. Vengalattore.

41

392.    On March 20, 2015, Mittman and Affel conducted an unrecorded interview with Chakram.

393.    During the interview Chakram described the lab as a great place to work.

394.    Chakram denied that Dr. Vengalattore had yelled at him or any other students in the lab, and denied having ever cried in the lab.

395.    Chakram denied that Dr. Vengalattore had ever "sidelined" Roe or any other student, or threatened to do so.

396.    Chakram said that Roe had struggled in the lab and often took professional criticism personally.

397.    Chakram also said that Roe often spoke about personal issues in the lab.

398.    Chakram noted that Roe often referred to him, Dr. Vengalattore, and others with names like "honey" and "babe," and Chakram said that it had made him "uncomfortable."

399.    Chakram had told Roe that she should not use those terms with him or anyone else in the lab.

400.    Roe, however, had continued to use these terms despite his requests to stop.

401.    On March 20, 2015, Laurel Parker, a consultant hired by Cornell, and Affel conducted an unrecorded interview with Patil.

402.    Patil was not informed of the nature of the inquiry before the interview.

403.    Patil requested that the interview be recorded and that he be given a transcript of the interview, but Affel and Parker refused those requests.

404.    Patil also complained that he had previously been interviewed during the tenure review process and his words were inaccurately summarized before being shown to Dean Ritter.

405.   Patil denied that Dr. Vengalattore had ever been inappropriate with any student in the lab and said that Dr. Vengalattore "does not yell."

406.   Patil denied that Dr. Vengalattore had yelled at Roe or "sidelined" her.

407.   Patil told Parker and Affel that Roe had previously falsely accused Chakram of having smoked marijuana in the lab and having broken equipment.

408.   Patil told the investigators that Roe was disrespectful to Dr. Vengalattore, had "flipp[ed] off" Dr. Vengalattore in the presence of other students, and had raised her voice to him during meetings.

409.   Patil told the investigators that Roe was "inappropriate" in the lab, referring to him, Chakram and Dr. Vengalattore as "darling," would "pull[] their cheeks," and made inappropriate racial comments, telling Dr. Vengalattore in front of the other students, "You are all Indians. Of course you stick together," and telling Patil that he, Dr. Vengalattore and Chakram could be expected to work long hours because "they are Indians, who are hardworking like Chinese."

410.   Patil told the investigators that this behavior was unwelcome, and he considered it racist and harassing, and he had asked Roe to stop.

411.   Patil told the investigators, however, that Roe had refused to stop her unwelcome conduct.

412.   On March 23, 2015, Mittman and Affel conducted an unrecorded interview with Hamidian.

413.   During the interview, Hamidian said that he had ended his relationship with Roe in November 2010.

414.   Hamidian had also said that about three months later, Roe saw that Hamidian was in a new relationship and had said "that she could not believe that he had already started a new relationship."

415.   Hamidian noted that this would have been during Roe's alleged relationship with Dr. Vengalattore.

416.   Roe was never confronted with this statement or asked to explain it by the investigators.

417.   On April 2, 2015, Mittman and Affel conducted a series of unrecorded witness interviews in New York City, with Roe, Roe's sister, and Eliza Buhrer-Kapit.

418.   All of the interviews were conducted in short succession in the same location, and the witnesses were allowed to discuss their testimony with each other before and after the interviews.

419.   During Roe's interview, Affel informed Roe what evidence they had gathered so far during the investigation and allowed her to review the testimony of other witnesses.

420.   Roe admitted during the interview that she had previously accused Chakram of smoking marijuana.

421.   Roe also conceded, "She will call people honey and sweetie, unless they object, because she is from the south."

422.   Following the interview Roe requested that the investigators redact certain information from the notes of the interview, and Mittman and Affel complied.

423.   During Buhrer-Kapit's interview she shared with investigators that she had discussed the case with Roe prior to the interview.

424.   After the interview, Buhrer-Kapit was allowed to review notes of the interview, and wrote to the investigators that the notes "omit[] some of the caveats I made throughout the

interview. In particular, there were several points where I noted that my subjective views of [Dr. Vengalattore] should be taken with a grain of salt, given my relationship to [Roe]."

425.   On April 9, 2015, Affel conducted an unrecorded interview with Eliot Kapit, Buhrer-Kapit's husband.

426.   During the interview, Kapit noted that he had discussed the nature of the investigation with Buhrer-Kapit prior to the interview, and repeated what Buhrer-Kapit had reported having been told by Roe.

427.   On April 16, 2015, Affel conducted an unrecorded interview with Dr. Singh on the phone.

428.   Dr. Singh said that Roe had made the "power supply allegation" to her.

429.   Dr. Singh said that accusation "was not believable to her" based on her knowledge working in the lab with Roe and Dr. Vengalattore.

430.   Dr. Singh also encouraged the investigators to "check out the accused power supply and draw [their] own conclusions," because the "scientist" in her suggested that the accusation was not plausible.

431.   In mid-April, 2015, Roe, with Karns' help, obtained her medical records from campus health services.

432.   These records showed that Roe had taken a pregnancy test in January 2011 at campus health services, and, at the time, had reported her last sexual activity as having occurred on December 30, 2010.

433.   On April 16, 2015, Roe, with Karns copied on the message, emailed Mittman and Affel to tell them that her first sexual encounter with Dr. Vengalattore had happened between November 29, 2010 and December 17, 2010.

434.   In the same email, Roe alleged, for the first time, that she had also had sex with Dr. Vengalattore on December 30, 2010, when she had dropped her cat off at Dr. Vengalattore's house.

435.   On April 16, 2015, Mittman and Affel conducted an unrecorded interview with Dr. Sunil Bhave on the phone.

436.   Dr. Bhave told the investigators that he had observed Dr. Vengalattore in the lab with his students and Dr. Vengalattore "was very careful and politically correct."

437.   On April 20, 2015, Mittman and Affel conducted another in-person unrecorded interview with Dr. Vengalattore.

438.   Dr. Vengalattore asked Mittman and Affel to inform him of the date Roe had alleged the initial sexual assault had occurred.

439.   Mittman and Affel refused, and instead told Dr. Vengalattore to look at a blank December 2010 calendar and mark off all days during that month he was in Ithaca.

440.   Dr. Vengalattore asked if that was so the investigators could find a date that they could report back to Roe as a possibility, and the investigators did not respond.

441.   Dr. Vengalattore repeated his denial of having ever had a sexual relationship with Roe.

442.   The investigators presented Dr. Vengalattore with Roe's claim that she had reported having a sexual encounter with someone on December 30, 2010.

443.   The investigators asked Dr. Vengalattore who Roe had sex with, if not him.

444.   Dr. Vengalattore told the investigators he had no way of knowing and had no idea.

445.   Dr. Vengalattore informed the investigators that the investigation was unfair and biased against him.

446.   Dr. Vengalattore told the investigators that the "burden of proof should be on the person making the[] accusations" but he had been required "to constantly provide evidence that various fictitious allegations alleged to have happened 4-5 years ago, did not in fact happen."

447.   The investigators never denied that they had applied the burden of proof on Dr. Vengalattore.

448.   Dr. Vengalattore also objected to the investigators' reliance on hearsay and gossip.

449.   Mittman told Dr. Vengalattore that "if a lot of people claim to have heard it from [Roe] around the same time, then it becomes credible."

450.   Dr. Vengalattore then objected to having "not been told the day that the alleged assault was supposed to have occurred, or indeed the time period of this alleged relationship."

451.   The investigators refused to provide that information.

452.   Dr. Vengalattore asked the investigators why the investigators had not asked Roe questions about "multiple inconsistencies and legitimate questions" Dr. Vengalattore had raised about her claims.

453.   The investigators refused to answer.

454.   Dr. Vengalattore questioned why the investigation was proceeding under Policy 6.4 instead of the appropriate faculty grievance procedures, and noted that Mittman himself had already noted that Policy 6.4 could not govern the investigation because the time for such an investigation had passed.

455.   Dr. Vengalattore asked on what authority the investigation could proceed.

456.   The investigators refused to answer.

457.   Dr. Vengalattore asked if Roe could be punished for making "false allegations" against him.

458.   Mittman responded by suggesting that the allegations were not "false."

459.   Dr. Vengalattore noted that Policy 6.4 also required that the Dean of Faculty designate a faculty member to serve as a co-investigator and asked why one had not been appointed.

460.   The investigators refused to answer.

461.   Dr. Vengalattore next noted that Policy 6.4 required that he be presented with "all of the charges under investigation along with the evidence supporting them," and he asked why that policy had not been followed.

462.   The investigators refused to answer.

463.   Dr. Vengalattore also objected to his inability to cross-examine witnesses and being denied his right to view all the evidence against him.

464.   The investigators did not respond to his complaints.

465.   On April 20, 2015, Dr. Vengalattore sent a follow-up email to Mittman and Affel to memorialize his concerns about the investigation.

466.   In the email, Dr. Vengalattore again objected to the investigators' reliance on hearsay, and he asked why the witnesses he had provided, who had first-hand knowledge of the relevant events, had not been interviewed.

467.   Dr. Vengalattore asked if his proposed questions had ever been asked to Roe.

468.   Dr. Vengalattore noted that the investigators had asked him to speculate about who Roe could have been romantically involved with, and Dr. Vengalattore said he found the question "inappropriate" because he was not privy to that information.

469.   Dr. Vengalattore noted that the investigators had told him that Roe had no apparent motive to lie, and he said this suggested that the investigators presumed her story to be true.

470.   The investigators did not respond to Dr. Vengalattore's email.

471.    On April 21, 2015, Roe and Karns forwarded Mittman and Affel the e-mail Roe sent to

Harvey on December 31, 2010, concerning her "interesting and complex problems."

472.    On April 27, 2015, Roe and Karns sent Mittman and Affel an email reminding the

investigators that they had all agreed that Roe "was to be informed of when [Dr. Vengalattore]

was being contacted."

473.    In another email sent the same day, Roe and Karns confirmed that they had already

spoken to the investigators about the substance of the questions that would be asked in an

interview the following day.

474.    On April 28, 2015, Roe spoke to Mittman and Affel on the phone, joined by Karns, in an

unrecorded interview.

475.    At the beginning of the interview, Mittman and Affel reviewed the names of witnesses

interviewed so far, and the nature of their statements, with Roe and Karns.

476.    On April 30, 2015, Mittman and Affel conducted an unrecorded interview with Scott

Flanz on the phone.

477.    Flanz told the investigators he had been an undergraduate in Dr. Vengalattore's lab from

2010-2012 and had been in the lab nearly every day during that period.

478.    Flanz said that he never saw Dr. Vengalattore yell at any students and never saw anyone

cry.

479.    Mittman and Affel asked Flanz if he had ever seen anyone call Roe "honey," and he said

no.

480.    Mittman and Affel never asked Flanz if *Roe* had referred to anyone in the lab by names

like "honey" or "baby."

481.   On April 30, 2015, Mittman and Affel conducted an unrecorded interview with Professor Dan Stamper-Kern on the phone.

482.   As written in their notes of the interview, the investigators encouraged Professor Stamper-Kern to share any "rumors" he had heard about Dr. Vengalattore.

483.   On May 4, 2015, Mittman and Affel conducted an unrecorded interview with Professor Schwab on the phone.

484.   Professor Schwab was not informed in advance of the nature of the interview.

485.   Professor Schwab told the investigators that Roe was "way off" in how she behaved in the lab, and "never displayed any sort of professional respect for" Dr. Vengalattore.

486.   Professor Schwab said that he "doubts that [Roe] would have treated a big white guy like himself the same way that she treated [Dr. Vengalattore]."

487.   Professor Schwab also told the investigators that Roe had relayed to him the power supply accusation in November 2012, and, at the time it had been that "equipment was slid towards her."

488.   Professor Schwab said that Roe's "story is getting more exaggerated over time about how violent the conflict was."

489.   Professor Schwab also told the investigators that Roe had been communicating her allegations against Dr. Vengalattore to a number of people, in an effort to make the tenure process more difficult for Dr. Vengalattore.

490.   On May 6, 2015, Affel conducted an unrecorded interview with Harvey on the phone.

491.   Harvey did not know in advance the nature of the investigation and had not spoken to any other witnesses.

492.   Harvey was not asked about the December 30, 2010 email she received from Roe.

493.   Harvey told Affel that she had worked in Dr. Vengalattore's lab from January 2010 until August 2010.

494.   Harvey said she had a "really great experience," and Dr. Vengalattore was always courteous and professional in the lab.

495.   Harvey also said that she was close personally with Roe during that period and after Harvey had left the lab.

496.   Harvey explained, however, that Roe was "not on the level" and had previously said that another student had "betrayed her trust" and acted inappropriately toward her.

497.   Harvey said that she knew the student Roe had referenced, "and that he was not any of the things that [Roe] said he was."

498.   Harvey told Affel that Roe also sometimes called her "hon or honey."

499.   Harvey also told Affel that Dr. Vengalattore and Roe were not in a "relationship" and said, "That was clearly not happening, and I really doubt they ever spent time together without the rest of the group around."

500.   The investigators never attempted to contact Chandler Kemp or Seong Woo Oh, two of Dr. Vengalattore's proposed witnesses.

501.   On May 6, 2015, Affel and Marilyn Tebor Shaw, an employee of Cornell's Title IX office, conducted an unrecorded interview with Professor Daniel Ralph on the phone.

502.   Professor Ralph was a fellow professor at Cornell.

503.   Professor Ralph said that Roe had "campaigned to keep other people from [Dr. Vengalattore's] group [] to have his chances at tenure messed up."

504.   On May 6, 2015, Affel conducted an unrecorded interview with Reynolds on the phone.

505.   Reynolds said that he had worked closely with Roe in the lab.

506.   Reynolds denied that he ever saw Dr. Vengalattore punish or "sideline" any students.

507.   On May 6, 2015, Mittman emailed Dr. Vengalattore to request an interview.

508.   The next day, Dr. Vengalattore responded in an email, and asked that all "conversations [] be on the record."

509.   Dr. Vengalattore also asked for any transcripts or notes of past interviews so that he could review them.

510.   At some point before May 28, 2015, Dr. Vengalattore was given access to a draft appendix of evidence and non-verbatim summaries of witness interviews by the investigators.

511.   On May 28, 2015, Dr. Vengalattore responded to the appendix.

512.   In his response, Dr. Vengalattore wrote:

> I must state at the outset that I do not believe enough questions have been asked, or that enough people with first-hand knowledge or experience of both parties, have been spoken to. There is a disturbing amount of hearsay and heated opinions from people who either have never spoken to the Respondent, or have never observed his interactions with his students and the Complainant. I can also see that many crucial details that one would have thought would be imprinted on the Complainant's mind, have not been pursued or have been wantonly left as vague and nebulous statements – easily massaged or reinterpreted at a later point. Especially in the context of 'proving' that a false allegation never occurred, this makes it extremely difficult to point to important, blatant and even crucial inconsistencies and falsehoods in these allegations. In a process where cross-examination is not allowed, this can make a huge difference to the final determination of the matter.

513.   Dr. Vegalattore also informed the investigators that they should have contacted Seong Oh and Kemp, as he had requested earlier.

514.   Dr. Vengalattore added that the investigators should also interview Jim Alexander, Shaffer-Moag, Michelle Wang, Paul McEuen, Jennie Guzman, Kater Murch, Dr. Subhadeep Gupta and Yariv Yanay.

515. Dr. Vengalattore further requested that the investigators follow up on Roe's statement to the investigators that she had been pursuing a relationship with a former high school boyfriend around the time she was allegedly involved with Dr. Vengalattore.

516. Dr. Vengalattore also commented that Harvey's account of Roe's false accusation against another student had involved Roe calling the student a "stalker."

517. On June 1, 2015, Dr. Vengalattore emailed Affel with further comments on the appendix.

518. Dr. Vengalattore first expressed "shock[]" that witnesses were not immediately given transcripts of their interviews.

519. Dr. Vengalattore wrote that the witness summaries indicated "that multiple witnesses have talked to each other, shared hearsay/bias and continue to do so," and wrote that his "work to prove my innocence has been made substantially harder due to this wanton lack of responsibility."

520. On June 2, 2015, Affel responded in an email, saying only, "Your questions and concerns will be included in the final report in this matter."

521. On June 4, 2015, Affel conducted an unrecorded interview with Saha on the phone.

522. Saha told Affel that she had been a graduate student at Cornell in 2010 until 2013 and had been friends with Roe.

523. Saha had traveled with Roe to India in January 2011.

524. Prior to the winter break in 2010, Saha had asked Roe if she had a "crush" on Dr. Vengalattore.

525. Saha explained that she had done so because Roe seemed to be close to Dr. Vengalattore.

526. Saha did not believe that Dr. Vengalattore had shown any conduct that might suggest he had romantic feelings for Roe.

527.    On June 4, 2015, Affel conducted an unrecorded interview with Professor Gretchen Campbell on the phone.

528.    Professor Campbell was a professor in Maryland who had observed Roe's conduct since she had left Dr. Vengalattore's project.

529.    Professor Campbell explained that Roe was "challenging to deal with," and had made "inappropriate remarks," in the workplace.

530.    Professor Campbell said that "she has witnessed [Roe] making inappropriate statements for a professional workplace," that were "both" "sexual" and "too casual."

531.    On June 16, 2015, Dr. Vengalattore wrote an email to Mittman and Affel asking again "for a specific date" on which the initial alleged assault had occurred.

532.    The investigators did not respond to this request.

533.    On June 21, 2015, Dr. Vengalattore sent an email to Mittman and Affel telling them that addressing his objections in a final report "is not acceptable."

534.    Dr. Vengalattore also wrote, "There cannot be a report without an objective, thorough and competent investigation. … I have repeatedly brought up serious and valid concerns about this process—with no response from you."

535.    Dr. Vengalattore also objected to Dean Ritter's judging the final report, as she had already described Dr. Vengalattore's "disturbing … treatment" of Roe, in an October 29, 2014, letter to the Chair of the Physics Department.

536.    On June 22, 2015, Affel came to Dr. Vengalattore's lab to review lab logs and computer files created in December 2010.

537.   On June 23, 2015, Affel wrote an email to Roe asking her if the initial alleged assault "occurred on a weekday or a weekend," and asked "the time that [she] arrived at [Dr. Vengalattore's] home."

538.   Roe responded that same day, in an email to Affel, with Karns and Mittman copied, saying that she did not know.

539.   On June 23, 2015, Affel wrote an email to Dr. Vengalattore asking for him to account for his whereabouts on December 15th and 16th, 2010.

540.   On June 25, 2015, Dr. Vengalattore responded to Affel's email, telling the investigators that he was in the lab all night on December 15th, and he left the lab after 7:40 a.m. on the 16th.

541.   Dr. Vengalattore then wrote that he had returned to the lab at 12:30 p.m. on the 16th, and gone home after 10:06 p.m.

542.   Dr. Vengalattore also included photos of the laboratory log, and computer files that had been created on those days, confirming his presence in the lab.

543.   Dr. Vengalattore wrote that the same lab records indicated that Roe had been in the lab on the morning of December 15th, but had not been in the lab at any point between December 16, 2010 and January 24, 2011.

544.   Dr. Vengalattore noted that the lab records confirmed that Chakram was in the lab on December 16, 2010, while he was there.

545.   On July 7, 2015, Dean Ritter sent an e-mail to Professor John Guckenheimer, a member of the tenure appeals committee, telling him that "a series of complaints were raised by [Roe] including an accusation that there had been an inappropriate sexual relationship between the two of them," and that "[p]reliminary evidence indicates that these complaints are not frivolous."

546.   On July 9, 2015, Affel wrote an email to Roe asking to speak with her "one more time" about the alleged initial assault.

547.   Affel also wrote that she wanted to show Roe the lab logs, so that Roe could identify dates when "it might have occurred."

548.   On July 10, 2015, Karns wrote an email to Affel saying Roe would not submit to another interview and blaming her inability to say when the encounter occurred as "consistent with trauma."

549.   Karns also sent Affel a link to information created by Dr. Rebecca Campbell.

550.   Dr. Rebecca Campbell is a well-known speaker who has lectured extensively to law enforcement about the need to presumptively believe alleged victims of sexual assault.

551.    Dr. Rebecca Campbell has given speeches to law enforcement about how victim statements that "don't make sense" should not be considered indicative of dishonesty.

552.   Dr. Rebecca Campbell has also been honored by an organization called "End Violence Against Women International," which itself has led a campaign called "Start by Believing."

553.   On July 13, 2015, Affel responded to Karns in an email saying, "We are, of course, very familiar with Dr. Campbell's work."

554.   Affel continued and apologetically wrote that Karns might be "misreading" her "earlier email," and said she "recognized that [Roe] had already responded that she does not have a memory of the exact date."

555.   On July 10, 2015, Dr. Vengalattore wrote an email to Mittman and Affel again complaining that witness interviews reported "multiple witnesses openly talking to each other and [Roe], also other 'witnesses' like Stamper-Kern 'reaching out' to [Roe] and other witnesses to 'prepare them' for questions."

556.    Mittman and Affel did not respond to this email.

557.    On July 13, 2015, Roe wrote an email to Mittman and Affel, with Karns copied.

558.    In the email Roe wrote that December 15, 2010, "may be a day with consistent conditions as described by me."

559.    On July 17, 2015, Mittman and Affel, again conducted an unrecorded phone interview with Roe, with Karns participating.

560.    During the interview, Roe was allowed to review pictures of the lab log, and asked again to identify the date of the alleged initial assault.

561.    Roe told the investigators that she had been in the lab on December 15, 2010.

562.    Roe also agreed that the lab log indicated that she had not been in the lab on December 16, 2010.

563.    On August 4, 2015, Karns sent an email to Affel, copying Mittman and Roe.

564.    In the email Karns demanded, "If there are additional questions to be asked, could you please send them by me first to determine if she has already answered them."

565.    In August 2015, Shaffer-Moag sent a letter to the tenure appeals committee on Dr. Vengalattore's behalf.

566.    In her letter, Shaffer-Moag described how she had been in Dr. Vengalattore's lab for three years, starting in 2012.

567.    Shaffer-Moag explained that she had been friends with both Reynolds and Roe.

568.    During the fall of 2012 Reynolds told Shaffer-Moag that he had a romantic interest in Roe, and was "heavily influenced" by her.

569.     Shaffer-Moag also reported that Roe had told her in 2012 that she was "sexist against men," and said that men in general, and Dr. Vengalattore in particular, were "not able to tell when their emotions are influenced by hunger while women can."

570.     Shaffer-Moag also wrote that she saw Roe attempt to "deny undergraduate men the opportunity of joining the lab."

571.     Shaffer-Moag explained that in 2012 three undergraduates attempted to join the lab, two men and her.

572.     Even though none had taken a relevant class in electronic circuits, Roe attempted to bar only the two male students from joining the lab.

573.     Shaffer-Moag, believed she had a "much weaker background in physics than did the two men, so there was no reason to try to bar them from the lab without barring" her as well.

574.     Shaffer-Moag was not contacted or interviewed by Mittman or Affel.

### D. The Investigators' Final Report

575.     On September 25, 2015, Mittman and Affel issued a final written report from the investigation.

576.     Mittman and Affel wrote, "the investigators recommend that the Dean find that a preponderance of the credible evidence supports the conclusion that the Respondent, a faculty member, had a romantic or sexual relationship with the Complainant, a student he directly supervised. For the reasons set forth herein, the investigators further recommend that no specific finding be made as to whether the first sexual encounter rises to the level of sexual assault as defined by Policy 6.4."

577.    In the report, the investigators premised their authority to conduct the investigation on Cornell's "'Romantic and Sexual Relationships Between Students and Staff' policy, set forth in the Cornell University Faculty Handbook, effective September 18, 1996," and Policy 6.4.

578.    The investigators also wrote that their decisions were "guid[ed]" by the Department of Education's 2001 Guidance, as well as the 2014 Q & A, and the suggested presumption that any relationship between faculty and a student constitutes sexual harassment.

579.    The investigators wrote, "Alleged violations of the policy are reviewed under the 'preponderance of the evidence' standard. This is the standard of proof applied by the investigators and the dean, not a burden of proof borne by either the student or faculty member."

580.    The investigators did not otherwise respond to Dr. Vengalattore's contention that he had borne the burden to disprove Roe's allegations.

581.    The investigators wrote that Roe's allegation of sexual assault "was time-barred by Policy 6.4."

582.    The investigators wrote that they had concluded the sexual assault investigation was "time-barred" on February 16, 2015, but "[a]t the request of the Dean," had proceeded with the investigation anyway.

583.    The investigators did not respond to any of Dr. Vengalattore's objections to the procedures used in the investigation, such as the lack of notice of the charges against him, his request that he be given transcripts of witness interviews, his request for informal notes of witness interviews, his request to see the evidence against him, his inability to question witnesses, his proposed witness questions, his inability to be represented by an attorney, his questions about Dean Ritter's partiality in the investigation, or his request that a faculty co-investigator be appointed.

584.   The investigators did not interview Chandler Kemp, Seong Woo Oh, Jim Alexander, Airlia Shaffer-Moag, Michelle Wang, Paul McEuen, Jennie Guzman, Kater Murch, Dr. Subhadeep Gupta or Yariv Yanay despite Dr. Vengalattore's request that the do so.

585.   Notably Shaffer-Moag's written concerns about Roe's "sexis[m] against men," had been presented to the tenure review committee prior to the issuance of the investigators' final report, but was not referenced in the investigators' report.

586.   The investigators referred to Dr. Vengalattore as having been represented by "counsel" during the investigation, although he had not been.

587.   The investigators made no reference to Karns or her involvement on behalf of Roe.

588.   The investigators conceded that many witnesses had spoken to each other during the investigation about their statements, both before and after interviews, but claimed that any resulting influence was irrelevant.

589.   The investigation report did not mention the earlier investigation conducted by Mittman regarding Roe's allegation that Dr. Vengalattore had improperly omitted her middle initial as an author on an academic paper.

590.   The investigators determined that Roe's claim that she had sex with Dr. Vengalattore on December 30, 2010 was to be credited.

591.   In support, the investigators wrote that Roe's email to Harvey on December 31, 2010, suggested that Roe had been involved romantically with someone.

592.   The investigators did not acknowledge, at any point in the report, however, that Harvey had never been asked about this email.

593.   The investigators also did not acknowledge that Harvey had accused Roe of being untrustworthy and of previously making false accusations against another student.

594.    The investigators further faulted Dr. Vengalattore for failing to prove that Roe "could

have had sex with anyone else" on December 30th.

595.    In the investigators' view, Dr. Vengalattore bore the responsibility of refuting Roe's

allegation by proving the identity of Roe's other sexual partner.

596.    Because there was no such evidence, the investigators wrote, "That the Complainant does

not admit to and others were not aware of another man in the Complainant's life in Ithaca on

December 30, 2010, does not mandate the conclusion that the Complainant's testimony that she

slept with the Respondent on December 30, 2010, be credited, but it does make that testimony

more plausible."

597.    The investigators also noted that Roe herself had said she was, at that time, attempting to

reunite with a high school boyfriend, who had not been interviewed, but the investigators

determined that any further inquiry was not necessary.

598.    The investigators also determined that Roe was credible because she had

contemporaneously reported being sexual active on December 30th, while visiting the campus

medical center.

599.    The investigators determined that Roe could not be thought to have recently fabricated

her accusations against Dr. Vengalattore because she had "no reason to lie" about her sexual

activity in 2011.

600.    The investigators did not address, however, that the contemporaneous report did not

identify Roe's sexual partner.

601.    The investigators also wrote that Dr. Vengalattore's "speculation" that Roe had been

involved with a person other than Dr. Vengalattore was "less plausible," because Dr.

Vengalattore had not proven that Roe was involved with any other person at the time.

602.    The investigators also found Roe's use of terms like "hey babe," to be probative of her credibility and supportive of her accusations.

603.    The investigators believed that it was Dr. Vengalattore's responsibility to stop Roe's behavior, and the fact that she continued, proved, to them, that he had been in a relationship with her.

604.    The investigators did not address the reports from Harvey, Chakram, Patil, Professor Schwab, and Professor Campbell, who had all said that Roe was sexually inappropriate in the lab despite being told that her conduct was unwelcome.

605.    The investigators defended Roe's use of such language, even though it was unwanted, writing that she used the term "honey," "when speaking to many people because she is from the South."

606.    The investigators also concluded that Roe's inappropriate behavior in the lab suggested that it was more likely that Dr. Vengalattore was romantically involved with her.

607.    The investigators noted that, having reviewed years of emails between Roe and Dr. Vengalattore, none referenced any romantic relationship at all.

608.    Nevertheless, the investigators wrote that this "tend[s] to lend credibility to [Roe's] allegation," because the two emailed frequently.

609.    The investigators also determined that it was not necessary to identify "the exact date of any single sexual encounter," but nevertheless said that an initial sexual encounter "likely" happened on December 15, 2010, at 7:40 p.m., even though "no date," including December 15th, "definitively matches [Roe's] account."

610.    The investigators viewed the lab logs showing Dr. Vengalattore was in the lab until after 10 p.m. on December 15th and Roe had not been in the lab at all on the 16th as being "not clear."

611.    Although the investigators also wrote that "it would be very unlikely that a significant modification to the lab log would be made to intentionally manipulate this analysis because the investigators have no reason to believe any individual involved herein would jeopardize the scientific integrity of the log."

612.    Even though Roe's allegation did not match this evidence, the investigators therefore determined that Roe's account proved the existence of some relationship, because Dr. Vengalattore had not "definitively excluded" every date "from possibility."

613.    The investigators disregarded all witness testimony that contradicted Roe's claims that Dr. Vengalattore had been verbally abusive, "sidelined" her work, or was physically intimidating, because "that some subjectively perceive conduct as justly harsh criticism and others perceive it as abuse also does not make it more or less likely that the faculty member had a sexual or romantic relationship with the student."

614.    The investigators expressly disregarded any evidence suggesting that Roe struggled academically in the lab, concluding that was "not the issue in this investigation."

615.    The investigators did not reference Professor Schwab's or Harvey's statements that Roe had been untruthful.

616.    The investigators determined that the lack of evidence supporting a year-long romantic relationship actually supported Roe's allegations, because "[c]ommon sense experience is that secretive relationships carried out by faculty members and students can be carried out without others, including other students and colleagues, becoming aware."

617.   The investigators also wrote that they did not believe Roe lied about her alleged relationship, because such a lie would constitute "an exceedingly poor choice" of lies.

618.   The investigators expressly disregarded the power supply accusation, writing that, even if Roe "embellished (or exaggerated) the power supply incident" such a lie "does not weigh into the investigators' analysis of the [Roe]'s general credibility or make it more or less likely that there was a romantic or sexual relationship."

619.   The investigators also did not draw any adverse inference from the delay or timing of Roe's report of sexual misconduct, "because it is well accepted that sexual assaults are often first reported long after they are alleged to have occurred."

620.   Ultimately, the investigators credited Roe's account because if she had been "fabricating the initial sexual encounter and the relationship as a whole, she could easily have created a much less complicated narrative, which would have been easier to support, and it would be unlikely that she would suggest to the investigators that the Respondent would ever admit to having any romantic or sexual relationship with her."

### D. Dean Ritter Adopts the Report While the Tenure Battle Continues

621.   October 6, 2015, Dean Ritter adopted the report's recommendation in a letter.

622.   Dean Ritter wrote:

> I find that a preponderance of evidence supports the claim that you were involved in a sexual relationship with your former graduate student over a period of several months while also serving as her graduate advisor. As a result, I find that you have violated the university's 'Romantic and Sexual Relationships' policy by engaging in such conduct. I also find that there is not significant evidence to support the claim that the initial sexual encounter between you and the graduate student involved a sexual assault. … Given the finding of an inappropriate sexual relationship, I also find that in your denial of a sexual relationship you have lied to the investigators in this case.

623.   Dean Ritter also wrote that she "intend[ed] to impose significant sanctions on" Dr. Vengalattore, which would be "suspend[ed]" "pending the outcome of [Dr. Vengalattore's] tenure appeal."

624.   On December 16, 2015, the Tenure Appeals Committee issued a decision upholding Dr. Vengalattore's grounds for appeal.

625.   The tenure appeals committee relied, in part, on Shaffer-Moag's letter, which had outlined Roe's professed "sexis[m] against men."

626.   On January 16, 2016, Dean Ritter convened yet another faculty committee to review the tenure matter further.

627.   On February 2, 2016, the committee recommended Dr. Vengalattore be granted tenure.

628.   On February 16, 2016, Dean Ritter formally overruled this newest recommendation and again denied Dr. Vengalattore tenure.

629.   On February 26, 2016, Dr. Vengalattore met with Professor Saul Teukolsky, who was interim chair of the Physics Department and had been involved in the tenure review process.

630.   During that meeting, Professor Teukolsky told Dr. Vengalattore that the faculty had considered Roe's accusations to have been false and malicious, but also said that the faculty would take no action, saying, "Can you imagine what would happen if we took action against a blonde, female student? Twitter would explode and the entire department would be labeled bullies. We don't want that."

631.   On May 3, 2016, the Provost upheld Dean Ritter's denial of tenure.

632.   Dr. Vengalattore then sought intervention in New York State Court.

633.    On November 23, 2016, New York State Acting Supreme Court Justice Richard W. Rich, Jr., ordered Cornell to vacate its negative tenure findings and grant Dr. Vengalattore a *de novo* determination.

634.    Justice Rich described the entire tenure review process as "flawed, secretive, [and] unfair," and concluded that Cornell "violated Professor Vengalattore's due process rights to such an extent as to be arbitrary and capricious."

635.    Justice Rich wrote that "when allegations of misconduct were made by a student against [Dr. Vengalattore] involving sexual assault and an alleged romantic relationship with one of the students, these allegations were in effect used against the Professor and he was not advised of the same until he filed his appeal on the tenure denial."

636.    Justice Rich also wrote that Dr. Vengalattore "was entitled to due process and a hearing on the matter," but Cornell denied him those rights in a "secretive" process.

637.    On February 6, 2017, Dean Ritter issued a letter informing Dr. Vengalattore that his "internal [tenure] appeal has concluded," and that "it [wa]s time to follow through o[n] [her] earlier commitment to impose additional sanctions," based on her October 6, 2015, findings.

638.    Dean Ritter imposed a sanction of "suspension without pay for a period of two weeks," effective June 1, 2017.

639.    On May 8, 2017, Professor Kevin Clermont wrote a letter to Cornell's University Counsel, describing the investigation against Dr. Vengalattore as a "miscarriage of justice" "so outrageous as to leave [him] ashamed of Cornell."

640.    Professor Clermont wrote, "Although I know that rearguing the merits is hopeless, I cannot resist saying that a reasonable person would not find guilt, even by a preponderance,

unless that person made the amateurish mistake of ignoring the probative value of the absence of direct evidence after an incredibly exhaustive investigation."

641.    Professor Clermont wrote that the investigation's "procedural path" raised it to "the stratosphere of injustice," because it "followed no procedure at all."

642.    Professor Clermont explained that the investigators had not followed Policy 6.4 "due to a time bar," and "thus concluded that the professor had no procedural rights at all."

643.    Professor Clermont wrote that this was "such a preposterous position that at first I could not believe that Cornell was relying on it. I still cannot believe that anyone but ideologues who have lost their bearings would defend it."

644.    Professor Clermont also described a "litany of procedural abuses by the investigators: their refusal to give [Dr. Vengalattore] basic information, to allow him to supplement the record or to challenge credibility, to afford him any rights at all. (Incidentally, the professor waived no rights, as he strenuously objected to the farce all along.)"

645.    On March 30, 2018, the New York Supreme Court, Appellate Division, Third Department, reversed the lower court and ruled that Cornell had not acted arbitrarily or capriciously during the tenure review process.

646.    In so doing, the Court found that "unlike Supreme Court, [] neither the sexual misconduct allegations raised by the graduate student nor her May 2014 letter improperly influenced the tenure decision."

647.    Dr. Vengalattore's academic appointment at Cornell ended on June 30, 2018.

### F. Dr. Vengalattore Suffers Continued Harms from the Dean's Decision

648.    Dr. Vengalattore has not been able to continue his research since leaving Cornell.

649.    Dr. Vengalattore has obtained several million dollars of grant money from a variety of sources to fund his research projects.

650.    Cornell has locked Dr. Vengalattore out of his lab and has not allowed his research to continue.

651.    Since leaving Cornell, Dr. Vengalattore has attempted to secure lab support from a number of other institutions so that he can continue his grant-funded research.

652.    Since leaving Cornell, Dr. Vengalattore has also sought academic employment at a number of universities so that he can continue his grant-funded research.

653.    Because of his significant academic and scientific contributions, Dr. Vengalattore is well-qualified for appointments at any of these colleges and universities.

654.    On information and belief, Cornell has communicated to each of these colleges and universities the substance of Dean Ritter's finding that Dr. Vengalattore was involved in a sexual relationship with his former graduate student over a period of several months while also serving as her graduate advisor, and that he lied to the investigators about that relationship.

655.    These statements are false.

656.    Cornell knows that these statements are false.

657.    As a result of that communication, none of these colleges or universities have offered employment to Dr. Vengalattore or allowed him to conduct his research at their facilities.

## COUNT I—VIOLATION OF TITLE IX
## PLAINTIFF V. DEFENDANT CORNELL

658.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

659.   Title IX provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

660.   Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant Cornell.

661.   Title IX prohibits any covered entity from discriminating "in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time" "on the basis of sex." 34 C.F.R. § 106.51(a)(1).

662.   Title IX requires a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b).

663.   Defendant Cornell discriminated against Plaintiff Dr. Vengalattore because of his sex by applying an unfair, unreliable and partial process against him in resolving Roe's complaints against him.

664.   The outcome in this case was erroneous, because Plaintiff Dr. Vengalattore was innocent and did not violate Defendant Cornell's policies.

665.   Gender bias was a motivating factor in Defendant Cornell's findings against Plaintiff Dr. Vengalattore.

666.   Defendant Cornell failed to conduct an adequate, reliable, and impartial investigation.

667.   Defendant Cornell's discriminatory process deprived Plaintiff Dr. Vengalattore, a male, of employment opportunities and imposed discipline on him on the basis of his sex.

668.   Defendant Cornell applied its policies and procedures in a gender-biased manner, and discriminated against Plaintiff Dr. Vengalattore on the basis of his sex, which led to an erroneous and adverse employment outcome.

669.   Particular circumstances suggest that the outcome was erroneous, and include, without limitation:

    a.   Defendant Cornell's Policy 6.4 is an unreliable method of determining fault because it:

        i.   Empowers the same investigators with the power to find facts as well as to prosecute the case;

        ii.   Does not require a preliminary determination that a complaint is well-founded before allowing an investigation;

        iii.   Does not require investigators to inform the target of the investigation about the nature of the charges or his right to an advisor before commencing an interview;

        iv.   Allows investigators to draw an adverse inference from a target's silence, lack of cooperation, or use of an advisor in the investigation;

        v.   Does not require investigators to tell the target the nature of the evidence against him;

        vi.   Does not guarantee that a target will be provided an advisor;

        vii.   Does not allow active participation by the target's advisor in the investigation;

        viii.   Does not allow a participant to directly question any witness;

        ix.   Does not provide the target with the right to confront his accuser;

     x.     Does not provide a live hearing to resolve factual disputes;

    xi.     Does not require that any witness interview be recorded;

    xii.     Does not require that any witness provide sworn testimony;

    xiii.     Does not require investigators to disclose exculpatory or other favorable evidence to the target of the investigation;

    xiv.     Does not place a burden of proof on the accuser; and

    xv.     Premises a finding of responsibility on a mere preponderance of the evidence.

b.  The investigation against Plaintiff Dr. Vengalattore was unreliable because it disregarded many of the few procedural protections Policy 6.4 does provide, including, without limitation:

    i.     Policy 6.4 requires investigations to be completed within 60 days, but the investigation lasted almost a full calendar year;

    ii.     Policy 6.4's limitations period barred the entire investigation, yet the investigators continued pursuing the matter outside of their jurisdiction;

    iii.     The investigators had no authority under Policy 6.4 to investigate the alleged violation of the romantic and sexual relationship policy because it was not an allegation of bias, discrimination, harassment or sexual and related misconduct;

    iv.     The investigators allowed Roe to reveal information about the investigation to others in violation of Policy 6.4;

v.     During the first interview, the investigators did not inform Plaintiff Dr. Vengalattore of the precise nature of the charges against him, or the evidence against him, as required;

vi.    The investigators did not allow Plaintiff Dr. Vengalattore to have the assistance of an advisor during his interviews;

vii.   The investigators provided Roe with an advisor but not Dr. Vengalattore;

viii.  The investigators allowed Roe's advisor, Karns, to actively participate in the investigation, including allowing her to communicate on Roe's behalf with the investigators, object to questions posed by the investigators, and work with the investigators to explain evidence that was inconsistent with Roe's allegations;

ix.    The investigators did not draw any adverse inferences when Roe refused to participate in aspects of the investigation or answer certain of their questions;

x.     The investigators did not interview all of Plaintiff Dr. Vengalattore's proposed witnesses, or ask his proposed questions of Roe;

xi.    The investigators did not prevent Roe from coordinating with potential witnesses on their witness statements;

xii.   The Dean of Faculty did not designate a faculty member to serve as a co-investigator, nor state in writing to all concerned parties the reason for this; and

xiii.  The investigation into the alleged violation of the romantic and sexual relationship policy was neither conducted by the Standing Committee on

Academic Freedom & Professional Status of the Faculty, nor in compliance with Article XVI, Section 10, of the Cornell University Bylaws.

c.   The Investigators' Determinations Were Biased and Unreliable because the investigators:

i.   Disregarded Roe's false allegations that Plaintiff Dr. Vengalattore had thrown a power supply at her;

ii.   Disregarded Roe's academic struggles in Plaintiff Dr. Vengalattore's lab as a motive to lie;

iii.   Ignored Roe's other efforts to derail Plaintiff Dr. Vengalattore's tenure prospects;

iv.   Disregarded Roe's own admission that she only made these allegations in September 2014 after learning that Dr. Vengalattore had been recommended tenure;

v.   Disregarded multiple witness reports of Roe's lack of professionalism in the lab;

vi.   Disregarded multiple witness reports of Roe's use of unwanted and unprofessional terms in the lab;

vii.   Disregarded witness reports of Roe's use of racially-charged language in the lab;

viii.   Disregarded multiple witnesses who directly contradicted Roe's account of Plaintiff Dr. Vengalattore's having yelled at her and other students in the lab;

ix.    Disregarded multiple witnesses who directly contradicted Roe's account

of Plaintiff Dr. Vengalattore's having punished and "sidelined" other

students in the lab;

x.    Presumed Roe's account was true, and assured her an aggressive response;

xi.    Conducted numerous unrecorded conversations with Roe in advance of all

formal interviews;

xii.    Collaborated with Roe on her account, and helped her revise her story to

fit with documentary evidence;

xiii.    Did not require Roe to specify any particular date that Plaintiff Dr.

Vengalattore had allegedly committed misconduct;

xiv.    Collaborated with Dean Ritter during the investigation, even though she

was the ultimate factfinder;

xv.    Submitted the report to Dean Ritter, who was biased, and had already

predetermined Plaintiff Dr. Vengalattore's guilt before the investigation

had been completed;

xvi.    Relied extensively on gossip, rumor and other hearsay as substantive

evidence;

xvii.    Did not attempt to interview Roe's high school boyfriend, despite Roe's

own statement that she was romantically interested in him at the time of

the alleged assault;

xviii.    Refused to ask Roe and other witnesses the questions proposed by

Plaintiff Dr. Vengalattore;

xix.    Created inaccurate and misleading notes of witness interviews;

74

xx.   Ignored evidence that Roe told Hamidian that she was not in a relationship in early 2011;

xxi.   Ignored evidence that Roe told Saha that she had no romantic interest in Dr. Vengalattore;

xxii.   Ignored evidence from Harvey that "a relationship was clearly not happening;"

xxiii.   Ignored multiple first-hand witnesses who stated that they had never witnessed Dr. Vengalattore behave in an inappropriate manner towards Roe or any other student;

xxiv.   Allowed Roe and Karns exclusive access to the investigation files and materials during the course of the investigation;

xxv.   Applied a presumption of guilt against Plaintiff Dr. Vengalattore;

xxvi.   Presumed that Roe was truthful, and relied on the work of Dr. Rebecca Campbell and other "Start by Believing" materials;

xxvii.   Faulted Plaintiff Dr. Vengalattore for not being able to disprove Roe's allegations with evidence related to her sexual conduct;

xxviii.   Redacted evidence before it was shared with Plaintiff Dr. Vengalattore;

xxix.   Ignored witness accounts that Roe had previously made false accusations that another student was a "stalker";

xxx.   Falsely described Plaintiff Dr. Vengalattore as having been represented by counsel in the final investigation report;

xxxi.   Disregarded lab records conclusively proving that Roe's account could not have happened as she claimed;

xxxii.   Improperly gave credibility to Roe because her story was too convoluted and incredible to have been manufactured; and

xxxiii.   Disregarded the lack of any objective evidence of a year-long relationship between Roe and Plaintiff Dr. Vengalattore.

670.   Particular circumstances suggest that gender bias was a motivating factor in the erroneous outcome, and include, without limitation:

a.   Circumstances suggest that Defendant Cornell adopted Policy 6.4 in an effort to lower the protections for males accused of sexual misconduct, and include, without limitation:

   i.   Before the 2011 DCL Defendant Cornell applied a much more protective procedure for accusations of sexual misconduct under the Campus Code of Conduct;

   ii.   Policy 6.4 was adopted to avoid enforcement by OCR;

   iii.   Policy 6.4 was adopted to avoid rescission of federal funds by ED;

   iv.   Even after the adoption of Policy 6.4, the Campus Code of Conduct was used for other investigations not related to sexual misconduct;

   v.   Statistically the overwhelming majority of investigations that have ever been conducted by Defendant Cornell into an alleged violation of Policy 6.4 have involved male respondents;

   vi.   Of the 34 formal complaints resolved under Policy 6.4 between 2014 and 2016, only three respondents were female;

   vii.   Of the 18 respondents to formal complaints resolved under Policy 6.4 in the 2016-2017 academic year, only one was female; and

> viii.   Defendant Cornell's use of Policy 6.4 was designed to make it more likely
>> that male respondents would be found responsible for alleged sexual
>> misconduct by removing procedural protections for the accused;

b.   The investigators refused to follow the more protective procedures set out in the
Faculty Handbook and the Campus Bylaws while investigating Plaintiff Dr.
Vengalattore for allegedly violating the romantic and sexual relationships policy
because he was male;

c.   The investigators disregarded certain provisions of Policy 6.4 as set forth above
because of anti-male bias against Plaintiff Dr. Vengalattore;

d.   The investigators have a history of anti-male bias, and both Mittman and Affel
have been accused of anti-male bias in prior lawsuits against Defendant Cornell;

e.   The investigators displayed gender bias in the investigation by:

> i.   Ignoring witness complaints that Roe had used unwelcome and sexually
>> inappropriate terms and unwelcome touching in a professional setting
>> toward male students and Plaintiff Dr. Vengalattore;

> ii.   Ignoring witness complaints that Roe had continued to use these
>> inappropriate terms even after being directed to stop and having been
>> informed that they were unwelcome;

> iii.   Failing to institute an investigation under Policy 6.4 for Roe's use of
>> inappropriate language and unwanted touching;

> iv.   Failing to institute an investigation under Policy 6.4 after Shaffer-Moag
>> reported that Roe professed she was "sexist against men," and had

attempted to deny two male students opportunities in Dr. Vengalattore's lab;

v.    Failing to interview Shaffer-Moag, despite her written report concerning Roe's misconduct and ant-male bias, because Shaffer-Moag's account was inconsistent with the investigator's perceptions toward Roe;

vi.    Giving inadequate weight to witness statements made by male witnesses that had accused Roe of being dishonest and unreliable;

vii.    Improperly defending inconsistencies in Roe's account as the product of trauma, despite the lack of any evidence that any traumatic event had occurred;

viii.    Promising Roe that Defendant Cornell would take an aggressive stance on accusations related to sexual misconduct;

ix.    Applying a presumption that a female complainant was reliable, and suggesting to Roe that the investigators would adhere to Dr. Rebecca Campbell's training materials;

x.    Appointing Karns to assist Roe and deferring to Karns' advocacy on behalf of Roe with no corresponding efforts taken for Plaintiff Dr. Vengalattore;

xi.    Placing the burden of proof on Plaintiff Dr. Vengalattore to disprove Roe's allegations;

xii.    Allowing Roe special access to the investigation file, and allowing her to prepare her witnesses in advance of any interviews; and

      xiii.    Applying a much more stringent credibility on Plaintiff Dr. Vengalattore and male witnesses who supported his account, while dismissing or disregarding the incredibility of Roe and female witnesses who supported her account.

671.   Based on the foregoing, Plaintiff Dr. Vengalattore was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

672.   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of career opportunities, reputational damages, economic injuries and other direct and consequential damages.

673.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II—VIOLATION OF TITLE VI
## PLAINTIFF V. DEFENDANT CORNELL

674.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

675.   Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color or national origin. 42 U.S.C. § 2000d.

676.   Title VI applies to all public and private educational institutions that receive federal funding, which includes Defendant Cornell. *See* 34 C.F.R. § 100.13(i).

677.   Title VI prohibits any covered entity from discriminating in employment decisions on the basis of race, color or national origin.

678.   Plaintiff Dr. Vengalattore was born in India, is ethnically Indian, and resides in the United States as a lawful permanent resident.

679.   At all relevant times, Defendant Cornell was aware of Plaintiff Dr. Vengalattore's race, color and national origin.

680.   Defendant Cornell intentionally discriminated against Plaintiff Dr. Vengalattore because of his race, color or national origin by applying an unfair, unreliable and partial process against him in resolving Roe's complaints against him.

681.   The outcome in this case was erroneous, because Plaintiff Dr. Vengalattore was innocent and did not violate Defendant Cornell's policies.

682.   Bias related to Plaintiff Dr. Vengalattore's race, color or national origin was a motivating factor in Defendant Cornell's findings against Dr. Vengalattore.

683.   Defendant Cornell failed to conduct an adequate, reliable, and impartial investigation.

684.   Defendant Cornell's discriminatory process deprived Plaintiff Dr. Vengalattore of employment opportunities and imposed discipline on him on the basis of his race, color or national origin.

685.   Defendant Cornell applied its policies and procedures in a racially-biased manner, and discriminated against Plaintiff Dr. Vengalattore on the basis of his race, color and national origin, which led to an erroneous and adverse employment outcome.

686.   Particular circumstances suggest that the outcome was erroneous, as set out in the preceding Count.

687.   Particular circumstances show that Defendant Cornell intentionally discriminated against Plaintiff Dr. Vengalattore on the basis of his race, color and national origin, and include, without limitation:

        a.   The investigators refused to follow the more protective procedures set out in the Faculty Handbook and the Campus Bylaws while investigating Plaintiff Dr.

Vengalattore for allegedly violating the romantic and sexual relationships policy because of his race, color or national origin;

b. During the tenure review process, and before the Policy 6.4 investigation had commenced, Professor Clancy wrote to Dean Ritter that she "found [Dr. Vengalattore's] interactions with the graduate students to be unacceptable and unsupportable by a major research university like Cornell. Clearly the only students who are prepared to take the abuse he dishes out are both men and they are both from the Indian sub-continent, where perhaps the culture between advisor and protégé is different."

c. Dean Ritter did not object to this racial characterization of Plaintiff Dr. Vengalattore and his students.

d. Instead Dean Ritter empowered Mittman and Affel with the authority to conduct an investigation under Policy 6.4 and the romantic and sexual relationships policy.

e. Dean Ritter then made the final determination concerning the investigation under Policy 6.4, on matters related to those discussed by Professor Clancy;

f. The investigators disregarded certain provisions of Policy 6.4 as set forth above because of racial bias against Plaintiff Dr. Vengalattore;

g. The investigators also displayed bias against Plaintiff Dr. Vengalattore on the basis of his race, color or national origin in the investigation by:

i. Ignoring witness complaints that Roe had used inappropriate racial comments in the lab, telling Plaintiff Dr. Vengalattore in front of the other students, "You are all Indians. Of course you stick together," and telling

Patil, Plaintiff Dr. Vengalattore and Chakram that they could be expected to work long hours because "they are Indians, who are hardworking like Chinese."

ii.    Ignoring witness complaints that Roe had continued to use these inappropriate terms even after being directed to stop and after having been informed that they were unwelcome;

iii.   Failing to institute an investigation into Roe's use of inappropriate language after having been asked to do so by a student in the lab;

iv.   Failing to draw any adverse conclusions from Roe's use of racially charged language;

v.    Disregarding witness statements that Roe acted inappropriately in the lab because Plaintiff Dr. Vengalattore was Indian;

vi.   Disregarding witness statements that stated Roe made unprofessional and disrespectful comments to Dr. Vengalattore and that she would not have behaved in that manner towards a US-born, white, professor;

vii.  Disregarding and giving inadequate weight to the testimony of witnesses—including Dr. Bhave, Chakram, Patel, Saha and Dr. Singh— who had described Roe as being untrustworthy and not credible, because the investigators perceived that these witnesses were Indian;

viii. Refusing to interview witnesses provided by Plaintiff Dr. Vengalattore, because the investigators perceived that the witnesses were Indian or members of other minority groups;

ix.   Placing the burden of proof on Plaintiff Dr. Vengalattore to disprove Roe's allegations because of his race, color or national origin;

688.   The circumstances set out in the preceding paragraph also demonstrate that Defendant Cornell's discrimination was a substantial or motivating factor for Defendant Cornell's erroneous disciplinary findings.

689.   Based on the foregoing, Plaintiff Dr. Vengalattore was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

690.   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of career opportunities, reputational damages, economic injuries and other direct and consequential damages.

691.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## <u>COUNT III—VIOLATION OF DUE PROCESS – 42 U.S.C. § 1983<br>PLAINTIFF V. DEFENDANT CORNELL</u>

692.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

693.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

694.   42 U.S.C. § 1983 provides a civil right of action for deprivations of constitutional protections taken under color of law.

695.   Defendant Cornell is a hybrid public/private university, with several schools operating under the State University of New York system.

696.   Defendant Cornell operates under New York Education Law § 5702 *et. seq.*

697. Through the 2001 Guidance, the 2011 DCL and the 2014 Q & A, Defendant ED coerced Defendant Cornell to revise its campus disciplinary policies, and its policies for adjudicating faculty complaints.

698. Through its aggressive enforcement actions against schools who chose to provide procedural protections in campus disciplinary proceedings Defendant ED coerced Defendant Cornell to remove appropriate protections for fear of likewise facing an enforcement action.

699. Defendant Cornell cited to 2011 DCL as a reason that it amended Policy 6.4 in 2012.

700. Defendant Cornell amended Policy 6.4 to avoid an enforcement action by Defendant ED.

701. Defendant Cornell referenced the 2001 Guidance and the 2014 Q & A in justifying the investigatory methods it used against Plaintiff Dr. Vengalattore.

702. Defendant Cornell was acting at the behest of Defendant ED when it applied its disciplinary process against Defendant Dr. Vengalattore.

703. Defendant Cornell was coerced to deny Plaintiff Dr. Vengalattore due process rights by Defendant ED for fear of being subject to an enforcement action.

704. Defendant Cornell was thus acting under color of law during its investigation and discipline of Plaintiff Dr. Vengalattore.

705. Plaintiff Dr. Vengalattore has a cognizable liberty interest in not being falsely branded as having improperly engaged in a romantic relationship with Roe.

706. Dean Ritter's determination that Plaintiff Dr. Vengalattore was involved in a sexual relationship with his former graduate student over a period of several months while also serving as her graduate advisor and Dean Ritter's determination that he lied to the investigators in this case when he denied having the sexual relationship, were injurious to Plaintiff Dr. Vengalattore's reputation.

707.   Dean Ritter's findings were false.

708.   Had Defendant Cornell employed an appropriate investigation in this matter, Defendant Cornell would have determined that the statement was false and that Plaintiff Dr. Vengalattore did not engage in any sexual relationship with Roe and was not untruthful during the investigation.

709.   Plaintiff Dr. Vengalattore has suffered a tangible and material injury as a result of Dean Ritter's findings because those findings have been communicated to other parties.

710.   Plaintiff Dr. Vengalattore has also suffered tangible and material injury because the findings have been communicated to prospective employers.

711.   Because Dean Ritter's false findings have been communicated to prospective employers, Plaintiff Dr. Vengalattore has been unable to find suitable academic employment despite being fully qualified.

712.   Defendant Cornell deprived Plaintiff Dr. Vengalattore of his reputational interests by employing a flawed investigation that failed to comport with the basics of due process.

713.   Defendant Cornell, acting under color of law, deprived Plaintiff Dr. Vengalattore of his constitutionally protected reputational interests.

714.   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of career opportunities, reputational damages, economic injuries and other direct and consequential damages.

715.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV—DEFAMATION
## PLAINTIFF V. DEFENDANT CORNELL

716. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

717. At the conclusion of the investigation into Plaintiff Dr. Vengalattore, Dean Ritter wrote:

> I find that a preponderance of evidence supports the claim that you were involved in a sexual relationship with your former graduate student over a period of several months while also serving as her graduate advisor. As a result, I find that you have violated the university's 'Romantic and Sexual Relationships' policy by engaging in such conduct. I also find that there is not significant evidence to support the claim that the initial sexual encounter between you and the graduate student involved a sexual assault. … Given the finding of an inappropriate sexual relationship, I also find that in your denial of a sexual relationship you have lied to the investigators in this case.

718. On information and belief, Defendant Cornell re-published Dean Ritter's statements to third parties, including but not limited to:

a. Boston University;

b. The California Institute of Technology;

c. Rice University;

d. The University of Arizona;

e. The University of Chicago;

f. The University of Colorado—Boulder;

g. The University of Maryland—College Park;

h. The University of Rochester;

i. The University of Washington—Seattle; and

j. Yale University.

719. Defendant Cornell's statement to the third parties was false, because Plaintiff Dr. Vengalattore was not involved in a sexual relationship with his former graduate student over a period of several months while also serving as her graduate advisor, did not violate Defendant

Cornell's "Romantic and Sexual Relationships" policy, and did not lie to the investigators in his case.

720.   Defendant Cornell acted with actual malice concerning the truth or falsity of these statements.

721.   Defendant Cornell acted without due regard and in a grossly irresponsible manner concerning the truth or falsity of these statements.

722.   Defendant Cornell acted in a negligent manner concerning the truth or falsity of these statements.

723.   Defendant Cornell knew of or recklessly disregarded the falsity of these statements, acted without due regard and in a grossly irresponsible manner, and acted negligently when it made them because it was aware of the inadequacy of the investigation leading up to Dean Ritter's findings.

724.   Defendant Cornell's statements were defamatory per se because they tended to injure Plaintiff Dr. Vengalattore in his trade, business and profession.

725.   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including without limitation lost employment and research opportunities that were denied to him by the recipients of Defendant Cornell's statements.

726.   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of career opportunities, reputational damages, economic injuries and other direct and consequential damages.

727.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT V—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(D)**
**PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF**
**EDUCATION**

728.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

729.    Defendant ED's promulgation of the 2011 DCL constituted "rule making" within the meaning of the APA, 5 U.S.C. § 551(5), and was subject to the notice and comment requirements of 5 U.S.C. § 553.

730.    The 2011 DCL imposed substantive requirements upon regulated entities above and beyond those required by federal statute or the ED before then.

731.    Under the 2011 DCL, schools receiving federal financial assistance are required, among other things, to use a preponderance of the evidence standard in sexual misconduct disciplinary proceedings.

732.    Promulgation of the 2011 DCL without notice and without providing an opportunity for comment ignored procedures required by law.

733.    Defendants Secretary DeVos and ED have treated the 2011 DCL as imposing binding legal obligations on regulated parties.

734.    Defendant ED has commenced enforcement actions against covered entities for not adhering to the requirements set out in the 2011 DCL.

735.    Defendant Cornell substantially altered its investigatory processes in response to the 2011 DCL and Defendant ED's related enforcement activity.

736.    Defendant Cornell applied the 2011 DCL in disciplinary proceedings against Plaintiff Dr. Vengalattore, and he is therefore within the zone of interests protected by Title IX.

737.    Therefore, the 2011 DCL is unlawful and should be set aside under 5 U.S.C. § 706(2)(D).

## COUNT VI—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D) PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF EDUCATION

738.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

739.   Defendant ED's promulgation of the 2014 Q & A constituted "rule making" within the meaning of the APA, 5 U.S.C. § 551(5), and was subject to the notice and comment requirements of 5 U.S.C. § 553.

740.   The 2014 Q & A imposed substantive requirements upon regulated entities above and beyond those required by the ED before then.

741.   Under the 2014 Q & A, schools receiving federal financial assistance are required, among other things, to apply a strong presumption that an otherwise consensual sexual relationship between an adult faculty member and an adult student is not consensual and therefore constitutes discrimination based on sex.

742.   Under the 2014 Q & A, schools receiving federal financial assistance are also required to adhere to the 2011 DCL's requirements, even when adjudicating complaints against faculty.

743.   Promulgation of the 2014 Q & A without notice and without providing an opportunity for comment ignored procedures required by law.

744.   Defendants Secretary DeVos and ED have treated the 2014 Q & A as imposing binding legal obligations on regulated parties.

745.   Defendant Cornell applied the 2014 Q & A in disciplinary proceedings against Plaintiff Dr. Vengalattore, and he is therefore within the zone of interests protected by Title IX.

746.   Therefore, the 2014 Q & A is an unlawful rule and should be set aside under 5 U.S.C. § 706(2)(D).

**COUNT VII—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(C)
PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF
EDUCATION**

747.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

748.   Title IX provides that no person, "on the basis of sex," be subjected to any discrimination under any federally funded educational program or activity.

749.   Title IX does not require that covered institutions employ any particular procedural mechanism for disciplining students or faculty.

750.   Title IX does not prohibit consenting adults from entering into romantic or sexual relationships.

751.   The 2001 Guidance requires covered institutions to presume that an otherwise consensual sexual relationship between an adult faculty member and an adult student is not consensual and therefore constitutes discrimination based on sex.

752.   Defendants Secretary DeVos and ED have treated the 2001 Guidance as imposing binding legal obligations on regulated parties.

753.   Defendant Cornell applied the 2001 Guidance in disciplinary proceedings against Plaintiff Dr. Vengalattore, and he is therefore within the zone of interests protected by Title IX.

754.   Forbidding covered institutions from allowing consenting adults to participate in consensual romantic or sexual relationships exceeds Defendants Secretary DeVos and ED's authority under Title IX.

755.   Therefore, the 2001 Guidance should be set aside under 5 U.S.C. § 706(2)(C).

**COUNT VIII—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(C)**

## PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF EDUCATION

756.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

757.    Title IX provides that no person, "on the basis of sex," be subjected to any discrimination under any federally funded educational program or activity.

758.    Title IX does not require that covered institutions employ any particular procedural mechanism for disciplining students or faculty.

759.    Title IX does not prohibit any covered institution from taking adequate measures to ensure that disciplinary proceedings are fair and impartial.

760.    Procedural protections applicable to all accused persons and enshrined in the Bill of Rights do not constitute improper discrimination based on sex.

761.    The 2011 DCL forbids covered institutions from applying certain procedural protections to the accused.

762.    Defendants Secretary DeVos and ED have treated the 2011 DCL as imposing binding legal obligations on regulated parties.

763.    Defendant ED has commenced enforcement action against covered entities for not adhering to the requirements set out in the 2011 DCL.

764.    Defendant Cornell substantially altered its investigatory processes in response to the 2011 DCL and Defendant ED's enforcement activity.

765.    Defendant Cornell applied the 2011 DCL in disciplinary proceedings against Plaintiff Dr. Vengalattore, and he is therefore within the zone of interests protected by Title IX.

766.    Forbidding covered institutions from providing any particular procedural protections to accused persons exceeds Defendants Secretary DeVos and ED's authority under Title IX.

91

767.   Therefore, the 2011 DCL should be set aside under 5 U.S.C. § 706(2)(C).

### COUNT IX—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C) PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF EDUCATION

768.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

769.   Title IX provides that no person, "on the basis of sex," be subjected to any discrimination under any federally funded educational program or activity.

770.   Title IX does not require that covered institutions employ any particular procedural mechanism for disciplining students or faculty.

771.   Title IX does not prohibit any covered institution from taking adequate measures to ensure that disciplinary proceedings are fair and impartial.

772.   Procedural protections applicable to all accused persons and enshrined in the Bill of Rights do not constitute improper discrimination based on sex.

773.   Title IX does not prohibit consenting adults from entering into romantic or sexual relationships.

774.   Under the 2014 Q & A, schools receiving federal financial assistance are required, among other things, to apply a strong presumption that an otherwise consensual sexual relationship between an adult faculty member and an adult student is not consensual and therefore constitutes discrimination based on sex.

775.   Under the 2014 Q & A, schools receiving federal financial assistance are also required to adhere to the 2011 DCL's requirements, even when adjudicating complaints against faculty.

776.   Defendants Secretary DeVos and ED have treated the 2014 Q & A as imposing binding legal obligations on regulated parties.

777.   Defendant Cornell applied the 2014 Q & A in disciplinary proceedings against Plaintiff Dr. Vengalattore, and he is therefore within the zone of interests protected by Title IX.

778.   Forbidding covered institutions from allowing consenting adults to participate in consensual romantic or sexual relationships exceeds Defendants Secretary DeVos and ED's authority under Title IX.

779.   Forbidding covered institutions from providing any particular procedural protections to accused persons exceeds Defendants Secretary DeVos and ED's authority under Title IX.

780.   Therefore, the 2014 Q & A should be set aside under 5 U.S.C. § 706(2)(C).

**COUNT X—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A) PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF EDUCATION**

781.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

782.   Title IX provides that no person, "on the basis of sex," be subjected to any discrimination under any federally funded educational program or activity.

783.   Title IX does not require that covered institutions employ any particular procedural mechanism for disciplining students or faculty.

784.   Title IX does not prohibit consenting adults from entering into romantic or sexual relationships.

785.   The 2001 Guidance requires covered institutions to presume that an otherwise consensual sexual relationship between an adult faculty member and an adult student is not consensual and therefore constitutes discrimination based on sex.

786.   The 2001 Guidance supports this conclusion by reference to criminal conduct by adult educators committed against children who cannot legally consent.

787.   The 2001 Guidance does not justify why this presumption would apply to consenting adults in a post-secondary education environment.

788.   Defendants Secretary DeVos and ED have treated the 2001 Guidance as imposing binding legal obligations on regulated parties.

789.   Defendant Cornell applied the 2001 Guidance in disciplinary proceedings against Plaintiff Dr. Vengalattore, and he is therefore within the zone of interests protected by Title IX.

790.   Forbidding covered institutions from allowing consenting adults to participate in consensual romantic or sexual relationships is arbitrary and capricious and exceeds Defendants Secretary DeVos and ED's authority under Title IX.

791.   Therefore, the 2001 Guidance should be set aside under 5 U.S.C. § 706(2)(A).

## COUNT XI—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A) PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF EDUCATION

792.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

793.   Title IX provides that no person, "on the basis of sex," be subjected to any discrimination under any federally funded educational program or activity.

794.   Title IX does not require that covered institutions employ any particular procedural mechanism for disciplining students or faculty.

795.   Title IX does not prohibit any covered institution from taking adequate measures to ensure that disciplinary proceedings are fair and impartial.

796.   Procedural protections applicable to all accused persons and enshrined in the Bill of Rights do not constitute improper discrimination based on sex.

797.   The 2011 DCL forbids covered institutions from affording procedural protections to the accused because to do so supposedly would not ensure prompt and equitable resolution of complaints.

798.   The 2011 DCL does not adequately explain why procedural protections prevent an equitable result.

799.   Providing procedural protections to the accused ensures an equitable outcome; it does not prevent one.

800.   Defendants Secretary DeVos and ED have treated the 2011 DCL as imposing binding legal obligations on regulated parties.

801.   Defendant Cornell applied the 2011 DCL in disciplinary proceedings against Plaintiff Dr. Vengalattore, and he is therefore within the zone of interests protected by Title IX.

802.   Forbidding covered institutions from affording procedural protections to the accused is arbitrary and capricious and exceeds Defendants Secretary DeVos and ED's authority under Title IX.

803.   Therefore, the 2011 DCL should be set aside under 5 U.S.C. § 706(2)(A).

### COUNT XII—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A) PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF EDUCATION

804.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

805.   Title IX provides that no person, "on the basis of sex," be subjected to any discrimination under any federally funded educational program or activity.

806.   Title IX does not require that covered institutions employ any particular procedural mechanism for disciplining students or faculty.

807.   Title IX does not prohibit any covered institution from taking adequate measures to ensure that disciplinary proceedings are fair and impartial.

808.   Procedural protections applicable to all accused persons and enshrined in the Bill of Rights do not constitute improper discrimination based on sex.

809.   Title IX does not prohibit consenting adults from entering into romantic or sexual relationships.

810.   The 2014 Q & A required covered institutions to apply a strong presumption that an otherwise consensual sexual relationship between an adult faculty member and an adult student is not consensual and therefore constitutes discrimination based on sex.

811.   The 2014 Q & A supports this conclusion by reference to criminal conduct by adult educators committed against children who cannot legally consent.

812.   The 2014 Q & A do not justify why this presumption would apply to consenting adults in a post-secondary education environment.

813.   The 2014 Q & A also forbid covered institutions from affording procedural protections to the accused because to do so supposedly would not ensure prompt and equitable resolution of complaints.

814.   The 2014 Q & A do not adequately explain why procedural protections prevent an equitable result.

815.   Providing procedural protections to the accused ensures an equitable outcome; it does not prevent one.

816.   Defendants Secretary DeVos and ED have treated the 2014 Q & A as imposing binding legal obligations on regulated parties.

817.    Defendant Cornell applied the 2014 Q & A in disciplinary proceedings against Plaintiff Dr. Vengalattore, and he is therefore within the zone of interests protected by Title IX.

818.    The 2014 Q & A document is arbitrary and capricious and exceeds Defendants Secretary DeVos and ED's authority under Title IX.

819.    Therefore, the 2014 Q & A should be set aside under 5 U.S.C. § 706(2)(A).

### COUNT XIII—VIOLATION OF THE SPENDING CLAUSE
### PLAINTIFF V. DEFENDANTS SECRETARY DEVOS AND DEPARTMENT OF EDUCATION

820.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

821.    The Spending Clause grants Congress the power "to pay the Debts and provide for the ... general Welfare of the United States." U.S. Const., Art. I, § 8, cl. 1.

822.    Title IX and Title VI were enacted pursuant to the Spending Clause. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998).

823.    The Spending Clause limits Congress' authority to condition payment of federal funds on state and local actors' engaging or refusing to engage in certain behavior.

824.    Congress, and by extension an administrative surrogate, must speak "unambiguously" if it "intends to impose a condition on the grant of federal moneys." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

825.    Congress, and its administrative surrogates, may not condition the grant of federal funds on a state or local actor's, including a private university's, engaging in otherwise unconstitutional behavior. *South Dakota v. Dole*, 483 U.S. 203, 208 (1987).

826.    Congress is forbidden from coercing states or local actors, including private universities, to adopt certain policies and practices on threat of having federal funds revoked. *Dole*, 483 U.S. at 211.

827.    Defendant Cornell receives a significant amount of federal funding each year, which is necessary for the university's continued operation.

828.    Defendant Cornell's receipt of federal funding is condition on the university's continued compliance with Title IX and Title VI.

829.    Defendants Secretary DeVos and ED altered the express terms of Title IX by imposing the requirements set out in the 2001 Guidance, the 2011 DCL, the 2014 Q & A, and/or the 2017 Q & A.

830.    Defendants Secretary DeVos and ED also altered the express terms of Title IX through threatened and actual enforcement actions aimed at forcing covered institutions to alter disciplinary procedures.

831.    Defendants Secretary DeVos and ED continue to alter the terms of Title IX by enforcing existing consent agreements and insisting that covered institutions not revert to fair procedures that were used before the 2001 Guidance, the 2011 DCL, the 2014 Q & A, and/or the 2017 Q & A.

832.    Defendants Secretary DeVos and ED improperly coerced colleges and universities to adopt fundamentally unfair campus disciplinary proceedings through the 2001 Guidance, the 2011 DCL, the 2014 Q & A, and/or the 2017 Q & A.

833.    Defendants Secretary DeVos and ED improperly coerced colleges and universities to adopt fundamentally unfair campus disciplinary proceedings through threatened and actual

enforcement actions aimed at forcing covered institutions to adopt disciplinary procedures that violated constitutionally guaranteed due process rights.

834.   Defendants Secretary DeVos and ED coerced Defendant Cornell to amend Policy 6.4 on threat of enforcement action.

835.   Defendants Secretary DeVos and ED continue to coerce colleges and universities by enforcing existing consent agreements and insisting that covered institutions not revert to fair procedures that were used before the 2001 Guidance, the 2011 DCL, the 2014 Q & A, and/or the 2017 Q & A.

836.   Even if the policies set out in the 2017 Q & A do not independently violate the Constitution, Defendants Secretary DeVos and ED have altered the requirements set out in Title IX, and have improperly coerced covered institutions to apply them for fear of losing federal funding.

837.   Despite the rescission of the 2011 DCL and the 2014 Q & A, Defendant Cornell continues to employ a fundamentally unfair campus disciplinary system for fear that Defendants Secretary DeVos and ED will rescind federal funding.

838.   Defendant Cornell applied unfair and unconstitutional disciplinary proceeds against Plaintiff Dr. Vengalattore because of Defendants Secretary DeVos and ED's conduct, and he is therefore within the zone of interests of Title IX.

839.   Defendants Secretary DeVos and ED therefore violated the Spending Clause by issuing the 2001 Guidance, the 2011 DCL, the 2014 Q & A, and/or the 2017 Q & A, and by engaging in enforcement actions related to covered institutions' campus disciplinary procedures.

840.   Therefore, the 2001 Guidance, the 2011 DCL, the 2014 Q & A, and the 2017 Q & A must be set aside.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff Dr. Vengalattore demands judgment against Defendants as follows:

(i) on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii) on the second cause of action for violation of Title VI, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii) on the third cause of action for a violation of the Fourteenth Amendment, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) on the fourth cause of action for defamation, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v) a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by Defendant Cornell should be reversed; (ii) Plaintiff's reputation should be

restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension and discipline be removed from his employment file; and (v) any record of the complaint against Plaintiff be permanently destroyed;

(vi) an injunction directing Defendant Cornell to: (i) reverse the outcome and findings regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his employment file; and (iv) permanently destroy any record of Roe's complaint;

(vii) on the fifth cause of action enter a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the APA by failing to notify the public and afford the public an opportunity to comment on the changes imposed upon colleges and universities receiving federal funding by the 2011 Dear Colleague Letter plus attorneys' fees, expenses, costs and disbursements;

(viii) on the sixth cause of action enter a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the APA by failing to notify the public and afford the public an opportunity to comment on the changes imposed upon colleges and universities receiving federal funding by the 2014 Q & A plus attorneys' fees, expenses, costs and disbursements;

(ix) on the seventh cause of action enter a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the APA because the changes imposed upon colleges and universities receiving federal funding by the 2001 Guidance exceeded the Department of Education's statutory authority, and were therefore unlawfully issued, a declaratory judgment forbidding Defendants Department of Education and Secretary

DeVos from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements;

(x) on the eighth cause of action a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the APA because the changes imposed upon colleges and universities receiving federal funding by the 2011 Dear Colleague Letter exceeded the Department of Education's statutory authority, and were therefore unlawfully issued, a declaratory judgment forbidding Defendants Department of Education and Secretary DeVos from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements;

(xi) on the ninth cause of action a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the APA because the changes imposed upon colleges and universities receiving federal funding by the 2014 Q & A exceeded the Department of Education's statutory authority, and were therefore unlawfully issued, a declaratory judgment forbidding Defendants Department of Education and Secretary DeVos from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements;

(xii) on the tenth cause of action a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the APA because the changes imposed upon colleges and universities receiving federal funding by the 2001 Guidance were arbitrary and capricious, and were therefore unlawfully issued, a declaratory judgment forbidding Defendants Department of Education and Secretary DeVos from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements;

(xiii) on the eleventh cause of action a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the APA because the changes imposed upon

colleges and universities receiving federal funding by the 2011 Dear Colleague Letter were arbitrary and capricious, and were therefore unlawfully issued, a declaratory judgment forbidding Defendants Department of Education and Secretary DeVos from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements;

(xiv) on the twelfth cause of action a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the APA because the changes imposed upon colleges and universities receiving federal funding by the 2014 Q & A were arbitrary and capricious, and were therefore unlawfully issued, a declaratory judgment forbidding Defendants Department of Education and Secretary DeVos from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements;

(xv) on the thirteenth cause of action a declaratory judgment that Defendants Department of Education and Secretary DeVos have violated the Spending Clause by improperly coercing colleges and universities receiving federal funding to alter their campus disciplinary proceedings, a declaratory judgment that Defendants Department of Education and Secretary DeVos acted unlawfully in promulgating the 2001 Guidance, the 2011 DCL, the 2014 Q & A, and the 2017 Q & A, and a declaratory judgment forbidding Defendants Department of Education and Secretary DeVos from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements; and

(xvi) awarding Dr. Vengalattore such other and further relief as the Court deems just, equitable and proper.

## <u>JURY DEMAND</u>

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

September 18, 2018

Respectfully,

*/s/ Caleb Kruckenberg*
Caleb Kruckenberg
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. N.W., Suite 450
Washington, D.C., 20036
caleb.kruckenberg@ncla.legal
(202) 869-5217
N.D. N.Y. Bar Roll # 700434