Exhibit 13



**Cornell University**
Division of Human Resources

**Alan L. Mittman**
Director
Workforce Policy & Labor Relations
391 Pine Tree Road
Ithaca, NY 14850-2820
t. 607.255.6866
f. 607.255.0298
e. alm63@cornell.edu
www.ohr.cornell.edu

## CONFIDENTIAL INVESTIGATIVE REPORT OF
## THE DIVISION OF HUMAN RESOURCES
## WORKFORCE POLICY & LABOR RELATIONS

**PARTIES:** Complainant (Student) and Respondent (Faculty Member)

**INVESTIGATORS:** Alan L. Mittman and Sarah B. Affel

**REVIEWER:** Dean Gretchen Ritter (the Dean)

**POLICY:** "Romantic and Sexual Relationships Between Students and Faculty" policy, set forth in the Cornell University Faculty Handbook, effective September 18, 19__

### BRIEF SUMMARY OF ALLEGATIONS AND RESPONSE

The Complainant alleges that there was a romantic and sexual relationship between the Complainant and the Respondent from December 2010 to December 2011. Specifically, the Complainant alleges: (1) that the first sexual encounter occurring at the Respondent's home between the Complainant's return to Ithaca after Thanksgiving 2010 and prior to her traveling home for Christmas on December 17, 2010 was a sexual assault; (2) that there was a subsequent sexual encounter on December 30, 2010, during which the condom worn by the Respondent slipped; and (3) that the Complainant and the Respondent had a romantic or sexual relationship from approximately December 2010 to December 2011. The Respondent denies all allegations of any romantic or sexual relationship and asserts that the Complainant has intentionally smeared his reputation and manufactured this complaint to derail his pending tenure case.

### RECOMMENDATION

In consideration of the totality of the circumstances—including the witness statements, arguments and documents included in the appendices—the investigators recommend that the Dean find that a preponderance of the credible evidence supports the conclusion that the Respondent, a faculty member, had a romantic or sexual relationship with the Complainant, a student he directly supervised. For the reasons set forth herein, the investigators further recommend that no specific finding be made as to whether the first sexual encounter rises to the level of sexual assault as defined by Policy 6.4.

| | |
|---|---|
| **/s/ Alan Mittman** | **9/25/15** |
| Investigator | Date |
| | |
| **/s/ Sarah B. Affel** | **9/25/15** |
| Investigator | Date |

Cornell University is an equal opportunity affirmative action educator and employer.
Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)          1 of 63
Invest. Rpt - Final to Dean 9.25.15          RR0259          Confidential - Personal
Distribution Not Permitted

**CONFIDENTIAL INVESTIGATIVE REPORT OF**
**THE DIVISION OF HUMAN RESOURCES**
**WORKFORCE POLICY & LABOR RELATIONS**

**Part I:**      **Relevant Policy Provisions**

    **A.**      **Romantic and Sexual Relationships Between Students and Staff**

The "Romantic and Sexual Relationships Between Students and Staff" policy, set forth in the Cornell University Faculty Handbook, effective September 18, 1996 (heretofore "the Romantic and Sexual Relationships Policy"), provides:

> The relationships between students and their teachers, advisors, coaches, and others holding positions of authority over them should be conducted in a manner that avoids potential conflicts of interest, exploitation, or personal bias. Given the inherent power differential, the possibility of intentional or unintentional abuse of that power should always be borne in mind. For example, a conflict of interest arises when an individual evaluates the work or performance of a person with whom he or she is engaged in a romantic or sexual relationship.
>
> Romantic or sexual relationships between students and persons in positions of authority compromise the relationship between students and the university. No member of the university community should simultaneously be romantically or sexually involved with a student whom he or she teaches, advises, coaches, or supervises in any way. Individuals in such positions of authority must not allow these relationships to develop or continue.
>
> In unusual circumstances the supervising dean* of the person in a position of authority may grant an exemption from this policy when full severance of the university relationship would create undue academic or financial hardship for the student.
>
> ――――――――
> *The supervising dean shall mean the dean of the school or college of the staff member's primary appointment, the dean of the Graduate School in the case of graduate students, the vice provost for research for staff members holding appointments in centers, and the vice president for student and academic services for staff members holding appointments in that division.

At the direction of the supervising dean, the Division of Human Resources, Workforce Policy & Labor Relations Office, may investigate alleged violation of the Romantic and Sexual Relationships Policy. Alleged violations of the policy are reviewed under the "preponderance of the evidence" standard. This is the standard of proof applied by the investigators and the dean, not a burden of proof borne by either the student or faculty member.

**B.**   **Policy 6.4: Prohibited Discrimination, Protected Status Harassment, Sexual Harassment, and Sexual Assault and Violence**

Policy 6.4 prohibits sexual harassment in the educational environment, as well as, sexual violence, including rape.  Policy 6.4 sets forth "Time Limits for Filing a Formal Internal Complaint," as follows:

> Complaints brought by faculty or staff members must be filed with WPLR or the JA within six months of the alleged action.  Complaints brought by students must be filed with WPLR or the JA, depending on the basis of the complaint, within one year of the alleged action, with the following exception: for students bringing a complaint against faculty in the context of a *subordinate-supervisory relationship* between the faculty member and the student (such as in relation to teaching, advising, research, and thesis or dissertation supervision), a student may file a complaint one year after no longer under the faculty's supervision or three years from the date of the alleged behavior, even if the student is no longer affiliated with the university, *whichever is earlier*.
>
> ❖ Note: Complainants are reminded that the more time lapses, the more difficult it is to obtain information, contact witnesses, or the alleged perpetrator may no longer be affiliated with the university.

Policy 6.4, p. 17 (emphasis added).

Herein, the Complainant's report of sexual assault is analyzed only under the Romantic and Sexual Relationships Policy because the Complainant's initial complaint to WPLR was made in November 2014, which was greater than one year after the Complainant was no longer under the Respondent's supervision, the Complainant having left the Respondent's lab in October 2012, and their contact regarding a 2014 publication did not rise to the level of a subordinate-supervisory relationship.  Accordingly, the complaint was time-barred by Policy 6.4.  The parties were duly notified that the complaint was proceeding under the Romantic and Sexual Relationship Policy.  See Appendix A, p. 10; and Appendix B, p. 590.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

RR0261

Confidential - Personal
Distribution Not Permitted

Confidential

**Part II:       Procedural History**

On November 2, 2014, Profs. Patterson and Thom put the Complainant in contact with Alan Mittman via email. The Complainant and Mittman spoke soon thereafter. The Complainant disclosed both the romantic or sexual relationship with the Respondent and that the Respondent sexually assaulted her at the outset of the romantic or sexual relationship. The Complainant requested that her name be corrected on the Respondent's website. She indicated that the Respondent was intentionally using her name without her middle initial because he thought it had a sexual connotation. Alan Mittman met with the Respondent regarding posting of the Complainant's name, as well as, Cornell's policy against retaliation.

In February 2015, the Complainant spoke to Alan Mittman and it became apparent that the Complainant had understood that additional actions were being taken in response to her November report. See the Complainant's February 4, 2015, email, which she stated her desired outcome as follows:

> I want this not to happen to another enthusiastic graduate student. I believe that if confronted, [the Respondent] will admit to what he believes was a consensual relationship. Based on that admission, I would like for either of the following to be put in place:
>
> 1. He would not be allowed to advise graduate students.
>
> or
>
> 2. He cannot be the chair of his graduate students' special committee. Any female graduate student wishing to join his group must be made aware of his past behavior and have an explicit meeting with the Title IX coordinator to discuss reporting. [The Respondent] should also not be allowed to be alone with female students or have to leave his office/lab door open.
>
> Currently, I believe you are scheduling an appointment with the dean to discuss how to proceed forward. I would like [the Respondent] to be confronted about our past relationship as soon as possible. I am aware that if he denies the sexual and romantic nature of it, an investigation involving a lot of people might have to occur.
>
> I am also aware that instituting the actions that I have mentioned might lead to the department being made aware of details of my personal life. I would ask for discretion and hope that information is provided on a need-to-know basis. Also, if someone in the department does need to know about the sexual/romantic relationship with my former advisor, I want them to know that for me, it was not consensual. It was rape.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

RR0262

Confidential - Personal
Distribution Not Permitted

Appendix B. p. 541.[1]

Thereafter, on February 16, 2015, the Complainant was interviewed. After this interview, the investigators concluded that the time limitations under Policy 6.4 barred an Internal Formal Complaint of sexual violence and sexual harassment. At the request of the Dean and with the Complainant's participation, this investigation proceeded under the Romantic and Sexual Relationships Policy. Affel and Mittman conducted the investigation into the alleged violation of the Romantic and Sexual Relationship Policy.

On August 20, 2015, at the request of the parties, the draft investigative report was provided to the parties for comment prior to being provided to the Dean. The parties were instructed that their comments and arguments would be included in the appendices available for the Dean to review, see Appendix C, and that the investigators would review their comments and arguments, and modify the report as appropriate, prior to submitting the report to the Dean. The parties were further informed that they would be notified, and provided a copy, when the finalized report was provided to the Dean. The parties were instructed that their comments were due on August 31, 2015. The Respondent, through counsel, requested, and was granted two extensions on this deadline. The final extension permitted the parties until September 21, 2015, to provide comments on the draft report.

On Friday September 18, 2015, the Complainant submitted her comments, through her advisor, in which she addresses the impact of the Respondent's alleged conduct and requests specific relief in the event that the Dean finds a violation of the Romantic and Sexual Relationships Policy. On Monday September 21, 2015, the Respondent, through his counsel, submitted his comments, in which he makes arguments that are raised during the course of the investigation, provides some new information not submitted during the investigation, addresses conclusions in the report with which he disagrees, requests a meeting with the investigators in advance of the issuing of the final report, and requests that he review the final report before it is submitted to the Dean. The Complainant, on September 24, 2015, also requested to review the final investigative report prior to its submission to the Dean.

Both parties' comments, which speak for themselves, where reviewed by the investigators and considered in this final version of the report submitted to the Dean on September 25, 2015. Consistent with the procedure set forth to the parties on August 20, 2015, and the Dean's request that the report be forwarded to her promptly, the final report is now submitted to the Dean and has not been recirculated to the parties for further comment. The Dean, of course, may request further investigation and may solicit further comments from the parties as she sees fit.

This report is written with the understanding that the reader, the Dean, has had the opportunity to fully review the appendices. This report does not, therefore, comment on every factual issue raised or argument made, although all were considered during the course of the investigation.

---

[1] Please note the Complainant's requested remedies at the close of the investigation, which are set forth in her comments included in Appendix C, differ from those set forth in her February 2015 email.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15                    RR0263                    5 of 63

Confidential - Personal
Distribution Not Permitted

**Part III:**     **Overview of Alleged Romantic and Sexual Relationship Between the Complainant and the Respondent**

The Complainant alleges that there was a romantic or sexual relationship between the Complainant and the Respondent from December 2010 to December 2011. Specifically, the Complainant alleges: (1) that the first sexual encounter—occurring at the Respondent's home between the Complainant's return to Ithaca after Thanksgiving 2010 and prior to her traveling home for Christmas on December 17, 2010—was a sexual assault; (2) that there was a subsequent sexual encounter on December 30, 2010, during which the condom worn by the Respondent slipped; and (3) that the Complainant and the Respondent had a romantic or sexual relationship from approximately December 2010 to December 2011. The Respondent denies all allegations of any romantic or sexual relationship and asserts that the Complainant has intentionally smeared his reputation and manufactured this complaint to derail his pending tenure case.

**A.     The Complainant's Allegations**

**(1)     The Alleged First Sexual Encounter**

The Complainant alleges that, in November 2010, about a week prior to the first sexual encounter:

> [S]he and The Respondent were in the lab doing about something and then The Respondent said that he wanted to date her. In response, The Complainant said to The Respondent that she was a second year graduate student, that she still has a lot to learn, and that she did not think it was good for him to confess his feelings because she did not want to date him. The Complainant reflected that once it was out there, she can't forget what he said.

Appendix A, p. 4.

The Complainant does not know the precise date and time of the first sexual encounter, but testified that the encounter occurred between her return from Thanksgiving, which would have been Monday, November 29, 2010, and when she traveled home for Christmas on December 17, 2010.[2] The Complainant testified that around 7:00PM on the date of the first sexual encounter she went by the Respondent's house to check on him because he was not answering his phone and was not in the lab.

The Complainant, during her February 23, 2015, interview described the initial sexual encounter as follows:

> With respect to the sexual assault in December 2010, The Complainant explained that she arrived at his house to check on him because he had not shown up in the lab that day. He

---

[2] The date of the first alleged sexual encounter—including a review of the relevant phone records, lab logs, and medical record—is addressed in detail in the analysis below.

had said that he would be there, but he did not show up. The Complainant tried to call The Respondent, but he did not pick up; so she went to his house. He came and answered the door. The Respondent asked her why she was there. She said that they were supposed to do something with the laser in the lab that day and he didn't show up. The Respondent said that he was working on grants and had worked from home that day. He was making dinner and he invited her in. The Complainant explained that he had invited her there before with the other graduate student. Also, when she was apartment hunting with her future roommates she had she found the house, but it was out of her budget. She showed the ad to The Respondent and he rented it.

That night, they sat on his couch and ate dinner. Eventually the conversation came around to the fact that he had confessed his feelings for her. At this time, The Complainant and The Respondent were still in The Respondent's living room. The Complainant does not remember what they talked about prior to the conversation coming around to The Respondent having confessed his feeling for her. She remembers that she was really stuck on the fact the she was a second year graduate student and not an independent researcher yet. She said to The Respondent that this was very bad timing on his part. She said that [his] giving her academic feedback would be really hard for her if they were having sex. The Respondent responded that it could also go wonderfully. The Respondent mentioned Prof. Carl Wieman as someone in AMO who had dated and then married one of his students.

With respect to whether what she was saying to The Respondent about him having confessed his feeling to her was the same as what she was thinking about what he had done, The Complainant explained that she was framing her response to The Respondent in this way because he was someone she had to work with everyday, so how else do you say no? In addition, The Complainant had just broken up with a long-term boyfriend and she was starting to see her high school boyfriend again some on the weekends. The Complainant was thinking, "how do I navigate this relationship?" She explained that she and The Respondent were close because he did not eat and she liked to cook, so she would feed him a lot. The Complainant said that she still bakes for people, but manages it differently now.

With respect to whether in December 2010 The Respondent knew about her seeing her high school sweetheart again and having recently broken up with her long-term boyfriend, The Complainant said yes he did.

The Complainant remembered that on that evening they ate dinner and talked on the couch in The Respondent's living room, they brought their plates to the kitchen at some point, and they returned to the couch in the living room. While on the couch in the living room, The Complainant and The Respondent began kissing. The Complainant does not remember how it started. The Complainant remembers that The Respondent started kissing her stomach. When he started kissing her stomach, The Complainant had her arms crossed over the stomach and her pants. The Respondent would pull on her arm and say, "come on." The Complainant would then pull her arm back crossed over her stomach. The Respondent said "come on" and pulled her arm multiple times, "come on," "come on," "come on," like a cadence around six or ten times. Then, when The Complainant didn't

uncross her arms, that is when The Respondent started to stick his hands down her pants, touching both above and below her underwear. While The Respondent was touching and kissing The Complainant, he made statements that talked in terms of her ex-boyfriend, who was Iranian, but not Islamic. The Complainant explained that there was a parallel that The Respondent liked to draw that people who were Islamic were barbaric, but that he, as a Hindu man, worshiped women. When The Respondent started to finger her, he said things to her about how he worships her, saying "I want to worship you." The Complainant could not remember if she said anything to The Respondent in response. While The Respondent was fingering her, he also kissed her lower stomach and then he started to go down on her. The Respondent unbuttoned The Complainant's pants. The Complainant knows that they had sex and that she stayed the night at The Respondent's house. She does not now remember, because sex was a typical component of the later sexual and romantic relationship, any details of the sex that night. She does not now remember whether they had sex on the couch or went upstairs to his bedroom.

With respect to whether she remembers anything that she said to The Respondent that night, she said that they talked about it in terms of her not wanting to have sex with him because the of the reasons that she had explained of her being a graduate student and she had been seeing her high school boyfriend and was going to tell her high school boyfriend that she loved him.

The Complainant remembers that she slept that night, she woke-up and she left. The Respondent walked her to the door the morning when she left. She went home and then she went to the lab. The Complainant said that she does not remember anyone else in the lab that next day. The Complainant and The Respondent had a conversation in the lab that next morning. The Respondent asked The Complainant if she only had sex with him because he was her advisor. The Complainant told The Respondent, "no." The Complainant thinks that they talked about it and she basically had a plan to tell her high school sweetheart that she loved him and she was planning to stick to that plan. With respect to what she was thinking when she said "no" to The Respondent's question, The Complainant said that it is hard to look back and know what she was thinking because she now feels that she did not understand herself back then. Also, she thought, what else was she supposed to say, what did it make her if she slept with him because he was her advisor.

Appendix A, p. 10. With respect to her conversation with the Respondent the day after the first sexual encounter, in her February 16, 2015, interview, the Complainant explained: "'what else was I supposed to say,' and if she said something else, that would be that she was raped, then she would have to leave the lab, so what else could she say?" Appendix A, p. 5.

(2)   **Alleged December 30, 2010, Sexual Encounter**

The Complainant testified that, when she and the Respondent had sex, "the condoms tended to fall off the Respondent when he was pulling out" and that, on one occasion, she had a positive home pregnancy test and went to Gannett Health Services for a pregnancy screen. Appendix A, p. 27. The Complainant provided a release for her medical record. The date of the

426

Complainant's visit to Gannett was January 27, 2011. Her Gannett medical record included the following relevant information: "+ heterosexual genital contact since last normal period (Dec. 30); + current contraceptive method (condoms); + imperfect or inconsistent use of current contraceptive (condom slipped a little)." Appendix B, p. 5. The Complainant testified that this December 30, 2010, sexual encounter leading her to go to Gannett for a pregnancy screening, was with Respondent when she returned to Ithaca to leave her cat with the Respondent, who had agreed to cat-sit while the Complainant traveled to India for several weeks.

### (3) Alleged Romantic or Sexual Relationship from December 2010 to December 2011

In her February 16, 2015, interview, the Complainant described her relationship with the Respondent as follows:

> The Complainant said that after that, they had a very weird relationship and that The Respondent had a temper. She explained that she would go to his house at night and they would have dinner. In the lab, The Respondent would yell at her and Vatsan [another PhD student in the Respondent's lab] until one of them cried. She said that it was really hard for her to be in this relationship, which they were keeping a secret. She wanted them to come forward about the relationship. The Complainant said that having sex with him made it worse for her when he told her that she was stupid and lazy at work. The Respondent told her that he was only losing his temper with her in the lab because her questions were stupid. He told her that she should say "I'm sorry but I have a stupid question," before she asked him any questions. He instructed her to say "can you please rephrase that?" if he started to say mean things to her.

> The Complainant explained that their relationship continued for a while, until around December 2011. During the relationship he kept telling her not to tell anyone. She told her friend Rachel about the relationship, but not the sexual assault, around Spring[3] 2011.

> The Complainant further explained that during the relationship, basically, she would go to his house. In July 2011, she moved out of an apartment with roommates and got her own apartment, at which time he came over to her house a few times.

> The Complainant explained that her relationship with The Respondent was sexual. To her, this means that they had vagina/penal sexual intercourse and they had oral sex, both ways.

> The Complainant found the situation to be very untenable. He had a bad temper. She told The Respondent that it was really hard for her. While ending the relationship, she told him she wanted to kill herself. She told The Respondent that she wanted to end the relationship or to come forward because it was too hard for her. They had this conversation in the lab about ending it or coming forward. Ultimately, The Respondent said he was okay with ending the relationship.

---

[3] The Complainant Correction: Originally "October."

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

RR0267

9 of 62

Confidential - Personal
Distribution Not Permitted

427

With respect to whether she and The Respondent knew about the Romantic and Sexual Relationship Policy, The Complainant said yes, that she had suggested that The Respondent speak with Prof. Itai Cohen, and that The Respondent said, "no," because they would immediately remove her from the lab and her career would be ruined. The Complainant thought that the policy would force her to be removed from the lab because The Respondent told her so. He also said that her career would be ruined because no one would ever believe that she did real research/scientific work on her own if they knew there was a romantic relationship between them. These are the reasons why she did not reveal the relationship.

With respect to whether The Complainant talked to The Respondent about keeping the relationship secret post-breakup, The Complainant said they did have some discussion. She asked The Respondent for permission to tell her sisters and he said, "yes." The Complainant did tell her sisters. The Complainant said that she had been pushing The Respondent to tell Prof. Schwab or Prof. Cohen because she thought it would give him perspective. The Respondent would tell her not to tell anyone. The Complainant believes that The Respondent never talked to anyone.

Appendix A, p. 5-6.

During her February 23, 2015, interview, upon additional inquiry by the investigators, the Complainant further explained the romantic or sexual relationship as follows:

The Complainant said that she did confess her feelings to her high school sweetheart that winter and he shot her down. After that happened, was when the romantic relationship with The Respondent became a thing. At that time, she was living with other students, so she and The Respondent would work late in the lab and then go to his house. Their relationship was sexual. They talked about wanting to have kids and The Complainant felt like she was in a relationship. She felt that she could make it work, but she was not talking to anyone about the relationship, which was out of character for her. During the relationship, she was having tension headaches and trying not to cry while she was just trying to be okay on a day-to-day basis with the relationship. She went to Gannett several times about the headaches.

While in the relationship, The Complainant would get upset because The Respondent did something that a crappy boyfriend would do. The Complainant explained that, usually when that would happen in a relationship then you could just not talk to the crappy boyfriend and you could be mad at him, but she would have to talk to The Respondent because she would need to learn from him or ask a question or order something. For example, he invited her to dinner and did not show-up, she would be mad at him and then would have to deal with him as her PI the next day. The Respondent had encouraged The Complainant not to tell anyone about the relationship, but one day she broke down and called Rachel, her old college roommate who was working in human resources. Rachel was the first person The Complainant told about the relationship. It was around the Spring of 2011.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

10 of 63

RR0268

Confidential - Personal
Distribution Not Permitted

\*\*\*

With respect to how the relationship came to an end, The Complainant said that it came about because she was very unhappy and she is not a secretive person. She shares the details of her life with college friends and her two sisters. She was miserable during the relationship. She decided that it either had to be open or it was the end of the relationship. The Respondent reiterated that if they told anyone, then the university would remove her from the lab immediately. She suggested that The Respondent talk to Prof. Cohen. The Respondent said that Prof. Cohen had more loyalty to the department than to The Respondent. They knew that advisors should not be in relationships with students, although they did not necessarily read the policy itself. The Respondent said that if the relationship got out, no one would take her seriously as a scientist, they would not think that she did the work, they would think that she got first author because she was sleeping with her PI.[4]

Appendix A, p. 12-13.

During her April 2, 2015, interview, in response to further inquiry, the Complainant provided the following additional information about the sexual nature of her relationship with the Respondent:

The Complainant said that when she has sex the partner wears a condom and that she always asks the other person to get an STD test if they have not had one in the past year. She said that her boyfriends have all done it except for The Respondent. The Complainant laughed that one of her older boyfriends went for his STD check and he had to get a prostate exam and when he came back he laughed that he had done it for her. The Complainant said that The Respondent was a terrible boyfriend because he did not get the STD testing done for her. She said that she goes every year and he should have gone. The Complainant said that she did not get to work through this issue with The Respondent. She said that they would have sex and then he would curl-up in his little blanket and he was done with her.

The Complainant said that they always used condoms. She said that the condoms tended to fall off of The Respondent when he was pulling out. On one occasions, she got a positive pregnancy test. In the end she thinks that the positive result was due to malaria medication. She was worried that it was because the condom slipped off, so she went to Gannett for a pregnancy test. She said that the condom slipped off when they had sex prior to her going to India [in January 2011] and then in India she did not get her period, so she took a test. Before administering the test at Gannett, the nurse asked if a positive result would be good news. She said that it would be inconvenient. The test was negative. They told her that because she hydrated well, they should re-take the test in the morning and when she was dehydrated. She was not pregnant, she got her period. The Complainant said that she told The Respondent about this. She said that he was the guy she was sleeping with at that time. The Complainant said that she believes that abortion should be legal, but that she does not

---

[4] The Complainant Comment: "He told her that people knowing about their relationship would ruin her career."

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

**RR0269**

11/6/53

Confidential - Personal
Distribution Not Permitted

429

believe in it for herself. She said that she is a healthy young person with a loving parents and that if the outcome of their having sex was a pregnancy, then there will be a baby. The Complainant said that she tells this to people with whom she engages in sexual activity. She said that she remembers talking to The Respondent about this while they were riding on the 10 Bus in January heading for Gannett. The Complainant said that The Respondent knew her policy about babies. The Complainant said that it was luck that she was not pregnant.

The Complainant said that she asked The Respondent to get an STD test right after having sex with him. She said that The Respondent refused. The Complainant said she told him this was a typical practice of hers. The Complainant said that he called Gannett and found out that faculty cannot use Gannett and then the issue fizzled. The Complainant did not remember if this conversation took place at his house or in the lab. When he did not get the testing, this was frustrating to The Complainant. She said that no one else did not get tested. It was so frustrating, she thought that if you can't go to Gannett, there are other doctors who can look into it. She said that she eventually ga

With respect to other information about the sexual re        ip,   he Complainant said that she could not remember. The Complainant the  sa      he was uncircumcised. She said that he wasn't doing anything creative s   ual      hey had oral sex. They had missionary and doggie[5] style sex. There was   o st    ding up sex or anal play. Nothing like that on the creative scale; it was b   ing    Sh   aid that they had sex at his house. They also had sex once in Arizona in hi           ich was a little hut, at the Biosphere. The Complainant said that after s   T    Re   ndent curls up like a caterpillar, he does not cuddle. She said that he of  n d es     ve a top sheet on his bed, that there was just a comforter. She thought that h   he   and making the bed were not a priority for him.

Appendix A, p. 28-29.

Finally, with respect to   heth   r The Respondent showed interest in renewing the relationship after December 201  the Comp   nant said that in 2012 after she quit his group and was leaving for Maryland, the Re  onden  asked her if she still had "a shot." Appendix A, p. 10.

### B.     The Respondent's Allegations

The Respondent denies all allegations of any romantic or sexual relationship and asserts that the Complainant has intentionally smeared his reputation and manufactured this complaint to derail his pending tenure case. During his March 3, 2015, interview, the Respondent provided information regarding his assertion, including the following:

Upon being informed of the nature of the investigation, The Respondent stated that he had met with Alan Mittman in November regarding another complaint that The Complainant had made, that complaint was regarding her middle initial, and that that complaint was preceded by complaints by The Complainant since May 2014. The Respondent said that

---

[5] The Complainant Comment: The Complainant requested that "and doggie" be removed.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

12 of 63
RR0270

Confidential - Personal
Distribution Not Permitted

they have all been false allegations by The Complainant. He said that she has been making false allegations since his tenure process began. To The Respondent this is indistinguishable from harassment. The Respondent explains that he spends a lot of time responding to frivolous complaints and then there is no follow-up.[6]

The Respondent denied having any romantic or sexual relationship with The Complainant. He said that you always hear it is highly inappropriate to have a relationship. He does know of colleague/collaborator who married a former student, but in that case they were not involved in a relationship when he signed off on her thesis.

With respect to the type of relationship that he did have with The Complainant, The Respondent explained that he came to Cornell in the spring of 2009 as a beginning faculty member. The Complainant had been at Cornell prior to his arriving and had explored a few groups. The Respondent said that things had not worked out for her in the other groups. When The Respondent arrived, he was starting with an empty lab and was actively looking for graduate students. Towards the end of the spring of 2009, The Complainant tried out The Respondent's lab while she was still in classes. Starting in the summer of 2009, The Respondent was building the experiment with The Complainant in his lab and he was training The Complainant in atomic physics because she had no experience in this area. The Respondent explained that it is normal to need to train someone in atomic physics because you have to build your own machine. The data in an atomic physics experiment shows up four years down the road, first you need to build the experiment. The Respondent said that a high degree of precision is necessary. Some students get it right away, some don't. In 2009 he started putting the vacuum chamber together. By the end of 2009, there was a lot of progress even though The Complainant was "hands off." The Respondent said that when The Complainant would get stuck, she would move on to another part of the project and he would have to clean up after her.

They did, however, have some nice steps in late 2009. At that time, the two undergraduates in the group were outpacing her. The Respondent said that The Complainant saw this too. In early 2010, The Complainant wanted to leave, to quit the group. Around March 2010, The Respondent took Vatsan on as a student and Vatsan got started in the lab around May 2010. The Respondent said that Vatsan has just now defended his thesis with The Respondent. Around spring 2010 when Vatsan began, work was going very well. Around the summer of 2010, The Complainant had changed her mind about wanting to leave. The Respondent explained that shortly before fall 2010 he asked The Complainant if she was leaving, she had been ambivalent over the summer, but as of the fall she said that she was staying and that she did not have other support. The Respondent said that he knew The Complainant was dating another student around this time and that it was not going well. The Respondent said that this boyfriend was a physics student, he would sometimes be in their lab, he would sometimes take The Complainant home. The Respondent knew that it was not going well because on many occasions The Respondent would be coming into the

---

[6] The Respondent Comment: "…from the department or the University. There has been no acknowledgment of the various evidence I have provided. Each false allegation has been swept under a rug, and a new one is concocted. This has been going on for more than a year."

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

13 of 63

RR0271

Confidential - Personal
Distribution Not Permitted

lab and Vatsan would be standing outside the lab looking uncomfortable and The Complainant would be in the lab with her shades on crying. On these days, The Respondent would say to The Complainant that maybe she should go home. The Respondent did not think that it was appropriate that other people had to leave that lab because she was crying and did not want to talk about it. The Respondent said that her boyfriend's name was Mohammad Hamidian. The Respondent said that Mohammad graduated in 2011 and that he then stayed on as a post doc and a research associate.[7]

\*\*\*

The Respondent said that The Complainant would lend a piece of broken equipment and then blame the other students for breaking the equipment. The Respondent said that he knows she broke the equipment. The Respondent said that an example was that she was the last one to use a laser. Another student then wanted to use the laser. The Complainant was told to teach the other student how to move the laser. The Respondent talked to the other student and learned that The Complainant told that student the wrong way to move the laser. The Respondent credited the other student when that student told The Respondent that The Complainant told the other student the wrong way to move the laser because the other student's account is very plausible because the other student is still in The Respondent's group and that student is an extremely careful person.

The Respondent said that he also spoke the The Complainant when she alleged that Vatsan was smoking pot in the lab. The Respondent confronted Vatsan, who denied smoking pot and offered to go to Gannett to take a blood and urine test. The Respondent talked to Vatsan about what he was doing all day. The Respondent went back to The Complainant to ask her what she actually saw. The Complainant said that Vatsan was in the other lab, that she was not present, but that there was a clear smell when she walked into the lab where Vatsan was and Vatsan was behaving strangely. Vatsan, on the other hand, told The Respondent that he had not spoken to The Complainant that day. The Respondent told The Complainant that Vatsan offered to take a drug test. The Respondent credited Vatsan. Vatsan never took a drug test. The Respondent said that he credited Vatsan because he offered to take a blood test, he was very coherent, and he was very consistent in his story and The Complainant was not.

\*\*\*

The Respondent said that he felt concerned for The Complainant, and maybe protective, because of what she was going through and also because she took a chance on this group. The Respondent said that The Complainant wanted to be personally involved, even about outside of the lab stuff. For example, The Complainant wanted to be playing tennis with The Respondent and Vatsan, however, The Complainant needed to be taught how to play tennis. She came to tennis with The Respondent and Vatsan and Vatsan ended up standing on the side because she needed to be taught how to play. The Respondent said that this behavior made him think that she was not mature. The Respondent said that around the

---

[7] The Respondent Comment: "I am not sure when Dr. Hamidian graduated. 2011 is just a guess."

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

RR0272

14 of 63

Confidential - Personal
Distribution Not Permitted

summer of 2011 he found that she was very immature and he realized that he had to take a step back because The Complainant told him that Kasturi (another student) asked her if she had a crush on The Respondent. The Respondent said that The Complainant just posed this as a statement, she did not say that she had a crush on him. The Respondent said that a few times he told The Complainant that she was being unprofessional because a few times[8] she said, "hey babe," to him. The Respondent told The Complainant that this was unprofessional, The Complainant told The Respondent that this was southern. The Respondent said that Vatsan was present when The Complainant said, "hey babe." Vatsan would raise his eyebrows. The Respondent said that he and Vatsan would look at each other. The Respondent said that The Complainant would do other similar things like, for example, then he would need to move the mouse to change the parameters, she would not take her hand off the mouse and would say, "I know you want to hold my hand." The Respondent explained that The Complainant was a physical person because she would hold your hand or hold your arms.

With respect to building camaraderie in the lab, The Respondent explained that he would take the group out to lunch or dinner. They would play weekly soccer games when the weather was good. They would go on group runs, even Vatsan came on one run and he is not an athlete. The Respondent said that he tried to have group lunches to talk not just about physics. The Respondent explained that a large part of the group is comprised of undergraduate students and he did not want them to feel intimidated by him. The Respondent explained that atomic physics is highly team based, no one person can run the experiment, and you spend a lot of time together. The Respondent said that they would have group dinners at restaurants a lot of the time, they also had cookouts at his house and they went to Vatsan's house and The Complainant's house. The Respondent said that if his mom was in town, then they would host the students at his house and his mom would make Indian food.

\*\*\*

In early September 2012 The Respondent was finally relaxed again.[9] At this time, The Complainant demanded to work with Collin. When Vatsan returned, The Respondent said that Vatsan would join The Complainant and Collin because they were not moving the project forward on their own. This was the opto-mechanics project. The Respondent said that The Complainant had requested to be changed in order to work on the opto-mechanics project, rather than the other experiment, because she was more likely to get papers out of this project. The Respondent said that this was a competitive project, so The Respondent wanted the project to progress.

---

[8] The Respondent Comment: "(many times, and not just to me. I have seen her do this to Vatsan, and some of the undergraduates as well)"

[9] The Respondent Comment: "(Again, this is a faulty notion. The narrative that 'I was stressed out in 2012 and the group climate reached a low point' is a figment of Gibbons/LMA's imagination. I suggest you talk to the rest of the group who were around in this period. Also see Yogesh/Vatsan's letter attached to my University appeal.)"

Almost two days after Vatsan was assigned to work on the project with The Complainant and Collin, The Complainant sent an email to the DGS and said she was leaving. The Respondent said that The Complainant wanted to be an author on the two or three publications where the work was 70% complete at the time she was leaving. The Respondent said that he did not try to convince her to stay because she had stagnated. He asked her to write a thesis to document her work, but The Complainant and the DGS said that that was not necessary. When she asked for authorship, The Complainant did not specify the order of authorship or how the paper would be written. The Respondent said that there was very little detail from The Complainant. The Respondent said that he would forward the interviewers his October 25, 2012, email to The Complainant.[10]

About a week after The Complainant left, their experiment worked. The Complainant contacted The Respondent and said that she wanted to rejoin the group. She came in person and she sent him emails. The Complainant wanted The Respondent to talk to his senior collaborators. She said she felt that she was the only one who could run the experiment. The Respondent talked to his collaborators and they told him that he should have fired her a long time ago and that he should not take her back. The Respondent said that the collaborators with whom he spoke were Keith Schwab and Sunil Bhave. The Respondent told The Complainant that it was not a good idea for her to come back. During October and November, the plan was for The Complainant to take her qualifying exam, get her masters, and then transfer somewhere else with her masters. The Complainant asked The Respondent for a lot of help on her qualifying exam and the exam went well.

In January 2013, The Complainant came to the lab to get her stuff. At this point she said that she was leaving. She came to say goodbye. The Respondent said that there was no expectation that she would write the papers after she left the lab. The Respondent said that it was clear when she left the lab that the projects were not complete, so The Respondent made it clear that he could not guarantee the author ordering. The Respondent said that he made this clear in his October 25, 2012, email. So much work was left to be done after The Complainant left the lab that The Respondent discussed with the other graduate students not having The Complainant on the paper at all. The other students did not want her on the paper. The Respondent said that The Complainant was very unprofessional when they sent her a draft of the paper. She was supposed to review it for clarity and review the conclusions. The Respondent said that he told The Complainant that it was clear that she did not understand the research because her objections to the paper were not valid. With respect to emails about the paper in April 2012, The Respondent said that The Complainant sent an email saying that she did not want contact with them and making a comment about the lack of scientific integrity in the paper. This comment about the lack of scientific integrity made The Respondent upset and he started to ignore her emails. The Respondent said that in November The Complainant sent him an email about his not having updated a link to the paper on his website and that this was the last contact that he had had with The Complainant.

---

[10] The Respondent Comment: "and the DGS Gibbons... and I did forward these emails."

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

16 of 63
RR0274

Confidential - Personal
Distribution Not Permitted

The Respondent said that a few weeks before the 2014 DAMOP Conference he received and email from the DGS telling him not to contact The Complainant.[11]  In June 2014 he saw her at the DAMOP Conference, but he did not talk to her.  In June or July of 2013, at the Gordon Conference, The Respondent said hi and waved to The Complainant and she walked right past him.  When he gave a talk at the conference, she got up and left his talk and her other friends followed her out.[12]  A colleague told The Respondent that The Complainant was upset that her name was not on the slide attributing work in his lab.

With respect to whether The Complainant's work assignment changed materially in 2012, The Respondent said no and that both papers were relying on one technique.  The Respondent said that he was basically doing the BEC project on his own because they did not have enough people in the lab.  The Respondent said that the understanding is that everyone is involved, but there has to be a lead person on a project.  For the imaging project, The Complainant was the lead.  She had said that she felt very uncomfortable using the high powered laser in the BEC on her own.

\*\*\*

With respect to whether he ever talked to The Complainant about the Cornell relationship policy or about having a relationship, The Respondent said yes.  The Respondent explained that it came up because, around the same time that The Complainant said to him that a student asked her if she had a crush on him, The Complainant also brought up Sunil, who married a student, and Carl Wieman who married his first graduate student.  The Respondent said that he told The Complainant that these were not good ideas.  The Respondent said that it was around this time that he realized that he had to take many steps back because he did not want to give her any illusion.  The Respondent stated that this was not a long conversation with The Complainant, he just tried to nip it in the bud.

With respect to whether they talked about what would happen if someone were in a relationship with her professor, The Respondent said that, frankly, he is not sure himself what would happen so he is not sure what, if anything, he told The Complainant.

With respect to whether he had feelings for The Complainant, The Respondent said that he has been protective of her.  The Respondent said that he felt that she was trying hard to do well.  The Respondent said that when The Complainant was sick and when she said

---

[11] The Respondent Comment: "This is not what I said. Gibbons never sent me an email. I sought a meeting with him in early May 2014 when I came to know of the various rumors and false allegations that LMA had circulated among the graduate students. I met with Gibbons to ask him if LMA had mentioned any such allegation to him when she left Cornell in 2012. I also wanted to ask him if, LMA had mentioned any such thing to him, why was I kept in the dark about it. Gibbons directly lied to me and claimed that he knew of no such allegations by LMA. I asked Gibbons to conduct an investigation. He responded saying it was 'not his responsibility', and then warned me against contacting the student."

[12] The Respondent Comment: "She stood at the door and beckoned to her colleagues. After a few minutes, they reluctantly followed her out."

things were not going well for her, he felt protective and obligated to her. The Respondent said that he had no romantic feelings for The Complainant. The Respondent said that there used to be a time when they were good friends, but that he would say the same thing about being friends with Vatsan and Yogesh. The Respondent said that if he was sick, she would come to his home and make sure that there was food and that if he was going grocery shopping, she would bring people with her. The Respondent said that The Complainant got along well with his parents.

With respect to whether there was a time when he was absent from the lab and The Complainant came to his home to check on him, The Respondent said that there could have been. The Respondent said that once the experiment had a vacuum leak when his parents were visiting him. The Respondent said that The Complainant came to his house and that she chatted with his parents while he was showering and then he and The Complainant went back to the lab. The Respondent said that there were times when she would come by his house. He would do the same for her, particularly when she was living alone he would check on her.[13] The Respondent said that Vatsan and Collin would also check on her.

With respect to whether on one occasion[14] when she stopped by his house because he had not come to the lab and he was working on a grant from home, The Respondent said that if he and The Complainant had arranged to meet in the lab, then he would not put off meeting her in the lab. The Respondent said that he did not remember if she ever found that he was working on a grant when she stopped by his house, but that it was not likely because working from home is only something that he had started doing recently, particularly this winter because it was so cold.[15]

With respect to whether they ever had dinner when she visited his home, The Respondent said "sure," and he could remember a few occasions, for example after a Wegman's trip, that they ate dinner just the two of them at this home. The Respondent said that they never at a restaurant just the two of them. The Respondent said that he and Vatsan had gone to restaurants and to his home to eat.[16]

The Respondent said that his relationship with The Complainant was friendly, maybe too friendly, but never romantic or sexual.  When The Complainant mentioned to The Respondent that another student had questioned her about having a crush on The Respondent, The Respondent thought that The Complainant would not think that there was

---

[13] The Respondent Comment: "if she said she was sick"

[14] The Respondent Comment: "(from my recollection, you said this was supposed to have happened some time in Dec 2010)"

[15] The Respondent Comment: "Also, I have no record of writing or submitting a grant proposal in that period. Further, I was in Tucson in end of Jan 2011 for a funding review. It would make no sense for me to be writing a grant proposal a month before a funding review. The time before a funding review, I am usually in lab trying to take as much data as possible."

[16] The Respondent Comment: "… many times."

anything romantic between them, but that he did not want to be giving the wrong impression to people outside of the group.

With respect to whether The Complainant ever stayed over at this house for the night, The Respondent said not that he could remember and that that would be very unusual. The Respondent said that he had spent the night at Vatsan's house because once after a very long day he collapsed on Vatsan's couch. The Respondent explained that Vatsan and The Complainant both lived much closer to the lab than he did.

With respect to whether he ever stayed the night at The Complainant's house, The Respondent said no.

\*\*\*

With respect to whether he ever made a statement to The Complainant about how he would treat a woman in a relationship, including that because he was a Hindu man he would worship her, The Respondent said, "no." With respect to whether he ever said anything about how Mohammad would treat a woman because Mohammad was Iranian or because of Mohammad's religion, The Respondent said "never." The Respondent explained that The Complainant would, that she would make inappropriate statements.

With respect to whether he ever said anything to The Complainant suggesting that he was interested in her romantically, The Respondent responded that she thinks he has, so he is trying to wrap his mind around what he could have said. The Respondent said that the best that he could say is that she might have misinterpreted his concern for her for something else. The Respondent said that as far as he is concerned, he never suggested anything like that to The Complainant. The Respondent said that he stopped going on runs with her in the summer of 2011 when he realized that things were getting too familiar with them and it was reflecting badly on the group.

\*\*\*

With respect to whether The Complainant was ever in his bedroom, The Respondent said that he lives in a three-bedroom apartment. The Respondent said that The Complainant was in one of the bedrooms, not his, because the cat would hide in that bedroom.[17] The Respondent said that there are two bathrooms, one of the first floor and one on the second floor. The Respondent said that guests would generally use the one of the first floor, but that he was not sure if The Complainant would have had an occasion to be upstairs to use the second floor bathroom when he had the group over for a dinner.

With respect to whether The Complainant ever said to him that their having a relationship would be inappropriate, The Respondent said, "no," and that, if anything, that was what he

---

[17] The Respondent Comment: "This is also the bedroom with the dresser. My parents sleep there when they visit."

was coming from him.  The Respondent said that The Complainant never expressed an opinion to him about the other professors dating students.

With respect to whether he could ever remember an evening when he was working on a grant from home and she came over,[18] The Respondent responded that he was not saying that he doesn't remember, he is saying that it is highly unlike him to work from home until very recently.  The Respondent said that they would check-up on each other in the lab if someone was sick and she would take people to Wegman's.

***

With respect to whether he ever asked The Complainant to date him, The Respondent said, "no."  With respect to whether he ever confessed that he had feelings for her and she responded that it was not good for him to have feelings, The Respondent said not that he can remember, no.[19]  The Respondent said that The Complainant asked him many times why he was single and that she would also ask Vatsan why he was single.[20]

***

With respect to why he thinks The Complainant is lying to the interviewers, The Respondent said that he has thought about this.  He does not know.  He said that it did not work out with The Complainant in his lab, but that she went to another lab on amicable terms.  The Respondent said that things were fine and then something just flipped.[21]

Appendix A, p. 43-58.

During his April 20, 2015, interview in response to additional questioning from the investigators, the Respondent provided the following:

With respect to whether he had ever gone to Gannett, The Respondent said once before a talk in Spain when he needed a TB test and some forms.  The Respondent said that he think that this was the only time.  The Respondent said that he did not call Gannett about STD testing.  The Respondent said that he did not receive STD testing.  The Respondent said that The Complainant did not ask him to get STD testing.

With respect to whether he had sex on December 30, 2010, and the condom slipped off, The Respondent said, no, he never had sex with The Complainant.  The Respondent said that The Complainant never discussed a pregnancy test with him when she came back from

---

[18] The Respondent Comment: "(also see above)"
[19] The Respondent Comment: "This makes it sound like I was confused. The answer is no."
[20] The Respondent Comment: "As I also showed in the list of emails, she tried on multiple occasions to sign me up for speed dating. She also claimed that she had asked her aunt (who has some affiliation with the vet school) to 'set me up' with students/postdocs at the vet school. Vatsan/Scott should be able to corroborate this."
[21] The Respondent Comment: "(Also see emails/texts in the period that she was at Cornell)."

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

20 of 63

RR0278

Confidential - Personal
Distribution Not Permitted

India. The Respondent said that she had broken up with her previous boyfriend before she went to India. The Respondent said that she asked about what he thought about a graduate student having a baby. The Respondent said that he told her that he had a friend as a graduate student who had a baby and that it cut into her work. The Respondent said that he asked her a few times if there was something that he needed to know and she said, no. The Respondent thought that this conversation was after she came back from India, but he did not know how soon after. The Respondent said that the conversation took place on the #10 bus. He gets on this bus in front of the Christian church by Cascadilla. The Respondent said that this is the bus that he takes and that, at that time, she would get on the same bus at an earlier stop because they leaved one block from each other. He said that he walks to the stop by the church and then walks up the cemetery if he misses the bus. The Respondent did not specifically remember what The Complainant said during this conversation on the bus. The Respondent did not know if she was seeing anyone at that time, he did know that she just broke up with the student from the other physics group.[22] With respect to whether The Complainant said whether she would keep a child if she were pregnant, The Respondent said that they did not discuss this and that to his recollection she was very cryptic and asked what his opinion was about graduate students with families and babies. With respect to who he thought would have gotten her pregnant, he said that he just assumed that it was Mohammad if she were pregnant. The Respondent said that she never brought it up again.[23]

With respect to whether The Complainant told him she took a pregnancy test, he said, not that registered in his mind or that had a large impact on him. The Respondent said that he would not have been surprised if The Complainant had mentioned that she was going to Gannett because she used to go to Gannett a lot. He said that if she was going to Gannett for a pregnancy test, rather than other treatment, it did not register for him. With respect to his thoughts on a medical record identifying that she had sex on December 30, 2010, and her testimony that it was with him, The Respondent said that that would be a lie. With respect to whom she would have had sex with on December 30th if not him, The Respondent said that he does not know and that it was not him. With respect to whether she had broken up with Mohammad at that time, The Respondent said yes.[24] With respect to whether she had told him that she was seeing anyone else, he said that he did not know.

With respect to whether The Respondent had dated anyone since being at Cornell, The Respondent said that his last girlfriend was in Berkeley when he was doing his post doc. He said that they talked about getting engaged. She was in Palo Alto and he took the job

---

[22] The Respondent Comment: "(I am guessing that she broke up, I can't be certain)."

[23] The Respondent Comment: "Also, at the time, I probably thought this was just one more hypothetical question that she would often ask with no particular context. See, for instance, text messages about whether I would adopt a foster child – there is no context, and it is brought up and dropped for no apparent reason. I (and the group) just learned not to read too much into these kinds of questions."

[24] The Respondent Comment: "I believe I said I think so, but I can't be sure. Her fights with Dr. Hamidian had been going on for a while, and I don't know if there was a specific date that she broke up with him."

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

21 of 63

RR0279

Confidential - Personal
Distribution Not Permitted

at Cornell. She could not find anything here and they broke up. The Respondent said that he has not dated anyone since then. He thought that he would not date anyone until he got his tenure and his lab established. The Respondent said that he has not had any sexual partners since Berkeley. With respect to whether he had any physical characteristics that would only be seen in an intimate setting, The Respondent said that he could not think of any. With respect to whether he was circumcised, The Respondent said no, he is Hindu. The Respondent said that it is common knowledge that Hindus are not circumcised. The Respondent said that he would not have discussed with The Complainant, or anyone else, that he was not circumcised.

Appendix A, p. 67-68.



Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

22 of 63
RR0280

Confidential - Personal
Distribution Not Permitted

**Part IV:      Summary and Timeline of Events**

The following summary and timeline sets forth in chronological order relevant facts from the time when the Complainant began her academic career at Cornell to the conclusion of this investigation, indicating where significant facts are contested by the parties.

1. The Complainant came to Cornell in August 2008 as a Physics Department PhD candidate.  The Complainant had previously studied physics as an undergraduate with Prof. Brian Demarco at the University of Illinois.  Appendix A, p. 21.

2. The Respondent came to Cornell in the Spring Semester 2009 as a Physics Department faculty member.  Prior to coming to Cornell, the Respondent received his PhD from MIT and completed a post-doctoral fellowship at UC Berkeley with Prof. Dan Stamper-Kurn. Appendix A, p. 66, 149.

3. In January 2009, the Complainant joined the Respondent's lab.  At around that time, two other students, and later a third student, joined the Respondent's lab.  By approximately December 2009, the three other students in the lab—Ian, Pete, and Dan—had left the lab.  From approximately December 2009 to April 2010, the Complainant was the only PhD student in the Respondent's lab.  In 2010, the Complainant considered leaving the Respondent's lab.

4. In March 2010, the Complainant corresponded with Prof. Michelle Wang about the Complainant's evaluation of the Respondent.  On March 9, 2010, the Complainant told Prof. Wang: "I will get that done by tomorrow.  Finding positive things to say will not be hard, however wording feedback might be.  I did talk to him yesterday, so that was productive."  Appendix B, p. 20.  The Complainant's March 2010 review of the Respondent was as follows:

   > [The Respondent] has done an excellent job of training and mentoring undergraduates. The three undergraduates in the group all seem to be taking charge of their research projects, learning, and becoming excited about physics research. This success does not seem to translate to an ability to do the same for graduate students. [The Respondent] has attempted different strategies from writing notes about relevant research topics, to having graduates and undergraduates work closely, and being more hands on. However, a tone was set fairly early on that was stressful. He never demands more of his students than he demands of himself, however the demands on himself are unreasonable to expect of students. He finds it disappointing when his students do anything but research. When his main goal of the semester was to train a graduate student, he stretched himself thin by taking on so many undergraduates. His advice and comments on how he wants work to be done are sometimes coupled with harsh criticisms, then he gets confused at the lack of productivity. He constantly claims that the students can be productive on a normal schedule, but has not adapted how he works in lab. At times, he will have the student working on something, be demanding a concrete result, then wonder why the student is not in the main lab asking questions. Instead of communicating clearly what he expects or if he wants the

student in lab, he only expresses disappointment after the task has been complete. Along the lines of unreasonable expectations, he encouraged the student to take courses but failed to realize the amount of time necessary to complete the courses and pressured the student to be in lab on an extended basis, not allowing flexibility for group work. The pressure and stress has not been conducive to learning. He has tried to change the environment of the lab, however that has been hard to achieve with just one lab member. A lot of the stress and pressure comes from the experiment needing to move forward and the student feeling like she can not learn fast enough in order to contribute to the experiment in a significant way.

Improvements I would suggest are more clear, open communication and an adjustment of expectations so the environment becomes more enjoyable. Instead of expressing displeasure when the student is not around, set up appointments or time everyday to talk about progress. More graduate students would be good. Also, [the Respondent] needs to remember that he is the only person in the group with experience and needs to not make it difficult to talk to him. Hiring a post doc might also improve progress and take some of the additional pressure off the graduate students.

Appendix B, p. 552.

5. In the summer of 2010, Srivatsan "Vatsan" Chakram Sundar joined the Respondent's lab. Starting in the fall of 2010, the Complainant and the Respondent were working on an experiment together. At that time, Vatsan was working on a different project.

6. In October or November 2010, the Complainant broke-up with her boyfriend, Mohammad Hamidian, who was a physics PhD student in another lab.

7. As described in greater detail above, the Complainant alleged that, in late November 2010, the Respondent told the Complainant that he had feelings for her. The Respondent denies this allegation.

8. On a date between November 29, 2010, and December 17, 2010, per the Complainant's allegation set forth in greater detail above, the first sexual encounter between the Complainant and that Respondent occurred. The Respondent denies this allegation.

9. On December 17, 2010, the Complainant left Ithaca to spend Christmas with her family. By December 30, 2010, the Complainant returned to Ithaca to bring her cat to the Respondent, who had agreed to cat-sit for the Complainant while she traveled to India for several weeks.

10. On December 30, 2010, per the Complainant's allegation set forth in greater detail above, the Respondent and the Complainant had sex and the condom slipped, resulting in the Complainant, on January 27, 2011, going to Gannett Health Services for a pregnancy screen. The Respondent denies this allegation.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

24 of 63
RR0282

Confidential - Personal
Distribution Not Permitted

11. On December 31, 2010, the Complainant sent the Respondent an email entitled, "Phone Numbers for Pearl and info to come rescue me," which included contact information relative to caring for her cat and contact information for the Complainant while she was in India. Appendix B, p. 608.

12. On December 31, 2010, the Complainant sent an email to Shannon Harvey in which the Complainant stated that she was on the bus to New York City to celebrate New Year's and that: "My life is always a mess, now I have a whole new hoard of interesting and complex problems . . . Feel a little like lady Brett Ashley."[25] Appendix B, p. 556.

13. On January 1, 2011, at 3:32AM, the Complainant wrote the Respondent an email stating: "▇▇▇ has my phone/perhaps the Egyptian cab driver miss you . . . ." Appendix B, p. 210. At 4:51AM, the Respondent responded: "so one of them was responsible for the prank calls? These 'egyptian' cab drivers can get pretty drunk ▇guess." Appendix B, p. 209-210. At 7:31AM, the Complainant wrote: "okay…slightly worried about my sister. . . ." Appendix B, p. 209-210. At 7:37AM, the Respondent responded: "I was worried about you . . what's going on? I get a strange email from you and a couple of calls from google phone with no one answering me late on new year's day. should I call your phone, should I call someone, should I just ignore it?" Appendix B, p. 209-210. At 8:02AM, the Complainant wrote: "yeah, ▇▇▇ [the Complainant's sister] got my phone at the end of the night. . . . . and I could not figure out how to use google phone . . ." Appendix B, p. 209-210. The Complainant emailed again at 8:08AM and 8:54AM and the Respondent at 8:19AM. Appendix B, p. 209-210.

14. On January 14, 2011, the Complainant wrote to the Respondent from India and asked him questions about his religious beliefs and about poverty. On the same day, the Respondent provided an email response sharing his thoughts on both subjects. Appendix B, p. 206-208.

15. On January 27, 2011, the Complainant went to Gannett Health Services for a pregnancy screening after a positive home pregnancy test on January 20, 2011. The Complainant reported to Gannett that her last menstrual period was December 20, 2010, that she last had sex on December 30, 2010, and that the condom had slipped off a little. Appendix B, p. 5.

16. In August 2011, Collin Reynolds joined the Respondent's lab as a PhD candidate. In the fall of 2011, Yogesh Patel joined the Respondent's lab as a PhD candidate. Appendix A, p. 166.

17. At some point during 2011, the Complainant disclosed to Rachel Mathis, her friend from college, that she was in a relationship with the Respondent. Rachel cannot remember the date of the initial disclosure, but did remember that the Complainant disclosed that she was presently in the relationship. Appendix A, p. 122-123.

---

[25] Lady Brett Ashley is a character in "The Sun Also Rises," by Earnest Hemingway. The meaning ascribed to this literary reference by the Complainant is discussed below.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

25 of 63
RR0283

Confidential - Personal
Distribution Not Permitted

18. Beginning in the summer of 2011 and continuing until spring 2012, the Complainant was running partners with Eliza Buhrer-Kapit. During this time, the Complainant spoke to Eliza about the Respondent, but did not disclose a sexual assault or romantic or sexual relationship. Appendix A, p. 109-112.

19. On September 30, 2011, the Complainant submitted a very positive letter as part of the Respondent's review, after which his contract was extended for three more years. In her letter, the Complainant described the Respondent as "an amazing advisor, teacher and mentor." Appendix B, p. 522.

20. In the late fall of 2011, during a family trip to Georgia, the Complainant's sister ████ observed that the Complainant was very skinny and acting weird. Between seeing the Complainant in Georgia and Thanksgiving, on November 25, 2011, the Complainant told ████ that she was in a relationship with the Respondent. At that time, neither the Complainant, nor ████ told other family members. Appendix A, p. 104-105.

21. On December 11, 2011, the Complainant began dating ████████, another graduate student. It is around this same time that her alleged romantic and sexual relationship with the Respondent ended. Appendix B, p. 653. The Respondent denies the allegation that there was any romantic or sexual relationship.

22. Text messages, dated between March 3, 2012 and January 9, 2013, retrieved from the Respondent's old cell phone show that the parties were in communication about non-academic and academic topics during this time. Appendix B, p. 373-375.

23. On April 12, 2012, the Complainant and the Respondent went to the Syracuse Mall, where the Respondent purchased an iPad with his personal credit card at the Apple Store. Appendix B, p. 561. The Complainant is in possession of that iPad and identified it as a gift to her from the Respondent. Appendix B, p. 562. The Respondent acknowledges that he purchased the iPad with his personal credit card, but denies that he gave the iPad to the Complainant as a gift and suggests that the Complainant took it from the lab. Appendix A, p. 61-62.

24. In May 2012, the Complainant, the Respondent, and Collin, traveled to the Biosphere in Arizona for a DARPA meeting. The meeting was from May 4-6, 2012. The Complainant testified that she and the Respondent had sex in the Respondent's "hut" at the Biosphere. The Respondent denies this allegation. Collin testified that during their trip to Arizona the Complainant laid across the Respondent to sleep during the overnight flight. The Respondent did not recall this conduct. Appendix A, p. 26, 166; Appendix B, p. 683; Appendix C, p. 36.

25. On July 13, 2012, the Complainant text messaged her sister ████ saying that the Respondent called the Complainant, "emotionally fragile because [she] cried when he yelled at [her]." ████ responded: "Tell him when his boss fucks him and then yells at

him all the time for not living up to crackpot ideals, then he can start calling you fragile."
Appendix B, p. 12-13.

26. On October 9, 2012, the Complainant had a text message exchange with her sister ▇▇▇▇ in which the Complainant referenced having "dumped" the Respondent and said that the Respondent "should have kept his dick in his pants." Appendix B, p. 11-12.

27. On October 25, 2012, the Complainant, the Respondent and Prof. Lawrence Gibbons, the Director of Graduate Studies for the Physics Department met, at which meeting the Complainant told the Respondent that she would be leaving his research group. After that meeting, the Respondent sent an email summarizing the discussion, which email included the following:

> Since my arrival at Cornell in early 2009, ▇▇▇▇ has taken the lead role in the construction of a novel BEC apparatus intended for studies of correlated ultracold matter. Much of this effort has been dedicated to the development of the ultrahigh vacuum chamber, the laser system and associated instrumentation associated with the apparatus. Since early 2012, we have been in a position to pursue a couple of interesting research projects - (i) The realization of a "all optical Bose condensate" and (ii) Non-destructive fluorescence imaging of ultracold bosons in an optical lattice. Of these, the first project is very close to completion, and ▇▇▇▇ will be the first author of the published result. The second project is at an earlier stage, but I acknowledge that ▇▇▇▇ took the preliminary steps towards realizing this imaging technique. Once we reproduce the experiment with Bose-condensed atoms, this will be a landmark achievement. At this point, I am not sure of the remaining obstacles in this project. If these turn out to be negligible, ▇▇▇▇ will once again be the first author of the published work.

Appendix B., p. 525.

28. In November 2012, the Complainant contacted Prof. Keith Schwab at CalTech and informed him that she was leaving Cornell to go to Ian Spellman's group at NIST. Appendix B, p. 458. The Complainant and Prof. Schwab spoke on the phone and the Complainant said that she was leaving the Respondent's group because of a "conflict of personality which led to an incident where she claimed [the Respondent] 'threw a piece of equipment [a power supply] at her.'" Appendix B, p. 458. Prof. Schwab, in a letter supporting the Respondent's tenure, wrote that the Complainant further explained that the Respondent "put down a small piece of electronics on the table or counter, with some force, which made a noise and slid in her general direction." Appendix B, p. 458. The Respondent denies ever throwing equipment and argues that the Complainant describes the "power supply incident" inconsistently, calling into question her credibility in this matter. Appendix A, p. 56.

29. On November 28, 2012, the Complainant sent the Respondent the following email:

> Thank you for taking the time to talk to me last night. At this point I really need to

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

27 of 63
RR0285

Confidential - Personal
Distribution Not Permitted

just focus on preparing for my A-exam done. I agree with you that discussing things further might just upset us both; however, it does seem to be a shame that we would both like for me to run M1 and can't seem to come up with a solution. I believe you should still talk to Keith [Schwab] or Sunil [Bhave]. I am overwhelmed and cannot make a decision until after the A-exam and my visit to Maryland. Even then, I might just need the holidays to think.

Appendix B, p. 60. The Complainant and the Respondent ascribe significantly different meaning to this email and the preceding conversations. The Complainant testified that, around this time, the Respondent had asked her to stay and had asked her if their relationship still had a chance. Appendix B, p. 24. The Respondent testified that, around this time, the Complainant had requested to return to his group because they had recent successes in the lab and that he was not inclined to allow her back into the group. Appendix B, p. 49.

30. In December 2012, the Complainant successfully completed the A-exam.

31. In January 2013, the Complainant joined Prof. Ian Spielman's lab at the National Institute of Standards and Technology ("NIST") in Maryland, where she continues her research at this time. Prof. Speilman testified that the Complainant is performing very well as a student. Appendix B, p. 136-137. The Complainant projects that she will complete her PhD, with a degree from Cornell, in the spring or summer of 2016. Appendix B, p. 15. The Respondent is no longer on the Complainant's PhD committee.

32. On April 15, 2013, the day of the Boston Marathon bombings, the Complainant called Swati Singh, a Harvard student who visited the Respondent's lab for two weeks in 2010. Swati testified that during this conversation the Complainant said something along the lines of "if I have my way, he will have a hard time getting tenure." Appendix B, p. 461.

33. In June 2013, the Complainant and the Respondent both attended the Gordon Conference. The Complainant and the Respondent spoke at the conference. The Complainant testified that the Respondent tried to schedule to speak with her late in the evening and, after she said no, the next day he tried to get her away from the group. The Complainant testified that she sat with him at a public table and tried to talk to the Respondent about collaboration on the article referenced above, but the Respondent told her she could edit the paper and asked her why she was so angry. During this conversation, at the Complainant's request, Prof. Spielman stayed in the room and kept the Complainant in sight. The Respondent testified that, at the conference, the Complainant, with her friends, walked out on his presentation. Vatsan testified that at this conference the Complainant first told him that the Respondent threw a power supply at her. Appendix B, p. 464.

34. Between February 28, 2013, and November 3, 2013, the Complainant contacted the Respondent nine times by email, without substantive reply, regarding the paper on which she expected to be the first author. Appendix B, p. 376-421.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

28 of 63
RR0286

Confidential - Personal
Distribution Not Permitted

35. On February 1, 2014, the Complainant contacted the Cornell Ombudsman and discussed her advisor having pursued a relationship with her, but did not disclose the sexual assault allegation.  Appendix A, p. 13.

36. On February 2, 2014, the Complainant contacted Prof. Ritchie Patterson by email saying that she would like to come forward with a concern to someone who could be discrete. Soon thereafter, the Complainant and Prof. Patterson spoke.  The Complainant mostly described to Prof. Patterson tensions in the working group, but also said that some things happened that she would not want other female students to experience.  The Complainant did not explicitly allege that the Respondent raped her or that there was a romantic or sexual relationship between them.  The Complainant asked Prof. Patterson if she could warn off other students from joining the Respondent's lab, which Prof. Patterson could not do.  Appendix A, p. 74-77.

37. On April 17, 2014, Yogesh Patil, a student in the Respondent's lab, sent the Complainant a draft of the paper that the Complainant had been contacting the Respondent about between February 28, 2013, and November 3, 2013.  Yogesh gave the Complainant 24-hours to provide comments on the draft.  That day, there are several emails between Yogesh and the Complainant about the time allotted for her to provide comments.  The Complainant emailed Yogesh her first set of comments that day.  On April 18, 2014.  The Complainant sent her second set of comments and an email expressing her opinion that the paper is not ready for submission.  On April 19, 2014, the Respondent and the Complainant exchanged several emails about the paper.  On April 21, 2014, the Complainant emailed the Respondent and Prof. Lawrence Gibbons, saying: "The most recent draft of the paper I've seen looks great and I am comfortable being an author on it. I do not need to see another draft."  Appendix B, p. 377-413.  Prior to sending this email, the Complainant consulted various individuals, including Prof. Gretchen Campbell and her undergraduate advisor about her concerns about the paper.  Appendix A, p. 21, 174.

38. On May 10, 2014, the Complainant submitted a letter to the Dean's Review Committee regarding the Respondent's tenure.  In this letter, the Complainant states that the Respondent: constantly degrades students in a harassing and humiliating way;" "did not respect boundaries," including demanding to know what medication she was taking; "is utterly unconcerned with developing his students' scientific abilities or careers;" and "would take control of graduate student projects."  The Complainant also stated that, around June 2012, the Respondent picked up a power supply and "threw it" at her and, the next day, when she initiated a conversation with him about it, he called her "emotionally fragile."  The Complainant did not reference the alleged sexual assault or romantic or sexual relationship.  Appendix B, p. 437-441.

39. Around July 25-26, 2014, the Complainant traveled to Germany, where she attended a conference and spent time with Eliza Buhrer-Kapit.  Eliza observed that the Complainant was "on edge" because she had written a negative letter for the Respondent's tenure file.  The Complainant told Eliza that there were things about the Respondent that the Complainant did not want anyone to find out.  Eliza asked the Complainant if the things the Complainant did not want anyone to know were related to the Respondent having

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

29 of 63
RR0287

Confidential - Personal
Distribution Not Permitted

447

bought the Complainant's cat a cat tower for Valentine's Day. Thereafter, the Complainant told Eliza that the Respondent sexually assaulted her and that they had a relationship. Appendix A, p. 112-113.

40. On July 24, 2014, the Respondent advised the editor of "Physical Review A" to delete the Complainant's name from the author list. Appendix B, p. 432. On July 25, 2014, and August 4, 2015, the Respondent sent emails to the editor of "Physical Review A" indicating that he believed it was "extremely inappropriate" for the Complainant to be listed as an author on the paper, which she had approved on April 21, 2014, because she had engaged in "acts of deceit, manipulation and sabotage." Appendix B, p. 431.

41. On July 25, 2014, the Complainant received an email from an editor of the "Physical Review A" indicating that her name had been moved to third author of the paper. Appendix B, p. 425.

42. On July 28, 2014, the Complainant received an email from the editor of the "Physical Review A" indicating that her name had been removed from the list of authors of the paper. Appendix B, p. 427. On July 30, 2014, the Complainant sent an email to the editor of the "Physical Review A" indicating that she had not been notified of and did not approve the authorship changes. Appendix B, p. 425. In July or August 2014, the Physics Department intervened and the Complainant was ultimately listed as third author on the paper. On September 24, 2014, the paper was published in "Physical Review A." See Nondestructive imaging of an ultracold atomic gas, Y. S. Patil, S. Chakram, [the Complainant], and [the Respondent], Phys. Rev. A 90, 033422 (2014)

43. August 11, 2014, the Respondent submitted his "Response to DGS's report on student letters" in his tenure case, in which he set forth his position on his interactions with the Complainant since his 2013 Third Year Review and set forth in detail his position that her allegation that he tampered power supply is false. Appendix B, p. 450-453.

44. On September 24, 2014, the Complainant again contacted Prof. Patterson via email. Soon thereafter, the Complainant and Prof. Patterson spoke. The Complainant told Prof. Patterson that the Respondent had sex with her after she had clearly said no and that, after that, she and the Respondent then had a relationship. Prof. Patterson contacted Prof. Julia Thom and Mittman for guidance. Appendix A, p. 74-75.

45. On February 16, 2015, the Complainant was first interviewed for this investigation. The Complainant was again interviewed on February 23, 2015. Appendix A, p. 1.

46. On February 27, 2015, the Respondent submitted his Appeal in his tenure case. Appendix B, p. 468-513.

47. On March 2, 2015, the Respondent was informed of this investigation by an email stating:

    Please be advised that my office has been authorized by Dean Ritter to review your

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15
30 of 63
RR0288
Confidential - Personal
Distribution Not Permitted

alleged romantic or sexual relationship with a student under your supervision in or around the 2011 calendar year. The pertinent Cornell University Faculty Handbook section entitled "Romantic and Sexual Relationships Between Students and Staff" can be found at: http://theuniversityfaculty.cornell.edu/handbook/ROMANTIC.pdf.

Appendix B, p. 590.

48. On March 3, 2015, the Respondent was first interviewed for this investigation. Appendix A, p. 1.

49. Between February 16, 2015, and July 17, 2015, the parties and 24 witnesses were interviewed on the following dates:

The Complainant Interviews:
The Complainant – February 16, 2015 (phone)
The Complainant – February 23, 2015 (phone)
The Complainant – April 2, 2015 (in person)
The Complainant – April 28, 2015 (phone)
The Complainant – July 17, 2015 (phone)

The Respondent Interviews:
The Respondent – March 3, 2015 (in person)
The Respondent – April 20, 2015 (in person)

Witness Interviews:
Ritchie Patterson – March 2?, 201? (in person)
Srivatsan "Vatsan" Chakra... Sundar – March 20, 2015 (in person)
Yogesh Patil – March 2?, 201? (in person)
Susan Holcomb – March 2?, 2015 (in person)
Mohammad Hemi...tian – March 23, 2015 (in person)
[redacted] – April 2, 2015 (in person)
Eliza Buhler-Kapil – April 2, 2015 (in person)
Rachel Matt... – April 9, 2015 (phone)
Eliot Kapit – April 9, 2015 (phone)
Brittany Johnson – April 10, 2015 (phone)
Stefan Natu – April 15, 2015 (phone)
Ian Spielman – April 16, 2015 (phone)
Swati Singh – April 16, 2015 (phone)
Sunil Bhave – April 17, 2015 (phone)
Scott Flanz – April 30, 2015 (phone)
Dan Stamper-Kurn – April 30, 2015 (phone)
Kristina Colladay – May 4, 2015 (phone)
Keith Schwab – May 4, 2015 (phone)
Shannon Harvey – May 6, 2015 (phone)
Daniel Ralph – May 6, 2015 (in person)
Collin Reynolds – May 6, 2015 (phone)

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

RR0289

31 of 63

Confidential - Personal
Distribution Not Permitted

Lorraine Sadler – May 11, 2015 (phone)
Kasturi Saha – June 4, 2015 (phone)
Gretchen Campbell – June 4, 2015 (phone)
Appendix A, p. 1.

50. On May 26, 2015, the Complainant and the Respondent were provided with draft copies of Appendix A and Appendix B and provided substantive written responses thereto. Appendix B, p. 650-686.

51. On July 9, 2015, the Complainant and the Respondent were provided with updated draft copies of Appendix A and Appendix B and both provided email responses.  Appendix B, p. 636-640, 572-580.

52. This review closed on August 7, 2015.  The report was provided to the parties electronically on the evening of August 20, 2015.  At the request of both parties, the report was provided to the parties prior to being provided to the Dean.  The investigators requested that the parties provide comments within 10 days after receiving the report.

53.  Upon the Respondent's request for two extensions, the parties were allowed until September 21, 2015, to provide comments.

54. The Complainant submitted comments through her advisor on September 18, 2015.  See Appendix C.

55. The Respondent submitted comments through his advisor on September 21, 2015.  See Appendix C.

56. This report was submitted to the Dean on September 25, 2015.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

32 of 63

RR0290

Confidential - Personal
Distribution Not Permitted



**Part V:**     **Analysis**

   **A.     Investigative Process**

The investigators interviewed the Complainant, the Respondent and twenty-four witnesses during the course of this investigation.  The interviews are included in Appendix A to this report.  Each party and witness had an opportunity to review his or her interview for accuracy and to provide comments.  The parties had the opportunity to review and comment on the interviews included in Appendix A.  Similarly, the documents collected during the course of this investigation, including extensive written comments from both parties, were compiled in Appendix B to this report.  The parties also had the opportunity to review and comment on Appendix B.  The parties had the opportunity to review and comment on a draft of this report.  The parties' comments are compiled in Appendix C.

There is no formula to determine where the truth lies in any particular case.[26]  The investigators were tasked with looking at the testimony and documents obtained during the course of the investigation and drawing upon commonsense, life experience, knowledge of human nature, and good judgment to resolve conflicts therein.  The investigators looked at the quality and the strength of the testimonial and documentary evidence, not merely the sheer volume.  In general, the investigators credited documentary evidence and reliable statements made by the parties and the witnesses contemporaneous to underlying events.

In so doing, and by conducting this totality of the circumstances analysis of the testimony and documents in this investigation, the investigators looked to many factors to assess credibility and assign weight to the testimonial and documentary evidence.  The investigators considered whether the witness had an opportunity to hear or see the events about which he or she testified and the witness's ability to recall events accurately.  The investigators also considered whether the witness had a motive to lie at the time he or she made a particular statement, the witness's opportunity to reflect on the events prior to making the statement, the witness's opportunity to fabricate an untruthful account prior to making the statement, the witness's biases and allegiances, and the witness's interest in the outcome of this investigation.  Moreover, the investigators considered the witness's appearance and demeanor when speaking to the investigator, the witness's frankness or lack of frankness when speaking to the investigator, and whether the witness's account of events was plausible or implausible, reasonable or unreasonable, probable or improbable.

The investigators also looked to whether a witness's statement was internally consistent over time and to whether it could be corroborated by documentary evidence or the testimony of other

---

[26] In articulating the relevant factors that the investigator considered when assessing credibility, which are set forth in the paragraphs below, the investigator was guided by and draws heavily from the Massachusetts District Court Model Criminal Jury Instructions, Instruction 2.260: "Credibility of Witnesses" (2009 ed.) (available at: http://www.mass.gov/courts/court-info/trial-court/dc/dc-crim-model-jury-inst-gcn.html); and the New York State Unified Court System Criminal Jury Instructions, "Credibility of Witnesses (available at: http://www.nycourts.gov/judges/cji/1-General/CJI2d.Credibility.pdf).

witnesses. The investigators closely considered inconsistencies in the statements made by witnesses, including inconsistencies within a witness's statements to the investigator and others and inconsistencies between one witness's statements and the statements of other witnesses. When determining what weight to give to an inconsistency, the investigators considered whether the inconsistency should properly be attributed to an innocent mistake or to an intentional falsehood, whether the inconsistency was regarding an important fact or a minor detail, whether the inconsistency reflected a change in the witness's account that furthered that witness's position, and, where the inconsistency was an omission, whether it would have been reasonable to expect the witness to provide the information at the time it was omitted, including whether the witness's attention was drawn to the matter. That a witness was false or mistaken in one or more statements does not require the investigators to discredit every statement of the witness. Conversely, that a witness was truthful or accurate in one or more statements does not require the investigators to accept every statement of the witness.

In this case, the Respondent has commented on the presence of opinion testimony and information not gained through direct observation in the witness statements. He challenges the Complainant's case on the ground that witnesses are merely restating information learned only from the Complainant. Statements of opinion based on information not gained through direct observation are present in both the witness statements favorable to the Respondent and those unfavorable to him. Witnesses were instructed at the beginning of the interviews that the investigators were interested in hearing about their observations and about their opinions; but to be clear when what they were sharing was an opinion or an observation. Similarly, witnesses were asked to share information learned secondhand, including "gossip," and to share where they learned that information. Opinion and secondhand information served the purpose of allowing the investigators to better understand the biases or affiliations of the witnesses, indicating to the investigators additional witnesses to interview, and shedding light on the conclusions drawn as a result of all the information possessed by the witness. In this way, witnesses' opinions—which are included in their interviews, but not dwelt upon in or critical to this report—aided in this investigation. We agree with the Respondent that, because a witness held an opinion or that a witness had been provided information by either party did not, in and of itself, render accurate any particular position put forth by the parties or witnesses.

The Respondent has also commented that witnesses were swayed or biased by information learned only from the Complainant. This too was true of many witnesses' statements, favorable or unfavorable to the Respondent, whether swayed by information he provided and allegiance to him or by information the Complainant provided. For example, several witnesses were students or recent graduates who still relied on the Respondent for their academic success or for future letters of recommendation. Other witnesses were close friends of the Complainant's who accepted her account and as a result developed an opinion of the Respondent. That a witness trusted or believed information learned from any one party or that a witness had a friendship with or respect for anyone party does not render their statement unreliable, but is, of course, weighed and considered.

Finally, considerable information extraneous to the purpose of this investigation was gathered during the witness interviews. This reflects the fact that many witnesses were not aware of the nature of this investigation and information identifying the nature of the investigation was not

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

34 of 63
RR0292

Confidential - Personal
Distribution Not Permitted

provided to the witnesses by the investigators to protect the confidentiality of this matter and to limit disclosure of the nature the allegations.  It also reflects the fact that the investigators use a style of interviewing that includes open-ended and non-leading questions, allowing the witnesses to provide a narrative.

**B.      Analysis of Information Gathered During the Investigation**

The central issue in this case is the irreconcilably inconsistent positions of the parties regarding the Complainant's allegation that she and the Respondent had a romantic or sexual relationship, in violation of the Romantic or Sexual Relationships Policy, between approximately December 2010 and December 2011.  The investigators have closely reviewed and considered all of the statements and documents contained in Appendix A and Appendix B.  The analysis below reflects the analysis most meaningful to the investigator's recommendation.  Because the factors considered by the investigators were broad, the discussion of these considerations does not lend itself to a linear narrative arc.  For ease of reading, the investigators organize the analysis into eleven general categories:  (1) Medical Record & December 30, 2010, Sexual Encounter; (2) The Complainant' Disclosure of the Relationship to Rachel Mathis; (3) The Complainant's Disclosure of the Sexual Assault to Her Sister; (4) Volume of Telephone & Text Message Communication Between December 2010 and December 2011; (5) March 31, 2012, and January 9, 2013, Text Messages; (6) Emails Between the Complainant and the Respondent Around the Time of the Alleged Romantic or Sexual Relationship; (7) Possible Date of Initial Sexual Encounter: Lab Logs, Phone Records, Emails, Text Messages; (8) Gifts; (9) The Complainant's and the Respondent's General Character and Behavior in the Lab; (10) Observations of the Complainant and the Respondent Together; and (11) Motive to Lie and Other Issues of Credibility.

*(1)      Medical Record & December 30, 2010, Sexual Encounter*

As detailed immediately below, the Complainant's January 27, 2011, Gannett Health Services medical record—particularly when considered together with her bank information showing she was in Ithaca on December 30, 2010, her email to Shannon Harvey on December 31, 2010, and her email to the Respondent on December 31, 2010—tends to support the Complainant's allegation of a sexual relationship with the Respondent.

The Complainant's January 27, 2011, medical record reflects that the Complainant reported that she was last sexually active on December 30, 2010 and that, at that time, she and her sexual partner used a condom that slipped.  The Complainant had a positive home pregnancy test on January 20, 2011.  The Gannett pregnancy screen was negative.  The health care provider attributed the positive home pregnancy test to a possible interaction with malaria medication.  In this setting, the Complainant was seeking medical care; it is reasonable to conclude that the Complainant was honest with her medical provider about her last date of sexual activity and the positive home pregnancy test.  See Appendix B, p. 5.

The Complainant's testimony that she was in Ithaca on December 30, 2010, is supported by her Bank of America statement, which shows that on December 30, 2010, the Complainant made deposits at a Bank of America ATM in Ithaca.  Appendix B, p. 555.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

35 of 63
RR0293

Confidential - Personal
Distribution Not Permitted

The Complainant's testimony that she was in contact with the Respondent during the time that she was in Ithaca at or around December 30-31, 2010, is supported by both the Complainant's and the Respondent's testimony and the Complainant's December 31, 2010, email to the Respondent.  See Summary of Events, #11, above.  The Complainant and Respondent both testified that, while the Complainant traveled to India during the 2010-2011 winter break, the Respondent cared for her cat.  Neither the Respondent, nor the Complainant, remembered the exact date that he began taking care of the cat.  The documentary evidence supports the conclusion that it began December 31, 2010.  On that day, the Complainant sent the Respondent an email with detailed contact information relative to his caring for her cat.  Appendix B, p. 608.  The Complainant's email to Shannon Harvey on December 31, 2010, further supports this conclusion in that it provides evidence that the Complainant left Ithaca for New York City by bus on December 31, 2010.  Appendix B, p. 556.

Moreover, the Complainant's December 31, 2010, email to Shannon supports the inference that, at that time, the Complainant was in an untenable romantic or sexual situation.  The Complainant wrote: "my life is always a mess, now I have a whole new hoard of interesting and complex problems . . . Feel a little like lady Brett Ashley."  Appendix B, p. 556.  During this investigation, the Complainant explained her literary reference as follows: "I must have just reread The Sun Also Rises.  I did mean that my love life was getting me in trouble because I had just slept with the Respondent.  That vague allusion is all Shannon knew about the relationship.  I never told her about the sexual nature of my relationship with the Respondent and I don't think that she had any context to understand my statement."  Appendix B, p. 565.

With respect to the Respondent's denial that the Complainant had sex with him on December 30, 2010, and his suggestion that she could have had sex with anyone else, in considering the plausibility of the Complainant's claim it is relevant that by December 30, 2010, the Complainant had broken-up with her longtime boyfriend Mohammad Hamidian and that, per Mohammad's testimony, they were not involved after their break-up.  According to the Complainant's testimony, she was pursuing her high school boyfriend at that time.  He, however, was not in Ithaca and, also, according to the Complainant's testimony, turned her down that winter.[27]  Furthermore, according to the Complainant's, the Respondent's,          and Eliza's testimony, the Complainant's next known boyfriend after Mohammad, apart from the Respondent, was Yariv Yanay, who she did not start dating until December 2011.  That the Complainant does not admit to and others were not aware of another man in the Complainant's life in Ithaca on December 30, 2010, does not mandate the conclusion that the Complainant's testimony that she slept with the Respondent on December 30, 2010, be credited, but it does make that testimony more plausible.

---

[27] The Respondent, during the course of the investigation and in his comments in Appendix C, suggests that the investigators erred in not interviewing the Complainant's high school boyfriend.  The investigators concluded that, in light of the testimonial and documentary evidence, this line of inquiry was speculative and not necessary.  If the Dean finds that this point is pertinent to her analysis, at the Dean's request, the investigators would explore this line of inquiry.

454

Furthermore, both the Complainant and the Respondent testified that the Complainant referenced pregnancy while riding the 10 Bus, which does stop in the Respondent's neighborhood and across from Gannett Health Services. The Complainant and the Respondent characterize the conversation differently. The Complainant testified that she disclosed to the Respondent that she was concerned that their sexual encounter resulted in a pregnancy and that she was going to have a pregnancy screen. The Complainant testified that the Respondent knew her position that, if the outcome of sex was a pregnancy, then there would be a baby. Appendix A, p. 27-28. The Respondent testified that the Complainant asked his thoughts about a graduate student having a baby. The Respondent believed this conversation was after the Complainant returned from India, but he could not remember how long after. Appendix A, p. 67. The fact that both parties agree that they discussed a graduate student having a baby is indicative of the truthfulness of the Complainant's version that conversation arose out of her concern that the Respondent had impregnated her, rather than the Respondent's version that a student asked her PI, with no contextual reason offered, his thoughts about a graduate student having a baby.

Finally, the medical record supports the Complainant's testimony that "condoms tended to fall off of the Respondent when he was pulling out." Appendix A, p. 27. The Complainant made the statement that the condom had slipped during sex on December 30, 2010, to Gannett Health Services, where she would have had no reason to lie. This statement was made on January 27, 2011. To believe that it was fabricated as part of an ultimate plot to interfere with the Respondent's career would require the highly implausible inference that the Complainant began to lay the foundation for a plot to derail the respondent's tenure case approximately four years prior to bringing the alleged romantic or sexual relationship forward to the institution. This is particularly compelling and contrary to the Respondent's fabrication argument because, on September 30, 2011, 9-months <u>after</u> she disclosed to Gannett that she had sex on December 30, 2010, the Complainant wrote the Respondent a highly favorable letter as part of his Third-Year Review. See Appendix B, p. 522.

The Complainant provided this testimony regarding the condom having slipped on April 2, 2015. At which time, she did not have a copy of the medical record to provide to the investigators. Rather, after the interview, the Complainant signed a waiver permitting Gannett Health Services to release the record directly to the investigators. The Respondent suggests that the Complainant may have recounted an experience with another sexual partner and attributed it to the Respondent. The Respondent's speculation is less plausible that the Complainant's testimony taken together with the testimonial and documentary evidence in this investigation.

### (2)    *The Complainant's Disclosure of the Relationship to Rachel Mathis*

Pursuant to the Complainant's testimony, the first person she told that she was in a relationship with the Respondent was her college friend Rachel Mathis in spring 2011. As explained below, Rachel's testimony corroborates the Complainant's testimony. See Appendix A, p. 122-123.

Rachel testified that the Complainant told her that she was in a relationship with the Respondent and that it was complicated. Rachel testified that the Complainant told her that she was uncomfortable, that the relationship was a situation she needed to get out of, and that no one

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

37 of 63
RR0295

Confidential - Personal
Distribution Not Permitted

could know about the relationship. Rachel also testified that the Complainant told her that the Respondent had a bad temper and that he threw something at or towards her in a lab or workroom.

Rachel testified that the Complainant shared with her that she was in a relationship with the Respondent while the relationship was ongoing. Rachel knew that she was, for a period of time, the only person who the Complainant told about the relationship. Rachel did not have a specific memory of the date when the Complainant first told her about the relationship. Rachel knew that at least some of their conversations while the Complainant was in a relationship with the Respondent occurred while Rachel lived in Iowa, which was from 2011 through 2012. This is consistent with the Complainant's testimony that she disclosed the relationship to Rachel in the spring of 2011.

Rachel's testimony is significant to this investigation for two reasons. First, Rachel's testimony does corroborate the Complainant's that she was in a relationship with the Respondent that she kept a secret. However, as the Respondent argues, all of Rachel's information was based solely on what the Complainant told her. That the Complainant told her account to many people or a very few people, does not necessarily make the account more or less true.

Second, and more importantly, Rachel's testimony establishes when the Complainant first told someone that she was in a relationship with the Respondent. This sets the time at which the Complainant would need to be initially motivated to fabricate a relationship with the Respondent as spring 2011, which is only a few months before the Complainant wrote the Respondent a glowing letter for his Third-Year Review, a year and half before the Complainant left the Respondent's lab, three years before she wrote a negative letter for his tenure review file, and more than three years before she brought the relationship to the attention of the University. Notably, it was not until nearer to the time of her interview that the Complainant told Rachel about the sexual assault allegation. The sexual assault allegation, therefore, does not have the same timeframe with respect to identifying the time at which the Complainant would need to be initially motivated to fabricate a sexual assault allegation, if it were found to be a fabrication. Arguments relative to the Complainant's motives to lie are set forth and analyzed in greater detail below.

The Respondent's argument that when the Complainant disclosed that she was in a "relationship" with the Respondent, that they were "involved," and that it was secret she might have been talking to Rachel about a non-sexual or romantic relationship, see Appendix C, p. 24-25, is a tortured interpretation of commonly used language that should be given its clear meaning in the context of Rachel's testimony.

*(3)    The Complainant's Disclosure of the Sexual Assault to Her Sister*

In late fall 2011, the Complainant disclosed to her sister ▉▉▉▉ that she was in a relationship with the Respondent. Appendix A, p. 104-108.

As with Rachel's testimony, ▉▉▉▉ testimony provides relevant information about the time at which the Complainant would need to be initially motivated to fabricate a relationship with the

Respondent, if the allegation were to be discredited. The Complainant disclosed the relationship to ▮▮▮▮ between seeing the Complainant during a family trip to Georgia in late fall 2011 and Thanksgiving 2011, which was November 25, 2011. ▮▮▮▮ testified that the Complainant told her that she was sleeping with the Respondent and that she wanted to marry him. The Complainant told her that no one knew about the relationship and that ▮▮▮▮ was the only one in their family that she told. The Complainant did not tell ▮▮▮▮ about the sexual assault allegation until later. The Complainant's very positive account of the relationship to her sister is consistent with the very positive review that the Complainant gave the Respondent on September 30, 2011. Appendix B, p. 522-523.

▮▮▮▮ testimony is also relevant because she observed the Complainant in late fall 2011. During their family trip to Georgia, ▮▮▮▮ observed that the Complainant was very skinny and was acting weird including grabbing the skin between her forefinger and thumb and physically rocking. The Complainant's father, who is a doctor, asked ▮▮▮▮ if the Complainant was using drugs. ▮▮▮▮ observations are consistent with the Complainant's testimony that, at that time, she was crying and not eating and that she went to Gannett for headaches and the doctor told her to rub the skin between her forefinger and thumb to help prevent tension headaches. There is a reasonable inference that the physical condition was the result of anxiety around her secret relationship with the Respondent.

The text messages provided by ▮▮▮▮ are documentary evidence that by 2012 the Complainant had told ▮▮▮▮ both about her relationship with the Respondent and that the relationship was over. On July 13, 2012, the Complainant text messaged ▮▮▮▮ saying that the Respondent called the Complainant, "emotionally fragile because [she] cried when he yelled at [her]." ▮▮▮▮ responded: "Tell him when he looks weak, him and then yells at him all the time for not living up to crackpot ideals, then he can start calling you fragile." Appendix B, p. 12-13. On October 9, 2012, the Complainant had a text message exchange with her sister ▮▮▮▮ in which the Complainant references having "dumped" the Respondent and that the Respondent "should have kept his dick in his pants." Appendix B, p. 11-12.

> (4)   *Volume of Telephone & Text Message Communication
> Between December 2010 and December 2011*

The Complainant provided her telephone records for communications between the Complainant's cell phone and the Respondent's between May 2010 and June 2012. Appendix B, p. 211. The records show that there was an increase in communication between the Complainant and the Respondent between February 2011, by which time the Complainant would have returned to the lab after her trip to India, and January 2012, with the volume of calls and text messages between February 2012 and June 2012 remaining greater than the volume had been prior to February 2011. Appendix B, p. 212. The records also show that beginning in February 2011, and continuing throughout the provided records, the Complainant and the Respondent had significant volume of contact between 8:00PM and 1:00AM. Appendix B, p. 212.

That the initial increase in the volume of communication and the late night communication coincides with the period of time during which the Complainant alleges she and the Respondent began a romantic relationship supports the inference that in early 2011 there was some change in

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

39 of 63
RR0297

Confidential - Personal
Distribution Not Permitted

the nature of the relationship between the Complainant and the Respondent. The increased volume and the late hours are both consistent with the relationship transforming from one that was appropriately professional to one that was more personal. There may, however, be a possible alternate explanation for the increased communication and the late hour, which should be considered. For example, an increased workload in the lab and the uncontested testimony that the Respondent regularly worked late into the night. In addition, there only a slight decline in volume, not a return to the 2010 level, after January 2012, at which time the Complainant testified the romantic relationship was over.

Neither the Complainant, nor the Respondent, could provide the content of their text messages during that time. The Complainant testified that she deleted the text messages with the Respondent when she moved to Maryland because she found rereading them to be upsetting. Appendix A, p. 14. The Respondent testified that he had several new phones since that time and he was only able to retrieve text messages from March 31, 2012, and January 9, 2013. Appendix B, p. 372. See below analysis of the content of these text messages. The investigators do not, as the Respondent suggests, draw a negative inference from the fact that the other party has maintained text messages from 2010-2012. Neither party had an obligation to do so under Cornell policy. Moreover, with the common turnover of smart phones, neither party would reasonably be expected to have retained his or her phone or messages from that time period. Finally, the time that the Complainant moved to Maryland in January 2013 was far in advance of her decision to bring the allegations addressed herein to the attention of Cornell.

Because the content of the text messages is not available to review for further evidence of a causal connection between the increased communications, there is only a correlation. The correlation does, however, make the Complainant's allegation more plausible.

> (5)    *March 31, 2012 and January 9, 2013, Text Messages*

The Respondent provided the content of his text messages with the Complainant between March 31, 2012, and January 9, 2013. Appendix B, p. 372. The text messages provided include approximately 87 texts between the Complainant and the Respondent. Approximately 61 of which are from the Complainant and 26 are from the Respondent.

A portion of the text messages do not reflect an inappropriate relationship between the Complainant and the Respondent. For example, they regard their work in the lab or regard the Complainant driving or picking-up the Respondent, who does not drive. The majority of the texts do not fall into this category. The majority of the text messages between the parties are casual and not related to work. Several of the text messages are regarding the Complainant's cats. The Complainant, consistent with the Respondent's testimony, on several occasions seems to be speaking playfully in the voice of the cat, sending messages like, "I miss my belly rubs" and "I miss you," accompanied by pictures of the cat.

The text messages also include unprompted text messages from the Complainant at 1:00AM on May 6, 2012, saying that she can't sleep and at 10:56PM on May 11, 2012, saying, "How are you, I miss ya_". These text messages were sent only days after the May 2012 trip to the Biosphere in Arizona, see Appendix C, p. 36, during which the Complainant alleges that she and

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

40 of 53
RR0298

Confidential - Personal
Distribution Not Permitted

the Respondent had sex in his hut and Collin Reynolds testified that he saw the Complainant laying across the Respondent sleeping on the flight, see Appendix A, p. 26, 166.  These text messages also coincide with emails discussed on page 45 below on included in Appendix B, p. 96.   The Respondent, in his response to the draft report, provided the specific dates of the trip to the biosphere and argued that the fact that one of the sexual encounters specifically recounted by the Complainant during the investigation occurred after the time at which she alleges the relationship ended is an inconsistency that bears on her credibility.[28]

These text messages, as well as several others, are not typical of a professional relationship between a faculty member and a student under his direct supervision.  The Respondent has argued that this lack of professionalism is entirely attributed to the Complainant's personality and is not suggestive of a romantic or sexual relationship.  In support of this argument, the Respondent notes that these text messages are from after the time of the alleged relationship and that the majority of the text messages are from the Complainant to the Respondent.

The Respondent's argument is belied by the fact that he does not respond in writing—as one would expect a faculty member to do—to the text messages in a manner that would put a stop to, or at least discourage, the Complainant's behavior.  Being a young, new faculty member could account for this shortcoming; however, these text messages were three years into his time as a faculty member at Cornell and long after spring/summer 2011 the time at which the Respondent testified that the Complainant told him that another graduate student, Kasturi Saha, asked if the Complainant had a crush on the Respondent, which per the Respondent's testimony, caused him to see he had to "take a step back" from the Complainant.  Appendix A, p. 46.

     (6)    ***Emails Between the Complainant and the Respondent Around the Time of the Alleged Romantic or Sexual Relationship***

At the request of the investigators, the Complainant and the Respondent each provided the emails between them during the approximate time of the alleged romantic or sexual relationship.  The emails provided by each party did not precisely match the emails provided by the other.  Both provided many emails related to their work in the lab, as well as emails that were not.  Emails unrelated to the lab relevant to considering the nature of their relationship are highlighted below.

- On September 16, 2010, Complainant sent the Respondent an email stating:

    Ha ha, funny story. Speed dating is not tomorrow. You had to sign up by tomorrow in order to participate on 9/26.... I guess this explains the lack of email. So plenty of time for prep work...

    Plus, I know you like old movies and felt very alone your first year of college...

---

[28] In consideration of the totality of the circumstances addressed in this report and included within the appendices, that this sexual encounter was in 2012 does not change the investigator's recommendation in this matter.  If the Dean finds that this point is pertinent to her analysis, at the Dean's request, the investigators would explore this line of inquiry.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

41 of 63

**RR0299**

Confidential - Personal
Distribution Not Permitted

Confidential

Appendix B, p. 29. The Complainant testified that, prior to her alleged romantic or sexual relationship with the Respondent, she had talked to the Respondent, and others, about needing to find the Respondent a girlfriend so he would not be in the lab all of the time.

- On November 16, 2010, at 4:57PM, the Complainant sent an email to the Respondent that included the following: "I have a crazy suggestion, instead of doing analysis . . . you could do this thing, I know you do it very seldom so you might find it a little strange . . . but you could sleep . . . crazy, I know." Appendix B, p. 167. On the same day, at 9:31PM, the Complainant sent the Respondent the following email: "You know, if you would just go to sleep occasionally without stressing out, we could have man-appreciating Mondays ;)" The Respondent testified that he did not specifically remember what the Complainant meant by "man-appreciating Mondays," but that she did make a big deal about having women appreciation weeks because she was the only woman in the lab.

- On May 29, 2010, the Complainant sent the Respondent an email regarding a work related trip to Boston in which she suggested: "we could check out the dog shelters in Boston (they should have more of a selection.)" Appendix B, p. 18. The Complainant also suggested that, if the Respondent was bored, he should shop for a computer for her. Appendix B, p. 18. The Respondent replied with the "cart details" for a Lenovo computer for the Complainant to purchase using a discount coupon he had from a prior purchase. Appendix B, p. 19.

- On July 5, 2010, the Complainant sent the Respondent an email saying, "I did some research and chows tend to make good apartment/busy people dogs! Let me know if you want to go check her out." Appendix B, p. 28. The Complainant, and other witnesses, testified that the Complainant talked about the Respondent getting a pet so that he would not be in the lab all of the time.

- On January 1, 2011, at 3:32AM, the Complainant wrote the Respondent an email stating: "███ has my phone/perhaps the Egyptian cab driver miss you . . . ." Appendix B, p. 210. At 4:51AM, the Respondent responded: "so one of them was responsible for the prank calls? These 'egyptian' cab drivers can get pretty drunk I guess." Appendix B, p. 209-210. At 7:31AM, the Complainant wrote: "okay…slightly worried about my sister. . . ." Appendix B, p. 209-210. At 7:37AM, the Respondent responded: "I was worried about you . . what's going on? I get a strange email from you, and a couple of calls from google phone with no one answering me late on new year's day.. should I call your phone, should I call someone, should I just ignore it?" Appendix B, p. 209-210. At 8:02AM, the Complainant wrote: "yeah, Amanda got my phone at the end of the night. . . . . and I could not figure out how to use google phone . . ." Appendix B, p. 209-210. The Complainant emailed again at 8:08AM and 8:54AM and the Respondent at 8:19AM. Appendix B, p. 209-210. At 12:41PM, the Respondent wrote: "Hey, sorry I got a little snappish.. All I could register in my half-asleep state was Party . . . ███ . . . alcohol . . . weird phone calls . . . ███ in trouble . . . F***!" Appendix B, p. 861.

Confidential - Personal
Distribution Not Permitted

- On January 12, 2011, the Complainant sent the Respondent an email from India that included the following: "PPPS. I am mad at you for not picking up . . . You should probably call when you wake up." Appendix B, p. 192.

- On January 14, 2011, the Complainant wrote to the Respondent from India and asked him questions about his religious beliefs and about poverty. On the same day, the Respondent provided an email response sharing his thoughts on both subjects. Appendix B, p. 206-208. The Respondent's email began: "pretty weird email to get at 3:00 in the morning, and just got back after a long day/chat about Generation 1. But here goes . . .." Appendix B, p. 206.

- On January 17, 2011, the Complainant sent the Respondent an email, entitled "You're in serious trouble mister," regarding the Respondent emailing slides to his class in which she wrote: "Oh yes, send them soon or you will be in serious trouble with me;" and "Packing up and getting ready to go. I'll call you in the Kolkata Airport and let you know how the flight looks, then possibly again in Delhi, but we will be running to make our connection so I might not . . . Then I will call you once I am safely at ▮▮▮▮▮▮ in New York." Appendix B, p. 191.

- On January 18, 2011, at 4:06AM, the Complainant sent the Respondent the following email, entitled "Prompt Response": "Hey mister . . . When I send emails at 11PM your time, I expect a response! Call you soon at Turkish IST, so about 8am your time to let you know I am leaving Kolkata for Deli." Appendix B, p. 204-205. At 5:34AM, the Respondent responded: "Have to catch a flight that I'm catching in (10min).. so bagheera[29] and I called it an early night. Will be in the air when you call.. will text when I land." Appendix B, p. 204. With regard to this email, the Respondent testified that they would work on the experiment late into the night and the Complainant, who was a very nice person, would express concern about him working very late. Appendix A, p. 52.

- On February 1, 2011, at 11:14PM, the Complainant sent the Respondent the following email:

    Hello darling,

    Julia and I are bunking up which is why I haven't called you. I am off to sleep now, but I would like to, hoping that things go as planned tomorrow, pick you up from the airport. I really appreciate you and can't wait to show you how I feel. I hope you're having a good time and I am sure you are blowing the other scientists' minds.

    So what time do you get in?

Appendix B, p. 205. The Respondent testified that after receiving this email he had a conversation with the Complainant and told her to leave her cat with Vatsan, but the cat

---

[29] The cat.

Confidential - Personal
Distribution Not Permitted

actually disliked Vatsan. The Respondent further testified that, at the time of this email, the Complainant's roommate Julia was having a psychological issue and the Complainant was worried that Julia would hurt the cat, so the Respondent gave the Complainant a key to his house so that she could leave the cat at his house while he was out of town. Appendix A, p. 51. The Respondent provided an email to his landlord from February 7, 2011, asking the landlord to let the Complainant into his house because he was out of town and the Complainant had lost the key. Appendix B, p. 188.

- On March 11, 2011, the Complainant sent the following email to the Respondent: "Good morning sunshine!" Appendix B, p. 174. Notably, this email was not included in the emails provided by the Respondent, nor did he provide any response objecting to the Complainant's informality.

- On March 25, 2011, at 9:52AM, the Complainant sent the Respondent the following email:

  Hey Babe,

  I can't find my phone. Is it at your place?

- Appendix B, p. 197.

- On March 25, 2011, the Respondent rep . . . . . . been trying to call your number for the last 30mins. . its either dead or at your place." Appendix B, p. 197. Notably, the Respondent's response does not object to the Complainant using such an informal salutation. The Respondent testified that he did not know why her phone would be at his house. Appendix A, p. 52. He speculated that maybe she left her phone after a group dinner or after dropping off the cat. Appendix A, p. 52. The Respondent testified that "hey babe" was just the type of thing she would say and that he would sometimes call her out on it at group meetings, but not always. Appendix A, p. 52. The Complainant testified that the Respondent never confronted her about any of this or told her that it was unprofessional. Appendix A, p. 23. There was also no third party testimony that the Respondent disciplined the Complainant's use of informal or intimate language in the lab or other settings.

- On November 17, 2011, the Complainant sent the Respondent the following email: "Sickness is all in the mind :P Hope your enjoying the snow . . . we are going somewhere to look at something on Saturday . . . be ready." Appendix B, p. 118

- On December 7, 2011, the Complainant sent the Respondent an email that just said "hello." Appendix B, p. 119.

Emails between the parties continued after the end of the alleged romantic or sexual relationship.

- On January 19, 2012, the Complainant sent the Respondent an email entitled "Abstract Rough Draft" that was as follows: "It's like sandpaper rough . . . the Packers post season

rough . . . your face rough . . .." The Respondent testified that this email was in regard to a rough draft and was demonstrative of the type of unprofessional language the Complainant used. Appendix A, p. 52. Notably, there is no response by the Respondent to the Complainant's reference to the roughness of his face.

- On March 5, 2012, the Complainant sent the Respondent the following email at 8:57PM: "Hope your having fun. Calling you to talk." Appendix B, p. 96. This email was sent during their May 2012 trip to the Biosphere in Arizona.

- On March 7, 2012, the Complainant sent the Respondent an email that included the following: "Travel safe today. Call me when you get to my native land :-)" Appendix B, p. 93.

- July 24, 2012, the Complainant sent the Respondent the following email at 3:15PM:

  They were concerned about you because apparently I left the office with death in my eyes...
  Collin said you were just asking for it and Vatsan laughed a lot....
  :-P
  No worries,
  I'll get you back one day.

  Appendix B, p. 200. At 3:33PM, the Complainant sent the Respondent the following email: " What to make fun of me some more, I can't diagonalize a 2X2 matrix. . . ." Appendix B, p. 201.

- On October 12, 2012, the Complainant sent the Respondent the following email at 8:04PM: "About to put my pizza in the oven, want to come eat dinner? I tried to call but your phone is dead . . ."

The Respondent's response to the tone and content of the Complainant's emails is, generally, that the emails are primarily from the Complainant and they demonstrate the way in which she was unprofessional and inappropriate.

Several witnesses echoed the impression that the Complainant's interactions with the Respondent deviated from what is expected in a faculty-student relationship. For example: Collin Reynolds testified that his impression was that the Respondent and that Complainant were closer than a graduate student and professor should be, although it did not seem overly inappropriate to him. Appendix A, p. 166. Kasturi Saha testified that the huge amount of time that the Complainant spent with the Respondent in and out of the lab prompted Kasturi to ask the Complainant if she was had a crush on the Respondent. Appendix A, p. 171. Prof. Schwab testified that the Complainant was a very unusual graduate student because she would never display any sort of professional respect for the Respondent. Appendix A, p. 157. ▓▓▓▓ the Complainant's sister, before learning of the alleged relationship, thought that the Complainant buying the Respondent a shirt and the Respondent cat-sitting were not things that she would do with her boss. Appendix A, p. 105. Shannon Harvey observed that the Complainant was

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

45 of 63
RR0303

Confidential - Personal
Distribution Not Permitted

friendly with the Respondent and opined that "it's a common power dynamic in graduate school that a grad student will think that being friendly with professors makes them important, and will 'show off' by talking about them, and that's how I perceive what all that was about now." Appendix A, p. 163.

The Complainant does not dispute that the emails—or, for that matter, text messages and other communications—do not reflect a professional relationship with the Respondent. The Complainant attributes the casual, familiar, and, at times, intimate tone of the emails to the fact that she and the Respondent were having or had had a romantic relationship. She notes that terms of endearment in the emails, specifically "darling" and "babe," are ones that she reserves for men with whom she is in a relationship, as opposed to "honey," a term that she uses when speaking to many people because she is from the South.

The emails—in consideration of the volume of the emails, the familiar and, at times, intimate tone, and the fact that the Respondent's few written responses are also familiar and do not correct the Complainant's conduct—support the conclusion that the relationship between the Complainant and the Respondent was not the professional relationship expected between a faculty member and a student he supervises. The emails do not, however, require the conclusion that the relationship was romantic, although they tend to lend credibility to the Complainant's allegation.

> (7) **Possible Date of Initial Sexual Encounter: Lab Logs, Phone Records, Emails, Text Messages**

The Complainant has consistently testified that she does not remember the precise date of the initial sexual encounter. She attributes her lack of memory in part to the time that has passed and in part to the fact that they had other sexual encounters over the course of approximately a year thereafter. Identifying the exact date of any single sexual encounter is not necessary under the Romantic or Sexual Relationship Policy. The fact of any romantic or sexual relationship during any period of supervision is sufficient.

That said, the investigators closely reviewed the available documentary evidence to determine whether that evidence conclusively precluded all dates from the alleged time period from being the possible date of the first sexual encounter or established a date or dates as the likely date of the alleged sexual encounter. Specifically, the investigators closely compared (1) the Complainant's cell phone records, (2) the Complainant's December 15, 2010, text messages with Vatsan, (3) the lab logs for M1, (4) the Respondent's emails from December 15-16, 2010, and (5) the Complainant's January 27, 2011, medical record. The investigators analyzed these records in light of the Complainant's account that: the first sexual encounter occurred between her returning from Thanksgiving and leaving for winter break; that the Respondent was not in the lab when she expected him to be; that she called the Respondent's cell phone several times and he did not answer or return her calls; that she believes that calls were from her cell phone, but she could have called him from the landline in the lab; that she went to the Respondent's home around 7:00PM; that the Respondent told her he was working on grants and had worked from home; that she did not have her period during the first sexual encounter; and that she did not remember anyone else in the lab the next day.

Upon close analysis, the documentary evidence does not conclusively preclude all dates in the relevant time period, nor does it conclusively establish any date in that period as the date of the alleged first sexual encounter. The analysis also demonstrates that no one day in the relevant time period conclusively meets all of the elements of the Complainant's account. On balance, as described below, the documentation establishes December 15, 2010, as the most likely date to correspond to the Complainant's account that she was unable to reach the Respondent and, as a result, went to his home in the evening.

### (i)    Cell Phone Records

The Complainant's cell phone records reflect eleven days between November 29, 2010, and December 15, 2010, in which she received no incoming contact from the Respondent. On six of these days the Complainant called or texted the Respondent without reply (specifically, November 30, 2010, and December 2, 3, 9, 10, and 15, 2010) and on five days there were no cell phone calls or texts, incoming or outgoing, between them (specifically, November 29, 2010, and December 4, 6, 12, and 13, 2010).

On November 30, 2010, the Complainant made two calls at 10:11AM and 12:06PM. On December 2, 2010, the Complainant made one call at 10:15AM. On December 3, 2010, the Complainant made one call at 10:15AM. On December 9, 2010, the Complainant made one call at 9:37AM. These mid-morning calls are not consistent with the Complainant's account that she went to his house in the evening because he had not returned her calls and was not in the lab when she expected him to be, particularly because there was consensus among witnesses that it would not be unusual for the Respondent to stay very late in the lab and then arrive after 10:00AM on days when he was not teaching.

On December 10, 2015, the Complainant made five outgoing calls between 11:28AM and 11:45AM and one outgoing text message at 11:55PM. She did, however, receive a text message from the Respondent at 1:14AM on December 11, 2010. Again, the relative early hours of the calls is not consistent with the Complainant's account that she went to his house in the evening because he had not returned her calls and was not in the lab when she expected him to have been, nor would it be likely that he texted her while she slept at his house.

On December 15, 2010, the Complainant made four outgoing calls to the Respondent's cellphone at 12:59PM, 3:26PM, 5:13PM, and 7:40PM,[30] and one outgoing text at 2:31PM. The time of this series of calls and the text messages is consistent with the Complainant's account that she went to the Respondent's home in the evening because he had not returned her calls and was not in the lab when she expected him to be.

---

[30] Notably, consistent with this phone record, during her February 16, 2015, interview, prior to her having obtained her phone records from her carrier, the Complainant testified that she went to the Respondent's house around 7:00PM. Appendix A, p. 4.

Confidential - Personal
Distribution Not Permitted

### (ii)    Text Messages

On December 15, 2010, the Complainant sent text messages to Vatsan at 3:45PM saying: "Hey, Mukund's not there . . . Is he?" To which Vatsan responded: "nope, not yet." At 5:17PM, the Complainant sent Vatsan another text message saying: "Still not there?" to which Vatsan respondent, "no, not yet." These text messages are consistent with the Complainant's account that she was looking for the Respondent and the Respondent was not in the lab. These text messages also reflect that at the time they were sent the Complainant was also not in the lab because she would not have needed to ask Vatsan whether the Respondent was in the lab if she was in the lab. The amount of time the Complainant was absent from the lab is not clear from the documentary evidence. Thus, whether the Respondent was in the lab working at some time on December 15, 2010, unknown to the Complainant, during the period when she was absent, is not clear from the documentary evidence.

### (iii)    Lab Log

In the later stages of the investigation, after the investigators made further inquiry into these dates, the Respondent suggested that the lab log could provide information regarding who was in the lab on a particular date and what work they were doing.

Handwritten[31] entries in the lab log are considered herein to support an inference as to whether or not the Complainant or the Respondent was in the lab on a particular day. The lab log is not, however, a sign-in or sign-out sheet for the lab. There was no procedure in place for monitoring who was in the lab at any given time or precisely what each individual did on any given day. Moreover, on a given day, an individual may be in the lab but never have reason to make an entry in the lab log. Finally, the lab log could be subject to notes being written on a date other than the date indicated or to possible manipulation. The investigators suggest that it would be very unlikely that a significant modification to the lab log would be made to intentionally manipulate this analysis because the investigators have no reason to believe any individual involved herein would jeopardize the scientific integrity of the log.

With respect to November 29, 2010, and December 4, 6, 12, and 13, 2010, the dates on which there were no calls between the Complainant and the Respondent, these days are not likely to be the date of the alleged initial sexual encounter because, as the Complainant testified, the Complainant believed she called the Respondent from her cell phone and on these days the handwriting in the lab log shows the Respondent's handwriting on the log after the Complainant, or the Complainant not writing in the log at all. See Appendix B, p. 705-707, 720, 730, 757-762, and 762.

Similarly, on December 3, 9, and 10, 2010, both the Complainant and the Respondent make substantial entries in the log, making it less likely that the Respondent was absent from the lab when the Complainant expected him to be present. Appendix B, p. 718-720, 746-750, and 755.

---

[31] Both the Complainant and the Respondent identified their own handwriting, the other's handwriting, and Vatsan's for the investigators.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15                    RR0306                    49 of 63

Confidential - Personal
Distribution Not Permitted

On November 30, 2010, the Respondent's handwriting is only found on the graphs inserted into the lab log. Appendix B, p. 709.

There is no lab log entry for December 2, 2010, although there are entries in the Respondent's handwriting on the December 1, 2010, log reflecting that he worked into the early morning hours of December 2, 2010. Appendix B, p. 713. The absence of a log entry dated December 2, 2010, could suggest that the Respondent was not in the lab, but may also suggest that the experiment was not run that day.

December 15, 2010, the day on which the phone records are most consistent with the Complainant's account, is also the day on which the lab log is most consistent with the Complainant's account, although not definitively so. The lab log reflects that the Respondent worked overnight from December 14, 2010, to 7:40AM on December 15, 2010, when he left the lab. Appendix B, p. 764-765. The Complainant's handwriting shows that she logged the routine benchmarking, which is done by the first person in the lab on any given morning. Appendix B, p. 764. The handwriting in the lab log also shows Vatsan was working in the lab that day. Appendix B, p. 764-765. The Respondent's handwriting appears with the single note, "Need more power," written on the graph inserted in the December 15, 2010, log. Appendix B, p. 765. The Complainant contends that this note could have been added on December 16, 2010, when the Respondent reviewed the work she and Vatsan did in the lab on December 15, 2010. The final note in the log was made by Vatsan, demonstrating that Vatsan was present when the experiment was left overnight, but not indicating whether anyone else was also there. Appendix B, p. 765.

In addition to the lab log for December 15, 2010, the Respondent reviewed the online lab file for that day. From the online file, the Respondent provided information that the Complainant's work reflected in the log was completed around 11:00AM on December 15, 2010. Appendix B, p. 628. The Respondent also provided information and documentation that at 12:30PM there was a continuation of ODT logging and at 1:10PM, 1:47PM, and 1:52PM new sequences were created. Appendix B, p. 628 and 85. The Respondent claims that this was work only he could have done, see Appendix B, p. 628, and the Complainant contends that both she and Vatsan could have done this work, see Appendix A, p. 36-42, and Appendix B, p. 572. There were no written policies for the lab indicating specifically what work each graduate student was permitted or qualified to do at that time.

Pursuant to the Complainant's account, both she and the Respondent were in the lab the day after the first sexual encounter and she did not remember any other students in the lab. The Complainant's handwriting is not in the lab log for December 16, 2010. Appendix B, p. 765. Notably, Vatsan took the benchmarks that day indicating that he was in the lab, at least when the experiment was first run in the day. The log and testimony reflect that the Complainant generally took the benchmarks because she was generally the first person in the lab. Appendix B, p. 765. This could reflect, as the Complainant suggests, that she arrived at the lab later than usual due to the sexual encounter. This could reflect, as the Respondent suggests, that she was not present in the lab that day.

<strong>(iv)    <em>The Respondent's December 15-16, 2010, Emails</em></strong>

At the investigators' request and after notifying the Respondent, Cornell Information Technologies pulled the Respondent's Cornell emails from December 15-16, 2010.  See Appendix B, p. 771.  The Respondent did not have any outgoing emails during this time period. The emails are, therefore, of very limited relevance because without outgoing mail they do not necessarily correlate with what the Respondent was actually doing at this time.

One incoming email does tend to correlate with the Complainant's account that the Respondent said that he was doing work related to a grant when she arrived at his home on the evening of the alleged first sexual encounter.  On December 16, 2010, the Respondent received an email from Booz, Allen, and Hamilton, a consulting firm, which stated:

> Here is the language that you should use to acknowledge the support from the seedling: "This work was supported by the DARPA QuASAR program with a grant from ARO".  Make sure to include this in any publication that comes out of this effort; you may want to also acknowledge the support from any other agencies that helped fund your work.
>
> In addition, make sure to send Jamil, Peter and me a copy of your preprints whenever you have them ready for submission.

Appendix B, p. 772.  Moreover, it is not contested that in December 2010 the Respondent had a DARPA grant and that he had an upcoming funding review in Tuscan on January 19-20, 2011, at which he would need to show milestones had been met.  Appendix A, p. 59.  The Respondent further explained that he had DARPA reviews every four to five months and that he would have been working in the lab to meet milestones, not working from home, if he were working to prepare for his DARPA funding review.  Appendix A, p. 48 and 59.  This leaves the questions of the Respondent working at home on December 15, 2010, in some doubt, but does not settle the question.  As such, the investigators cannot give it substantial weight.

The Respondent also received an email on December 16, 2010, indicating that he had met with a prospective student on or around that date, which he argues is suggestive that he was on campus. Appendix B, p. 775

On December 15, 2010, the Respondent was forwarded an email regarding grading for the Fall semester, which he had previously received on December 14, 2010.  Appendix B, p. 834.  The email indicates that the deadline for entering grades is 72 hours after the final.  Appendix B, p. 834.  The Respondent argues that this is a submission that he would have done from his office computer, not from home, and, therefore, it can be inferred that he was on-campus that day. Appendix B, p. 628.  The Respondent's emails do not, however, reflect on what day he submitted his grades.

<strong>(v)    <em>Medical Record</em></strong>

The Complainant testified that she did not have her period during the first sexual encounter.  Her January 27, 2011, Gannett Health Services medical record reflects that her last menstrual period

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

RR0308

50 of 63

Confidential - Personal
Distribution Not Permitted

was December 20, 2010, and before that was November 24, 2010.  Therefore, all of the dates between November 29, 2010, and December 17, 2010, would be consistent with the Complainant's testimony that she did not have her period.

In sum, taking all of the evidence set forth above in item (7), no date definitively matches the Complainant's account, but not every date in the relevant time period is definitively excluded from possibility; and December 15, 2010, is most reasonably consistent with the Complainant's version.  The investigator cannot, however, establish that December 15, 2010 is more likely than not the date of the alleged first sexual encounter.  That the precise date of an alleged first sexual encounter cannot be established with certainty does not require the conclusion that the sexual encounter did not occur, although it is a factor that may be considered in determining the strength of the credible evidence in support of the allegation.

     *(8)*    ***Gifts***

The Complainant asserts that the gifts she received from the Respondent are further evidence that they had a romantic or sexual relationship.  The Complainant alleges that the Respondent gave her earrings, a Teavana tea set, an iPad, a cat tree, a heart rate monitor, an arm band for her iPhone 4, and a microwave.  Appendix B, p. 562-564 (including photographs of the earrings, tea set, iPad and cat tree).

During his March 3, 2015, interview the Respondent reviewed the list and photographs of the gifts that Complainant alleged she received from him.  Appendix A, p. 53.  The Respondent testified that he bought the cat tree while he was cat sitting during the Complainant's trip to India and that he bought the Complainant the tea set for Christmas or her birthday because she drank a lot of tea.  The Respondent did not remember the heart rate monitor or the arm band, but did remember that the Complainant was interested in running and he was not sure if he gave them to her.  The Respondent said that he did not give the Complainant the microwave, unless it was something the lab was throwing out.  The Respondent denied giving her the earrings or the iPad.  The Respondent further testified that he gave his students, including Vatsan, Christmas and birthday gifts and that they also gave him gifts.

With respect to the Respondent and his students exchanging gifts, the Respondent testified that he gave his students gifts and they gave him gifts.  Appendix A, p. 53.  He said that the Complainant would bring him food and brought him a strange type of coffee.  The Respondent said the when someone from the group traveled, they would bring back gifts.  In addition, a collaborator had provided mugs, hats, and t-shirts to the group.  The Respondent said that Vatsan once gave him a book and brought him a handicraft from India and that the Complainant's mother gave him a book.  Appendix A, p. 62-63.  In his April 20, 2015, interview, the Respondent said that he stopped giving gifts in 2011 because the group was too big and because he thought that it could be misinterpreted, particularly after a student had asked the Complainant if she had a crush on him.  Appendix A, p. 62.

The Complainant testified that the Respondent did not give all of the other students birthday and Christmas gifts.  Appendix A, p. 25.

Yogesh, who joined the lab in the fall of 2011, testified that he never exchanged gifts in the lab and that he believed that Vatsan and the Complainant also did not exchange gifts. Appendix A, p. 87. Yogesh said that the Respondent did not give gifts. Yogesh believed someone in the lab exchanged gifts prior to his joining the lab. Yogesh said that Vatsan brought back a small tapestry when he returned from India. Yogesh said that he and Vatsan received mugs after the Respondent, the Complainant, and Collin visited the Biosphere in Arizona in 2012.

Vatsan also testified that the Respondent did not give presents. Appendix A, p. 81. Vatsan said that they would have cake to celebrate birthdays. Vatsan did receive a mug from the Respondent, which he did not characterize as a gift, and the Complainant did bring him back a bag after she traveled to India. Vatsan said that they did exchange holiday gifts once. Vatsan said that once he gave the Respondent a book and once the Respondent gave him a book.

With respect to the iPad, at the Respondent's second interview, the interviewers confronted him with the receipt from the April 12, 2012, purchase of the iPad, which he then confirmed was purchased with his credit card. Appendix A, p. 61-62. The Respondent stated that he now remembered buying the iPad and that the Complainant had driven him to Syracuse for some reason related to his green card. The Respondent said that they went to the mall because the Complainant needed to shop. The Respondent said that the Complainant told him that Scott, an undergraduate student, had made fun of his clothes and that he needed to buy some new clothes so that he looked like a professor. The Respondent stated that during this time period he purchased several tablets for the lab, including the iPad. The Respondent said that he purchased it with his personal credit card because he planned to see if it worked well before being reimbursed. The Respondent has, in response to the draft report, submitted receipts that he contends show that he on other occasions used his personal credit card to purchase equipment for the lab. The Respondent suggested the iPad may have been registered to the Complainant because it was a project that she worked on. The Respondent said ultimately he was unable to use the tablet in the lab, so he never sought to be reimbursed. Appendix A, p. 63. The Respondent said he did not know how the iPad went "missing." Appendix A, p. 63. The Complainant, on the other hand, testified that the iPad, which is registered in her name, was a gift and she has had it since the time it was purchased.

The investigators note that the change in the Respondent's account between his first interview, when he was directly confronted with photo of the iPad, and his second interview, when he was directly confronted with the receipt is meaningful because, although his attention was drawn to the iPad in the first interview, he denied buying it. It is implausible, although possible, that he would forget such an expensive purchase.

With respect to the cat tree, the Respondent admitted to purchasing it when he was cat sitting for the Complainant's cat while she was in India and then giving it to her. Appendix A, p. 53. In response to the draft report, Respondent for the first time submitted a receipt, dated December 2011, a year after the Complainant's trip to India, which he contended was for the cat-tree he gave to the Complainant. Appendix C, p. 62. Eliza Buhrer-Kapit believed, based on what she learned from the Complainant during their time running together in the fall 2011-spring 2012, that the Respondent had given the Complainant the cat tree as a Valentine's Day gift to her cat. Appendix A, p. 111. The Complainant would have told Eliza about the cat tree as a gift years

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

52 of 63
RR0310

Confidential - Personal
Distribution Not Permitted

470

prior to the Complainant disclosing the alleged sexual assault to anyone and significantly prior to the Complainant leaving the Respondent's lab. The Complainant returned from India about two weeks prior to Valentine's Day 2011.

On balance, the Respondent purchasing gifts for the Complainant supports her allegation of a romantic or sexual relationship.

### (9)   The Complainant's and the Respondent's General Character and Behavior in the Lab

Witnesses have provided conflicting testimony regarding both the Complainant's and the Respondent's general character and behavior in the lab. The testimony, while overviewed below, is of only limited significance to this investigation because, even if the least flattering portrayal of both parties were in fact most accurate, it would have little bearing on whether they were in a romantic or sexual relationship.

The Respondent has painted the Complainant as a poor student who worked considerably shorter hours than other graduate and undergraduate students in his lab. While some witnesses characterize the Complainant as driven and hardworking and her current advisor reports that she has been successful in his lab, others witnesses characterize the Complainant as the Respondent does. Whether a student is a strong student or a weak student does not correlate to whether there was a relationship between the student and the faculty member. To the extent that the Complainant's alleged weakness as a student could be a motive to lie, that is addressed below.

The Complainant has painted the Respondent as verbally abusive towards her and other graduate students, giving harsh criticisms, yelling in the lab, and causing students to cry. The Complainant testified that this treatment of the graduate students was in contrast to his positive mentoring of the undergraduate students in his lab and efforts to have group activities. Some witnesses, particularly Yogesh and Vragan, dispute this characterization, while others report that the Respondent yelled loudly enough to be heard from other labs, ripped graduate students apart during group meetings, and was quietly aggressive. That a faculty member is a good mentor and colleague to some, while unfairly critical of others, does not make it more or less likely that he had a romantic or sexual relationship with a student. Moreover, that some subjectively perceive conduct as justly harsh criticism and others perceive it as abuse also does not make it more or less likely that the faculty member had a sexual or romantic relationship with the student.

The Complainant has also alleged that the Respondent would "sideline" or assign menial tasks to students as punishment. She claimed that she was sidelined by being assigned to a secondary experiment after she ended the alleged relationship with the Respondent. This claim was not substantiated by the other graduate students in the lab or the lab log and is not given any weight in this investigation.

The investigators could have interviewed more students and colleagues affiliated with the Respondent's lab, as both parties provided additional names. Additional testimony of the nature overviewed above would not have any bearing on this investigation. The quality of the

Confidential - Personal
Distribution Not Permitted

471

Complainant as a student and the Respondent as a faculty member is not the issue in this investigation.

### (10)    Observations of the Complainant and the Respondent Together

The Complainant testified that, while the relationship was ongoing, it was kept a secret from everyone, except her friend Rachel and sister ████  The Complainant did not testify to any public displays of affection or incidents where a third party might have seen them being intimate together. The Respondent argues that the lack of such evidence supports the conclusion that there was no relationship. Common sense experience is that secretive relationships carried out by faculty members and students can be carried out without others, including other students and colleagues, becoming aware. The absence of such evidence is, therefore, not dispositive. Moreover, the Complainant made no allegation that the alleged romantic or sexual relationship carried over into the workplace or that they were living together. To the contrary, she claims that they would meet at the Respondent's house and they kept their relationship a secret and that the Respondent gave her every reason to do so by saying that no one would believe that she was doing scientific work if they knew she was sleeping with him and that it would ruin her career if anyone found out. Appendix A, p. 6, 29.

While no witness made any observations that directly or conclusively evidenced the nature of the Complainant's and the Respondent's relationship, many witnesses did provide some testimony regarding observations of the parties' interactions. The witnesses' opinions about the meaning of what they observed varied and, while included in the witness statements, are not overviewed herein.

Vatsan, who was a PhD student in the Respondent's lab during the relevant period, testified that the Complainant had an informal way of speaking, for example calling the Respondent and Vatsan "honey." Vatsan also heard the Complainant use the term "babe" sometimes. Vatsan said that it was weird to see a student call her advisor "honey" and "babe." Appendix A, p. 81.[32] Vatsan had gone out to dinner with the Respondent, just the two of them, but did not think the Respondent had ever gone out to dinner alone with the Complainant. Appendix A, p. 83. Vatsan recalled one occasion when the Complainant spent the night at the Respondent's house while the Respondent was taking care of her cat. Vatsan said that he walked the Complainant to the Respondent's house and he believed that the Respondent worked all night in the lab. Vatsan went home to his own house. Appendix A, p. 83.

Yogesh, another PhD student in the Respondent's lab, testified that the Complainant was overly friendly. The Complainant would call the Respondent and Vatsan "honey" and "darling." Yogesh did not believe that this was appropriate behavior towards a professor. Appendix A, p. 85. Yogesh testified that the Complainant "flipped off" the Respondent during a group meeting. Appendix A, p. 86.

Mohammad Hamidian, the Complainant's boyfriend until October or November 2010, testified that the Complainant talked to him about wanting to find the Respondent an apartment, a

---

[32] Complainant's and Respondent's discussion of this language is addressed above.

Confidential - Personal
Distribution Not Permitted

dog/pet, and/or a girlfriend so that the Respondent would not be in the lab all of the time. Appendix A, p. 97.  Mohammad also observed that the Respondent would "hang out" with his students, including sitting close to them, drinking with them, having personal conversations with them, and making inappropriate jokes to male students.  Appendix A, p. 99.

Scott Flantz, who was an undergraduate in the lab between 2010-2012, did not hear anyone referred to as "honey" or by a nickname.  Appendix B, p. 148.

Prof. Stamper-Kurn, the Respondent's post doc advisor, did not observe the Respondent and the Complainant together, but was told by Lukas Buchmann, a post doc in his group, that Lukas observed the Complainant and the Respondent together at the Biosphere and noted a "strange dynamic" between them and that the Complainant "had some strange power over him, like she could twist him around her finger."  Appendix A, p. 153.

Prof. Schwab testified that the Complainant did not show the Respondent the level of professional respect that you would expect from a graduate student, and that she was overly familiar with the Respondent, mothering him and patronizing towards him.  Appendix A, p. 157-159.  Prof. Schwab offered as an example of the Complainant's conduct in general, that one night at dinner the Complainant offered Prof. Schwab her chapstick and Prof. Schwab responded that he had no intention of using her "herpes stick."  The Complainant then respondend that she takes not getting STDs very seriously.  Appendix A, p. 159.[33]

Shannon Harvey, who worked as an undergraduate in the Respondent's lab from January 2010 to August 2010, testified that the relationship between the Complainant and the Respondent was complicated and that they were simultaneously good friends and not necessarily the best at working together.  Appendix A, p. 161.  Shannon said that the Complainant shared personal information about the Respondent, including talking about him getting a dog, his furniture, his house, how he does not visit his family, his friendships with colleagues, and his professional feuds.  Appendix A, p. 162.  She also said that the Complainant knew a lot about everyone's life.  Appendix A, p. 163.  Shannon remembered that the Complainant would sometimes call her "hon" or "honey," but did not recall to the Complainant using this language towards the Respondent.  Appendix A, p. 162.

Collin Reynolds, a PhD student in the Respondent's lab from August 2011 to June 2013, observed the Complainant laying across the Respondent to sleep during an overnight flight to the Biosphere in Arizona.  Appendix A, p. 166.  Collin also observed that the Complainant would get more upset than he would have expected when the Respondent was upset about how things were going in the lab.  Appendix A, p. 167.

---

[33] The investigators note that it was Prof. Schwab's comment that inappropriately brought the conversation to the vulgar, not the Complainant's.  The Complainant testified that at the time she made this comment she and the Respondent were in a relationship and it was a point of contention that the Respondent had not been tested for STDs, as she had asked him to.  Appendix B, p. 660.

Kasturi Saha, who completed her PhD in 2013, observed that the Complainant and the Respondent spent a lot of time together, in and out of the lab, which prompted her to ask the Complainant is she had a crush on the Respondent. Kasturi testified that the Complainant shrugged off the question. Appendix A, p. 171-172.

In sum, the witnesses' observations of the Complainant and the Respondent cut both ways and do not substantially bolster or undermine the Complainant's or the Respondent's allegations.

### (11)    Motive to Lie and Other Issues of Credibility

The parties' respective motives to lie and issues of credibility raised during the course of the investigation are addressed herein. The investigators address allegations of both parties and assume the reader's familiarity with the underlying allegations, which were summarized above and set out in greater detail in the attached appendices.

#### (i)    Complainant's Motive to Lie: Spring/Fall 2011

With respect to the Complainant's motive to lie about a romantic or sexual relationship between the Complainant and the Respondent, she would have had to have been first motivated around the spring of 2011, when she shared the relationship with her friend Rachel, and the fall of 2011, when she shared the relationship with her sister. The Complainant's motive to lie is distinct from a motive to come forward to the administration with her accusation.

To the extent that it has been argued that the Complainant fabricated this relationship to disrupt the Respondent's tenure prospects, in the spring of 2011, the Complainant was just three years into her PhD and the Respondent was three years from his initial tenure review. The Complainant had, in 2010, prior to the alleged relationship, given the Respondent an evaluation somewhat critical of his conduct towards her in the lab, after consultation with Prof. Wang. The Complainant then gave a very positive review of the Respondent in September 2011, during the alleged relationship. Were the Complainant to have initially fabricated the relationship to disrupt the Respondent's career, it would be inconsistent that she would then be giving him an overwhelmingly positive review, which coincided with her telling her sister that she thought she and the Respondent might get married. The Complainant's conduct, in disclosing the relationship and significantly improving her evaluation of the Respondent, is more consistent with the Complainant's account that she was in a relationship with the Respondent that, at the time, she thought would result in marriage and them becoming a powerful couple in their field, than with someone implausibly laying the ground work for a several yearlong plot to disrupt the Respondent's chances at tenure in 2015.

#### (ii)    Complainant's Motive to Lie: 2014 Conflict Over Authorship

To the extent that the Complainant's motive to lie could be attributed to the conflict over authorship of the paper published out of the Respondent's lab in 2014, this conflict first arose years after the Complainant disclosed the alleged relationship and after she had left the Respondent's lab and does not, therefore, provide a motive to have lied beginning in 2011. The Complainant's consistent account of the publishing of this paper—specifically that she attempted

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

56 of 63
RR0314

Confidential - Personal
Distribution Not Permitted

to collaborate, that, in the end, she was provided a draft and 24-hours to review the draft, that her name was dropped from second author to third, and that the Respondent sought to have her removed from the list of authors in June 2014—is supported by the emails provided to the investigators. Appendix B, p. 367-436. The Respondent correctly argues that the October 25, 2012, email reducing to writing the authorship arrangement agreed to when the Complainant left the lab does not promise that the Complainant would be first author on the 2014 publication, which was on the "non-destructive fluorescence imaging of ultracold bosons." Appendix B, p. 525. The Complainant's claims that she was promised first authorship are an exaggeration of the promises in the October 25, 2012, email, but not related to the subject matter of this investigation. Similarly, whether it was unethical or improper for the Respondent to request to have the Complainant's name removed from a publication after submission on grounds wholly unrelated to the science is not related to the subject matter of this investigation as it occurred prior to the Respondent becoming aware of the allegation at issue here.

### (iii) Complainant's Motive to Lie: Academic Struggle

To the extent that the Complainant's motive to lie could be attributed to her having struggled as a student in the Respondent's lab, the investigators note that, at the time the Complainant brought forward the allegation at issue here, she was in a new lab, where her current advisor reports she is doing well, and on track to earn her Cornell degree. To needlessly provoke the ire of her former advisor is contrary to her best interest. Were she to fabricate a story around her falling out with the Respondent, an allegation of a sexual relationship with her advisor is an exceedingly poor choice because such a relationship historically is not cast a female student in a flattering light. Moreover, were she motivated to lie to explain her departure from the Respondent's lab, to have first disclosed to a close friend in 2013 more than a year prior to leaving the lab, and then to have waited years to bring it to the administration's attention is unreasonable and implausible.

Moreover, the Complainant's alleged discouraging students' from joining the Respondent's lab does not bear on this investigation. To the extent that any of the Complainant's allegations about the Respondent are true, it is wholly reasonable, and thus consistent with her allegations, that she would discourage students, particularly female students, from joining the Respondent's lab. Moreover, as Shannon Harvey testified, a student told her that it was "everyone," not merely a single source, who recommended against working in the Respondent's lab. Appendix A, p. 163. To draw the inference that the Complainant discouraged students from joining the Respondent's lab in 2014 as part of a plan to interfere with his tenure prospects would again require the inference that she had a plan beginning in spring 2011, that included disclosing the alleged relationship to Rachel and her sister and writing a positive Third-Year Review letter. This is an inference we have already discredited as implausible above.

### (iv) Complainant's Credibility: Power Supply Accusation

The Respondent argues that the Complainant's accounts of his allegedly throwing a power supply have been inconsistent and that this inconsistency significantly impacts her general credibility.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

RR0315

57 of 63

Confidential - Personal
Distribution Not Permitted

The Complainant alleges that, in the summer of 2012, after the June 2012 DAMOP Conference, the Respondent threw a power supply at her and then the next day called her emotionally fragile. Appendix B, p. 440. On July 13, 2012, the Complainant text messaged her sister ▮▮▮▮ saying that the Respondent called the Complainant, "emotionally fragile because [she] cried when he yelled at [her]." ▮▮▮▮ responded: "Tell him when his boss fucks him and then yells at him all the time for not living up to crackpot ideals, then he can start calling you fragile." Appendix B, p. 12-13.

The Complainant reported the allegation to Prof. Gibbons in 2012, but did not seek administrative action against the Respondent, and later included the allegation in her 2014 tenure letter. Appendix B, p. 440. More recently, Prof. Gibbons, as part of the tenure process, spoke with the Complainant about her allegation and summarized her account as follows:

> First of all, she states that there were no other witnesses to the incident. In our phone conservation, she immediately put the incident in a broader context where she states that [the Respondent] would vent frustration by whacking computer screens, which she would joke about. In this particular instance, [the Complainant] states that she and [the Respondent] had a disagreement about whether or not to change a particular power supply in one of the experiments. She describes [the Respondent], in frustration, grabbing one of the supplies in question from a shelf, throwing with a motion similar to a two-handed pass from the chest with a basketball, and having it land roughly six inches from her feet.

Appendix B, p. 491. On July 17, 2014, Prof. Schwab submitted a letter in support of the Respondent's tenure, which characterized the Complainant's 2012 account to him as follows:

> When I spoke to [the Complainant] on the phone on 13 November 2012, I asked why she felt the need to leave your group. She said there was a conflict of personality which led to an incident where she claimed you "threw a piece of equipment at her." I was very surprised by this claim and asked her to describe this situation more fully. She said that during a discussion where there was a disagreement, you put down a small piece of electronics on a table or counter, with some force, which made a noise and slid in her general direction.

Appendix B, p. 459.

The Respondent denies ever throwing equipment at the Complainant and characterizes that allegation as a fabrication. The Respondent argues that not only are the above accounts inconsistent, the Complainant was working on experiment M2 at that time, which does not need power supplies, and, in any case, the power supplies for M1 weigh around 20 pounds. Appendix B, p. 452. The Respondent characterizes the alleged inconsistencies as "yet another attempt at obfuscation, i.e. 'Let me tell you one (less egregious) lie' so that 'you will now believe my next (more egregious) one'." Appendix B, p. 453. The Complainant argues that the inconsistencies are the result of the retelling by other people and that her account that the power supply was thrown at her feet has been consistent. Appendix B, p. 659.

However, the alleged throwing of a power supply is not the issue in this investigation and was not, therefore, the focus of this investigation. Moreover, this incident is alleged to have occurred _after_ the Complainant first alleged the relationship.

Notwithstanding, even if the inconsistent accounts from Prof. Gibbons and Prof. Schwab were to reflect inconsistent accounts by the Complainant, the investigators find that the credible evidence supporting the reasonable inference that there was a romantic or sexual relationship outweighs the argument that the Complainant embellished (or exaggerated) the power supply incident. Furthermore, the allegation, if true, does not weigh into the investigators' analysis of the Respondent's general credibility or make it more or less likely that there was a romantic or sexual relationship. While this issue may be otherwise relevant to the Department, it does not have significant bearing on the outcome of this investigation.

### (v)    Respondent/Complainant Credibility: Bedroom

With respect to whether the parties' differing testimony about the Respondent's sleeping arrangement may bear on either parties' credibility, the Complainant testified that she and the Respondent would sleep in the master bedroom when she slept at his house and the Respondent testified that he and the Complainant never slept together and, in any case, he would sleep in a secondary bedroom where his desk and computer were located, not the master bedroom. Both the Complainant and the Respondent drew rough diagrams of the Respondent's house, which were, in relevant part, such as the location of the master bedroom, bathroom, and laundry room, very similar. This was, however, all information that the Complainant could easily have learned when visiting for a group dinner or picking up her cat.

### (vi)    Delayed Report of Alleged Sexual Assault

The Complainant's allegation that the Respondent sexually assaulted her during the first sexual encounter of their relationship came significantly after she first disclosed a relationship to her friend Rachel and sister Amanda. The Complainant attributes this delay to her not knowing herself during the course of the relationship and concerns about her career if she came forward. The Complainant characterized the progress of her reporting the Respondent's conduct in the lab, their relationship, and then the sexual assault as a:

> saga that keeps going and not stopping. The Complainant said that it was really nice to tell Eliza and that she blamed herself a little less. The Complainant said that she stopped blaming herself when she told Ian and she really stopped blaming herself when she learned that The Respondent denied the whole thing. She said that he is lying about it. If he really thought that what he did was wrong, he would admit to the relationship and say it was a mistake. The Complainant said that lying shows that he does not think that what he did was wrong or that he thinks that he can get away with and that he will do it again.

Appendix A. p. 30. Moreover, notably, the Complainant was well settled in her new lab and had successfully separated the likely success of her career from the Respondent's when she first reported the sexual assault.

Confidential - Personal
Distribution Not Permitted

To the extent that the Respondent is arguing that the timing of the sexual assault disclosure coinciding with his tenure case reflects the Complainant's motive to fabricate the allegation to disrupt his tenure application, the investigators considered that argument during the investigation, but did not find it compelling in light of the Complainant's testimony and the evidence of the sequence of the Complainant's conduct, including: disclosing the relationship to ████ and Rachel in 2011; making a vague disclosure to Prof. Patterson and the Ombudsman in February 2014; submitting the negative tenure letter in May 2014; disclosing the alleged sexual assault to Eliza in July 2014; choosing not to disclose the alleged sexual assault to Prof. Lawrence Gibbons and Prof. Paul McEuen when interviewed for the tenure case in July 2014, see Appendix B, p. 489; and disclosing the alleged sexual assault to Prof. Patterson in September 2014. The Complainant's conduct was consistent with her testimony that she had not initially intended to disclose the alleged sexual assault to Cornell. Appendix A, p. 31. The Complainant explained that she submitted the negative tenure letter, not intending to disclose the alleged sexual assault. Appendix A, p. 31-32. When interviewed in July 2014 for the tenure case, she did not disclose the alleged sexual assault because she did not want to talk about her sex life with two older men. Appendix A, p. 33. The Complainant explained that she disclosed the sexual assault as she was able. Appendix A, p. 33. See also Appendix A, p. 30 (excerpted above). Finally, that a Complainant may be motivated to come forward with an allegation because of a pending tenure case does not require the conclusion that the allegation was *fabricated* to disrupt the tenure case. To the extent that the Complainant's allegations about the Respondent are true, it is wholly reasonable, and thus consistent with her allegations, that she would discourage Cornell from extending tenure to the Respondent.

Finally, because it is well accepted that sexual assaults are often first reported long after they are alleged to have occurred, it is reasonable to not consider a delayed report, in and of itself, to be evidence of dishonesty. Here, the Complainant's report was delayed past the time for reporting a sexual violence under Policy 6.4. The investigators do not, therefore, make any determination as to whether the initial encounter was a sexual assault.

### (vii)   *Complainant's Confidence in Respondent's Admission*

The Complainant's confidence, both in writing and verbally to the investigators, that the Respondent would admit to the relationship, but deny the sexual assault, while it could have been feigned, is not consistent with her having fabricated the relationship whole cloth and her requested remedies in February 2015 were not consistent with an intent to destroy his career. In her February 4, 2015, email to Mittman, the Complainant wrote: "I believe that if confronted, [the Respondent] will admit to what he believes was a consensual relationship." Appendix A, p. 541-542. Were the Complainant fabricating the initial sexual encounter and the relationship as a whole, she could easily have created a much less complicated narrative, which would have been easier to support, and it would be unlikely that she would suggest to the investigators that the Respondent would ever admit to having any romantic or sexual relationship with her.

### (viii)   *Respondent's Motive to Lie*

With respect to the Respondent's motive to lie, the Respondent may be motivated to deny the initial sexual encounter, or the relationship as a whole, out of concern for his career. His denial

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

60 of 63

RR0318

Confidential - Personal
Distribution Not Permitted

is, however, as consistent with innocence as with this motive. The Respondent may reasonably have believed that a consensual relationship would not necessarily end his career at Cornell in light of references to Prof. Wieman and Prof. Bhave, both of whom married female graduate students they had supervised.

Confidential

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

61 of 63
RR0319

Confidential - Personal
Distribution Not Permitted

**Part VI:      Conclusion – Application of the Credible Evidence to the Prohibitions Set Forth in the Romantic and Sexual Relationship Policy**

In consideration of the totality of the circumstances—including the witness statements, arguments, and documents included in the appendices—the investigators recommend that the Dean find that a preponderance of the credible evidence supports the conclusion that the Respondent, a faculty member, had a romantic or sexual relationship with the Complainant, a student he directly supervised. For the reasons set forth herein, the investigators further recommend that no specific finding be made as to whether the first sexual encounter rises to the level of sexual assault as defined by Policy 6.4.

Guiding language in the Romantic or Sexual Relationship Policy and in the guidance issued by the Department of Education's Office of Civil Rights (OCR), may inform the Dean's response after consideration of the report and accompanying appendices.

The Romantic and Sexual Relationship Policy identifies exploitation, the inherent power differential, and unintentional or intentional abuse of power as concerns underlying the policy. The policy further states that "a conflict of interest arises when an individual evaluates the work or performance of a person with whom he or she is engaged in a romantic relationship."

Further, in 2001, OCR advised:

> In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual. In cases involving older secondary students subject to the presumption, OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome. In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations. The factors include the following:
>
> - The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

See U.S. Department of Education, Office of Civil Right, "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," (Rev. 2001) (available at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf). In 2014, OCR simply advised: "In cases involving a student who meets the legal age of consent in his or her state, there will still be a strong presumption that sexual activity between an adult school employee and a student is unwelcome and nonconsensual." U.S. Department of Education, Office of Civil Rights, "Questions and Answers on Title IX and Sexual Violence" (Issued 2014) (available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf).

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

62 of 63

RR0320

Confidential - Personal
Distribution Not Permitted

The concerns identified in the Romantic and Sexual Relationship Policy and by OCR are particularly poignant in a small educational environment, where a single faculty member has substantial control over the student's academic evaluations, and the same faculty member has an indispensable role in progressing the student towards graduation and aiding the student in securing post-graduation employment.

Cornell Rom. and Sex. Rel. Pol. Rpt (WPLR)
Invest. Rpt. - Final to Dean 9.25.15

63 of 63
RR0321

Confidential - Personal
Distribution Not Permitted

Confidential