Exhibit 26



**Cornell University**
**Division of Human Resources**

**Appendix C Table of Contents:**

1.  The Complainant's Response to the Draft Investigative Report, with cover email, submitted September 18, 2015

2.  The Respondent's Response to the Draft Investigative Report, with attached Exhibits, submitted September 21, 2015



Cornell University is an equal opportunity affirmative action educator and employer.
Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)          1 of 63
App. C - Final to Dean 9.25.15

Confidential - Personal
Distribution Not Permitted



**Cornell University**
**Division of Human Resources**

1. The Complainant's Response to the Draft Investigative Report, with cover email, submitted September 18, 2015



Cornell University is an equal opportunity affirmative action educator and employer.
Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)                    2 of 63
App. C - Final to Dean 9.25.15

Confidential - Personal
Distribution Not Permitted

## Sarah B. Affel

| | |
|---|---|
| **From:** | lizkarns@gmail.com on behalf of M. Elizabeth Karns <karns@cornell.edu> |
| **Sent:** | Friday, September 18, 2015 10:07 AM |
| **To:** | Sarah B. Affel; Alan L. Mittman; ███████████; ███████████ |
| **Subject:** | Replaced Letter -- Response to Investigation |
| **Attachments:** | LA impact statement and request letter.pdf |

Dear Sarah -- Please find attached the letter in response to the investigation of LA v MV. The letter summarizes the impacts and the requests for specific actions.

In the event there is a voluntary severance prior to the conclusion of this matter these requests need to be part of that negotiation.

Sincerely,

--
---------------------------------------------
M. Elizabeth Karns, MPH JD
Dept of Social Statistics
Cornell University
296 Ives Faculty Building
607-255-4572

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)
App. C - Final to Dean 9.25.15

Confidential - Personal
Distribution Not Permitted

September 18, 2015

Dean Gretchen Ritter
College of Arts and Sciences
Cornell University
Ithaca NY 14853

Dear Dean Ritter:

In my capacity as Procedural Advocate for Complainants, appointed by the President's Office, I am writing on behalf of LA, a graduate student in the Department of Physics, College of Arts and Sciences, Cornell University. As you know, her former advisor MV has been found to have violated University policy on romantic and sexual relationships between students and staff as described in the Faculty Handbook on page 124.  I am writing to summarize the harms that this violation has caused to LA, and to convey her specific requests for actions by the University. The requests must form part of any agreement or negotiation of MV's voluntary or involuntary severance.

The numerous problems and conflicts that LA has experienced directly due to her relationship with MV amply illustrate why the University has a policy regarding romantic and sexual relationships. MV violated this policy, and exploited the power difference between himself and a graduate student for his personal needs. This action by a Cornell faculty member has caused, and continues to cause, harm to the graduate student, LA.

Like many abusers, MV groomed, controlled and isolated LA. He was in a position to do this as her academic advisor, mentor, and lab director. He controlled her work environment, and he used outbursts of his volatile temper to control her behavior at work. He controlled her educational environment as her advisor – setting the conditions under which she was to achieve specific milestones along with complying with his sexual expectations. He controlled her personal time through the required hours in the lab and time with him outside of the lab. And he attempted to control her disclosure of the relationship to others by telling her that it would ruin her career.

There is ample evidence in the report and appendices to support the finding of a violation of the policy. However, there is little information about the on-going harm that LA has experienced. The harms to LA due to the violation of this policy can be broadly summarized in three areas: educational, professional and health impacts.

**Educational Impact**
The educational impact has been apparent throughout the relationship and the subsequent investigation. LA is continuing to progress through her program, but the violations of policy have impeded her progress and deprived her of the support that students are owed from their department.

Due to the abuse, it became clear that LA should seek another physical location to complete her research. Therefore, four and a half years into her graduate education at Cornell, she had to find another facility with the capacity to do her specific work on cold atoms. She found a lab at the JQI, a collaboration between NIST and the University of Maryland, which would allow her workspace and supervision. However, this lab is 6 hours from Ithaca.  She continues to be a Cornell graduate student, but student support services such as counseling, healthcare, or security services, as well as the support and camaraderie of her fellow graduate students, are practically unavailable to her.

During this time LA has found her ability to focus and concentrate on research severely disrupted. The numerous disruptions due to the investigation, in particular the need to document events that MV falsely denied and the prolonged questioning from professional colleagues, have made normal progress towards a PhD extremely difficult. At this point LA is approximately two years behind her planned schedule for graduation.

**Professional Impact**
MV has intentionally damaged LA's professional development and reputation, as is clear in the evidence. His refusal to disclose the relationship while it was on-going and afterwards led to conclusions by leaders of the field regarding LA's behavior (see Schwab and Ralph statements); his disparagement of her abilities has led to an undermining of the confidence that others had in her, particularly the witnesses in her professional field such as Gretchen Campbell and Swati Singh.

LA has been prevented from attending professional conferences because of fears of being harassed by MV. She declined to attend DAMOP (June 2015) when she knew he would be there. She plans to attend the next meeting only when accompanied by a security attendant.

The impact of MV's violations of policy has followed LA to her present institution. Because of the on-going harassment by MV, she has had to explain numerous times that there is an investigation, that she cannot speak about the investigation, and that she needs to be away from the Ithaca campus. This is a significant distraction from LA's activities as a professional physicist, and from her development of a professional reputation – she has to use up the small amount of social capital that she has with her new colleagues to mitigate the on-going damage by MV rather than advancing her own professional career.

Most recently, this came up when the organizers of a speaker series at the JQI contacted MV as a potential speaker for early October 2015. MV accepted the offer within hours of the request without disclosing that he was forbidden to be at the research facility while LA was there. Again, LA had to approach her professional colleagues and, for her own safety, explain that he was prohibited from visiting the institute while she was present because of the on-going investigation.

In the last month, just when LA had an article accepted to Science, one of the most prestigious journals in her field, she had to take time during regular working hours to seek an order that would keep MV away from her current workplace at UMD. She had to spend a day at a Maryland county courthouse and another half day with UMD Title IX representatives. Time when she should have been focused on responding to comments on the article or developing new research plans was diverted to dealing with the continued harassment by MV.

MV attempted to retract the authorship of LA on a publication. When he was not allowed to do that he has persistently refused to present LA name in the same format as all other authors. His refusal to correct the presentation on all forms is another form of professional harassment.

**Health Impact**
Unsurprisingly, the abuse and harassment by MV have had an impact on LA's health. While he was refusing to let her publicly disclose the relationship her health deteriorated so far that her family became extremely concerned. Her parents, both physicians, recognized the damage this was causing to her health. They have had to take time off to support LA during the identification and investigation of the abusive relationship.

She has suffered anxiety, high blood pressure, and weigh-loss due to the abusive relationship. She had to seek a pregnancy test because of a condom failure and a late period. MV's refusal to get tested for STDs led to unnecessary concern over her own disease status.

**Request for Acknowledgment and Prevention of Future Acts**
LA requests acknowledgment of the finding of the violation of Cornell policy to be expressed in the following ways:
1. Letter for future employers that explains the delay in educational progress, and summarizes the investigation and finding of MV's violation of Cornell policy.
2. Direction to the Graduate School and to the DGS of Physics that LA should be given an additional two years to complete her degree without penalty.
3. Letter or email to each witness involved in the investigation, notifying them that MV was found in violation of the policy. This is particularly important for the professional reputation of LA – at this time many have been left with only the distorted information MV has given them about the case.
4. Letter to the Cornell Physics Department members regarding the outcome of the case. This is necessary because of the comments made by MV after the relationship was reported. MV has stated that LA made "baseless" harassment claims, and he has denigrated her abilities as a scientist.
5. Clear limitations on MV's presence at conferences that LA is planning to attend. While MV is an employee of Cornell or associated with any Cornell projects or funding, his planned professional activities should be reviewed to

identify potential conflicts with LA. MV should notify his supervisor in the department who can communicate with LA on scheduling.

6. Representation of LA's work on all articles, websites, and other materials that is identical in form to other contributors. No alterations of her name, spacing, or abbreviations should be permitted. MV has not yet complied with this request.

Again, the requests must form part of any agreement or negotiation of MV's voluntary or involuntary severance. Please feel free to contact me if you have any questions.

Sincerely,

/s/ M. Elizabeth Karns MPh JD
Procedural Advocate for the Complainant
Dept. of Social Statistics
ILR School, Cornell University

Confidential - Personal
Distribution Not Permitted

Confidential



**Cornell University**
**Division of Human Resources**

2. The Respondent's Response to the Draft Investigative Report, with attached Exhibits, submitted September 21, 2015



Cornell University is an equal opportunity affirmative action educator and employer.
Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)        8 of 63
App. C - Final to Dean 9.25.15

Confidential - Personal
Distribution Not Permitted

# FLEISCHMAN LAW FIRM

565 Fifth Avenue, Seventh Floor
New York, NY 10017
TEL 212.880.9567    FAX 917.591.5245
www.fleischmanlawfirm.com

September 21, 2015

**VIA ELECTRONIC MAIL**

**Alan L. Mittman**
Director
Cornell University Division of Human Resources
Office of Workforce Policy & Labor Relations
391 Pine Tree Road
Ithaca, NY 14850-2820
Alm63@cornell.edu

**Sarah B. Affel**
University Lead Investigator
Cornell University Division of Human Resources
Office of Workforce Policy & Labor Relations
391 Pine Tree Road
Ithaca, NY 14850-2820
sba49@cornell.edu

Re: Professor Mukund Vengalattore

Dear Mr. Mittman and Ms. Affel,

This Firm represents Professor Mukund Vengalattore and we submit this letter in response to the draft report dated August 20, 2015 ("Report") setting forth the initial findings of an investigation conducted by Cornell University's ("Cornell" or the "University") Division of Human Resources ("Division") into an alleged romantic or sexual relationship in violation of University policy between Dr. Vengalattore and ▮▮▮▮▮▮▮▮▮, a graduate student who worked in Dr. Vengalattore's lab between 2009 and 2012. The Division has granted us this opportunity to provide comments and observations regarding the Report's analysis and conclusions prior to the Division finalizing the Report and transmitting it to Dean Ritter. We have carefully and closely reviewed the Report and the evidence that it cites. For the reasons we detail below, we respectfully submit that the Report's finding, that a preponderance of credible evidence supports the conclusion of a romantic or sexual relationship, is without a factual basis. In reaching its

1

findings, the Report does not draw reasonable inferences based on all of the credible facts and circumstances and instead, mistakenly construes facts in the light least favorable to Dr. Vengalattore. In many instances, and as documented in detail herein, the Report does not reflect that the Division followed up on important, readily-verifiable information casting grave doubt on Ms. ████ credibility, both generally and in respect of specific accusations she has leveled against Dr. Vengalattore. Accordingly, and without waiver of Dr. Vengalattore's rights, remedies, claims, and defenses, prior to the Division finalizing and forwarding its Report to Dean Ritter, we respectfully request that the Report's conclusion be changed to state that there is not a preponderance of credible evidence supporting the existence of a romantic or sexual relationship. Furthermore, because the allegations Ms. ████ has leveled against Dr. Vengalattore are false and highly prejudicial, and because the Report as currently drafted, credits those allegations, we respectfully request that: (1) the Division agree to meet with us in advance of finalizing its Report; (2) the Division provide us with any amended draft Report before it is sent to the Dean, and provide us an opportunity to transmit any additional comments or observations on such amended draft Report; and (3) include a copy of this letter when transmitting any final Report to the Dean.[1]

## INTRODUCTION

The draft Report fails to identify sufficient evidence of a romantic or sexual relationship between Ms. ████ and Dr. Vengalattore to satisfy the applicable preponderance of evidence standard.[2] Despite numerous interviews of witnesses proposed by Ms. ████ the Report does not identify one person that actually witnessed Dr. Vengalattore acting romantically or inappropriately towards Ms. ████ Indeed, witnesses confirm that Dr. Vengalattore treated Ms. ████ similarly to his other graduate students during the alleged romantic relationship. Despite unfettered access to Dr. Vengalattore's emails and text messages, the Report does not identify any such communications initiated by Dr. Vengalattore acknowledging or suggesting the existence of a romantic relationship. The record established to date instead confirms that Dr. Vengalattore never discussed romantic or sexual feelings toward Ms. ████ and the two never discussed dates or romantic plans by text or email. The Report, however, fails to acknowledge that the absence of such critical evidence weighs heavily against a finding that Dr. Vengalattore had a romantic relationship with Ms. ████

Further, the investigation has also uncovered, but has failed to address, ample evidence of multiple falsehoods, inconsistencies and exaggerations in the various accounts offered by Ms. ████ each posing serious questions about her credibility. Both individually and together,

---

[1] The Division has indicated in prior emails to the undersigned that this letter will be included in the final Report's Appendix. Given this letter's length, the gravity of the charges against our client, and the Report's overall length, we respectfully request that the Division specifically direct the Dean's attention to our letter in its transmittal correspondence.

[2] As set forth in the reservation of rights in this letter, *infra*, we do not concede that a preponderance of evidence standard is procedurally appropriate due process wise for the allegations at issue, but we have nevertheless evaluated the Report, and present our comments under that standard.

2

these oversights – respectfully – render the Report fatally flawed and requiring amendment, including reversing its current conclusion.

The objective evidence uncovered by the Division supports Dr. Vengalattore's account of his interactions with Ms. ███ and contradicts her fabrications. To summarize Ms. ███ proffered narrative, she accuses Dr. Vengalattore of raping her in December 2010. She then claims to have subsequently entered into a relationship with him, through which Dr. Vengalattore abused his power as her professor to coerce her to have sex with him. Ms. ███ further alleges that Dr. Vengalattore verbally abused her while she was working in his laboratory ("lab"), and claims to have finally ended the sexual relationship in December 2011. Upon allegedly breaking up with Dr. Vengalattore, Ms. ███ claims he "sidelined" her by giving her menial tasks in the lab. Ms. ███ further claims that Dr. Vengalattore continued to act abusively toward her in 2012 and, as a result, she supposedly had no choice other than to quit working in our client's lab in the fall of 2012.

In reality, and as the evidence demonstrates, there was no romantic relationship between Ms. ███ and Dr. Vengalattore. Instead, the evidence at most reveals that the two parties were platonically friendly as they worked side-by-side in Dr. Vengalattore's lab and helped each other outside the lab when they could. When Ms. ███ travelled, Dr. Vengalattore agreed to take care of her cat. Dr. Vengalattore would walk Ms. ███ home on nights that she stayed late in the lab. Because Dr. Vengalattore could not drive, Ms. ███ would, on occasion, offer to drive him to buy groceries or perform other errands. Occasionally, they would eat meals together, usually with other members of Dr. Vengalattore's lab. Taken both individually and collectively, this evidence neither directly or inferentially suggests anything beyond a sociable student-teacher relationship, that featured friendly courtesies between both parties to manage out-of-class responsibilities in the face of hectic professional and academic schedules. Dr. Vengalattore has previously testified that he considered Ms. ███ a "friend," and the evidence demonstrates that they had a pleasant working relationship, the same type of relationship that Dr. Vengalattore strove to maintain with *other* graduate and undergraduate students (male and female) whom he worked with and supervised.

By the summer of 2012, despite their friendly dealings with each other, it became apparent that Ms. ███ was having significant difficulties performing tasks that a graduate student with commensurate experience should have been able to perform. Dr. Vengalattore and other graduate students were forced to spend excessive time assisting Ms. ███ when she should have been working independently. Ms. ███ became increasingly aware of her poor performance in the lab and grew uncomfortable about her ability to lead experiments. Yet, despite Ms. ███ difficulties in the lab in 2012, Dr. Vengalattore remained sociable with Ms. ███ while maintaining his professional objectivity regarding her academic struggles. Ultimately, however, Ms. ███ decided to leave Dr. Vengalattore's lab after it became clear she was not making sufficient progress in her lab work.

As noted above, Ms. ███ has accused Dr. Vengalattore of having raped her. Although the Report acknowledges that University action on that accusation is time-barred under University policies, the mere inclusion of this highly inflammatory yet completely unsupported allegation reflects on both the Report's serious flaws and Ms. ███ credibility. The evidence clearly reveals Dr. Vengalattore did not rape Ms. ███.

3

- *First*, lab and phone records are inconsistent with Ms. ▮▮▮▮ ever-changing testimony regarding the timeline surrounding the alleged rape.

- *Second*, email and text communications from Ms. ▮▮▮ to Dr. Vengalattore maintain a friendly tone after the alleged rape, never referencing or alluding to a rape or anything even close to such a horrific charge.

- *Third*, Ms. ▮▮▮▮ continued her working relationship with Dr. Vengalattore after the alleged rape.

- *Fourth*, Ms. ▮▮▮ told no one about the alleged rape until 2015, when she leveled rape allegations with the express intention of derailing Dr. Vengalattore's tenure prospects.

Thus, Ms. ▮▮▮▮ rape allegations, manufactured four years after the alleged incident, are entirely unsubstantiated and contradicted by objective evidence. Unfortunately, the Report, as currently drafted, fails to clearly and objectively address the incredibility of Ms. ▮▮▮▮ rape allegations. That absence is deeply problematic not merely because of the stain it otherwise leaves on Dr. Vengalattore's reputation, but because these false accusations should have led the Report to apply and reflect tremendous skepticism to *all* of Ms. ▮▮▮▮ accusations.

Furthermore, there is also no support for Ms. ▮▮▮▮ contention that Dr. Vengalattore coerced her into having sex after the alleged rape. Rather, the emails and texts between Dr. Vengalattore only document a friendly relationship between the parties. Regrettably, the Report seizes upon a handful of emails read in isolation – out of almost 1,000 communications – in which Ms. ▮▮▮ adopts an overly familiar tone with Dr. Vengalattore. Plainly, our client could not control what Ms. ▮▮▮ chose to write to him, but the record is clear that Dr. Vengalattore never reciprocated in kind, and in fact, sometimes civilly chastised Ms. ▮▮▮▮ after he correctly perceived that Ms. ▮▮▮▮ communications were inappropriate. Importantly (but not carefully addressed in the Report) many of the emails identified by the Division either *pre-date* the alleged start of the relationship (December 2010) or were written *after* the alleged relationship ended (December 2011). Thus, Ms. ▮▮▮▮ overly familiar emails do not correlate to the dates of the alleged sexual relationship, and do not indicate a relationship beginning in December 2010 and ending in December 2011. Instead, the emails are, at best, plainly consistent with Dr. Vengalattore's testimony that the two had a friendly and civil student-teacher relationship between 2009 and 2012.

There is also no credible evidence that Dr. Vengalattore "sidelined" Ms. ▮▮▮▮ after she allegedly broke up with him. To the contrary, the relevant email evidence and the witness testimonies from Dr. Sundar (App. A at 81), Mr. Patil (App. A at 90) and Mr. Reynolds (App. A at 167) clearly point out that Ms. ▮▮▮▮ was not "sidelined" or assigned "menial tasks." In fact, lab records demonstrate that Ms. ▮▮▮▮ routinely struggled to complete her tasks in the lab. The lab records also clearly demonstrate that there was no change in Ms. ▮▮▮▮ scientific responsibilities, and that Prof. Vengalattore and the rest of the group went to inordinate lengths to help Ms. ▮▮▮ make progress on her research work.

It is important to note that, other than the alleged rape in mid-December 2010, Ms. ▮▮▮▮ alleges only two other specific instances where the two supposedly had sex: on

4

December 30, 2010 and in Arizona on trip to the Biosphere. Ms. ███ has not provided any details of the alleged December 30, 2010 sexual encounter. Review of the Report does not indicate whether the Division pressed Ms. ███ to give specific details about this alleged second encounter, what (if any) reason she provided for not giving them, and how the absence of such details impacted the Division's assessment of her accusation. If Ms. ███ does provide such details about the timing of this alleged sexual encounter, Dr. Vengalattore is prepared to search through lab and other records that may disprove Ms. ███ allegations.

With respect to the third alleged encounter, Ms. ███ alleges that she had sex with Dr. Vengalattore in a room located in the Biosphere in Arizona when the two attended a conference there. However, this allegation cannot be credited because the record is clear that the two parties went to the Biosphere in 2012, *after* Ms. ███ alleges the sexual relationship ended.[3] Such internal contradictions in Ms. ███ testimony significantly impair her credibility. Respectfully, by extension, these contradictions also undermine the credibility and strength of the entire Report, especially because, as noted above, the Report does not clearly address their impact on the Division's analysis. Moreover, Ms. ███ has claimed that she possesses "several emails and texts alluding to her getting together with Dr. Vengalattore," (App. A at 102) but has not produced any of these. Her failure to do so is unsurprising given that, in truth, no such relationship existed.

It is unclear when Ms. ███ first began to fabricate details of a romantic relationship. If the testimony of her friend, Rachel Mathis, and her sister is credited, it was in 2011 when Ms. ███ first privately discussed with Ms. Mathis her supposed romantic relationship with Dr. Vengalattore. In these conversations, there was no discussion of rape or sexual assault. Indeed, Ms. Mathis did not testify that she believed in 2011 that Ms. ███ was in a sexual relationship with Dr. Vengalattore. During this time period, Ms. ███ may have embellished her relationship with Dr. Vengalattore because she had romantic feeling towards him or just wanted to make her time at Cornell seem more interesting. Regardless of her motivations, this rank hearsay evidence fails the relevant standard; it cannot seriously be argued that Ms. ███ statements to her friend and sister proves it is more likely than not that a relationship existed given the glaring absence of any evidence corroborating her tale.

Ms. ███ false allegations became more malignant in September 2014. By that time, Dr. Vengalattore had learned that Ms. ███ had falsely alleged in a tenure review letter that he threw a power supply at her and was generally abusive to his students. Ms. ███ knew that it was unlikely that Dr. Vengalattore would write her a positive review, seriously jeopardizing her chances of obtaining her Ph.D. When Dr. Vengalattore's department voted to grant him tenure, Ms. ███ believed that she needed a way to explain why she could not obtain a positive review from Dr. Vengalattore. It was at this time that Ms. ███ apparently decided to fabricate claims of rape and sexual abuse.

After Ms. ███ made her allegations of sexual abuse, Dr. Vengalattore's tenure was denied by the Dean. In this context, we have particular concerns regarding the Report's failure to carefully scrutinize the timing of Ms. ███ allegations in connection with her earlier effort to sabotage his tenure review. Our concern is acute in these regards because while all of

---

[3] Attached hereto as Exhibit A is a receipt establishing that the Biosphere trip occurred in 2012.

Ms. ██████ false accusations are troubling, this subset of allegations falsely paint Dr. Vengalattore as a manipulative, dangerous man, a depiction that unfairly burdens our client's professional and personal reputation. Respectfully, review of the affirmative evidence and the evidentiary gaps should result in an amended Report that not only concludes that no credible evidence demonstrates violation of University policy by Dr. Vengalattore, but also communicates that it is more likely than not that Ms. ██████ has attempted to destroy our client's career and reputation, and apparently has no moral qualms about leveling false rape charges to achieve that end.

For all these reasons, which are discussed in greater detail below, we respectfully request that the Division amend the draft Report's conclusions, and state that no credible evidence demonstrates a violation of University Policy by Dr. Vengalattore. As noted above, we request that the Division provide us a copy of its amended draft Report prior to transmitting said Report to the Dean, and further agree to meet with us in advance of transmitting its final Report.

## BACKGROUND

In January 2009, Dr. Vengalattore joined Cornell as a Physics Department faculty member. He is an atomic physicist specializing in ultracold atomic gasses. Prior to joining Cornell's faculty, he obtained his doctorate from the Massachusetts Institute of Technology, and completed a post-doctoral stint at the University of California-Berkeley with Professor Dan Stamper-Kurn. At the time he arrived at the University, Cornell did not have an ultracold atomic gas program and thus, did not have students with experience in ultracold atomic gasses. Upon starting at Cornell, Dr. Vengalattore began building incredibly complex systems to run experiments, applying for grant money, and recruiting and training students who did not have experience in ultracold atomic gasses. Dr. Vengalattore worked extremely long hours, frequently staying is his lab until 2 a.m., and on a number of occasions remaining in the lab for "all-nighters."

By 2012, Dr. Vengalattore had built two labs: one studying a new form of atomic matter ("M1") and another examining the use of cold atomic gasses as sensors ("M2").[4] Ms. ██████ came to Cornell in August 2008 as a Physics Department Ph.D. candidate. She joined Dr. Vengalattore's labs in early 2009, when she was serving as a teaching assistant at Cornell. In the summer of 2009, Dr. Vengalattore began funding Ms. ██████ when she began working in his lab full time. Ms. ██████ however, worked far shorter hours than Dr. Vengalattore. Typically, she would arrive to work no earlier than 9:00-10:00 a.m. and leave at 5-6 p.m.

In 2009 and 2010, Ms. ██████ assisted Dr. Vengalattore with building the systems related to M1. To perform experiments on ultracold atoms, a lab must spend years building systems to run the experiments. In early March 2010, Srivatsan Chakram Sundar, another graduate student, joined the lab and also worked on M1. During that same time period, Dr. Vengalattore was also working with undergraduate students to build the systems for M2. Dr. Vengalattore hoped that by the summer of 2010, Mr. Sundar and Ms. ██████ would be able to work on M1 independently, while he focused his efforts on M2. Unfortunately, that did not

---

[4] Parenthetically, by the end of 2013, Dr. Vengalattore's group had built a third lab ("M4"). This is relevant because it further reveals the long hours our client devoted to his research and work.

6

happen and Dr. Vengalattore spent his days working on M1 and his nights working on M2.  In the summer of 2011, Dr. Vengalattore hired two more graduate students, Collin Reynolds and Yogesh Patel, both of whom worked primarily on M2.

By all accounts in 2011, although the hours were long, the labs made significant progress. On September 30, 2011, Ms. ████ submitted a glowing review of Dr. Vengalattore stating that Dr. Vengalattore was patient and helped students, including herself, when they were stuck on a problem.  Ms. ████ stated:

> Dr. Mukund Vengalattore is an amazing advisor, teacher and mentor.
> . . . .  When we are stuck, he takes the opportunity not just for us to learn from our mistakes, but also to learn some interesting physics along the way.  A good example of this is my installing of some Insulated Gate Bipolar Transistors (IGBTs) this summer. The company provides driver circuit kits and when they work, they work fine, but they are not very robust.  I got very frustrated because something that should have taken not that long was taking forever because of the inconsistent behavior while debugging.  Instead of becoming frustrated with me, Dr. Vengalattore encouraged me to design my own driver circuit and to make a group meeting presentation on what IGBTs and the problems I encountered.

App. B at 522-23.  While Ms. ████ now attempts to disown this statement by claiming that she was "in love" and "naïve," (App. A at 34), these statements are entirely consistent with *other* student reviews of Dr. Vengalattore in this *same* time period.[5]  It is a reasonable inference, therefore, that Ms. ████ made these statements because Dr. Vengalattore truly was (and remains) a good mentor to his students and not because she was in a relationship with Dr. Vengalattore.

In 2012, however, Dr. Vengalattore grew increasingly frustrated with Ms. ████ inability to conduct M1 experiments independently, despite the significant amount of mentoring and guidance he had provided her (often to the detriment of time he needed to devote to the M2 lab).  Emails from this same period document Dr. Vengalattore's frustration and professional constructive criticism and Ms. ████ corresponding defensive reaction.  For example, on August 24, 2012, Ms. ████ wrote to Dr. Vengalattore and complained:

> Look I am feeling a little overwhelmed and like [sic] I am not sure how to proceed.
>
> Your recent feedback to me was that getting 5% of many things done is not very productive and I agree.  Also, you pointed out that also because there are several things that I tend to juggle at once, when I get stuck on one, I tend to bounce on the

---

[5] Testimony adduced by Dr. Vengalattore's students include Scott Flanz (App. A at 146), Shannon Harvey (App. A at 160), Dr. Sundar (App. A at 78), and Mr. Patil (App. A at 8) and a report by Ms. Pamela Strausser professionally assessing Dr. Vengalattore's group (App. B at 507-514), all confirm this inference.

7

the [sic] other one without sticking to one and really solving the challenges that have arisen.

Okay, so right now I am feeling stress about juggling these 3 things:

M1: At some point you need to step back and go help the other experiments. I am completely unprepared for this.

. . .

I am beginning to feel like I can do nothing right, once I start working on or doing one thing, I feel guilty about not working on the other. It also seems that I am bouncing around too much. I really need your advise [sic] on how to manage my time on all the fronts, in addition to preparing myself for actually accomplishing something on my A exam and not embarrassing myself or you.

App. B at 68.[6] The frustration documented in the email above closely echoes similar complaints Ms. ███ lodged in 2009 when she observed that the undergraduate students in the lab were self-sufficient and productive, and (baselessly) deemed it a 'failure' of Dr. Vengalattore that she was unable to demonstrate the same research prowess or maturity. (App. B at 552). These communications reveal a pattern-and-practice on Ms. ███ part of inappropriately blaming our client for her struggles, when in reality, Dr. Vengalattore's various research and teaching commitments left him with little time to work with Ms. ███ on a one-on-one basis. In its current guise, however, the Report does not appear to identify, analyze, or draw reasonable inferences from this pattern.

Unable to make significant progress on M1, in the summer of 2012, Ms. ███ asked Dr. Vengalattore if she could work primarily on M2. Dr. Vengalattore granted this request and assigned Ms. ███ and Mr. Reynolds significant responsibility in running M2. By the fall of 2012, however, it was clear that Ms. ███ and Mr. Reynolds were not making sufficient progress in their work. As a result, Dr. Vengalattore stated that the two should work with Mr. Sundar in completing M2. Immediately thereafter, in a meeting with Dr. Lawrence Gibbons (the Director of Graduate Studies for Cornell's Physics Department) on October 25, 2012, Ms. ███ informed Dr. Vengalattore that she intended to leave his lab. Dr. Vengalattore was gracious when learning of her departure. Indeed, despite Ms. ███ struggles and inefficiency, our client provided a letter to Dr. Gibbons that credited Ms. ███ efforts, and expressed his hope that Ms. ███ might have an opportunity to be first author on two papers coming out of the lab. The letter stated:

To summarize the discussion, we need to ensure that ███ receives appropriate scientific credit for her contributions to our research group. Since my arrival at Cornell in early 2009, ███ has taken the lead role in the construction of a novel BEC apparatus intended for studies of correlated ultracold matter. Much of this

---

[6] Dr. Sundar's (App. A at 80) and Mr. Reynolds' (App. A at 166-67) testimonies further document Ms. ███ inability to accept criticism. It appears that even the most gently-couched critique invariably evoked a strong emotional response from Ms. ███

effort has been dedicated to the development of the ultrahigh vacuum chamber, the laser system and associated instrumentation associated with the apparatus. Since early 2012, we have been in a position to pursue a couple of interesting research projects --- (i) The realization of an "all-optical Bose condensate" and (ii) Non-destructive fluorescence imaging of ultracold bosons in an optical lattice. Of these, the first project is very close to completion, and ▮▮▮ will be the first author of the published result. The second project is at an earlier stage, but I acknowledge that ▮▮▮ took the preliminary steps towards realizing this imaging technique.

Once we reproduce the experiment with the Bose-condensed atom, this will be a landmark achievement. At this point, I am not sure of the remaining obstacles in this project. If these turn out to be negligible, ▮▮▮ will once again be the first author of the published work.

In addition, to assist Ms. ▮▮▮ career prospects, Dr. Vengalattore offered to work with her in drafting a master's thesis explaining Ms. ▮▮▮ role in constructing the lab apparatus. Generally, this work is not reflected by authorship on published papers, but a well written thesis on the subject is nevertheless highly valued within the atomic physics community.

At this time, from Dr. Vengalattore's perspective, Ms. ▮▮▮ departure from the lab was amicable, and no evidence suggests he had any basis to surmise otherwise. After she left the lab, Ms. ▮▮▮ wished Dr. Vengalattore a happy birthday and the two exchanged texts about their Thanksgiving plans. (App. B at 375.) There was no indication of the false and defamatory allegations to come from Ms. ▮▮▮.

In late November 2012, Ms. ▮▮▮ learned that Dr. Vengalattore's group had created a superfluid, a major breakthrough necessary to conduct future experiments on M1. App. B at 59. Upon learning of the breakthrough, Ms. ▮▮▮ stated that she was excited because Dr. Vengalattore's group had been working towards that goal for years (App. A at 24), and requested permission to rejoin Dr. Vengalattore's group. In fact, she transmitted multiple emails to Dr. Vengalattore requesting that he discuss her potential return with his scientific collaborators, Keith Schwab and Sunil Bhave. App. B. at 59-60. However, given her previous, material difficulties in running experiments and refusal to dedicate more time and effort to his lab, Dr. Vengalattore decided not to rehire Ms. ▮▮▮.

In January 2013, Ms. ▮▮▮ joined the lab of Dr. Ian Spielman at the National Institute of Standards and Technology ("NIST") in Maryland. This lab conducts studies in cold atomic physics. According to the Report, Ms. ▮▮▮ expects to receive her degree from Cornell in the spring or summer of 2016. (App. A at 15).

## MS. ▮▮▮ FALSE, CONTRADICTORY ALLEGATIONS

Despite outward appearances of an amicable split with Dr. Vengalattore's lab, Ms. ▮▮▮ was resentful. On April 15, 2013, she spoke with Swati Singh, a post-doctorate fellow at the Harvard-Smithsonian Center for Astrophysics, who had previously collaborated with Dr.

9

Vengalattore. Ms. █████ boasted to Dr. Singh, "If I have my way, [Dr. Vengalattore] will have a hard time getting tenure." App. B at 461. Later, at a conference on June 2013 in which Dr. Vengalattore gave a presentation, Ms. █████ appeared angry, and she and her colleagues walked out of our client's presentation. Throughout 2013, Ms. █████ made multiple attempts to assist in drafting the papers that were in progress in Dr. Vengalattore's lab, but was told that the experiments were still ongoing and that the papers would not be in the 'draft' stage until the experiments were concluded. App. B at 419.

On February 2, 2014, Ms. █████ approached Dr. Ritchie Patterson and "mostly described tensions in the working group." App. A at 74. She cryptically stated that Dr. Vengalattore did certain things in the lab that she did not want other women to experience. App. A at 74. However, Dr. Patterson "came away from the conversation thinking that maybe [Dr. Vengalattore] had asked [Ms. █████ out several times and had not taken no for an answer easily." App. A at 74.

This resentment grew after Ms. █████ was not made first author on the two papers referenced in Dr. Vengalattore's letter to Dr. Gibbons, quoted above. In what the Report acknowledges as an "exaggeration" on her part, Ms. █████ has repeatedly claimed that Dr. Vengalattore promised her first authorship on two papers. Report at 56. Unfortunately, as sometimes happens in scientific research, the first paper referenced in the email to Dr. Gibbons was never published, *not* out of any spite to Ms. █████ but because *another* lab achieved similar results before Dr. Vengalattore. *See* S. Stellmer et al, Phys. Rev. A 87, 013611 (Published Jan. 14, 2013; submitted on preprint Dec 11, 2012).

With respect to the second study, as Dr. Vengalattore's email states, Ms. █████ was only promised first authorship *if* remaining obstacles proved negligible. In fact, there was significant additional work to be done on the second study, and it was only published a year-and-a-half *after* Ms. █████ left Dr. Vengalattore's lab. Indeed, Ms. █████ ultimately conceded that Dr. Vengalattore conceptualized the experiment, Mr. Patel and Dr. Vengalattore performed the experiments, data analysis and the simulations, and Ms. █████ along with others, *only* contributed to the development of the apparatus necessary to conduct the experiment. (App. B at 423). Nevertheless, Ms. █████ irrationally believed that she was entitled to be first author on the second study and was baselessly angry when her claimed entitlement did not come to fruition. After Ms. █████ learned that she would not be first author, in an effort to make it appear that Dr. Vengalattore had stolen her work, Ms. █████ falsely told her friends that "she [had] wrote most of the article." (App. A. at 128). Therefore, it is an established fact that Ms. █████ had no qualms about making baseless, potentially career-ending allegations against Dr. Vengalattore, and had an observable pattern and practice of doing so. As such all such claims should be given little weight by the Division, and invite immediate skepticism regarding her later claims.

In April 2014, Ms. █████ received a draft of the study listing her as second author. In response, on April 18, 2014, Ms. █████ questioned the study's scientific integrity. App. B at 383. In what objectively presents as a fit of pique, on April 21, 2014, Ms. █████ demanded that her name be removed from the paper altogether. App. B at 380. Yet the next day, without further comment, Ms. █████ stated: "The most recent draft of the paper I've seen looks great

Confidential - Personal
Distribution Not Permitted

and I am comfortable being an author on it." App. B at 379.  Despite the fact that the paper was still being revised, Ms. ████ advised Dr. Vengalattore not to contact her again.  App. A. at 21.

On May 10, 2014, *after* Ms. ████ learned that she would not be first author on any study coming out of Dr. Vengalattore's lab, Ms. ████ wrote a defamatory tenure review letter of Dr. Vengalattore.  Among other allegations, she falsely stated that Dr. Vengalattore "constantly degrades graduate students in a harassing and humiliating way," and further claimed "[a]s a research supervisor and informal teacher, I have found Dr. Vengalattore to be abusive to the detriment of his students' wellbeing and careers."  Ms. ████ tenure review letter also alleged that Dr. Vengalattore promised to make Ms. ████ first author on two papers, but (supposedly) failed to follow through.  In addition, Ms. ████ tenure review letter stated that Dr. Vengalattore got so frustrated with Ms. ████ at one point that he picked up a power supply – "a metal box weighing five pounds – and threw it at [her]."  App. B at 438-441.

The allegations in the tenure review letter are demonstrably false and contradicted by Ms. ████ prior statements.  Her comments are also contradicted by the vast majority of the group (more than 18 former and current students) who have submitted 'glowing testimonials' about Dr. Vengalattore's group – a fact acknowledged by Dean Ritter.  The current draft Report, however, does not appear to acknowledge or address that critical inconsistency.  That absence is surprising to us, because, with respect to abusive treatment of students, such allegations could easily be disproved by talking with other students of Dr. Vengalattore.  Presently, however, it is not clear that the Division conducted a comprehensive cross-check.  For example, an independent climate study commissioned by the physics department in September 2014 found:

> Lab cohort is a cohesive team: Undergraduates can turn to graduate students or to the PI for help, both on an individual level and in the larger group setting.  The graduate students look to each other and to the PI for assistance.  Because the PI is often present in the lab during the week and always in the lab during weekends students feel they have great access and feel that they are truly working together.

App. B at 511.  The same study also indicated that our client's students were highly engaged, even euphoric at their accomplishments.  These comments bear no resemblance to Ms. ████ defamatory claims, and, importantly, flow from multiple sources.  Given that Ms. ████ characterizations are wildly divergent from the other students' comments, we would expect the Report to account for this material variance.

Moreover, the statements in Ms. ████ tenure review letter are directly contradicted by Ms. ████ September 30, 2011 review of Dr. Vengalattore, quoted above.  With respect to the alleged "promise" to make Ms. ████ first author on two papers, as discussed above, that allegation is contradicted by an email contemporaneous with the alleged promise.  As for the allegation of thrown piece of equipment, Ms. ████ told a far less dramatic version of the story to Dr. Schwab after she left Dr. Vengalattore's lab.  In *that* conversation, Ms. ████ stated that a piece of equipment was "slid towards her, not thrown in a dangerous way."  App. A at 158.  Critically, and its other falsehoods and distortions aside, Ms. ████ tenure review letter neither refers to or suggests *any* romantic or sexual relationship with Dr. Vengalattore (let alone rape).

11

In July 2014, after learning of Ms. ███████ tenure review letter's false allegations, Dr. Vengalattore removed Ms. ███████ name from the second study, given obvious and correct concerns regarding her professional integrity. App. B at 481. But, after Ms. ███████ complained, in an effort to avoid even the appearance that he was retaliating against her for her letter, Dr. Vengalattore placed her name back on the paper as third author. App. B at 423. Based on advice from senior faculty who shared our client's concerns about Ms. ███████ integrity, Dr. Vengalattore advised the editor of the journal at issue (Physical Review) to include a statement that transparently delineated the individual contributions on this paper and make it extremely clear that she had no role in the data acquisition, its analysis or the writing of the paper. Each of these statements – all of which are essential components of academic integrity and transparency – can be corroborated by detailed lab records. Mr. Sundar was moved to second author because of the significant work that he did between April 2014 and August 2014, when the paper went through four revisions.

In September 2014, Dr. Vengalattore's department voted to grant him tenure, an important intermediate step before a final tenure decision is made. Shortly after the department vote, Jeevak Parpia, interim chair of the Physics Department, called Ms. Aycock to tell her that the Department had voted to grant Dr. Vengalattore tenure. App. A at 14. At that time, Ms. ███████ did not expect Dr. Vengalattore to get tenure. App. A at 14.

Now, apparently recognizing that her defamatory tenure letter was insufficient to derail Dr. Vengalattore's tenure process, Ms. ███████ decided to fabricate claims of rape and coercive sexual relationship. On September 24th or 25th of 2014, almost four years after the alleged incident, Ms. ███████ told Dr. Patterson that Dr. Vengalattore had sex with her (claiming that he forced himself upon her even though she had said no) and told Dr. Patterson that, thereafter, she was involved in a long relationship that she allegedly could not extract herself from. App. A at 74. On February 4, 2015, Ms. ███████ stated: "[I]f someone in the department does need to know about the sexual/romantic relationship with a former advisor, I want them to know for me, it was not consensual. It was rape." (App. B at 541-42).[7]

As detailed herein, the evidence does not support Ms. ███████ allegations of rape or a sexual relationship. She appears to have fabricated these horrific accusations as a way to explain her poor performance as a student and exact baseless revenge on Dr. Vengalattore for his perceived role in hindering her career. These very real and strong motives do not appear to have been considered or addressed in the Report. Respectfully, those omissions render the Report's analyses and conclusions fatally deficient.

---

[7] In November 2014, Ms. ███████ made the strange allegation that Dr. Vengalattore omitted her middle initial from her name in the second publication because he believed ███████" had a sexual connotation while "███████" did not have sexual connotation. Report at 4. Dr. Vengalattore has previously directed the Division's attention to ample evidence (App. B at 505-06) establishing that this accusation is yet another frivolous, bad-faith complaint by Ms. ███ but the Report does not clearly reflect that fact.

12

## RESPONSE TO REPORT'S ANALYSIS OF EVIDENCE

**I.     MEDICAL RECORDS & ALLEGED DECEMBER 30, 2010 SEXUAL ENCOUNTER**

Contrary to the Report's conclusions (pp 35-61), Ms. ███████ medical records provide no support that Ms. ████ had a sexual relationship with Dr. Vengalattore on December 30, 2010.  On January 27, 2011, Respondent's medical records show that she went to Gannett Health Services ("Gannett") to take a pregnancy test ("Pregnancy Test Record") (App. B at 5).  The Pregnancy Test Record indicated that she had sex on December 30, 2010, that she took a home pregnancy test on January 20, 2011 that was positive, and that she took a home pregnancy test on January 27, 2011 that was negative.

The Report's conclusion that the Pregnancy Test Record "tends to support the Complainant's allegation of a sexual relationship" lacks credible support.  Although the Pregnancy Test Record states Ms. ████ had "heterosexual genital contact since last normal period (Dec. 30)" it does not state that Ms. ████ had sex with Dr. Vengalattore or identify the person whom Ms. ████ has sex with.  Thus, the Pregnancy Test Record, on its face, provides no support of a romantic relationship with Dr. Vengalattore.  It only suggests that Ms. ████ was sexually active on or around December 30, 2010.  Indeed, as set forth below, the evidence shows that she was in a relationship with her high school boyfriend during this time period.

As set forth below, the Report's attempt to link the pregnancy test to an alleged sexual encounter with Dr. Vengalattore appears to rely upon an inadequate investigation, a misreading of the evidentiary record and unsupported inferences.  Moreover, the Division has not received an account of any detail about the timing of the alleged sexual encounter from Ms. ████ making it impossible for Dr. Vengalattore to refute the allegation with objective evidence.

*First*, that Ms. ████ and Dr. Vengalattore were in Ithaca for at least part of December 30, 2010 (Report at 36) does not support Ms. ████ contention that she had sex with Dr. Vengalattore on that date.  At the time, both Ms. ████ and Dr. Vengalattore lived in Ithaca.  The mere fact that they were both in town on December 30, 2011 is not unusual (and indeed expected) and does not support the existence of a sexual relationship.

*Second*, no objective credible evidence suggests that Ms. ████ and Dr. Vengalattore were together on December 30, 2010.  Indeed, the only objective evidence supports the inference that the two met on December 31, 2010, when Ms. ████ dropped off her cat before leaving for New York.  (App. A at 60).  On December 31, 2010 at 8:46 a.m., Ms. ████ sent an email to Dr. Vengalattore giving detailed instructions on who to contact if Ms. ████ cat fell ill.  The December 31, 2010 email does not support Ms. ████ contention that the two were together on December 30, 2010 – let alone had sex on that date – and does not reference any romantic relationship.  The December 31, 2010 email lends credibility to Dr. Vengalattore's contention that his interaction with Ms. ████ during this time period was related to extending her the favor of caring for her cat during her absence, not romance.  Consequently, the Report's conclusion that the December 31, 2010 email "tends to support the Complainant's allegation of a sexual relationship with the Respondent" is unexplained and unsupported.  (Report at 34).

13

*Third*, the Report mistakenly discounts the possibility that Ms. ███ had sex with her former high school boyfriend on or around December 30, 2010.  The Report states: "According to Complainant's testimony, she was pursuing her high school boyfriend at that time."  (Report at 36. *See also* App. A at 11).  Indeed, in mid-December, Ms. ███ planned to tell her high school boyfriend that she loved him.  (App. A at 11).  Although Ms. ███ later represented that her high school boyfriend ultimately "shot her down" in the winter of 2010/2011, it appears Ms. ███ relationship with that boyfriend was ongoing in December 2011.  Indeed, Ms. ███ asserts that she was seeing her former high school boyfriend on weekends.  (App. A at 11).  We understand that Dr. Vengalattore has repeatedly requested that the Division locate and interview this individual.  However the Report does not indicate that the Division has done so (or why it has been unable to do so).  Given the obvious significance of these facts to Ms. ███ accusations, and the Report's narrative, this absence raises important questions regarding the investigation process we believe the Division must address.

The Report assumes, without support, that Ms. ███ and her high school boyfriend were not in the same place on or around December 30, 2010.  (Report at 36).  The Report states, without citation to the evidentiary record, that Ms. ███ high school boyfriend was not in Ithaca on December 30, 2010.  However, critically, it appears from the record that Ms. ███ high school boyfriend sometimes visited her in Ithaca.  In her interview, Eliza Buher-Kapit states that the "Complainant had a friend from high school visit and she was supposed to cook him dinner, but that [Dr. Vengalattore] made her stay at the lab until 11 pm."  (App. B at 116).  Moreover, even if Ms. ███ high school boyfriend was not in Ithaca on December 30, 2010, Ms. ███ was traveling on or around December 30, 2010 from her hometown to Ithaca.  Report at 24.  Although an ATM deposit appears to indicate that Ms. ███ was in Ithaca at some point on December 30, 2010 (App. B at 555) it is plausible that she returned to Ithaca after visiting her high school boyfriend on or around December 30, 2010.  Therefore, the fact that Ms. ███ was in an admitted relationship with her high school boyfriend weighs heavily against the inference that she took a pregnancy test after a sexual encounter with Dr. Vengalattore.  Unfortunately, the Report does not adequately address this critical, far stronger, common-sense inference.

*Fourth*, Ms. ███ text dated December 31, 2010 to her friend Shannon Harvey – an undergraduate who worked in Dr. Vengalattore's lab from January 2010 to August 2010[8] – is not probative of whether Ms. ███ had a sexual relationship with Dr. Vengalattore.  The text states: "I have a whole new hoard of interesting and complex problems . . . Feel a little like Lady Brett Ashley."  (App. B at 556).  As an initial matter, this statement is grossly ambiguous and it is not clear that she is referring to an ongoing romantic or sexual relationship, let alone an untenable romantic or sexual situation.  Therefore, the Report's conclusion that the December 31, 2010 text "supports the inference that, at the time, Ms. ███ was in an untenable romantic sexual situation" appears, regrettably, to be premised purely on unsupportable speculation.

Moreover, Ms. ███ December 31, 2010 text did not reference Dr. Vengalattore.  Only Ms. ███ statement in an email to the Division on June 15, 2015 (App. B at 565), nearly five years later, connects this literary reference to an alleged relationship with Dr. Vengalattore.  But by 2015, as discussed herein, Ms. ███ was engaged in an active campaign

---

[8] App. A at 166.

to falsely tarnish Dr. Vengalattore's reputation.  As such, the June 15, 2015 email, viewed in its proper context, should have, minimally, been reflected in the Report as a years-after-the-fact communication that was regarded with deep skepticism.

Additionally, Ms. ▮▮▮▮ recent contention that she was alluding to a relationship with Dr. Vengalattore directly contradicts her own statement that she was actively hiding the relationship.  In the December 31, 2010 text, Ms. ▮▮▮▮ promised to "send a better email soon," presumably to discuss in detail the topics alluded to in the December 31, 2010 text. Indeed, one would expect a follow up email given that Ms. ▮▮▮▮ admits Ms. Harvey did not have "any context to understand [her] statement." (App. B at 565).  To the extent that the Division granted any weight to Ms. ▮▮▮▮ text message, such reliance is, respectfully, flawed given that the Report neither states nor suggests that the Division in fact asked Ms. Harvey whether Ms. ▮▮▮▮ further explained, either in writing or orally, what her "interesting and complex problems" were or sought relevant emails from Ms. Harvey.  The context, timing, and circumstances of the text messages warranted greater scrutiny and investigation.

In any case, Ms. ▮▮▮▮ statements to Ms. Harvey warrant little-to-no weight as Ms. Harvey knew Ms. ▮▮▮▮ to make false statements about Ms. ▮▮▮▮ personal life.  Ms. Harvey states that she "got a certain vibe that things with [Ms. ▮▮▮▮ were not on the level" (App. A at 162) and that she had to filter Ms ▮▮▮▮ statements about Ms. ▮▮▮▮ life because such statements were "usually one-sided in her favor and didn't always match up with my perception." (App. A at 163).  Tellingly, Ms. Harvey states that this tendency to fabricate caused Ms. ▮▮▮▮ to make an unsubstantiated allegation that an undergraduate in Dr. Vengalattore's lab rifled through her belongings.  (App. A at 161).  Just as with Dr. Vengalattore, the undergraduate was "blindsided" by Ms. ▮▮▮▮ allegations. (App. A. at 161).  But, in yet another troubling omission, these important statements about Ms. ▮▮▮▮ personality (which were evident to her colleagues) are not addressed or accounted for in the Report as currently composed.  Thus, to the extent that Ms. ▮▮▮▮ is comparing herself to Lady Brett Ashley, a woman who invariably charms the men that she meets and is involved in a web of romantic relationships, it likely that the comparison does not truthfully characterize Ms. ▮▮▮▮ relationship to the men in her life.  If anything, it reveals Ms. ▮▮▮▮ willingness to engage in fictional distortions.  That hypothesis is supported by the fact that despite Ms. ▮▮▮▮ contention that she discussed "romantic relationships" with Ms. Harvey (App. B at 565), it is Ms. Harvey's opinion that a romantic relationship between Dr. Vengalattore and Ms. ▮▮▮▮ "was clearly not happening." (App. A at 163).

*Fifth*, the fact that "others were not aware of another man in [Ms. ▮▮▮▮ life in Ithaca on December 30, 2010" (Report at 36) does not make Ms. ▮▮▮▮ testimony that she slept with Dr. Vengalattore "more plausible."  As discussed above, Ms. ▮▮▮▮ could have had sex with her high school boy friend in or out of Ithaca, she could have had a one-time sexual encounter with someone not otherwise in her life, or she could have had a relationship the interviewees were not aware of.  These are <u>all</u> plausible situations, all of which are "more likely" than the charges that Ms. ▮▮▮▮ has leveled against Dr. Vengalattore.  Nevertheless, the Report (as currently drafted) has decided to credit Ms. ▮▮▮▮ allegations.

*Sixth*, Ms. ▮▮▮▮ claim that she disclosed that she may be pregnant to Dr. Vengalattore on the Number 10 bus on the way to her appointment at Gannett, a ride that lasts

15

four minutes, is not plausible. (Report at 36). At the time of the January 27, 2011 appointment, both Ms. ████ and Dr. Vengalattore regularly took the Number 10 bus to work. It defies common sense that Ms. ████ would wait until seven days after first receiving a positive result on her initial pregnancy test (and *hours* after she had a negative pregnancy test) to disclose that Dr. Vengalattore may have impregnated her. Moreover, it is odd that Ms. ████ would choose to disclose to Dr. Vengalattore that he may be the father of her baby in a public place given that she claims that she was carrying on a clandestine relationship.

Also, in her testimony, in addition to disclosing the existence of the pregnancy to Dr. Vengalattore, Ms. ████ also claims that she discussed her philosophy on abortion and that she would have the baby if she were pregnant. (App. A at 26-27). It is implausible that Dr. Vengalattore would choose a four minute ride on a crowded bus to have this conversation. Indeed, it far more plausible that Ms. ████ a women who wanted a career in physics and feared that she was pregnant, asked her advisor his thoughts on a graduate student having a baby. (App. A at 67). Nor is this supported creative speculation. The record shows that Ms. ████ asked questions about religious and social issues out of the blue on other occasions. *See* App. B at 31 (questions Islam and Christianity) and 373 (questions Dr. Vengalattore on being foster parent). When Dr. Vengalattore pointed out this prior pattern to the Division, Ms. ████ apparently responded that she had posed these questions to our client because "[they] were in a sexual/romantic relationship." App. B at 659. However, Ms. ████ false explanation disregards the fact that the latter text message was sent in July 2012, *after* the end of the alleged relationship. Therefore, contrary to the Report, Dr. Vengalattore's rendition of the discussion is far more plausible than Ms. ████ version.

*Seventh*, the Pregnancy Test Record does not support Ms. ████ testimony that "condoms tended to fall off of Respondent when pulling out" as the Report states. (Report at 37). The Pregnancy Test Record does not reference Dr. Vengalattore at all. Yet the Report inexplicably discounts the possibility that Ms. ████ fabricated her testimony about condoms slipping during sex with Dr. Vengalattore (App. A at 27) to match what was said in the Pregnancy Test Report.

*Eighth*, it is unfair to Dr. Vengalattore for the Report to draw any inference from the Pregnancy Test Report without conducting a reasonable investigation. Notably, the Report does not indicate if the Division conducted any analysis of Ms. ████ texts and emails from January 20, 2011 to January 28, 2011 to determine who she may have talked to about the positive pregnancy result. Given that such analysis would be critical to corroborating Ms. ████ version of events, we must surmise that either no such analysis occurred, or the Division could not locate any such emails. Either results materially undermines the Report's current conclusions.

## II. COMMUNICATIONS WITH RACHEL MATHIS

The Report places undue weight and draws unsupported inferences from the testimony of Rachel Mathis, a good friend of Ms. ████. Ms. Mathis first met Ms. ████ when they were freshmen in college and the two were in a sorority together. (App A at 122). Between the beginnings of 2011 to the end of 2012, Ms. Mathis claims that she spoke to Ms. ████ about Dr. Vengalattore and Ms. ████ stated that she was "involved" with Dr. Vengalattore.

16

Critically, Ms. Mathis did <u>not</u> testify that Ms. ███ had told her that she had sex with Dr. Vengalattore. Rather, Ms. Mathis stated numerous times that she could not remember the details of their conversation. Appendix A at 122-23 states:

- Rachel said that when they talked The Complainant would recount experiences and interactions with the Respondent, but that Rachel cannot recall the details now because it has been so long.

- Rachel was having trouble remembering specific information that the Complainant had provided because it had been so long.

- Rachel apologized that she was not able to remember more because the conversations when the Complainant and Respondent were involved happened so long ago.

Despite her general lack of memory, Ms. Mathis testified that she did not think Ms. ███ used the "term [] boyfriend" when describing Dr. Vengalattore (App. A. at 123). Ms. Mathis also states that she "was pretty sure that [Ms. ███ and Dr. Vengalattore] did not actually go out on dates." Ms. Mathis' failure to recall *any* discussion with Ms. ███ about a sexual relationship with Dr. Vengalattore and her general lack of memory about her discussions with Ms. ███ give her testimony limited value, certainly not rising to the level of satisfying a preponderance-of-the-evidence standard, either standing alone or in combination with other record evidence. Indeed, the "secret" involvement that Ms. Mathis refers to could just as easily refer to a close non-sexual relationship that Ms. ███ developed or thought, irrationally, would turn romantic. Therefore, Ms. Mathis' testimony does not corroborate Ms. ███ contention that she was in a sexual relationship with Dr. Vengalattore. We also direct the Division's attention to the fact that Ms. ███ contacted Ms. Mathis in 2015 (App. A at 122), and informed Ms. Mathis of her (false) accusations regarding Ms. ███ alleged relationship. This contact, minimally, warrants evaluating whether Ms. Mathis has (even subconsciously) fashioned her testimony to reflect Ms. ███ hearsay statements to her. The Report as currently drafted does not appear to explore or consider this possibility.

**III.     COMMUNICATIONS WITH ███████**

The testimony of ███████ ("███ Ms. ███ sister, also fails to make a sexual relationship between Ms. ███ and Dr. Vengalattore more plausible under the applicable standards. Although ███ testifies that that Ms. ███ first told ███ that she was sleeping with Dr. Vengalattore in the fall of 2011, there is no objective corresponding evidence in the form of email or texts suggesting that such a conversation took place. ███ states that Ms. ███ was looking ill and "acting weird" in the fall of 2011. (App. A at 105). ███ testified that Ms. ███ would "grab the skin between her thumb and forefinger and was rocking." (App. A at 14). Indeed, Ms. ███ father asked if she was taking drugs. (App. A at 105). It is surprising that ███ did not text or email Ms. ███ about the alleged relationship given the physical and emotional state of her sister in the fall of 2011. Therefore, the lack of objective evidence relating to Ms. ███ alleged disclosure to her sister weighs against ███ credibility.

17

Additionally, it was clear that ████ perceived that Ms. ████ was experiencing emotional difficulties. ████ attributed Ms. ████ problems to studying at Cornell, and suggested that Ms. ████ leave Cornell. (App. A at 104). It is plausible that Ms. ████ could have embellished her relationship with Dr. Vengalattore to help explain her emotional condition and problems at Cornell.

The Report's present conclusion that "there is a reasonable inference that the physical condition [of Ms. ████ was the result of anxiety around her secret relationship with [Dr. Vengalattore]" is unwarranted. The evidence instead establishes that, prior to her alleged relationship with Dr. Vengalattore, she suffered similar physical and emotional problems. For example, in an October 21, 2009 email from Ms. ████ to Dr. Vengalattore, Ms. ████ stated that she was suffering from headaches and was in need of therapy. (App. B at 603). Minimally, a more detailed analysis of Ms. ████ medical records is necessary before the Division could plausibly link her headaches and other medical problems to an alleged relationship with Dr. Vengalattore. Indeed, the Report's inference that Ms. ████ medical problems arose from the alleged sexual relationship with Dr. Vengalattore unfortunately appears to be premised upon pure speculation; speculation that conflicts with all evidence uncovered by this investigation. The speculative inference is not even supported by ████ own testimony, who stated that Ms. ████ wanted the relationship and wanted to marry Dr. Vengalattore. (App. A at 104).

Finally, while there is objective evidence (in the form of text messages) that Ms. ████ did inform her sister of a sexual relationship in July of 2012 (App. B at 12), by this time, as discussed above, Ms. ████ was having difficulty working independently in Dr. Vengalattore's lab. It was clear that both she and Dr. Vengalattore were frustrated with her performance. It is more likely than not that at this time, Ms. ████ invented the existence of a sexual relationship with her supervisor to explain her poor performance in the lab to her sister. The Report does not explain why *this* inference – which is clearly supportable given context and objective evidence – is not more plausible than a conclusion that rests on hearsay statements that do not bear any hallmarks for truthfulness.

IV.     **VOLUME OF TEXT MESSAGES**

The Report's analysis of the call and text volume between Dr. Vengalattore and Ms. ████ do not establish or suggest the existence of a romantic relationship. The Report presently concludes that increased call and text volumes between the two from February 2011 to January 2012 make "[Ms. ████ allegations more plausible." (Report at 39). Respectfully, the Division appears to have materially misinterpreted that data. Instead, the increased call volumes correspond to increased lab work and Ms. ████ contraction of mononucleosis in or around June of 2011, which required more information about the lab to be relayed to her remotely. (App. B at 212). Increased call and text volume do not correspond to the beginning of the alleged relationship in December 2010. (App. B at 212). Call volumes between February and April 2011 are roughly the same as call volumes *after* the alleged relationship ended in December 2011.

To the extent that there are late night calls and texts, such calls and texts occur both before and after the alleged sexual relationship. (App. B at 212). Critically, it is plain that an overwhelming majority of the calls/texts, especially communications initiated after 6- 7:00PM,

18

and on weekends, were originated *by Ms.* ███████ She would frequently ask to be updated about progress in the lab after she left. Late night calls about lab work are unsurprising, given that it is undisputed and corroborated by numerous witnesses that Dr. Vengalattore kept long hours in the lab, frequently staying until 2am or pulling "all-nighters."

Additionally, and fatally, Ms. ███████ destroyed her texts to and from Dr. Vengalattore in 2013 (App. A at 14), at around the time that she threatened to make it difficult for Dr. Vengalattore to get tenure. (App. B at 461). Consequently, rather than analyze the volume of text messages, the Division should infer that such texts likely contradict Ms. ███████ allegations of a romantic or sexual relationship. If the texts in fact supported her allegations, it is logical to conclude that Ms. ███████ would not have attempted to destroy them, particularly considering the timing of the spoliation. Thus, we respectfully submit that the Report should not draw any inference from the volume of calls and texts between Ms. ███████ and Dr. Vengalattore. Minimally, we believe it would be appropriate for the Report to draw an adverse inference *against* Ms. ███████ especially given that: (1) she destroyed relevant text messages at a time when she knew a dispute with Dr. Vengalattore was likely; and (2) spoliation results in considerable prejudice to Dr. Vengalattore, given its clear relevance to the disputed facts.

**V.   EMAILS AND TEXTS BETWEEN MS. ███████ AND DR. VENGALATTORE**

The Report's finding that emails and texts between Ms. ███████ and Dr. Vengalattore "lend credibility to [Ms. ███████ allegations]" is mistaken. Ms. A█████ has alleged that she was raped and in an abusive sexual relationship. App. A at 31 ("The Complainant said that she knows that she was sexually abused."). The emails and text messages show a string of communications from Ms. ███████ to Dr. Vengalattore that the Report characterizes as not indicative of "the professional relationship expected between a faculty member and the student he supervises." (Report at 45). Yet review of the Report indicates that the Division did not find one communication from Dr. Vengalattore to Ms. ███████ suggesting that he coerced her or abused her. Indeed, Dr. Vengalattore did not even mention or allude to a sexual relationship with Ms. ███████ Moreover, there is not a shred of evidence in Ms. ███████ communications while she was working at Dr. Vengalattore's lab that document or suggest any trauma or abuse of any kind experienced at her job. Instead, the emails show that Ms. ███████ was not telling the truth about the nature of her relationship with Dr. Vengalattore.

Because Ms. ███████ inappropriately familiar emails (which our client certainly did not solicit from her) both pre-date and post-date the alleged relationship, they support Dr. Vengalattore's testimony that he and Ms. ███████ were friendly throughout her time at the lab. For example, on September 16, 2010, prior to the start of the alleged relationship in December 2010, Ms. ███████ attempted to sign Dr. Vengalattore up for speed dating. (App. B at 29). According to the Report, on November 16, 2010, Ms. ███████ stated, "I have a crazy suggestion, instead of doing analysis … you could do this thing, I know you do it very seldom so you might find it a little strange … but you could sleep … crazy, I know." (Report at 41). It is undisputed that these and other emails cited by the Report dated prior to December 2010 are not indicative of an ongoing romantic relationship.

Other emails cited by the Report post-date the alleged sexual relationship. For example, on October 12, 2012, Ms. ███████ invites Dr. Vengalattore over for pizza. (App. B at 50).

19

While the Report faults Dr. Vengalattore for not responding in writing to correct Ms. ███ conduct (Report at 40-41), the texts and emails in fact reference communications where Dr. Vengalattore *did* express concern over Ms. ███ inappropriate conduct. On April 18, 2012, Ms. ███ stated in a text: "Just talked to my mom. Probably should have done that a few hours ago. Don't worry about me. Sorry for frustrating you." On June 15, 2012, Ms. ███ states: "I am sorry. I won't bother you again." (App. B at 373). Moreover, review of the Report does not indicate that the Division asked students in Dr. Vengalattore's group of his response to Ms. ███ Had they done so, the Division would have learned of Dr. Vengalattore's careful attempts to remedy Ms. ███ inappropriate behavior.

In addition, Dr. Vengalattore often, appropriately, exercised great caution in dealing with Ms. ███ at times where she seemed to be experiencing high anxiety. For example, in February 2011, Ms. ███ roommate attempted to commit suicide. Ms. ███ complained about her own mental health because she was caring for her roommate twenty-four hours a day, five days in a row. App. B at 595. During this time period, Dr. Vengalattore was at a conference, but nevertheless allowed Ms. ███ to leave her cats at his house because Ms. ███ was afraid that her roommate would harm them. While at the conference, Ms. ███ sent Dr. Vengalattore an uncharacteristically emotional email that stated: "I really appreciate you and can't wait to show you how I feel." (App. B at 205). Rather than chastising Ms. ███ about the tone of this email, Dr. Vengalattore suggested that she leave her cats with Mr. Sundar, rather than at his house. Thus, Dr. Vengalattore felt constrained to rebuke Ms. ███ when she was experiencing stress in her personal life. Sadly, Ms. ███ later conduct frame the maxim *"no good deed goes unpunished."*

Where Ms. ███ used familiar greetings on emails such as "darling" and "babe" (App. B at 205), Dr. Vengalattore did not ascribe significant meaning to those greetings, as she commonly referred to other people in the lab as "babe" or "darling." Mr. Sundar testified that Ms. ███ would call him "honey" or "darling." (App. A at 81). Mr. Sundar stated that "he took it just as her style of speaking." Mr. Sundar further stated "that [Dr. Vengalattore] took it in the same way." Mr. Patel also testified that the Respondent would call Mr. Sundar "honey" or "darling." (App. A at 85). Thus, Ms. ███ lab mates simply believed that Ms. ███ had an overly familiar way of speaking. Dr. Vengalattore's focus was on completing his work on a timely-basis (a job hindered by Ms. ███ struggles and inefficiencies), and thus, unsurprisingly, he did not devote his limited free time to educating Ms. ███ a graduate student – on proper email communication etiquette.

Notably, the record indicates that Ms. ███ would use overly familiar language when she was forwarding subpar work product to Dr. Vengalattore, strongly suggesting she hoped to substitute charm for professionalism. For example, the March 11, 2011 email from Ms. ███ to Dr. Vengalattore attached with the greeting "good morning sunshine" attached a draft of a poster. (App. B at 174). The January 9, 2012 email, in which Ms. ███ states that "the work product is rough like Dr. Vengalattore's face," attaches a poorly written rough draft of an abstract. (App. B at 199). Dr. Vengalattore did not take these overly familiar emails as romantic overtures, but instead regarded them as Ms. ███ childish strategy to deflect attention from poor work product. Indeed, Mr. Patil apparently shares Dr. Vengalattore's perspective; Mr. Patil stated that he believed Ms. ███ inappropriate behavior was a defense mechanism. App. A at 85.

20

Correspondingly, Dr. Gretchen Campbell, who knows Ms. ███ because she is a colleague of Ian Spielman (Ms. ███ new advisor), believes Ms. ███ makes inappropriate comments purely for shock value:

> Prof. Campbell said that she has witnessed the Complainant making inappropriate statements for a professional workplace. Prof. Campbell said that it has been so long that she cannot remember any details of statements that the Complainant has made. With respect to whether the statements were inappropriate because they were sexual or because they were too casual, Prof. Campbell said a little bit of both and that she thought that the Complainant was trying to be shocking.

App. A at 176. As is the case with other record evidence, these are important testimonies attesting to Ms. ███ general character, and are vital to contextualizing her comments, and assessing her credibility. However, they are not properly addressed in the Report.

In sum, the emails cited by the Report do not support Ms. ███ allegations of abuse or make allegations of a romantic relationship more credible. They instead reveal conduct by an immature graduate student failing to respect her supervisor's wishes, and her supervisor's patience with the same (patience for which, today, he unfairly faces dire consequences).

## VI.   ALLEGED FIRST SEXUAL ENCOUNTER

The Report concludes that "no date definitively matches [Ms. ███ account of her first sexual encounter," which allegedly occurred between November 29, 2010 and December 17, 2010. (App. B at 558). Ms. ███ claims that she can remember very few details about the alleged sexual assault. Ms. ███ has given inconsistent statements as to why her recollection is vague. On the one hand, she claims to be unable to remember any of the details of sex that night "because sex was a typical component of the later sexual and romantic relationship." (App. A at 11). On the other hand, her advocate, Liz Karns, claims that Ms. ███ cannot remember specific details of the evening because she was the victim of a traumatic sexual assault. (App. B at 582). In any case, once it became clear that these few details that Ms. ███ does "remember" are not corroborated by the objective evidence, Ms. ███ refused to answer further questions about the first sexual encounter. (App. B at 582). Yet the Report mistakenly draws no adverse inference from that fact.

Ms. ███ claims that Dr. Vengalattore was not in the lab on the alleged day of the first sexual encounter, so she went to his house uninvited to check up on him. Ms. ███ had previously told friends that Dr. Vengalattore had been missing from the lab for several days, a claim she apparently backtracked from because it was not supported by the objective evidence. (App. A at 74). Ms. ███ thereafter accuses Dr. Vengalattore of raping her that evening. Ms. ███ claims that she and Dr. Vengalattore were at the lab alone the next day. This accusation is clearly refuted by uncontested lab records showing that Dr. Sundar was actually the first in the lab on December 16th and that Dr. Vengalattore also was present in lab that day. App. B at 765. Notably, there is no evidence that Ms. ███ was in the lab on December 16th. Faced with this further evidence of her fabrications, Ms. ███ provides no plausible explanation for her "memory" that she was alone in lab with Dr. Vengalattore on the 16th and that "she does not remember anyone else in lab that day."

21

After analyzing lab records, emails, text messages and cell phone records, the Report concludes that December 15, 2010 is "most reasonably consistent" with Ms. ███ timeline (Report at 50), but that the Division could not conclude that December 15, 2010 "was more likely than not the date of the alleged first sexual encounter." (Report at 50. However, the Division could easily have gathered sufficient information (such as lab records and other objective evidence (App. B at 764-65, App. B at 628) and reviewed them with current and former students to evaluate if the lab records for December 15, 2010 and December 16, 2010 are inconsistent with circumstances surrounding the alleged rape, and instead confirm Dr. Vengalattore's account that he was in his lab the day of the alleged rape. Specifically, Ms. ███ clams that (1) Dr. Vengalattore predated a note in the lab book is contrary to lab policy and (2) others could have performed the experiments that he was undertaking is an easily refutable factual impossibility. However, in its present form, the Report does not appear to have probed and addressed these critical items. The Report includes Ms. ███ rape allegations in its narrative, but only cites University Policy 6.4's time-bar as a procedural for not further pursuing this line of inquiry. However, because her accusations are demonstrably false for the reasons explained above, and because these fabrications undermine Ms. ███ *overall* credibility, the fact that the Report does not analyze and address evidence substantively undercutting her grave accusations remains problematic and prejudicial, regardless of the fact that such claims are also time-barred.

## VII.      GIFTS

In 2009 and 2010, Dr. Vengalattore's lab was small and close-knit. Dr. Vengalattore exchanged small gifts with his students. For example, Dr. Vengalattore purchased a coffee mug for Mr. Sundar, who also remembers exchanging gifts one Christmas. App. A at 81. Mr. Sundar stated that he gave a book to Mr. Vengalattore as a gift one year. App. A at 81. Dr. Vengalattore gave a tea set to Ms. ███ a gift consistent with the gifts Dr. Vengalattore gave to Mr. Sundar and not indicative or a romantic relationship. App. A at 53. Dr. Vengalattore also purchased a cat tree in December 2011 (after the end of the alleged relationship) when he was cat-sitting so that Ms. ███ cats would not tear up his furniture. Attached hereto as Exhibit C is a copy of the purchase order for the cat tree. Despite the fact that the cat tree was purchased after the end of the alleged relationship.[9] Ms. ███ falsely told her friends that Dr. Vengalattore had purchased it as a Valentine's Day (2012) gift for her cat – yet more evidence that Ms. ███ grossly exaggerated her relationship with Dr. Vengalattore to her friends. Dr. Vengalattore did not purchase an iPad or earrings for Ms. ███ and does not recall purchasing a heart rate monitor for her. App. A at 53. In short, Dr. Vengalattore treated Ms. ███ similarly to other students and his purchase of token gifts for Ms. ███ does not reflect a romantic relationship.

The Report mischaracterizes Dr. Vengalattore's testimony with respect to the purchase of an iPad. The Report erroneously contends that in an initial interview, Dr. Vengalattore denied buying an iPad. In reality, Dr. Vengalattore testified that "he did not buy The Complainant the iPad." App. A at 53.

---

[9] The Report at 51 erroneously indicates that the cat tree was purchased prior to Valentine's Day in 2011. We understand that Dr. Vengalattore has previously, explicitly advised Division investigators of the correct date he purchased the cat tree.

22

In a second interview, when presented with the receipt for the iPad, Dr. Vengalattore confirmed that he did not purchase the iPad as a gift for Ms. ███ but sought the iPad for his lab. App. A at 62. Contrary to the Report's present conclusion, Dr. Vengalattore's testimony in the first and second interview is entirely consistent. The Division, again without any substantiation, apparently did not find it credible that Dr. Vengalattore would purchase an iPad with his own credit card for his lab and not seek reimbursement. But Dr. Vengalattore explained that he often purchased things for his lab without seeking reimbursement, and that is consistent with his pattern-and-practice. Attached hereto as Exhibit B are personal credit card transactions reflecting $15,000 of lab equipment purchased on Dr. Vengalattore's personal credit card. Thus, Dr. Vengalattore's testimony that he purchased the iPad for his lab is not only credible, but is strongly supported by documented evidence – evidence that the Division failed to obtain.

In short, Dr. Vengalattore treated Ms. ███ similarly to his other students, and his purchase of token gifts for Ms. ███ is not reflective of a romantic relationship.

**VIII.      OBSERVATIONS OF THE COMPLAINANT AND RESPONDENT TOGETHER**

The Division failed to find a single person who witnessed Dr. Vengalattore and Ms. ███ that believed, in 2011, the two were romantically involved. While theoretically possible, it would take unfailing discipline to hide a romantic relationship in a lab environment where Dr. Vengalattore was working 12 to 18 hour days in close proximity to several undergraduate and graduate students (*see* Strausser Report). The Report, however, fails to properly infer that the lack of witnesses strongly suggests that no such relationship existed.

In stating that testimony of persons who witnessed Dr. Vengalattore and Ms. ███ interact "cut[s] both ways," the Report appears to "cherry-pick" certain statements of witnesses without putting them in context. While Mr. Sundar testified that Ms. ███ called Dr. Vengalattore "honey" and "babe," as noted above, Mr. Sundar further testified she called Mr. Sundar those nicknames as well. App. A at 81. The notes of Mr. Sundar's testimony state, "Vatsan said that he took it just as her style of speaking. Vatsan thought that Respondent took it in the same way. Vatsan said that they did not interpret in a more personal way." App. A at 82. In addition, Mr. Patil also stated that he witnessed Ms. ███ call Mr. Sundar "darling." Again, confronted with evidence pointing to her falsehoods, Ms. ███ has resorted to highly implausible narratives including one that "she reserved darling and babe for men she was involved in a relationship, but that honey etc. were not." Report at 45.

These are important facts, but as currently composed, the Report selectively and inappropriately picks isolated sentences, which, unfortunately, cast our client in a false light of inappropriate behavior. Furthermore, in its current form, because the Report as currently composed does not address critical, blatant incongruities in Ms. ███ account (*e.g.* that this secret relationship was a traumatic event in her life, to the point that she would throw up after personal attacks in the lab juxtaposed with the few unprofessional, friendly and overly familiar emails that the Report finds supportive of her allegations) it results in a confused picture wherein Ms. ███ was simultaneously traumatized *and* overtly familiar and inappropriately friendly with Dr. Vengalattore. Despite repeated attempts by Dr. Vengalattore to point out this incongruity, the Division has, unsurprisingly, not identified a single first-hand witness who can attest to having observed either of these diametrically opposed scenarios. Given the close knit

23

nature of the lab, the team work inherent to each project and the long hours that are spent with multiple individuals in each lab, this absence of any first hand testimony that can corroborate either of her polar narratives should be considered damning to her credibility. Unfortunately, the Report in its present form does not reflect that reality.

By way of example, certain witnesses refer to Ms. ███ conduct at the Biosphere in Arizona. For example, Mr. Reynolds testified that he witnessed Ms. ███ "laying across" Dr. Vengalattore on the overnight flight to the Biosphere in 2012. App. A at 166. Again, it is undisputed that there was no romantic relationship between Ms. ███ and Dr. Vengalattore at this time. Moreover, Mr. Reynolds testified that he did not witness anything "overly inappropriate" between Ms. ███ and Dr. Vengalattore and attributed Ms. ███ way of speaking "to her being a first time grad student." App. A at 166. *See also* App. A at 159 (Keith Schwab's testimony that 'neither the Complainant nor the Respondent ever gave any indication that there was something sexual or off-color about their relationship. Dr. Schwab instead said that he always had the impression that the Respondent is a real professional and that he treats his students like professionals.)

Moreover the Report notes that Kasturi Saha, a physics student at Cornell and a very close friend of Ms. ███ who was in Dr. Vengalattore's lab for a brief period time, asked Ms. ███ whether she had a crush on Dr. Vengalattore. Report at 54. However, Ms. Saha stated that she never saw anything indicating a romantic relationship and the two were just spending a lot of time together. App. A at 177. That the "two were... spending a lot of time together" is unremarkable given the pace of work at the lab, but no credible inference of a romantic or sexual relationship can be drawn from that. Indeed, Mr. Vengalattore was spending long hours in the lab with Mr. Patil (App. A at 86) and Dr. Sundar (App. A at 78).

Thus, contrary to the Report's conclusion, testimony of persons who witnessed Ms. ███ and Dr. Vengalattore together, strongly indicate that there was no romantic relationship between them. The only credible inference that can be drawn is that, for whatever reason, Mr. ███ behaved excessively casually with her supervisor and fellow students, and now seeks to manipulate their having indulged such eccentricities into devastating, false accusations.

IX.   MS. ███████ CREDIBILITY AND MOTIVE TO LIE

In assessing Ms. ███ credibility, the Division must take into account multiple inconsistencies and false statements in her testimony.

*First*, Ms. ███ has made wholly unsupported allegations of rape and a coercive relationship. The evidence shows the opposite. Ms. ███ made a string of overly familiar emails to Dr. Vengalattore to which he either did not respond or responded verbally telling Ms. ███ to act more professionally.

*Second*, Ms. ███ has fabricated a claim that Dr. Vengalattore "sidelined" her after she ended the alleged relationship. In fact, the Report found: "This claim was not substantiated by the other graduate students in the lab or the lab log and is not given any weight in this investigation." Report at 52.

24

*Third*, Ms. ██████ claims that Dr. Vengalattore was abusive to his graduate students, including Mr. Sundar. The Climate Study, referenced above, and Mr. Sundar's own testimony contradict this statement. (App. A at 78).

*Fourth*, Ms. ██████ claims that she and Dr. Vengalattore had sex in the Biosphere in Arizona. This is one of three sexual experiences Ms. ██████ has alleged. However, the two went to the Biosphere in 2012, after the alleged sexual relationship ended. Because of these false statements and inconsistencies, Ms. ██████ testimony that there was a sexual relationship should not be credited.

Ms. ██████ had a strong motive to fabricate an abusive relationship in September 2014. She had recently made false statements about Dr. Vengalattore in the tenure review letter, feared retaliation from Dr. Vengalattore (App. A at 113), and learned that Dr. Vengalattore's department just voted to give him tenure. Ms. ██████ knew that a bad recommendation or no recommendation from Dr. Vengalattore would make it difficult for her to obtain her Ph.D (App. A at 75) and that the various fabrications in her letter had significantly damaged her credibility within the Physics department. Therefore, at the time that Ms. ██████ first alleged a sexual assault, she had a motive to publicly make defamatory statements about Dr. Vengalattore. She needed a way to neutralize and distract from any negative recommendation from Dr. Vengalattore.

The investigation credits testimony that Ms. ██████ disclosed a relationship to Ms. Mathis and her sister ██████ in 2011. Although Ms. ██████ might not have possessed a motive to harm Dr. Vengalattore's reputation at this time, that does not mean she had no motive to lie about her relationship. From her contemporaneous emails and alleged statements to ██████ it appears that she liked Dr. Vengalattore and wanted to have a relationship with him. (App. A at 25). Perhaps these witnesses conflated Ms. ██████ later statements about a sexual relationship with earlier conversations where Ms. ██████ described a non-sexual "involvement" with Dr. Vengalattore. Perhaps Ms. ██████ lied about sex in 2011 to make it appear that Dr. Vengalattore reciprocated her feelings or make her life seem more interesting than it was. In any case, and regardless of Ms. ██████ subjective motives at that time, the Report errs in assuming Ms. ██████ had no motive to lie simply because, in 2011, she did not seek to sabotage Dr. Vengalattore's professional reputation.[10]

---

[10] Please note, as noted, above,  although our comments and recommendations set forth herein address whether the Report's analyses and conclusions satisfy a preponderance-of-the-evidence standard, we do not concede that such standard necessarily satisfies requisite due process standards, either facially or on an "as applied" basis. In providing the within comments and observations, please note that they have been presented  without waiver of any and all rights, remedies, defenses, causes of action or claims possessed by Dr. Vengalattore against any party, including without limitation Ms. ██████ or Cornell University (including without limitation any division, department, office, officer, director, trustee, employee, or agent of Cornell).

25

## **CONCLUSION**

For more than a year now, our client's reputation and integrity has been attacked, premised on the demonstrably false and incredible accusations of Ms. ████ that likely result from her unseemly motive to destroy Dr. Vengalattore's career to somehow make up for her own professional struggles and challenges. Although, given the severity of the accusations, it is perhaps understandable that the Division has been called upon to conduct an investigation. At present, the basis and reasoning underscoring the Report's conclusions clearly fail to satisfy even the liberal preponderance-of-the-evidence standard governing this process.

Thus, for the forgoing reasons, we believe that the Report should find that there is not a basis to conclude that the preponderance of credible evidence supports the existence of a romantic or sexual relationship between Dr. Vengalattore and Ms. ████ There is no basis to continue subjecting our client to this time-consuming and emotionally draining process. We trust that, as objective investigators committed to fairness and due process, you will carefully consider this letter, and we expect that the Report's analyses and conclusions will be so modified. As noted above, we request that the Division provide us a copy of any revised draft Report before it is transmitted to the Dean, and further request that the Division agree to meet with us after review of this letter.

Thank you for your consideration, and please do not hesitate to contact us with any questions.

Respectfully Submitted,

FLEISCHMAN LAW FIRM PLLC

By: /s/ Keith M. Fleischman

Keith M. Fleischman
Joshua D. Glatter
Ananda N. Chaudhuri
Julia Sandler

26



# EXHIBIT A

Documentation regarding trip to Biosphere in May 2012 with LMA, Collin Reynolds



Mukund Vengalattore <mvengalattore@gmail.com>

## FW: DARPA meeting held May 4-6, 2012

3 messages

**Linda S. Hatch** <lsh32@cornell.edu>
To: Mukund Vengalattore <mukundv@cornell.edu>

Fri, May 4, 2012 at 8:15 AM

Hi Mukund,

Can you please complete a web req for this payment?  I can enter the dollar figures when I receive them from Val.

Thanks,

Linda

5/4/12

---

**From:** Val Kelly [mailto:vkelly@email.arizona.edu]
**Sent:** Thursday, May 03, 2012 10:48 PM
**To:** Linda S. Hatch
**Subject:** DARPA meeting held May 4-6, 2012

Hi Linda,

Let me briefly introduce myself.  I am Val Kelly, the event coordinator for the DARPA meeting beginning tomorrow at The University of Arizona Biosphere 2.  Dr. Mukund Vengalattore informed me to get in touch with you to work out the invoice / payment information.

Please provide me with

1.    name of organization funding the event?

2.    paying organization / federally or state funded?

3.    is event funded by multiple parties or funding sources?

4.    If so, how much money will be covered by each account?  (dollar amount, or a percentage of total event, or a 'not to exceed' amount?

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)    36 of 63    Confidential - Personal
App. C - Final to Dean 9.25.15    Distribution Not Permitted

5.    Contact person name / address / email / phone number/ fax to send the invoice to

6.    what payment method?


Attached you will find the estimated cost for the DARPA meeting Dr. Vengalattore, ███████, and Collin Reynolds are attending.


Let me know if you have any questions.


Best,

Val


_____

Val Kelly

Program Coordinator Sr.

Conference and Group Sale

The University of Arizona Biosphere 2

32540 S. Biosphere Road

(520) 838.6154 (Office)

(520) 838.6162 (Fax)

vkelly@email.arizona.edu

http://www.b2science.org

---

Linda S. Hatch <lsh32@cornell.edu>                                                    Wed, May 9, 2012 at 2:12 PM
To: Mukund Vengalattore <mukundv@cornell.edu>

Hi Mukund,


Can you please provide a business purpose and account number for the DARPA meeting you attended?  I have the invoice for the accommodations and meals.


Thanks,

Linda

5/9/12

[Quoted text hidden]

---

**Mukund Vengalattore** <mukundv@cornell.edu>                    Wed, May 9, 2012 at 2:27 PM
To: "Linda S. Hatch" <lsh32@cornell.edu>

Hi Linda,
Sorry about the slow response on that .. The account number is
U76-8544 and the business purpose is "DARPA team meeting at U. of
Arizona, Tucson." The attendees from our group were myself, ███████
███████ and Collin Reynolds.

Let me know if you need me to fill out a webreq.

Thanks,
Mukund
[Quoted text hidden]
--
---
Mukund Vengalattore
Assistant Professor of Physics
536 Clark Hall
Cornell University
Ithaca, NY 14853

(607) 255 8178
mukundv@cornell.edu





EXHIBIT B

Confidential - Personal
Distribution Not Permitted

PayPal Website Payment Details – PayPal                    8/20/15, 8:33 PM



Documentation showing various lab equipment purchased using personal funds. (Bank account xxx-0833 and Credit Card xxx-7109). I did not seek reimbursement for any of these purchases.

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**eBay Payment Sent** (Unique Transaction ID #16E882042B4075247)

### Original Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Apr 20, 2010 | Payment To Chi Hung Ma | Completed | | -$54.95 USD |

### Related Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Apr 20, 2010 | Add Funds from a Bank Account | Completed | Details | $54.95 USD |

**Total amount:** -$54.95 USD
**Fee amount:** $0.00 USD
**Net amount:** -$54.95 USD
**Date:** Apr 20, 2010
**Time:** 10:27:33 PDT
**Status:** Completed

| Item # | Item Title | Qty | Price | Subtotal |
|--------|-----------|-----|-------|----------|
| 300413746114 | 1/4W Metal Film Resistor Assorted Kit 1% 1R-10MR 1000pc | 5 | $10.99 USD | $54.95 USD |

Shipping & Handling via Standard Delivery
(includes any seller handling fees):     --

Shipping Insurance :     --

**Total:**     $54.95 USD

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853
United States

Confidential - Personal
Distribution Not Permitted

Confidential

## Confirmed [?]

....................................................................

**Payment To:** Chi Hung Ma    (The recipient of this payment is **Non-U.S. - Verified**)
**Seller's ID:** apmmall.engineering
**Seller's Email:** hksunnyma@gmail.com

....................................................................

**Funding Type:** Instant Transfer
**Funding Source:** $54.95 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833
**Back Up Funding Source:** Visa Credit Card XXXX-XXXX-XXXX-7109

....................................................................

**Description:** Chi Hung Ma

....................................................................

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

[ Return to Log ]

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

Confidential

Confidential - Personal
Distribution Not Permitted



- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

## Transaction Details

**eBay Payment Sent (Unique Transaction ID #1NP05659XP1707035)**

### Original Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Feb 20, 2010 | Payment To Tara B Loder | Completed | ... | -$368.00 USD |

### Related Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Feb 20, 2010 | Add Funds from a Bank Account | Completed | Details | $368.00 USD |

**Total amount:** -$368.00 USD
**Fee amount:** $0.00 USD
**Net amount:** -$368.00 USD
**Date:** Feb 20, 2010
**Time:** 14:39:02 PST
**Status:** Completed

| Item # | Item Title | Qty | Price | Subtotal |
|--------|-----------|-----|-------|----------|
| 360233509091 | Lambda ZUP Series 6-36/6C Power Supply | 1 | $350.00 USD | $350.00 USD |

Shipping & Handling via USPS Priority Mail
(includes any seller handling fees):    $18.00 USD

Shipping Insurance :    --

**Total:**    $368.00 USD

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853
United States

**Confirmed** ⬚

**Payment To:** Tara B Loder    (The recipient of this payment is **Verified**)
**Seller's ID:** industrialconnections
**Seller's Email:** industrialconnections@yahoo.com

**Funding Type:** Instant Transfer
**Funding Source:** $368.00 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833
**Back Up Funding Source:** Visa Credit Card XXXX-XXXX-XXXX-7109

**Description:** Tara B Loder

https://www.paypal.com/us/cgi-bin/webscr?cmd=_view-a-trans&id=1NP05659XP1707035    Page 1 of 2

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)    42 of 63    Confidential - Personal
App. C - Final to Dean 9.25.15    Distribution Not Permitted



# PayPal

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

## Transaction Details

**eBay Payment Sent** (Unique Transaction ID #96591890PJ6959103)

### Original Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Mar 11, 2010 | Payment To Hui Liu | Completed | | -$134.87 USD |

### Related Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Mar 11, 2010 | Add Funds from a Bank Account | Completed | Details | $134.87 USD |

**Total amount:** -$134.87 USD
**Fee amount:** $0.00 USD
**Net amount:** -$134.87 USD
**Date:** Mar 11, 2010
**Time:** 19:36:15 PST
**Status:** Completed

| Item # | Item Title | Qty | Price | Subtotal |
|--------|-----------|-----|-------|----------|
| 370348242152 | Solid State Relay SSR 5 - 220V DC, 40A + Heat Sink | 1 | $9.99 USD | $9.99 USD |
| 370348277257 | Solid State Relay SSR 5 - 220V DC, 40A + Heat Sink | 1 | $9.99 USD | $9.99 USD |
| 250595161928 | Solid State Relay SSR 5 - 220V DC, 40A + Heat Sink | 1 | $9.99 USD | $9.99 USD |
| 250595225471 | Solid State Relay SSR 5 - 220V DC, 40A + Heat Sink | 1 | $9.99 USD | $9.99 USD |
| 250587703633 | Solid State Relay SSR 5-220V DC, 40A + Heat Sink | 5 | $14.99 USD | $74.95 USD |

Subtotal: $114.91 USD

Shipping & Handling $19.96 USD
(includes any seller handling fees):

https://www.paypal.com/us/cgi-bin/webscr?cmd=_view-a-trans&id=96591890PJ6959103
Page 1 of 2

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)        43 of 63
App. C - Final to Dean 9.25.15

Confidential - Personal
Distribution Not Permitted

Shipping Insurance :                                    --

**Total:**    $134.87 USD

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853
United States
**Confirmed** [?]

**Payment To:** Hui Liu    (The recipient of this payment is **Non-U.S. - Verified**)
**Seller's ID:** giorgio11185
**Seller's Email:** njlasz@gmail.com

**Funding Type:** Instant Transfer
**Funding Source:** $134.87 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833
**Back Up Funding Source:** Visa Credit Card XXXX-XXXX-XXXX-7109

**Description:** You have sent $134.87 USD to Hui Liu with PayPal

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

Return to Log

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

Confidential

https://www.paypal.com/us/cgi-bin/webscr?cmd=_view-a-trans&id=96591890PJ6959103    Page 2 of 2

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)    44 of 63    Confidential - Personal
App. C - Final to Dean 9.25.15                                      Distribution Not Permitted

**PayPal**

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**eBay Payment Sent** (Unique Transaction ID #092015554S482224J)

| Original Transaction | | | | |
|---|---|---|---|---|
| **Date** | **Type** | **Status** | **Details** | **Amount** |
| Feb 10, 2010 | Payment To K&S Publishing | Completed | | -$111.50 USD |

| Related Transaction | | | | |
|---|---|---|---|---|
| **Date** | **Type** | **Status** | **Details** | **Amount** |
| Feb 10, 2010 | Add Funds from a Bank Account | Completed | Details | $111.50 USD |

**Business Contact Information**

Customer Service URL: http://www.boonelistings.com
Customer Service Email: kssurplus@alltel.net

Total amount: -$111.50 USD
Fee amount: $0.00 USD
Net amount: -$111.50 USD
Date: Feb 10, 2010
Time: 17:42:31 PST
Status: Completed

| Item # | Item Title | Qty | Price | Subtotal |
|---|---|---|---|---|
| 390091479549 | DC/DC POWER SUPPLY MODULE 5 TO 12 VDC SOLA ELECTRIC | 9 | $9.95 USD | $89.55 USD |
| 390091479549 | DC/DC POWER SUPPLY MODULE 5 TO 12 VDC SOLA ELECTRIC | 1 | $9.95 USD | $9.95 USD |

Subtotal: $99.50 USD

Shipping & Handling $24.00 USD
(includes any seller handling fees):

https://www.paypal.com/us/cgi-bin/webscr?cmd=_view-a-trans&id=092015554S482224J                   Page 1 of 2

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)          45 of 63          Confidential - Personal
App. C - Final to Dean 9.25.15                                        Distribution Not Permitted

| | | |
|---|---|---|
| Shipping Insurance : | | -- |
| Seller Discounts (-) or Charges (+): | | -$12.00 USD |
| (seller discounts, services, etc.) | | |

| | | |
|---|---|---|
| **Total:** | | $111.50 USD |

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853
United States
**Confirmed** [?]

**Payment To:** K&S Publishing    (The recipient of this payment is **Verified**)
**Seller's ID:** sjp5030
**Seller's Email:** KSSURPLUS@RITTERNET.COM

**Funding Type:** Instant Transfer
**Funding Source:** $111.50 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833
**Back Up Funding Source:** Visa Credit Card XXXX-XXXX-XXXX-7109

**Description:** You have sent $111.50 USD to K&S Publishing with PayPal

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

Return to Log

- Help
- Contact
- Security
- Feedback [+]

© 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

Confidential

https://www.paypal.com/us/cgi-bin/webscr?cmd=_view-a-trans&id=092015554S482224J      Page 2 of 2

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)      46 of 63      Confidential - Personal
App. C - Final to Dean 9.25.15      Distribution Not Permitted

# **P** PayPal

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**eBay Payment Sent** (Unique Transaction ID #33403626W4258143N)

### Original Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Feb 5, 2010 | Payment To Katie Baggio | Completed | | -$419.94 USD |

### Related Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Feb 5, 2010 | Add Funds from a Bank Account | Completed | Details | $419.94 USD |

**Total amount:** -$419.94 USD
**Fee amount:** $0.00 USD
**Net amount:** -$419.94 USD
**Date:** Feb 5, 2010
**Time:** 14:36:46 PST
**Status:** Completed

| Item # | Item Title | Qty | Price | Subtotal |
|--------|-----------|-----|-------|----------|
| 230430434340 | 32 THORLABS PLANO CONVEX CYLINDRICAL LENES BRAND NEW | 1 | $399.99 USD | $399.99 USD |

|  | Shipping & Handling via Expedited Delivery (includes any seller handling fees): | $19.95 USD |
|--|--|--|
|  | Shipping Insurance : | -- |
|  | **Total:** | $419.94 USD |

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853
United States

https://www.paypal.com/us/cgi-bin/webscr?cmd=_view-a-trans&id=33403626W4258143N

Page 1 of 2

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)
App. C - Final to Dean 9.25.15

47 of 63

Confidential - Personal
Distribution Not Permitted

## Confirmed ▣

.......................................................................................................

| | |
|---|---|
| **Payment To:** | Katie Baggio   (The recipient of this payment is **Non-U.S. - Verified**) |
| **Seller's ID:** | surplus*worldwide |
| **Seller's Email:** | reflexologymat@aol.com |

.......................................................................................................

| | |
|---|---|
| **Funding Type:** | Instant Transfer |
| **Funding Source:** | $419.94 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833 |
| **Back Up Funding Source:** | Visa Credit Card XXXX-XXXX-XXXX-7109 |

.......................................................................................................

| | |
|---|---|
| **Description:** | Katie Baggio |

.......................................................................................................

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

Return to Log

Confidential

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

Confidential - Personal
Distribution Not Permitted

**PayPal**

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**eBay Payment Sent** (Unique Transaction ID #2UJ27350RC333750C)

**Original Transaction**

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Jan 28, 2010 | Payment To Tim Sanders | Completed | | -$424.00 USD |

**Related Transaction**

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Jan 28, 2010 | Add Funds from a Bank Account | Completed | Details | $424.00 USD |

**Total amount:** -$424.00 USD
**Fee amount:** $0.00 USD
**Net amount:** -$424.00 USD
**Date:** Jan 28, 2010
**Time:** 10:07:13 PST
**Status:** Completed

| Item # | Item Title | Qty | Price | Subtotal |
|--------|-----------|-----|-------|----------|
| 380191738210 | XANTREX XFR 7.5-140 DC power supply 0-7.5 @ 140 Amps | 1 | $399.00 USD | $399.00 USD |

| | | |
|---|---|---|
| Shipping & Handling via UPS Ground **Note:** UPS cannot ship to P.O. Boxes (includes any seller handling fees): | | $25.00 USD |
| Shipping Insurance : | | -- |
| **Total:** | | $424.00 USD |

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853

https://www.paypal.com/us/cgi-bin/webscr?cmd=_view-a-trans&id=2UJ27350RC333750C                Page 1 of 2

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)          49 of 63          Confidential - Personal
App. C - Final to Dean 9.25.15                                        Distribution Not Permitted

PayPal Website Payment Details – PayPal                                                      8/20/15, 8:37 PM

United States
Confirmed [?]

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

| | |
|---|---|
| **Payment To:** | Tim Sanders     (The recipient of this payment is **Verified**) |
| **Seller's ID:** | sandman.2000 |
| **Seller's Email:** | ebay@mho.com |

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

| | |
|---|---|
| **Funding Type:** | Instant Transfer |
| **Funding Source:** | $424.00 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833 |
| **Back Up Funding Source:** | Visa Credit Card XXXX-XXXX-XXXX-7109 |

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

| | |
|---|---|
| **Description:** | Tim Sanders |

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

Return to Log

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

PayPal Website Payment Details – PayPal                                    8/20/15, 8:39 PM

# PayPal

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**eBay Payment Sent** (Unique Transaction ID #10634159DF262561F)

| Original Transaction | | | | |
|---|---|---|---|---|
| **Date** | **Type** | **Status** | **Details** | **Amount** |
| Jan 22, 2010 | Payment To CDN Systems, LLC | Completed | | -$370.88 USD |

| Related Transaction | | | | |
|---|---|---|---|---|
| **Date** | **Type** | **Status** | **Details** | **Amount** |
| Jan 22, 2010 | Add Funds from a Bank Account | Completed | Details | $370.88 USD |

**Business Contact Information**

**Customer Service URL:** http://www.cdnsystems.com
**Customer Service Email:** sales@cdnsystems.com

**Customer Service Phone:** 512-933-0081

**Total amount:** -$370.88 USD
**Fee amount:** $0.00 USD
**Net amount:** -$370.88 USD
**Date:** Jan 22, 2010
**Time:** 17:57:52 PST
**Status:** Completed

| Item # | Item Title | Qty | Price | Subtotal |
|---|---|---|---|---|
| 390142654974 | HP Model 8112A 50MHz Pulse Generator with HPIB HP-IB | 1 | $350.00 USD | $350.00 USD |

Shipping & Handling via UPS Ground              $20.88 USD
(includes any seller handling fees):

Shipping Insurance (optional):              --

Invoice ID:  10818567

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)              51 of 63              Confidential - Personal
App. C - Final to Dean 9.25.15                                    Distribution Not Permitted

PayPal Website Payment Details – PayPal                                                    8/20/15, 8:39 PM

|  | **Total:** | **$370.88 USD** |

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853
United States
**Confirmed** ❓

**Payment To:** CDN Systems, LLC   (The recipient of this payment is **Verified**)
**Seller's ID:** athomemarket
**Seller's Email:** ebay@cdnsystems.com

**Funding Type:** Instant Transfer
**Funding Source:** $370.88 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833
**Back Up Funding Source:** Visa Credit Card XXXX-XXXX-XXXX-7109

**Description:** CDN Systems, LLC

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

[ Return to Log ]

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

Confidential

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)          52 of 63          Confidential - Personal
App. C - Final to Dean 9.25.15                                            Distribution Not Permitted

# PayPal

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**eBay Payment Sent** (Unique Transaction ID #8N1252599F7202023)

### Original Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Jan 20, 2010 | Payment To DUNN DAO | Completed | | -$485.98 USD |

### Related Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Jan 20, 2010 | Add Funds from a Bank Account | Completed | Details | $485.98 USD |

**Total amount:** -$485.98 USD
**Fee amount:** $0.00 USD
**Net amount:** -$485.98 USD
**Date:** Jan 20, 2010
**Time:** 11:07:25 PST
**Status:** Completed

| Item # | Item Title | Qty | Price | Subtotal |
|--------|-----------|-----|-------|----------|
| 250562456556 | HP 33120A Function Generator/Arbitrary Waveform Gen | 1 | $449.99 USD | $449.99 USD |

| | | |
|---|---|---|
| Shipping & Handling via USPS Priority Mail (includes any seller handling fees): | | $35.99 USD |
| Shipping Insurance : | | -- |
| **Total:** | | $485.98 USD |

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853
United States

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)    53 of 63
App. C - Final to Dean 9.25.15

Confidential - Personal
Distribution Not Permitted

Confidential

PayPal Website Payment Details – PayPal                                    8/20/15, 8:40 PM

## Confirmed [?]

........................................................................................................

| | |
|---|---|
| **Payment To:** | DUNN DAO    (The recipient of this payment is **Verified**) |
| **Seller's ID:** | 1009thcomputerservice |
| **Seller's Email:** | softbarns@yahoo.com |

........................................................................................................

| | |
|---|---|
| **Funding Type:** | Instant Transfer |
| **Funding Source:** | $485.98 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833 |
| **Back Up Funding Source:** | Visa Credit Card XXXX-XXXX-XXXX-7109 |

........................................................................................................

| | |
|---|---|
| **Description:** | DUNN DAO |

........................................................................................................

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

[ Return to Log ]

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)              54 of 63        Confidential - Personal
App. C - Final to Dean 9.25.15                                          Distribution Not Permitted

PayPal Website Payment Details – PayPal                                                                8/20/15, 8:41 PM



- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**eBay Payment Sent** (Unique Transaction ID #9JH03508WY246291T)

**Original Transaction**

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Jan 20, 2010 | Payment To Marc Loponte | Completed | | -$516.04 USD |

**Related Transaction**

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Jan 20, 2010 | Add Funds from a Bank Account | Completed | Details | $516.04 USD |

**Total amount:** -$516.04 USD
**Fee amount:** $0.00 USD
**Net amount:** -$516.04 USD
**Date:** Jan 20, 2010
**Time:** 11:08:52 PST
**Status:** Completed

| Item # | Item Title | Qty | Price | Subtotal |
|--------|-----------|-----|-------|----------|
| 190353963430 | HP Agilent 8656B 100khz-990MHz Signal Generator MINT | 1 | $495.00 USD | $495.00 USD |

Shipping & Handling via UPS Ground     $21.04 USD
**Note:** UPS cannot ship to P.O. Boxes
(includes any seller handling fees):

Shipping Insurance :     --

**Total:**     $516.04 USD

**Shipping Address:** Mukund Vengalattore
LASSP, 517 Clark Hall
Cornell University
Ithaca, NY 14853

Confidential - Personal
Distribution Not Permitted

Confidential

United States
**Confirmed** 🔲

| | |
|---|---|
| **Payment To:** | Marc Loponte     (The recipient of this payment is **Verified**) |
| **Seller's ID:** | acclaimtest |
| **Seller's Email:** | hitechgeek14@gmail.com |

| | |
|---|---|
| **Funding Type:** | Instant Transfer |
| **Funding Source:** | $516.04 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833 |
| **Back Up Funding Source:** | Visa Credit Card XXXX-XXXX-XXXX-7109 |

| | |
|---|---|
| **Description:** | Marc Loponte |

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

Return to Log

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates


**PayPal**

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**Express Checkout Payment Sent** (Unique Transaction ID #6D3294995N5185921)

### Original Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Feb 22, 2014 | Payment To TEKSTAR | Completed | | -$930.00 USD |

### Related Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Feb 22, 2014 | Add Funds from a Bank Account | Completed | Details | $930.00 USD |

### Shopping Cart Contents

| Qty | Item | Options | Price |
|-----|------|---------|-------|
| 1 | Great Condition Stanford SR560 Low-noise Voltage Preamplifier Item # 231198452369 | | $900.00 USD |
| | | Amount | $900.00 USD |

### Business Contact Information

**Customer Service Email:** tassel78@yahoo.com

|  |  |
|--|--|
| **Item Total:** | $900.00 USD |
| **Sales Tax:** | |
| **Shipping:** | $30.00 USD |
| **Seller discount or charges:** | $0.00 USD |

|  |  |
|--|--|
| **Total amount:** | -$930.00 USD |
| **Fee amount:** | $0.00 USD |
| **Net amount:** | -$930.00 USD |

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)                    57 of 63                    Confidential - Personal
App. C - Final to Dean 9.25.15                                                            Distribution Not Permitted

PayPal Website Payment Details – PayPal                                                          8/20/15, 8:46 PM

| | |
|---|---|
| **Date:** | Feb 22, 2014 |
| **Time:** | 12:35:47 PST |
| **Status:** | Completed |

| | |
|---|---|
| **Insurance:** | $0.00 USD |
| **Status:** | Completed |

**Shipping Address:** Mukund Vengalattore
536 Clark Hall
Cornell University
Ithaca, NY 14853
United States
**Confirmed** ❓

**Payment To:** TEKSTAR   (The recipient of this payment is **Verified**)
**Seller's ID:** techstar2003
**Seller's Email:** tassel78@yahoo.com

**Funding Type:** Instant Transfer
**Funding Source:** $930.00 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833
**Back Up Funding Source:** Visa Credit Card XXXX-XXXX-XXXX-0515

**Description:** Shopping Cart

Need help? If you have problems with an eBay transaction or want help settling a dispute with an eBay seller, go to the eBay Resolution Center. PayPal and eBay strongly recommend that you attempt to resolve issues directly with the seller whenever possible.

[ Return to Log ]

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

Confidential - Personal
Distribution Not Permitted

PayPal Website Payment Details – PayPal                                          8/20/15, 8:53 PM

 **PayPal**

- Summary
- Activity
- Send & Request
- Wallet
- Shop

- Settings
- Help
- Log Out

# Transaction Details

**Transaction Completed** (Unique Transaction ID #6FB58355K42857044)

### Original Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Sep 22, 2011 | Payment To Woot, Inc. | Completed | | -$394.19 USD |

### Related Transaction

| Date | Type | Status | Details | Amount |
|------|------|--------|---------|--------|
| Sep 22, 2011 | Add Funds from a Bank Account | Completed | Details | $394.19 USD |

**Business Name:** Woot, Inc. (The recipient of this payment is **Verified**)
**Email:** service@woot.com
**Billing Agreement ID:** B-1EF70716X3732662R
**Billing Description:** Orders I place at Woot.com

View Billing Agreement Details

**Total amount:** -$394.19 USD
**Fee amount:** $0.00 USD
**Net amount:** -$394.19 USD

**Item amount:** $394.19 USD
**Sales Tax:** $0.00 USD
**Shipping:** $0.00 USD
**Handling:** $0.00 USD
**Quantity:** 1

**Item Title:** HP Pavilion Intel Dual-Core Notebook with 17.3" BrightView LED Display (1)
**Invoice ID:** 34809944
**Date:** Sep 22, 2011
**Time:** 09:51:38 PDT

Confidential

https://www.paypal.com/us/cgi-bin/webscr?cmd=_view-a-trans&id=6FB58355K42857044                    Page 1 of 2

Cornell Rom. and Sex. Rel. Pol. Rpt. (WPLR)                    59 of 63                    Confidential - Personal
App. C - Final to Dean 9.25.15                                                          Distribution Not Permitted

**Status:** Completed

**Shipping Address:** No Address Provided

## Business Contact Information

**Customer Service URL:** http://www.woot.com
**Customer Service Email:** service@woot.com

**Customer Service Phone:** 214-764-2489

**Funding Type:** Instant Transfer
**Funding Source:** $394.19 USD - Bank of America (All except WA and ID) Checking (Confirmed) x-0833
**Back Up Funding Source:** Visa Credit Card XXXX-XXXX-XXXX-0515

Edit Funding Sources

**Description:** Woot, Inc.

Return to Log

- Help
- Contact
- Security
- Feedback [+]

- © 1999-2015 PayPal. All rights reserved.
- Privacy
- Legal
- Policy updates

Confidential - Personal
Distribution Not Permitted

Confidential



# EXHIBIT C

Confidential - Personal
Distribution Not Permitted



Mukund Vengalattore <mvengalattore@gmail.com>

---

## Your Amazon.com order of "Armarkat B5701 57-Inch Cat..." has shipped!

---

**Amazon.com** <ship-confirm@amazon.com>                                                    Tue, Dec 20, 2011 at 1:30 PM
Reply-To: "ship-confirm@amazon.com" <ship-confirm@amazon.com>
To: "mukundv@cornell.edu" <mukundv@cornell.edu>

                                            Your Orders  |  Your Account  |  Amazon.com

### Shipping Confirmation
Order # 105-5019298-7513046

## Hello Mukund Vengalattore,

Thank you for shopping with us. We thought you'd like to know that we shipped this portion of your order separately to give you quicker service. You won't be charged any extra shipping fees, and the remainder of your order will follow as soon as those items become available. If you need to return an item from this shipment or manage other orders, please visit Your Orders on Amazon.com.

---

Your estimated delivery date is:                              Your order was sent to:
**Thursday, December 22, 2011**                              **Mukund Vengalattore**
                                                             **207 MADISON ST**
[ **Track Your Package** ▶ ]                                  **ITHACA, NY 14850-3431**
                                                             **United States**

Your package is being shipped by UPS and the tracking number is 1ZW220560300381552. Depending on the shipping method you chose, it may take 24 hours for your tracking number to return any information.

## Shipment Details

          Armarkat B5701 57-Inch Cat Tree, Ivory                    **$78.95**
                              Sold by Amazon.com LLC (Amazon.com)


                                                    Item Subtotal:          $78.95
                                                    Shipping & Handling:    $26.55

                                                    Total Before Tax:      $105.50
                                                    Sales Tax Collected:     $8.44

| Shipment Total: | **$113.94** |
|---|---|
| Paid by Visa: | $113.94 |

You have only been charged for the items sent in this shipment. Per our policy, you only pay for items when we ship them to you.

## Other Items Shipping Soon

For order # 105-5019298-7513046
Placed on December 19, 2011

**Delivery Estimate: Saturday, December 24, 2011**
Da Bird Cat Toy - Easy Store - 2 Part Pole

Returns are easy. Visit our Online Return Center.

If you need further assistance with your order, please visit Customer Service.

We hope to see you again soon!

**Amazon.com**

Unless otherwise noted, items are sold by Amazon.com LLC and taxed if shipped to Kansas, North Dakota, New York, Kentucky or Washington. If your order contains one or more items from an Amazon.com partner it may be subject to state and local sales tax, depending on the state to which the item is being shipped. Learn more about tax and seller information.

Items in this order may be subject to California's Electronic Waste Recycling Act. If any items in this order are subject to that Act, the seller of that item has elected to pay any fees due on your behalf.

This email was sent from a notification-only address that cannot accept incoming email. Please do not reply to this message.

Confidential

Confidential - Personal
Distribution Not Permitted

