Exhibit 27

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of<br><br>MUKUND VENGALATTORE,<br><br>                                 Complainant,<br><br>              v.<br><br>CORNELL UNIVERSITY, GRETCHEN RITTER<br>                                     Respondent. | AMENDMENT TO<br>THE COMPLAINT<br><br>Case No.<br>10196089 |

Federal Charge No. 16GB804371

Pursuant to the provisions of § 297.4a of the Human Rights Law (Executive Law, Article 15) of the State of New York, and the New York State Division of Human Rights ("Division"), Rules of Practice § 465.4, the complaint in the aforesaid proceeding is amended as follows:

The Respondent, named in the original complaint as:

**Cornell University, Gretchen Ritter, Michael Kotlikoff, Erich Mueller, Eanna Flanagan, Wendy Tarlow, Madelyn Wessel, Jeevak Parpia, Paul McEuen, Jim Alexander, Itai Cohen, Ritchie Patterson, Peter Lepage**

has been modified to the correct legal name for this entity, as follows:

**Cornell University, Gretchen Ritter**

The above caption to this document reflects the correct caption for this complaint, as modified and accepted for filing by the Division.

Dated: August 2, 2018
      Albany, New York

                               STATE DIVISION OF HUMAN RIGHTS

By: _____
                          Terence Green
                          Office Assistant I

TO:

TO:Complainant
Mukund Vengalattore
207 Madison Street
Ithaca, NY 14850

Respondent
Cornell University
Office of University Counsel
300 CCC Building, 235 Garden Avenue
Ithaca, NY 14853

Respondent
Gretchen Ritter
Cornell University
c/o Cornell University
Office of University Counsel
300 CCC Building, Garden Avenue
Ithaca, NY 14853

I have not commenced any other civil action, nor do I have an action pending before any administrative agency, under any state or local law, based upon this same unlawful discriminatory practice.

_____

Mukund Vengalattore

STATE OF NEW YORK   )
                                          )   SS:
COUNTY OF                 )

Mukund Vengalattore, being duly sworn, deposes and says: that he/she is the complainant herein; that he/she has read (or had read to him or her) the foregoing complaint and knows the content thereof; that the same is true of his/her own knowledge except as to the matters therein stated on information and belief; and that as to those matters, he/she believes the same to be true.

_____

Mukund Vengalattore

Subscribed and sworn to
before me this          day
of                         , 20


_____

Signature of Notary Public

1019608 RECEIVED

## New York State Division of Human Rights
## Employment Complaint Form

JUL 2 0 2018

DIVISION OF HUMAN RIGHTS
BINGHAMTON REGIONAL OFFICE

| **1. Your contact information:** | |
|---|---|
| First Name  Mukund | Middle Initial/Name |
| Last Name  Vengalattore | |
| Street Address/ PO Box  207 Madison St. | Apt or Floor #: |

| City  Ithaca | State  NY | Zip Code  14850 |
|---|---|---|

**2. Regulated Areas:** You believe you were discriminated against in the area of:
- ☑ Employment *(including paid internship)*
- ☐ Apprentice Training
- ☐ Internship *(unpaid only)*
- ☐ Labor Organization
- ☐ Employment Agencies
- ☐ Licensing
- ☐ Volunteer Firefighting *(excludes disability, age, domestic violence victim status, arrest, conviction, genetic history)*

**3. You are filing a complaint against:**

| Employer Name  Cornell University | | |
|---|---|---|
| Street Address/ PO Box  391 Pine Tree Road | | |
| City  Ithaca | State  NY | Zip Code 14850 |

Telephone Number:
( 607 )255-6866                                    Ext.

In what *county or borough* did the violation take place?
   Tompkins County

Individual people who discriminated against you:
Name:  Gretchen Ritter          Title:  Dean of College of Arts & Sciences, Cornell
Name:  Michael Kotlikoff          Title:  Provost, Cornell

If you need more space, please list them on a separate piece of paper.   (see attached)

**4. Date of alleged discrimination** *(must be within one year of filing):*
The most recent act of discrimination happened on:   06    30    2018
                                                                                    month   day   year

**5. For employment and internships, how many employees does this company have?**
          ☐1-3     ☐4-14     ☐15-19     ☑ 20 or more    ☐Don't know

**6. Are you currently working for this company?**

| ☐ Yes.  Date of hire: ___ ___ ___  month  day  year | What is your position? |
|---|---|
| ☑ No.  Last day of work: 06  30  2018  month  day  year | What was your position?  Assistant Professor of Physics |
| ☐ I was never hired.  Date of application: ___ ___ ___  month  day  year | What position did you apply for?  Assistant Professor of Physics |

1
Complaint

Other individuals responsible for discrimination against me :
1. Erich Mueller, Director of Laboratory for Atomic and Solid State Physics (LASSP)
2. Eanna Flanagan, Chairperson of the Cornell Physics Department
3. Wendy Tarlow, University counsel
4 Madelyn Wessel, Lead University counsel
5. Jeevak Parpia, ex-Chairperson of the Cornell Physics Department and Professor of Physics at Cornell
6. Paul McEuen, ex-Director of LASSP and Newman Professor of Physics at Cornell

In addition, there is evidence that several current members of the Cornell Physics department
willingly participated in orchestrating a sham tenure process that was designed to guarantee
the termination of my employment. These faculty members notably include Paul McEuen, Jim Alexander,
Itai Cohen, Ritchie Patterson, Peter Lepage and others. This sham process is not only in violation of
Cornell's anti-harassment and anti-retaliation policies, it is also in contempt of a recent court order and
federal anti-retaliation laws.

**7. Basis of alleged discrimination**:

Check *ONLY* the boxes that you believe were the reasons for discrimination. Please look at page 2 of "Instructions" for an explanation of each type of discrimination.

| | |
|---|---|
| ☐ **Age**:<br>Date of Birth: _____ | ☐ **Military Status**:<br>☐ Active Duty    ☐ Reserves |
| ☐ **Arrest Record** *(resolved in your favor or youthful offender record or sealed conviction record)* | ☑ **National Origin**:<br>Please specify: Sub-continent |
| ☐ **Conviction Record** | ☐ **Predisposing Genetic Characteristic**:<br>Please specify: _____ |
| ☐ **Creed/ Religion**:<br>Please specify: _____ | ☐ **Pregnancy-Related Condition**:<br>Please specify: _____ |
| ☐ **Disability**:<br>Please specify: _____ | ☑ **Race/Color or Ethnicity**:<br>Please specify: Indian (South Asian) origin |
| ☐ **Domestic Violence Victim Status** | ☐ **Sexual Orientation**:<br>Please specify: _____ |
| ☐ **Familial Status**:<br>Please specify: _____ | ☐ **Sex**:<br>Please specify: _____<br>Specify if the discrimination involved:<br>☐ Pregnancy  ☐ Gender Identity ☐ Transgender Status<br>☐ Sexual Harassment |
| ☐ **Marital Status**:<br>Please specify: _____ | |

If you believe you were treated differently after you filed or helped someone file a discrimination complaint, participated as a witness to a discrimination complaint, or opposed or reported discrimination due to any category above, check below:

☑ **Retaliation**: How you did you oppose discrimination: By filing a discrimination complaint

**8. Acts of alleged discrimination**: *What did the person/company you are complaining against do? Check all that apply*

| | | | |
|---|---|---|---|
| ☐ Refused to hire me | ☐ Denied me an accommodation for my disability or pregnancy-related condition | ☐ Denied me leave time or other benefits | ☑ Harassed/ intimidated me (other than sexual harassment) |
| ☑ Fired me/laid me off | ☐ Denied me overtime benefits | ☐ Sexually harassed or intimidated me | ☐ Did not call back after lay-off |
| ☐ Demoted me | ☐ Paid me a lower salary than other co-workers doing the same job | ☐ Gave me different or worse job duties than other workers doing the same job | ☐ Denied me services/treated differently by employment agency |
| ☑ Suspended me | ☐ Denied me an accommodation for my religious practices | ☑ Gave me a disciplinary notice or negative performance review | ☐ Unlawful inquiry, or limitation, specification or discrimination in job advertisement |
| ☐ Denied me training | ☑ Denied me promotion/ pay raise | ☐ Denied a license by a licensing agency | ☐ Other: |

**9. Description of alleged discrimination**

*Tell us more about each act of discrimination that you experienced. Please include dates, names of people involved, and explain why you think it was discriminatory. TYPE OR PRINT CLEARLY.*

I am an Assistant Professor of Physics in Cornell's department of Physics. During my employment at Cornell (2009-2018), I've established Cornell's first program on experimental Atomic Physics and received more than $7 Million dollars of federal research funding.

The specific acts of discrimination I've faced are :

1. Deliberate bias, discrimination and denial of resources that have severely hampered the growth of my research program  (2012 - present). (see Cornell internal committee report acknowledging these discriminatory actions, in Appendix 1 )

2. Deliberate solicitation of false and defamatory accusations in retaliation following my complaints about the Cornell administrator's discriminatory treatment of my research program. (see timeline in next page)

3. Discriminatory treatment in regard to the false allegations including, inter alia, refusal to divulge details of the allegations, refusal to accord my right to due process, refusal to accord my right to a hearing, and other procedural abuses. There is strong evidence that these procedural abuses were orchestrated by the same administrators who were named in our complaints regarding discrimination (see commentary on these violations by Professor Kevin Clermont, Ziff Professor of Law at Cornell Law School, Appendix 6).

4. Repeated harassment, threats and imposition of a hostile work environment on me and my research students by Cornell administrators in response to our complaints (2014-present). We have obtained a restraining order issued by the NY State Supreme Court requiring Cornell to cease this harassment and disruption of our research studies (see Appendix 4). Despite this restraining order, senior administrators and faculty members (Gretchen Ritter, Jeevak Parpia, Erich Mueller, Jim Alexander etc) have continued to harass my research group in violation of the Court order. As a result of this ongoing harassment, a few of my students have suffered serious stress-related medical issues (2017-present).

5. My students and I have filed multiple internal complaints in relation to these events (see example communication from my student, Yogesh Patil, to senior Cornell administrators, Appendix 5). We have presented ample evidence that these discriminatory actions, and also pointed out that other faculty members (of Caucasian origin) are subject to very different treatment by the same Cornell administrators. These complaints have been allowed to lie fallow, and Cornell has refused to acknowledge or investigate our complaints.

6. Following Cornell's inaction, we have also filed complaints with the Department of Education and Office of Civil Rights. Notably, the OCR has deemed sufficient prima facie evidence of discrimination on the basis of national origin, race etc. as well as retaliation against us by Cornell. The OCR has also acknowledged that the Cornell administrators (e.g. Gretchen Ritter, Michael Kotlikoff, Jeevak Parpia etc) were aware that we were engaged in protected activity when they imposed retaliatory actions against us. (see OCR notification letters, Appendix 3)

7. Following our complaints to the OCR, Cornell has imposed retaliatory suspensions against me, escalated its harassment of my students, and most recently, orchestrated a sham tenure review process designed to terminate my employment (Dec 2017 - Feb 2018). (see letters stating retaliatory intent of Cornell's sham tenure review, Appendix 6)

(Please see next page for timeline of events, and more details of this complaint).

*If you need more space to write, please continue writing on a separate sheet of paper and attach it to the complaint form.  DO NOT WRITE IN THE MARGINS OR ON THE BACK OF THIS FORM.*

I am an Assistant Professor of Physics at Cornell University with a federally funded research program on Department of Defense (DoD) activities.

1. Over the past four years (2014-2018), Cornell University administrators (Gretchen Ritter, Jeevak Parpia etc) have repeatedly solicited false allegations of misconduct against me, and weaponized these false allegations to deny my tenure and terminate my appointment. These retaliatory actions by the Cornell administration began after I stated my intentions to file complaints about discrimination against my research program and other adminstrative misconduct by senior faculty within the Cornell Physics department and the College of Arts and Sciences.

2. An internal investigation by the Cornell tenure committee upheld my concerns stating, among other things, that (i) My research program was hampered by bias and discrimination, (ii) Senior administrators (e.g. Jeevak Parpia) have violated University policies in regards to their treatment of my research program and should be subject to disciplinary action. (iii)  My rights as a Cornell faculty member were repeatedly violated by penalizing me on the basis of false, unsubstantiated allegations while denying my right to notice and a hearing (see Appendix 1). These findings were summarily overruled by the Cornell University counsel's office without any basis.

3. My students and I have filed complaints with Cornell against the relevant administrators and presented ample evidence to corroborate our concerns (See example communication from my student to senior Cornell administrators. Appendix 5). These complaints have been deliberately allowed to lie fallow, while these administrators continue to engage in harassment and retaliation against my group. My students and I were also subject to overtly racist comments in regard to our complaints, including falsely giving credence to the false allegations stating that "it is common for faculty from the sub-continent to harass and abuse their students"

4. A recent lawsuit filed by me against Cornell in the NY State Supreme Court has found that Cornell's conduct in regard to my career was "grossly unfair, arbitrary, capricious and in denial of my due process rights." This decision closely agrees with the findings of Cornell's own internal investigations. Furthermore, the Court also issued a restraining order against the relevant administrators prohibiting further harassment of my research group and disruption of our studies (see Appendix 4). Despite this restraining order, Cornell administrators continue to harass threaten and coerce my students into leaving my research group. Senior faculty members within Cornell's own law school have deemed these actions to be compelling evidence of retaliation and contempt of court (see Letter of May 2017, Appendix 6). Two of my students have suffered serious stress-related health issues that their therapists have attributed to the hostile work environment imposed upon our research group by Cornell administrators.

5. Following Cornell's deliberate inaction in response to our complaints, my students and I have filed multiple complaints with the Office of Civil Rights (OCR) and presented evidence of Cornell's discriminatory and retaliatory actions against me and my research group (Nov 2016 - present). The OCR has deemed sufficient prima facie evidence supporting our complaints and has opened several investigations regarding Cornell's discrimination against my group on the basis of my national origin. The OCR has also opened investigations into the harassment and disruption of our federally funded research activities, and most recently, the retaliatory actions against me in response to our complaints (see Appendix 3). As such, our concerns and complaints have by now been acknowledged as valid by (i) Cornell's own internal committees, (ii) the Office of Civil Rights, and (iii) the NY State Supreme Court.

6. Notably, in investigating our complaints, the OCR has unambiguously stated that I was engaged in protected activity (e.g. my complaints regarding discrimination and retaliation), and the Cornell adminsitrators were well aware of my complaints when they engaged in retaliatory actions against me.

7. Despite this widespread acknowledgement of Cornell's illegal actions against me, Cornell University administrators have refused to address the matter. Rather, they have escalated their retaliatory campaign. Cornell University has terminated my appointment (June 2018), barred me and my students from campus (June 2018), and denied us access to our laboratory facilities (May 2018). As such, our DoD research has come to a complete halt The DoD has sent several inquiries regarding Cornell's disruption of our research activities, and the status of our research equipment. Cornell has incredibly claimed that this equipment is "Cornell property" despite the clear statutes of the federal research agreement which stipulate that these equipment belong to the federal government.

8. In addition to the illegal appropriation of federal research equipment used for our research activities, Cornell has also attempted to appropriate my federal research grants in blatant disregard for federal research agreements. (May 2018). In addition to the above facts, there is also ample evidence that Cornell has made false claims and misrepresented the status of my research program to the Army Research Office and other Department of Defense (DoD) officials. In these communications, Cornell has selectively removed statements that reveal the continued disruption of our research activities by Cornell administrators and the hostile work environment that has been imposed on my research group. Further, DoD contract officers have also acknowledged that Cornell University has mismanaged my federal research funding and made false claims to the funding agencies in this regard.

These facts (and the relevant documents) can be accessed at the following website ·
https://sites.google.com/view/harassmentatcornellphysics/home

I request assistance from the EEOC to resolve this matter and repair the damage to my career, reputation as well as the progress of our DoD research activities.

## Notarization of Complaint

Based on the information contained in this form, I charge the herein named respondent(s) with an unlawful discriminatory practice, in violation of the New York State Human Rights Law.

By filing this complaint, I understand that I am also filing my employment complaint with the United States Equal Employment Opportunity Commission under the Americans With Disabilities Act (covers disability related to employment), Title VII of the Civil Rights Act of 1964, as amended (covers race, color, religion, national origin, sex relating to employment), and/or the Age Discrimination in Employment Act, as amended (covers ages 40 years of age or older in employment). This complaint will protect my rights under federal law.

I hereby authorize the New York State Division of Human Rights to accept this complaint on behalf of the U.S. Equal Employment Opportunity Commission, subject to the statutory limitations contained in the aforementioned law.

I have not filed any other civil action, nor do I have an action pending before any administrative agency, under any state or local law, based upon this same unlawful discriminatory practice.
**PLEASE INITIAL**

I swear under penalty of perjury that I am the complainant herein; that I have read (or have had read to me) the foregoing complaint and know the contents of this complaint; and that the foregoing is true and correct, based on my current knowledge, information, and belief.

Sign your full legal name

AMANDA J. CATUNE
Notary Public, State of New York
Registration no. 01CA6355990
Qualified in Tompkins County
Commission Expires March 20, 20_21_

Subscribed and sworn before me
This 19 day of JULY 20 18

Signature of Notary Public

County: Tompkins

Commission expires: 3|20|2021

**Please note: Once this form is completed, notarized, and returned to the New York State Division of Human Rights, it becomes a legal document and an official complaint with the Division.**

APPENDIX 1  This is the internal report issued by the Cornell Tenure Appeals committee which upheld my appeal noting, inter alia, that I
was the victim of bias and discrimination that hampered the growth of my research program, (ii) my tenure review was
compromised by false and unvestigated allegations by a disgruntled former student, (iii) multiple faculty attested (even in 2015)
that the student in question was untrustworthy and had engaged in a campaign to sabotage my tenure review.
Based on documents produced subsequently in discovery  we have also learned that the Dean who orchestrated the denial of
my tenure had repeatedly made false claims to this committee to the effect that the student's allegations were "not frivolous" and
that each of my grounds for appeal should "be treated with skepticism" since I had "refused to take responsibility for the allegations"

Appeals Committee Report
Mukund Vengalattore Promotion to Associate Professor with Tenure

Mukund Vengalattore's (MV) appeal of the negative tenure decision by Dean Gretchen Ritter states
three grounds for his appeal:

> 1. During my probationary period, I was seriously hindered in meeting the department's
> standards due to a denial of departmental support, contrary to the normal practice.

> 2. In the conduct of the tenure review, there were violations of established procedures and
> practices of the University. As shown by multiple points of evidence, these violations seriously
> affected perceptions of my tenure case, and influenced the departmental vote and the Dean's
> decision.

> 3. The evaluation of my tenure dossier was substantially influenced by improper and
> unprofessional consideration of factors. Careful assessment of these factors was only performed
> after the departmental vote and the Dean's decision. Again, this improper and incomplete
> consideration has seriously affected the outcome of the tenure review.

We, the Appeals Committee, review key aspects of MV's tenure case and address each of these grounds
for appeal in this report.  In previous consideration of the case, opinions about whether MV should be
awarded tenure were sharply divided. The negative opinions were based upon (1) a thin publication
record and (2) scathing opinions of graduate students about how MV supervised them. The first ground
for the appeal relates to the publication record, and the second and third grounds for the appeal relate
primarily to MV's supervision of graduate students. However, this separation of the appeal grounds and
the reasons for denial of tenure is not complete.

MV's field of research is AMO physics. AMO experiments require custom built, high precision
equipment and are labor intensive. MV made the risky decision to build three independent experiments
while an assistant professor instead of one, so he needed a substantial number of laboratory assistants
to bring experiments to completion. MV relied upon both graduate students and undergraduates to
carry out this work. Everyone agrees that he has been extraordinarily successful in supervising and
inspiring undergraduates. His early efforts to recruit graduate students to his laboratory were less
successful. His appeal asserts that the Physics Department was biased against admitting students who
expressed an interest in his field of experimental AMO physics, with the result that he was unable to
recruit a sufficient number of capable graduate students to work in his lab. We find that MV's claims
are credible. We have not assessed the amount of bias nor its impact on the research progress of MV's
laboratory. Evaluation of these matters requires subjective judgment and speculation about what would
have happened if the Physics Department had acted differently.

To understand how bias might have occurred, we briefly summarize the graduate admissions process of
the Graduate Field of Physics. Unlike other Fields with which we are familiar, Physics faculty do not
have access to graduate applications. There is an admissions committee, and each application is

assigned by the DGS and Department Chair to two members of the committee to read and score. To set a calibration standard, a few files from previous years are distributed to admissions committee members. (Applications that are scored significantly differently by the two readers are discussed by the committee as a whole to reach a consensus score.) Decisions about admission and financial support are then made by the Physics DGS and the Department Chair using the scored applications. The decision process is closed: even members of the admissions committee only see the applications they score.

The Field ideal is to make admission decisions based upon quality and promise of the applicant rather than their expressed field of interest. However, this is not entirely possible. Research in the Physics Department is managed by two research centers, LASSP and LEPP. Each faculty member is associated with one of these two centers. Graduate applications are divided into four groups based upon whether the applicant is interested primarily in theoretical or experimental research and whether they are interested in areas that fall within the domain of LASSP or LEPP. Apart from this division, the Field seeks applicants with broad interests and makes strong efforts to develop a common core of expertise among its students. Applications that identify a specific research interest clearly associated with a single faculty member are discouraged, based upon the view that if such a student later decides that they have not made a good choice of advisor, they will have few opportunities to switch. This policy seems to work to the disadvantage of areas with few departmental faculty and/or areas that are seen as lying outside "core" physics.

MV is the only faculty member doing experimental research in AMO physics. He claims that applicants who expressed an interest in this field were subjected to higher standards than students in other fields. We met with the current and previous DGS (now Department Chair). They dispute MV's claim, but left our committee with the impression that that they regarded applications expressing interest in experimental AMO physics as targeted toward MV and therefore lacking the breadth sought by the Department.

MV actively tried to recruit students interested in AMO physics to Cornell. He identified highly talented undergraduates already doing research in AMO physics and encouraged them to apply to Cornell. He called the DGS' attention to these applications and advocated that they be admitted. The Field did not encourage his efforts or provide significant feedback to MV about these applicants. Instead, they characterized MV as stuck in the departmental culture of MIT where he had been a student and postdoc. During the middle of MV's term as an assistant professor, he served on the admissions committee and saw files of students who were admitted with undergraduate records that seemed markedly inferior to those of students he was recommending for admission. In a separate, but related, matter, undergraduates doing research in his laboratory who expressed a strong interest in continuing as graduate students working in MV's laboratory were strongly discouraged from doing so. The Department generally advises students not to remain at Cornell for graduate study, but their stated policy is to evaluate such applications equally with applications from students at other institutions. However, some of the most talented, prize winning undergraduates doing research in MV's laboratory were told by the Physics DUS that their graduate applications would not be considered. These events form the basis for the first ground of MV's appeal.

Given the restrictions on access to applications, our committee requested that MV be allowed to review graduate Physics applications for the years in question. The Graduate School enabled him to do so on their computers. He reviewed applications from students he had recommended and the distribution of scores given by the admissions committee to students who had been admitted. He presented our committee with data from his investigation that support his claims of bias. If his claims are correct, the bias could have been willful or an unintentional side effect of viewing applicants expressing interest in AMO physics as "specialists" rather than "generalists." Most relevant to MV's tenure case is that Physics admitted few graduate students with interests in experimental AMO physics during the critical early years of his appointment, thereby hindering MV's ability to grow his research program in a timely manner. When this issue surfaced during MV's tenure review and was called to the attention of the Department, there was a marked change in admissions decisions. In 2015, seven applicants in the category we are discussing were admitted, including a Cornell undergraduate who has already been doing research in MV's laboratory. This action lends supports to MV's claim that there was a strong pool of applicants in AMO Physics in earlier years, but that the Physics Department used higher standards in evaluating them.

We turn now to the second and third grounds of MV's appeal. Since there were few graduate students with exposure to AMO physics, MV had difficulty in recruiting graduate students to work in his laboratory. Thus far, there have been five graduate students who have done research in MV's laboratory. Two of these students left the laboratory in late 2012, after MV's third year review but well before his tenure review. This was a critical time for the laboratory. It was approaching a significant milestone, establishing a Bose-Einstein condensate (BEC) for its first time, but progress had slowed after the graduation of three talented undergraduate researchers. (At least one of these undergraduates had expressed strong interest in continuing to work in the laboratory as a graduate student, linking the admissions issues described above with the events described below.) The slow progress contributed to a tense atmosphere and may have been a factor in the departure of the two students (however, see the discussion of one of these students below). The third student among the five who worked with MV was doing a master's project while applying (successfully) to enter the AEP Field to pursue a PhD. The fourth student completed his degree and is now a postdoc continuing physics research elsewhere. The fifth student continues to do research in MV's laboratory and is highly enthusiastic about the work that he is doing.

The two students who left MV's laboratory wrote very critical letters about MV that are part of the tenure file. The Physics Department discussed these letters extensively when considering MV's tenure case. Many of the negative votes for MV's tenure cite deficiencies in MV's capabilities as a graduate student supervisor. (Note that the Physics Department makes the faculty statements about their tenure votes anonymous, so the tenure file does not identify the individuals writing each opinion.) Despite the large number of negative votes, the Physics Department recommended tenure and reaffirmed that recommendation in response to a preliminary denial of tenure by Dean Ritter. Dean Ritter then gave a final denial, and it is this action that is being appealed by MV. Dean Ritter's decision is based upon the mixed tenure vote by the Department and the two points stated above of a thin research record and MV's capability as a graduate supervisor. Although MV did not have access to the tenure file, his

appeal asserts that the critical student letters were improper and should not have been included in the file. They were a major factor in all of the decisions about the case thus far. If MV's assertion that the letters were improper is correct, they are clear grounds for our committee to uphold his appeal.

The letter from one graduate student (hereafter called GS) is a key document in the tenure file. It is strikingly different from the letter that GS wrote for MV's third year review in 2011. The earlier letter ends with the opinion that GS' choice of MV as an advisor and mentor was the best decision GS made. When MV learned in May 2014 that GS claimed that MV threw a power supply at GS, MV emphatically denied GS' allegations and requested that the Physics Department conduct an investigation of GS' claims. They did not do so: their efforts to investigate GS allegations were perfunctory. That is the basis for the second ground in MV's appeal.

University Standards of Ethical Conduct mandate that violations of these standards are to be reported to an individual's immediate supervisor and that failure of a supervisor to "report actual or possible violations may be subject to appropriate university discipline." Neither Jeevak Parpia (Physics Chair) nor Lawrence Gibbons (Physics DGS) did this when they learned about GS's allegations. Gibbons talked with remaining students in MV's laboratory and decided that the situation there was satisfactory, obviating the need for further investigation. Both Parpia and Gibbons led MV to believe that they would conduct the investigation he requested.

After the negative letters for the tenure review were received, Gibbons conducted another set of interviews with students in MV's laboratory and wrote a summary report for the Physics Department of his findings. MV was asked to write a response. MV's lengthy response pointed to inaccuracies and deficiencies in Gibbons' summary report. Parpia characterized MV's response as defensive and asked him to write one that was more conciliatory. Despite this back and forth, the Physics Department still did not investigate the validity of GS' allegations, claiming at that point that they did not have the resources to do so. The third ground for MV's appeal is that the negative tenure letters and Gibbon's summary report were improperly considered during the tenure review. Of course, he did not have access to the letters and could not directly rebut their allegations.

During the period of the tenure review, GS made additional charges of misconduct against MV based upon their personal relationship. These charges have been investigated extensively by the university. The confidential report from this investigation did not produce agreement between MV and GS, and both maintain that the other is lying about their past relationship. The investigative committee concluded that the evidence indicated that MV was lying. The misconduct charges were not part of the tenure deliberations, but we could not ignore them since GS' letter in the tenure file clearly had a strong negative influence on votes by the Physics department, ad hoc committee, FACTA and the tenure denial decisions by Dean Ritter. University policy states unequivocally that the charges made by GS establish a conflict of interest. Therefore, the letter from GS should have been removed from the tenure file when GS lodged additional charges against MV. We find that it was improper for the tenure review to be conducted with this letter, and therefore uphold the third claim in MV's appeal.

Based upon the issues described above, our committee finds that there are sufficient grounds for further consideration of MV's tenure case. We agree that the Physics Department and Graduate Field were

remiss in not conducting a more thorough investigation of GS's allegations about the power supply incident. When these became a central issue in MV's tenure case, the Physics Department still did not conduct a proper investigation. Failure to do so while leaving the letter in the tenure file infringed MV's rights as a faculty member. In further consideration of the tenure case, we raise the issue of whether Parpia and Gibbons now also have a conflict of interest. Note that MV and graduate student Yogesh Patil assert explicitly that Parpia and Gibbons violated university policies. These allegations could affect the judgment of Parpia and Gibbons about MV's tenure case.

In addition to finding that grounds two and three of MV's appeal has been established, we also support ground one of the appeal but have remaining questions about whether it has been conclusively established. With regard to ground one, we agree with MV that his progress in establishing a robust research program was seriously slowed by admissions decisions of the Graduate Field of Physics. However, the language giving Grounds for Appeal (Appendix 5, Section IV.B.1) do not fit this case completely. The guidelines for appeal state that the appellant was "unfairly and seriously hindered in meeting the departmental standards" by "having been denied departmental support, contrary to the normal departmental practices." In this case, the decisions in question were Field rather than Department decisions. Moreover, it is a subjective judgment as to whether these decisions were contrary to departmental (or Field) practices. The actions may have been taken to be consistent with Field policy but still have been in conflict with actual departmental practices. The closed nature of the graduate admissions procedures used by the Physics Graduate Field preclude determining this matter without a thorough analysis of their admissions decisions over several years, perhaps decades. Since no faculty members other than the current DGS and Chair have had access to all the applications, allegations of unfairness in the process cannot be judged from first hand experience of the faculty. Beyond this appeal, we urge the Physics Graduate Field to consider more openness in their evaluation of graduate applications.

With regard to Dean Ritter's final tenure recommendation for MV, we urge her to take into consideration the combined impact of (1) admissions decisions that disfavored students with an expressed interest in AMO physics and (2) the rigid time line for when research had to be published to be considered in the tenure review. MV's publication record in the months following assembly of the tenure file improved dramatically. Were his tenure review conducted in 2015 rather than 2014, criticism of the "thin" publication record by outside referees and Physics faculty would surely be muted. This fact was noted by the Physics Department in their response to the Dean Ritter's tentative denial of tenure, and there are even more publications in prestigious journals by MV since that time.

Tenure guidelines do not discuss when material submitted for a tenure review should be judged inadmissible or how misconduct on the part of a tenure candidate should enter into the tenure decision. In this case, where GS and MV dispute facts about their relationship, we think that the principle of "innocent until proved guilty" established "beyond a reasonable doubt" should apply: a more stringent legal standard than that used by the investigative committee when reaching their conclusion that MV was lying. Denying MV tenure on the basis of charges about his personal conduct that have not been resolved to the level of this legal standard would be unfair. The juxtaposition of the letters that GS

wrote for MV's third year and tenure reviews is prima facie evidence that GS' relationship with MV influenced the letters so strongly that they should not be regarded as an objective assessment of MV in his capacity as a supervisor of graduate students. Moreover, GS had a clear conflict of interest with MV and the tenure evaluation letter from GS should not have been included in the tenure package. Our committee was advised to treat the tenure appeal as independent of the other charges made by GS, and we are doing so. We find that inclusion of GS' letter in the tenure file was improper. Physics faculty explanations of their votes on tenure state clearly that this disputed information was a significant factor in their votes against awarding tenure. Dean Ritter's explanation for her final decision expresses skepticism about the veracity of input from MV and his current students based upon their stake in the outcome. After our extensive investigation of the case, our committee is far more skeptical of the veracity of the critical GS letter. There is little doubt that GS is angry and upset with MV. We were told by several individuals that GS engaged in a campaign to sabotage the tenure decision for MV. Moreover, multiple individuals described GS as untrustworthy. We note that the negative decisions reached by the ad hoc committee and FACTA were based upon their reviews of the tenure file. However, the tenure file does not give an account of the disputed, central issues discussed above. Our committee was also dubious at the outset about the issues raised by MV in his appeal. We became increasingly convinced of the validity of his appeal claims as our investigation proceeded and therefore uphold his appeal. Specifically, we note that the tenure file documents that MV is an outstanding teacher and that, apart from the opinions expressed by graduate students who left his laboratory in 2012, his record as a laboratory supervisor is very good.

Our decision to uphold MV's appeal is independent of the misconduct claims by GS. We recognize the seriousness of GS' charges, the effort the university has made to investigate them, and the conclusions they have reached. We think the university can and should deal with these misconduct charges directly, but agree with the advice we were given to treat them independently from MV's tenure decision.

In conclusion, we do not make a recommendation about whether MV should or should not be awarded tenure. The charge to our committee is to judge whether the deficiencies in the tenure review stated in MV's appeal are valid. We find that all three of his claims have merit and warrant further consideration of his tenure case. Sections IV.G.2 and IV.G.3 of Appendix V describe procedures to be followed when an appeals committee finds that grounds for an appeal have been established. Based on a finding that ground one of MV's appeal has been established, these procedures call for an extension of his appointment as an assistant professor followed by another tenure review. Based on a finding that ground two or three of MV's appeal has been established, the case is returned to the College Dean for reconsideration. We think that reconsideration is the appropriate action in this case.



Cornell University
Department of Physics

Eanna Flanagan, Chair

109 Clark Hall
Ithaca, New York 14853-2501
tel. (607) 255-6016
fax. (607) 255-2643
email. eef3@cornell.edu
www.physics.cornell.edu

15 December 2017

Assistant Professor Mukund Vengalattore
Physics Department
Cornell University

Dear Mukund:

I regret to inform you that the Cornell physics department voted this week against your promotion to Associate Professor with tenure. The vote was 28 (21 present, 7 advisory) to 2 (1 present, 1 advisory) with 1 abstention and 2 recusals. There were also 2 votes against tenure that were sent in after the faculty meeting and which are not officially counted, according to College policy.

The reasons for the negative departmental decision are

- Your experimental research since coming to Cornell has had limited depth, novelty and impact, as evidenced by the opinions of some of the external letter writers, by the citation counts compared to those of your peers, by the journals in which the results are published compared to those of your peers, and by our own assessment.
- While some of your teaching is excellent, in some courses it has been significantly below our standards, as evidenced by student evaluations and enrollments and by testimony of faculty involved in the courses.
- Your advising and mentoring has in some cases been excellent, but in many areas has been poor, as evidenced by student letters and other sources.

According to University and College policy, you now have the option of initiating a department level appeal of this decision. To do so you would need to respond in writing to this letter within three weeks of its receipt. In that response, you may address any issue that you deem appropriate and may present new evidence.

According to University policy, you are entitled to a terminal appointment of two full academic terms following receipt of the first written notice of the negative tenure decision, which in your case will extend through Dec 31, 2018.

Sincerely,

Eanna Flanagan

Eanna Flanagan
Chair

*APPENDIX 2 : This is the letter from the Physics department chairperson following the sham de novo review in late December 2017. By now, I have presented ample evidence that the purported reasons for the denial of tenure in the de novo review are fraudulent. Notably, in this letter, he states that I am entitled to employment through Dec 31, 2018 as per University policy.*



**Eanna Flanagan, Chair**

109 Clark Hall
Ithaca, New York 14853-2501
tel. (607) 255-6016
fax. (607) 255-2643
email. eef3@cornell.edu
www.physics.cornell.edu

18 May 2018

Assistant Professor Mukund Vengalattore
Department of Physics


Dear Mukund,

Due to the denial of your tenure case, we remind you that your last day of employment is June 30, 2018.   The Benefits Office will send you a letter with options for continuing your health insurance.  You may also contact them directly at 255-3936 or benefits@cornell.edu to discuss options.

You will be receiving a separate letter addressing your lab research space in LASSP and grants related to the support of that research effort.


Sincerely,

*Eanna Flanagan*

Eanna Flanagan
Chair


EF:dh


APPENDIX 2 . This is the letter I received from the Physics department chairperson contradicting his earlier statement in his Dec 2017 letter that I was entitled to employment through Dec 31. 2018 as per University policy. No reason or basis has been provided for this contradiction. He falsely states here that the purpose of this letter is to "remind" me of my last date of employment. To the contrary, this was my first notification that Cornell was reneging on its Dec 2017 letter. Multiple senior faculty members at Cornell University have stated that this sudden termination of my appointment is a continued pattern of retaliatory conduct directed against me. As of May 2018, Cornell has simultaneously barred my students from our laboratory facilities and attempted to illegally appropriate our research infrastructure and federal research grants

*APPENDIX 3 - Notification letters form the OCR regarding the various complaints we had filed. While choosing not to investigate some of our complaints on grounds of time limits, the OCR nevertheless deemed sufficient prima facie evidence to open multiple investigations into our complaints about discrimination and retaliation. Notably, the OCR also acknowledges that we were engaged in protected activity and that the University was aware of this fact when it retaliated against my research group (see bottom of page 6).*



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26ᵗʰ FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

April 14, 2017

Yogesh Patil
A20, Clark Hall
142 Sciences Drive
Cornell University
Ithaca, New York 14853

Re:     Case No. 02-17-2058
        Cornell University

Dear Mr. Patil:

On November 29, 2016, the U.S. Department of Education, Office for Civil Rights (OCR) received the above-referenced complaint you and five other complainants (collectively, "the complainants")[1] filed against Cornell University (the University).[2] The complainants alleged that the University discriminated on the bases of race, color, national origin and sex, by failing to respond appropriately to complaints that the complainants filed with the University between May 2014 and March 2016 (discussed below as complaints 1 through 9) (Allegation 1). The complainants also alleged that the University retaliated for complaints that the complainants filed with the University on February 12 and October 12, 2015, alleging discrimination on the bases of race, color, national origin and sex, by: (a) threatening to shut down the complainants' research laboratory in or around May 2016; (b) denying the complainants the opportunity to give talks within the University's physics department from academic year 2015-2016 to the present; (c) telling graduate students not to join the complainants' research laboratory from academic year 2014-2015 to the present; (d) soliciting false allegations against the complainants by a former member of the complainants' research laboratory between May 2014 and June 2015; and (e) soliciting a frivolous allegation that the complainants wrote the name of a former student incorrectly on their website in May 2016 (Allegation 2).

---

[1] The complainants filed a single, joint complaint. In an electronic mail message (email) to OCR on December 13, 2016, you identified yourself as the contact person, and provided information on behalf of the complainants. Hereinafter, you will be referred to as complainant 1. The complainants include complainant 1 and four other students who characterize themselves as non-white males of Chinese, Indian or Korean descent, and who work or have worked in the physic department's Ultracold Atoms Laboratory research group (the research group); and the laboratory's principal investigator professor (the professor) who characterizes himself as a brown male of Indian descent.
[2] The complainants filed a complaint with the U.S. Department of Justice (DOJ) on June 10, 2016. DOJ referred the complaint to OCR on November 29, 2016.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

In electronic mail (email) messages sent to complainant 1 on December 13, 2016 and March 7, 2017, OCR advised the complainants that it required additional information to continue processing the complaint and requested that complainant 1 respond to questions regarding the allegations. Based on information the complainants provided in the complaint, complainant 1 provided in response to OCR's questions, during an interview with OCR staff on January 18, 2017, and in supplemental documentation, OCR determined that Allegations 2(b) and 2(c) are appropriate for investigation. However, OCR determined that Allegations 1, 2(a), 2(d), and 2(e) are not appropriate for investigation for the reasons set forth below.

With respect to Allegation 1, the complainants alleged that the University discriminated on the bases of race, color, national origin and sex, by failing to respond appropriately to complaints they filed with the University between May 2014 and October 2015. In support of this allegation, complainant 1 provided to OCR summaries of seven complaints (complaints 1-7) filed with various University staff members, and documentation relating to the complaints. OCR also determined that the complainants raised two additional discrimination complaints (complaints 8-9).[3] The information complainant 1 provided indicated that the complaints all concerned allegedly false allegations made by a former member of the complainants' research laboratory (student A)[4] that were included in materials the University considered as part of the professor's tenure application (the tenure dossier)[5] and/or the University's response to complaints 1-9.

Regarding complaint 1, information complainant 1 provided indicated that in or around May 2014, the professor informed the Director of the University's Lab of Atomic & Solid State Physics (the director) that student A had accused him of throwing equipment at her, and requested that the University investigate the alleged incident. Complainant 1 asserted that in or around June 2014, the University informed the complainants that it did not have sufficient resources to conduct an investigation. Complainant 1 stated that in or around July 2014, the University promised to impose sanctions on student A, but in September 2014, the University stated that no investigation was conducted because an investigation would "disrupt [student A's] career."

With respect to complaint 2, information complainant 1 provided indicated that in or around November 2014, the complainants complained to the director that student A had accused one of

---

[3] Complaints 8 and 9 were raised in correspondence with the University pertaining to complaints 4 and 6.

[4] Student A is a white, female who left the group in or around October 2012.

[5] Information complainant 1 provided indicated that the professor's tenure review process began in the spring semester 2014. His tenure dossier included a tenure review letter submitted by student A wherein she alleged that the professor denied her appropriate authorship in certain scientific papers; threw lab equipment at her; and degraded and humiliated his students. Upon learning that the majority of the professor's department voted to approve his tenure in September 2014, student A made further allegations against the professor. The University denied the professor tenure on February 13, 2015 and the professor appealed on February 27, 2015. A Tenure Appeals Committee determined that student A's tenure review letter tainted the professor's tenure process and recommended that it be removed from the tenure dossier. On February 16, 2016, the University denied the professor tenure, which was again reviewed by the Tenure Appeals Committee. Again, the Provost ultimately denied the professor tenure. Thereafter, the professor filed an action in the Supreme Court of the State of New York, County of Schulyer, alleging that the University violated NY CLS CPLR § 7801 when it denied him tenure; and in a Decision and Order on November 23, 2016, the Court remanded the matter to the University to provide the professor with de novo tenure review, and instructed the University to exclude student A's tenure review letter from the tenure dossier.

the complainants of breaking equipment in or around summer 2012; accused the professor of throwing equipment at her in or around October 2012; accused the professor of abusing students in his research laboratory; accused the complainants of plagiarizing her work; spread assault and plagiarism allegations regarding the complainants; and accused the complainants of sexually harassing her by improperly stating her middle initial on the professor's research laboratory website, between June 2014 and the present. The information complainant 1 provided further indicates that the complainants requested that the University take the following actions: investigate the "frivolous allegations" made by former students in the complainants' lab group; provide the complainants with a written determination regarding student A's allegations against the professor; inform the complainants of the steps being taken to ensure that student A stops the "rumors and baseless falsehoods"; and acknowledge the impact of these false statements on the complainants. Complainant 1 stated that in or around January 2015, the director informed the complainants that an investigation had been completed, but the complainants were not formally notified of the determination. Rather, the director informed the complainants that the substance of the conclusions had been conveyed to people "on a need to know basis".

With respect to complaint 3, information complainant 1 provided indicated that on or about January 23, 2015, the complainants met with the University's Dean of Students (dean A) and complained about "a pattern of harassment and discrimination that [they] have been subjected to for over a year," and which they had complained about "repeatedly" within the physics department. However, the complainants did not provide details regarding the actions complained of or provide any information about the basis of the alleged harassment and/or discrimination raised in complaint 3. Complainant 1 stated that on or about January 26, 2015, dean A directed the complainants to bring their complaints to the University's Ombudsman and the Dean of the Graduate School (dean B).

With respect to complaint 4, the information complainant 1 provided indicated that on or about January 27, 2015, the complainants complained to dean B and the University's Associate Dean for Academic and Student Affairs (dean C) that student A had filed bad-faith and false allegations against the research group in the context of the professor's tenure review, but the physics department's Director of Graduate Studies (the director of graduate studies) did not respond appropriately to the allegations, and failed to inform the complainants about student A's allegations for more than two years. The complainants also asserted that due to student A's false allegations, the director of graduate studies conducted a review of the research group's dynamics (the review) on or about June 2014, which included "blatant fabrications" and "gave credence" to student A's complaints. In addition, the complainants asserted that the director of graduate studies shared the review within the physics department, which created a "hostile work environment" that compromised the professor's tenure review, the complainants' career prospects, and created a perception that the professor's research laboratory was a "place to avoid." Complainant 1 informed OCR that on or about May 6, 2015, dean B concluded that the complainants' concerns were outside the scope of the Graduate School Grievance Procedures, and on or about May 26, 2015, she refused the complainants' request to refer the complaint to the Graduate Grievance Review board.

With respect to complaint 5, information complainant 1 provided indicated that on or about February 12, 2015, the complainants complained to the University's Dean of Arts and Sciences

Page 4 of 10 – Yogesh Patil

(dean D) and the Dean of Faculty (dean E), that the physics department gave "undue credence" to student A's "[lies] and … bad-faith complaints" and ignored the complainants' allegations, and in doing so, the administrators from the physics department violated University policies as well as state and federal laws. In communication with dean D dated September 25, 2015, the complainants asserted that the University favored student A due to her race and sex[6]. Complainant 1 stated that the University examined the complainants' allegations and in October 2015, informed the complainants that student A is "untrustworthy," that she "repeatedly lied," and she went to "extraordinary lengths to sabotage [the professor's] tenure process." The University did not provide a formal written statement of findings to the complainants.

With respect to complaint 6, on September 21, 2015, the complainants submitted a written complaint to the University's interim Judicial Administrator (the judicial administrator), and generally alleged that student A engaged in harassing conduct when she made bad faith complaints against the group, which negatively affected the group's reputation, research progress and careers; the complainants did not assert that the alleged harassing conduct was based on race, color, national origin and/or sex. Complainant 1 stated that the complainants met with the judicial administrator on or about October 28 and November 2 and 10, 2015, regarding their complaint, and the judicial administrator asked "bigoted" questions, including asking whether one of the group members and the professor were related.[7] Complainant 1 provided documentation indicating that on February 24, 2016, the judicial administrator dismissed the complainants' complaint without investigation, and informed the complainants that they could not appeal her decision. Specifically, the judicial administrator found that the complainants had "not provided enough evidence to reasonabl[y] conclude [that the complainants had] been harassed" by student A, because her words or actions did "not rise to a reasonable interpretation of severely annoying behavior" and or "were beyond the scope of free speech".

With respect to complaint 7, OCR determined that on or about October 5, 2015, the complainants raised the identical allegations that they presented in complaint 6 to the University's Vice President and Chief Human Resources Officer (the vice president). Specifically, the complainants asked the vice president to facilitate an investigation of the bad faith complaints student A had made against the complainants, but did not assert that the alleged harassing conduct was based on race, color, national origin and/or sex. The complainants also objected that the judicial administrator had not yet acknowledged that they had filed complaint 6. Complainant 1 stated that the complainants never received a response from the vice president.

With respect to complaint 8, information complainant 1 provided indicated that on October 12, 2015, in correspondence sent after receiving dean C's decision regarding complaint 4, the complainants asserted that different rules applied to students and faculty of color as compared to student A, who is white and female. On October 23, 2015, dean C responded that her views

---

[6] Specifically, on September 25, 2015, complainant 1 wrote dean E and asked "if . . . the Department and the University would be this criminally negligent and forgiving of [student A's] unethical, dishonest and criminal conduct if she was not a blonde white female student." In correspondence to dean E dated September 26, 2015, complainant 1 further alleged that the University was "playing along with the whims of a white female student" and further stated that there was a "stark contrast" between "[t]he treatment by the University of frivolous complaints [made] by a dishonest and vindictive white female student [student A], and its treatment of the complainants (with documented evidence) of honest, hardworking students . . ."

[7] Complainant 1 stated that the group member in question and the professor are both brown.

differed substantially from the complainants', and stated she would no longer communicate with the complainants about complaint 4 as of that date.

With respect to complaint 9, in correspondence to the judicial administrator, dated March 29, 2016, the complainants objected to her decision regarding complaint 6, dated February 24, 2016, by stating that "[t]here [was] also ample evidence that the University ha[d] gone out of its way to suppress information regarding the misconduct of [student A], and … the University's inaction against [student A was], in violation of its own policies." In support of their assertions, the complainants informed the judicial administrator that a senior professor stated that "taking action against [student A] (a white female student), despite the evidence, would cause 'twitter to explode'" and alleged that "the University would rather let matters lie fallow." The complainants also stated that: "the ongoing harassment, the unethical and prejudicial treatment meted out by the University administration, and the facilitation of [student A's] unethical activities are each in violation of Title IX guidelines." The complainants requested that the judicial administrator provide them with the details of the investigation of complaint 6 and the actions taken by the University against student A; to date, the complainants have not received a response.

Based on the information provided, OCR determined that complaints 1-5 and 8 are untimely. OCR requires that complaints be filed with OCR within 180 calendar days of the alleged discriminatory event, or 60 days after the complainant became aware of the alleged discrimination, unless the time for filing is extended by this office. The information provided to OCR indicated that the University provided responses to complaints 1-5 and 8 prior to December 13, 2015, which is 180 days from the complainants' filing the complaint with DOJ on June 10, 2016. Specifically, OCR determined that the complainants filed complaint 1 in or around May 2014 and the University informed the complainants in June 2014 that it would not investigate the allegations; the complainants filed complaint 2 with the director in or around November 2014, and the director informed the complainants that an investigation was complete in January 2015, and did not respond thereafter to the complainants' request for documentation regarding the director's investigation or determination; on or about January 20, 2015, the complainants filed complaint 3 with dean A, who directed them to bring their complaints to the University's Ombudsman and dean B on January 26, 2015; the complainants filed complaint 4 with deans B and C on or about January 27, 2015, and dean B informed the complainants that their concerns were outside the scope of the Graduate School Grievance Procedures, on or about May 6, 2015; on or about May 26, 2015, dean C refused to refer their allegations to another University governing body, and on or about October 23, 2015, dean C stated that she would no longer communicate with the complainants about the allegations; the complainants filed complaint 5 with deans D and E on or about February 12, 2015 and the complainants learned of the University's findings and actions in October 2015; and the complainants raised complaint 8 with dean C on October 12, 2015, and dean C stated that she would no longer communicate with the complainants about their allegations on or about October 23 2015.

The complainants did not confirm whether they were requesting a waiver of the timeliness requirement. However, complainant 1 stated that the complainants did not file a complaint sooner because the University "gave [the complainants] a run around" and redirected their complaints to various University officials for eighteen months. Complainant 1 further stated that

the University gave the complainants the impression that it was addressing their complaints, and the complainants attempted to exhaust all possible means to address their complaints at the University level.

OCR may grant a waiver of the timeliness requirement where a complainant filed an internal grievance alleging the same discriminatory conduct or otherwise actively pursued resolution of the complaint issues with the recipient within the 180-day period and the OCR complaint was filed within 60 days after the grievance was concluded. OCR determined that, following the University's responses to complaints 4 and 5, on or about May 6, 2015 and in October 2015, respectively, the complainants should have been aware that the University was not responding further to the allegations in complaints 1-5 and 8.

With respect to complainants 6, 7 and 9, the information the complainants provided indicated that complaints 6, 7 and 9 related to matters that were previously raised in complaints 1-5 and 8. OCR determined that, following the University's responses to complaints 4 and 5, on or about May 6, 2016 and in October 2016, respectively, the complainants should have been aware that the University was not responding further to the allegations in complaints 1-5 and 8. The complainants' subsequent reiteration of these allegations in complaints 6, 7 and 9 do not constitute new, timely complaints. Therefore, after careful consideration, OCR has determined that the circumstances described do not warrant a waiver of the timeliness requirement. Accordingly, OCR has dismissed Allegation 1 as of the date of this letter.

With respect to Allegation 2(a), the complainants alleged that the University threatened to shut down their research laboratory in or around May 2016, in retaliation for the complaints the complainants filed with the University on February 12, 2015 (complainant 5) and October 12, 2015 (complaint 8), alleging that the complainants had been discriminated against on the bases of their race, color, national origin and sex.

In analyzing whether retaliation occurred, OCR must first determine whether the three prima facie elements of retaliation can be established: (1) whether an individual experienced an adverse action caused by the recipient; (2) whether the recipient (a) knew that the individual engaged in a protected activity or (b) believed that the individual might engage in a protected activity in the future; and (3) there is some evidence of a causal connection between the adverse action and protected activity. When a prima facie case of retaliation has been established, OCR then determines whether there is a facially legitimate, non-retaliatory reason for the adverse action, and if so, whether the facially legitimate, non-retaliatory reason is a pretext for retaliation, or whether the recipient had multiple motives (illegitimate, retaliatory reasons and legitimate, non-retaliatory reasons) for taking the adverse action.

OCR determined that the complainants engaged in protected activity when they filed complaints 5, 8, and 9 on February 12 and October 12, 2015 and March 29, 2016, respectively, alleging discrimination on the bases of race, color, national origin and sex. OCR determined that the University was aware of the complainants' protected activity.

During an interview with OCR staff on January 18, 2017, complainant 1 and the professor informed OCR that the professor obtained a temporary restraining order against the University,

Page 7 of 10 – Yogesh Patil

and as a result, the complainants' research laboratory remains open.  OCR determined that as part of the professor's challenge to the University denying him tenure in the State of New York Supreme Court, County of Schuyler (the Court), on July 1, 2016, it issued an Order to Show Cause ordering that the University, as well as their "agents, representatives, employees and all others acting in concert with them [were] enjoined and restrained from . . . halting, dismantling, or otherwise interfering with [the professor's] ongoing laboratory experience".

The information the complainants provided indicated that although the University threatened to shut down their research laboratory and would do so if the University denied the professor tenure, as of July 1, 2016, the University was enjoined from closing the research laboratory.  On November 23, 2016, the Court ordered the University to reconsider the professor's tenure application and complainant 1 confirmed that the research laboratory remains open.  Based on the above, OCR determined that Allegation 2(a) is not ripe for investigation because it rests upon contingent future events that may or may not occur as anticipated.  Accordingly, OCR will take no further action regarding Allegation 2(a), and has dismissed it as of the date of this letter.

With respect to Allegation 2(d), the complainants alleged that the University solicited false allegations from student A against the complainants, in retaliation for the complainants' filing of complaints 5 and 8.  Specifically, complainant 1 informed OCR that administrators from the physics department "habitually" solicited bad-faith complaints from student A against the complainants, between May 2014 and June 2015.  Complainant 1 provided OCR with a list of six allegations the complainants asserted the University solicited from student A between May 2015 and June 2015, in order "to blackmail [the complainants] into leaving [the University] quietly, or suffer the consequences of public exposure of embarrassing and career-ending accusations…"[8]

OCR determined that Allegation 2(d) is untimely, as the alleged adverse actions occurred between May 2014 and June 2015, which is more than 180 days from the complainant's filing of the complaint with the DOJ.  The complainants did not indicate whether they were requesting a waiver of the timeliness requirement; however, complainant 1 stated that the complainants did not file a complaint with the DOJ sooner because they pursued complaints 1-9 with the University first.  As discussed with respect to Allegation 1, OCR has determined that it will not grant a waiver of the timeliness requirement on that basis.  Accordingly, OCR has dismissed Allegation 2(d) as of the date of this letter.

With respect to Allegation 2(e), the complainants alleged that, in retaliation for their filing of complaints 5 and 8, the University solicited a frivolous allegation by student A, in June 2016.  Specifically, complainant 1 stated that the University solicited an allegation from student A that the complainants intentionally omitted spaces separating her first and middle initials and her last name when she was credited for a publication on the complainants' website.  Complainant 1 provided OCR with an email from the University's Title IX coordinator sent to the professor's

---

[8] Complainant 1 asserted that in or around May or June 2014, in connection with the professor's tenure review, the University solicited student A's allegation that the professor threw a power supply at her; in or around September 2014, following the initial positive vote by the physics department to grant the professor tenure, the University solicited allegations from student A regarding plagiarism and an "authorship dispute," an assault and secret romance, and the omission of student A's middle initial for a publication on the complainants' website; and between May and June 2015, the University solicited allegations of harassment at scientific conferences.

attorney, dated June 2, 2016, which specifies that student A previously complained that the complainants improperly omitted her middle initial on their website. The Title IX coordinator stated that while student A's middle initial was added following her prior complaint, her name was presented differently from other names on the web site, in that there were no spaces preceding and following her middle initial. The Title IX coordinator requested that the group update its website so that a space appears before and after student A's middle initial. The Title IX coordinator stated that if the complainants did not make the requested change, a University information technology (IT) staff member would effectuate the change. Complainant 1 asserted that the timing of the University's alleged solicitation indicates that the University attempted to prevent the professor from taking public action against the University.[9]

OCR has determined that the information complainant 1 provided does not indicate that the complainants experienced an adverse action with respect to Allegation 2(e). An adverse action is any act likely to dissuade a reasonable person in the complainant's position from making or supporting a charge of discrimination or from otherwise exercising a right under the statutes or regulations enforced by OCR. Petty slights, minor annoyances and lack of good manners are generally not adverse actions. While complainant 1 asserted that the timing of Title IX coordinator's email suggested it was in retaliation for the professor notifying the University that he intended to commence a lawsuit, OCR determined that neither the email itself nor the directive given constitute an adverse action. Rather, the Title IX coordinator requested for the group to change the presentation of student A's name to match the format of the other students listed, and she stated that the University would make the requested changes if the complainants did not. Therefore, OCR determined that the information complainant 1 provided is not sufficient to demonstrate that the complainants experienced an adverse action with respect to Allegation 2(e). Accordingly, OCR determined that a prima facie case of retaliation could not be established, and will not proceed further with the retaliation analysis. Therefore, OCR will take no further action regarding Allegation 2(e), and has dismissed this allegation as of the date of this letter.

However, as stated above, OCR will investigate Allegations 2(b) and 2(c).

OCR is responsible for enforcing Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d et seq., and its implementing regulation at 34 C.F.R. Part 100, which prohibit discrimination on the bases of race, color, and national origin in programs and activities receiving financial assistance from the U.S. Department of Education (the Department). OCR is responsible for enforcing Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. § 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in programs and activities receiving financial assistance from the Department. The University is a recipient of financial assistance from the Department. Therefore, OCR has jurisdictional authority to investigate the allegation under Title VI and Title IX.

---

[9] Complainant 1 asserted that the University's attorney told the professor's attorney in May 2016 that the University did not "consider it a risk that [the professor] would initiate a lawsuit, because the University could potentially level a lot of embarrassing and career-ending accusations against [the professor and the complainants]."

Page 9 of 10 – Yogesh Patil

The regulation implementing Title IX, at 34 C.F.R. § 106.71, incorporates by reference 34 C.F.R. § 100.7(e) of the regulation implementing Title VI, which provides that no recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by regulations enforced by OCR or because one has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing held in connection with a complaint.

Because OCR has determined that it has jurisdiction and that the allegations were filed in a timely manner, it is opening Allegations 2(b) and 2(c) for investigation. Please note that opening the allegations for investigation in no way implies that OCR has made a determination with regard to their merits. During the investigation, OCR is a neutral fact-finder, collecting and analyzing relevant evidence from the complainant, the recipient, and other sources, as appropriate. OCR will ensure that its investigation is legally sufficient and is dispositive of the allegations, in accordance with the provisions of Article III of OCR's Case Processing Manual.

OCR's goal is the prompt and appropriate resolution of the allegations contained in a complaint. OCR offers, when appropriate, an Early Complain Resolution (ECR) process, similar to mediation, to facilitate the voluntary resolution of complaints by providing an early opportunity for the parties involved to resolve the allegation(s). Some information about the ECR process is contained in the publication entitled, "OCR Complaint Processing Procedures", which was enclosed in OCR's previous letter to you acknowledging your complaint. This information is also on OCR's website at http://www2.ed.gov/about/offices/list/ocr/complaints-how.html

Also, when appropriate, a complaint may be resolved before the conclusion of an investigation after the recipient expresses an interest to OCR to resolve the complaint. In such cases, OCR obtains a resolution agreement signed by the recipient. This agreement must be aligned with the complaint allegations or the information obtained during the investigation, and it must be consistent with applicable regulations. Additional information about this voluntary resolution process may be found in the publication "OCR Complaint Processing Procedures", which was enclosed with OCR's previous letter to you, acknowledging your complaint. This information is also on OCR's website at http://www2.ed.gov/about/offices/list/ocr/complaints-how.html.

Please be advised that the University may not harass, coerce, intimidate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process. If this happens, the individual may file another complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Page 10 of 10 - Yogesh Patil

If you have any questions, please contact Kathleen Ryder, Compliance Team Attorney, at 646-428-3825, or kathleen.ryder@ed.gov; or Logan Gerrity, Compliance Team Attorney, at 646-428-3791, or logan.gerrity@ed.gov.

Sincerely,

*Logan Gerrity*

for Erin Emery
Compliance Team Leader

cc via email:    Huiyao Chen
                 Harry Cheung
                 Aditya Date
                 Minwoo Jung
                 Mukund Vengalattore

*APPENDIX 3  Soon after the OCR opened its investigations, Cornell suspended me for two weeks without pay. As such, we filed a new complaint claiming that this was a retaliatory act. The OCR agreed and opened a new investigation into this matter as well.*



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26th FLOOR
NEW YORK, NEW YORK, 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

October 24, 2017

Yogesh Patil
A 16, Clark Hall
142 Sciences Drive
Cornell University
Ithaca, New York 14853

Re:     Case No. 02-17-2550
        Cornell University

Dear Mr. Patil:

On July 5, 2017, the U.S. Department of Education, Office for Civil Rights (OCR) received the above-referenced complaint you (hereinafter, "complainant 1") and two other complainants (collectively, "the complainants")[1] filed against Cornell University (the University).   The complainants alleged that the University retaliated for a prior complaint they field with OCR against the University,[2] by suspending the professor without pay, from June 1 to 15, 2017 (Allegation 1); and failing to respond appropriately to complaints that the complainants filed with the University between April and August 2017 (Allegation 2).

In electronic mail (email) messages sent to complainant 1 on August 23, 2017 and September 14, 2017, OCR advised the complainants that it required additional information to continue processing the complaint and requested that complainant 1 respond to questions regarding the allegations. Based on information the complainants provided in the complaint, complainant 1 provided in response to OCR's questions, and in supplemental documentation, OCR determined that Allegation 1 is appropriate for investigation. However, OCR determined that Allegation 2 is not appropriate for investigation for the reasons set forth below.

---

[1] The complainants include complainant 1 and another student who worked or has worked in the Physics Department's Ultracold Atoms Laboratory research group (the research group); and the laboratory's principal investigator professor (the professor). Complainant 1 identified himself as the contact person for the complainants.
[2] The complainants, along with several other complainants, filed OCR Case No. 02-17-2058 on November 29, 2016. OCR notified the University about that complaint on April 14, 2017. In that complaint, the complainants alleged that the University retaliated for complaints that they filed with the University on February 12 and October 12, 2015 alleging discrimination on the bases of race, color, national origin and sex, by: denying the complainants the opportunity to give talks within the University's Physics Department from academic year 2015-2016 to the present (Allegation 1); and telling graduate students not to join the complainants' research laboratory from academic year 2014-2015 to the present (Allegation 2).

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 of 4 – Case No. 02-17-2550

In analyzing whether retaliation occurred, OCR must first determine whether the three prima facie elements of retaliation can be established: (1) whether a recipient or other person subjected an individual experienced to an adverse action; (2) whether the recipient or other person (a) knew that the individual engaged in a protected activity or (b) believed that the individual might engage in a protected activity in the future; and (3) there is some evidence of a causal connection between the adverse action and protected activity. When a prima facie case of retaliation has been established, OCR then determines whether there is a facially legitimate, non-retaliatory reason for the adverse action, and if so, whether there is a facially legitimate, non-retaliatory reason for the adverse action; and if so, whether the facially legitimate, non-retaliatory reason is a pretext for retaliation.

OCR defines an adverse action as an action that adversely affects a person's work, education or well-being in an unwarranted, serious, lasting, and usually tangible manner, including acts likely to dissuade a reasonable person in the complainant's position from making or supporting a charge of discrimination or from otherwise exercising a right under the statutes or regulations enforced by OCR. Petty slights, minor annoyances, a lack of good manners, or unpleasant but transient incidents are generally not adverse actions.

With respect to Allegation 2, the complainants alleged that the University retaliated for their filing of a prior complaint with OCR against the University, by failing to respond appropriately to complaints that the complainants filed with the University between April and August 2017. Specifically, complainant 1 asserted that the University "denie[d] [the complainants'] due process rights" by "not investigating several complaints [the complainants] made."

In support of Allegation 2, complainant 1 provided three documents (documents 1-3) to OCR. Document 1, dated April 26, 2017, is an email from the Chair of the Physics Department (the department chair) to the professor, which states that the complainants had raised allegations against the chair of the professor's tenure review committee (the tenure chair), and directed them inform the University's Dean of the Faculty (the faculty dean) about academic misconduct pursuant to University policy. OCR determined that document 1 is not a complaint; rather it is an email from the department chair in which he provided information about the process for filing a report of academic misconduct.

Document 2 is an email the professor sent to the department chair, the faculty dean, and the office of the faculty dean on April 26, 2017, in response to Document 1, and includes a detailed summary of the tenure chair's actions over the previous three years. In Document 2, the professor stated that he had previously complained to the previous dean of faculty regarding the tenure chair's misconduct and received an initial response in or around early 2015, but the University thereafter "disown[ed] responsibility from any action." The professor also identified various complaints filed by his students. In the email, the professor objected to being provided with information about how to file a complaint of academic misconduct, and stated that he believed that the prior complaints were still active within the University; the University had been "in possession of all the relevant supporting documentation for the past two years"; and these prior complaints had "already been upheld" by "higher authorities." The professor concluded by stating: "I am happy to discuss this matter further with you and [the faculty dean] as you deem convenient." Based on the foregoing, OCR determined that document 2 did not constitute a new complaint to the University.

Document 3 is an email that complainant 1 sent to the department chair and other University staff members on August 22, 2017, which contains a summary of complainant 1's communications with

the University regarding his response to a letter from the University, offering him an appointment to a graduate research assistantship in fall 2017. Complainant 1 signed the letter on August 11, 2017, accepting the appointment, and also added the following language to the document: "Apart from my objection to a morally bankrupt person, who has misled the students of our group and lied to us, and against who, we are given to understand, a complaint has been lodged with the Dean of Faculty, being the signatory to my offer letter." In the letter, complainant 1 also stated that he was notifying the University pursuant to University policy that he believed the department chair had a conflict of interest with respect to the research group. Thereafter, the department chair requested that complainant 1 sign the appointment letter without including objections. Complainant 1 responded that the professor had made complaints to the department chair and dean of faculty three months prior, but the University had not done anything about it, thereby creating a conflict of interest. Complainant 1 stated that he was "more than willing to fully cooperate with the investigation of [the tenure chair's] misconduct."[3] OCR determined that the alleged conflict of interest which complainant 1 cited in document 3 was a reference to the professor's statements in document 2, summarizing the tenure chair's actions over the previous three years. Accordingly, OCR determined that document 3 did not constitute a new complaint to the University.

Based on the foregoing, OCR has determined that the documents 1-3 did not constitute new complaints to the University. Therefore, the information the complainants provided did not indicate that the University failed to respond appropriately to complaints that the complainants filed with the University between April and August 2017, as alleged. In the absence of an adverse action, a prima facie case of retaliation could not be established, and OCR will not proceed further with the retaliation analysis. Accordingly, OCR has dismissed Allegation 2 as of the date of this letter.

However, as stated above, OCR will investigate Allegation 1.

OCR is responsible for enforcing Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d et seq., and its implementing regulation at 34 C.F.R. Part 100, which prohibit discrimination on the bases of race, color, and national origin in programs and activities receiving financial assistance from the U.S. Department of Education (the Department). OCR is responsible for enforcing Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. § 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in programs and activities receiving financial assistance from the Department. The University is a recipient of financial assistance from the Department. Therefore, OCR has jurisdictional authority to investigate the allegation under Title VI and Title IX.

The regulation implementing Title IX, at 34 C.F.R. § 106.71, incorporates by reference 34 C.F.R. § 100.7(e) of the regulation implementing Title VI, which provides that no recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by regulations enforced by OCR or because one has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing held in connection with a complaint.

Because OCR has determined that it has jurisdiction and that the complaint was filed in a timely manner, it is opening this allegation for investigation. Please note that opening an allegation for investigation in no way implies that OCR has made a determination with regard to its merit. During

---

[3] Complainant 1 also asked the department chair if she was threatening not to process his acceptance letter

Page 4 of 4 — Case No. 02-17-2550

the investigation. OCR is a neutral fact-finder, collecting and analyzing relevant evidence from the complainants, the recipient, and other sources, as appropriate. OCR will ensure that its investigation is legally sufficient and is dispositive of the allegations, in accordance with the provisions of Article III of OCR's *Case Processing Manual*.

OCR's goal is the prompt and appropriate resolution of the allegations contained in a complaint. OCR offers, when appropriate, an Early Complaint Resolution (ECR) process, similar to mediation, to facilitate the voluntary resolution of complaints by providing an early opportunity for the parties involved to resolve the allegation(s). Some information about the ECR process is contained in the publication entitled, "OCR Complaint Processing Procedures", which was enclosed in OCR's previous letter to you acknowledging your complaint. This information is also on OCR's website at http://www2.ed.gov/about/offices/list/ocr/complaints-how.html

Also, when appropriate, a complaint may be resolved before the conclusion of an investigation after the recipient expresses an interest to OCR to resolve the complaint. In such cases, OCR obtains a resolution agreement signed by the recipient. This agreement must be aligned with the complaint allegations or the information obtained during the investigation, and it must be consistent with applicable regulations. Additional information about this voluntary resolution process may be found in the publication "OCR Complaint Processing Procedures", which was enclosed with OCR's previous letter to you, acknowledging your complaint. This information is also on OCR's website at http://www2.ed.gov/about/offices/list/ocr/complaints-how.html.

Please be advised that the University may not harass, coerce, intimidate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process. If this happens, the individual may file a complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

If you have any questions, please contact Kathleen Ryder, Compliance Team Attorney, at 646-428-3825, or kathleen.ryder@ed.gov; or Logan Gerrity, Compliance Team Attorney, at 646-428-3791, or logan.gerrity@ed.gov.

Sincerely,

*Logan Gerrity*

for Erin Emery
Compliance Team Leader

cc via email:   Harry Cheung
                Mukund Vengalattore

*APPENDIX 4: The restraining order issued by the NY State Supreme Court requiring Cornell to cease its harassment of my research group and the disruption of our research activities.*

> At an Adjourned Term of the Supreme
> Court of the State of New York, held in
> and for the Sixth Judicial District at
> Watkins Glen, New York on the ___
> day of June, 2016.

PRESENT: HON. *EUGENE D FAUGHNAN*
          <u>Justice Presiding</u>

STATE OF NEW YORK
SUPREME COURT : COUNTY OF SCHUYLER

----------------------------------------------------

In the Matter of

MUKUND VENGALATTORE,

                         Petitioner,

   -vs
CORNELL UNIVERSITY; GRETCHEN RITTER

                         Respondents.

**ORDER TO
SHOW CAUSE**
(CPLR Article 78
and Article 63)

Index #: 16-119

Justice Assigned:

In a Proceeding Pursuant to CPLR Article 78

----------------------------------------------------

     Upon the annexed Verified Petition of the Petitioner, including all exhibits appended thereto, verified the 7th day of June 2016, and the accompany Affidavit of Mukund Vengalattore sworn to June 7, 2016, the accompanying Affirmation of Keith M. Fleischman, Esq. affirmed to June 7, 2016, and Petitioner's Memorandum of Law in Support of Order to Show Cause for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery, and upon all the papers and proceedings heretofore had and filed herein, the Respondents hereby are

     ORDERED TO SHOW CAUSE at a term of this Court to be held at the Schuyler County Courthouse, Franklin Street, Watkins Glen, New York on the 11th day of August, 2016, at 10:00 a.m. or as soon thereafter as counsel can be heard, why judgment should not be entered in favor of the Petitioner and against the Respondents, pursuant to Article 78 of the New York State

Civil Practice Law and Rules (CPLR) and CPLR 6301 *et seq.* enjoining Respondents from: (1) terminating or otherwise modifying Petitioner's employment at Cornell; (2) denying, interfering, impeding, or restricting his, and his students', assistants, and associates' access to and use of his laboratory; (3) directing Petitioner's grantors to cease funding Petitioner's research; (4) halting, dismantling, or otherwise interfering with Petitioner's ongoing laboratory experiments; (5) directing Petitioner's research team to find other research groups, together with awarding Petitioner such other and further relief as this Court deems just and proper.

Sufficient cause appearing therefor, it is

ORDERED, that Respondents, together with their agents, representatives, employees and all others acting in concert with them be and are hereby enjoined and restrained from: (1) terminating Petitioner's employment; (2) denying, interfering, impeding, or restricting Petitioner or Petitioner's students, assistants, or associates from accessing or using Petitioner's laboratories and office; (3) directing Petitioner's grantors to cease funding Petitioner's research; and (4) halting, dismantling, or otherwise interfering with Petitioner's ongoing laboratory experiments; and (5) directing Petitioner's research team to find other research groups, until this case is decided on the merits; and it is further

ORDERED that Petitioner is entitled to limited expedited discovery of Respondents prior to the determination of the permanent injunction motion, and are directed to provide responses and responsive documents and other information responsive to the Document Request attached as Exhibit "A" to Petitioner's Memorandum of Law in Support of Petitioner's Order to Show Cause for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery on or before ꓘ\_ꓘ\_ ꓛꓛ , 2016.

2

LET personal service of a copy of this Order to Show Cause and the papers upon which it is granted upon the Respondents by electronic mail to Associate University Counsel Wendy Tarlow Esq. at wet2@cornell.edu, or personal delivery of the same to the Office of University Counsel, located on the campus of Cornell University, at Ithaca, New York on or before the 1st day of July , 2016 be deemed sufficient service.

E N T E R

_____
Justice of Supreme Court

Eugene D. Faughnan, JSC

3

APPENDIX 5 : The following is a document produced as part of discovery during the 2016 lawsuit against Cornell. This is a communication from a student, Yogesh Patil, to senior CU administrators in Oct 2015 after he was threatened and told by the CU counsel and Assoc. Dean of the graduate school to cease his complaints against senior Physics faculty and A&S administrators   My students have repeatedly alerted senior administrators to the misconduct of these individuals and the harassment inflicted by them on my research group.

The Cornell Provost, Dr Kotlikoff has claimed that he never received such communications and has repeated those lies in his affidavit to the State Supreme Court.
More recently, CU counsel have deliberately removed these communications from the legal record while claiming to the State Appellate Court that these communications do not even exist
Lastly, the sender of this email, Yogesh Patil, has recently been the well-documented victim of retaliation by the same Cornell administrators. They have withheld his PhD degree in retaliation much to the disgust of senior professors in the Cornell law school. These law professors have written a public letter in support of Yogesh Patil. see
http://cornellsun.com/2018/07/04/19-cornell-law-professors-dismiss-title-ix-complaint-against-graduate-student-and-give-him-his-ph-d/

Jan Allen
Associate Dean for Academic and Student Affairs
Cornell University Graduate School
350 Caldwell Hall
Ithaca NY 14853-2602
phone: 607.255.7374

**From:** YSS Patil [mailto:ysp5@cornell.edu]
**Sent:** Monday, October 12, 2015 4:07 PM
**To:** Graduate School Associate Dean; Jan E. Allen; Graduate School Office of the Dean; Barbara A. Knuth; Joseph Arthur Burns; Mike Kotlikoff, Office of the Provost; Office of the President
**Cc:** Hil Fung Harry Cheung; Elizabeth N. Ellis; Airlia Winter Shaffer-Moag; Ajay Krishna Bhat
**Subject:** Ongoing Harassment of the Vengalattore Group

Dear Dean Allen,

This email summarizes the conversations we had at our meeting on October 09, 2015.
Harry F H Cheung (hc663) and Elizabeth Ellis (ene4) were present during this conversation.

It is by now recognized by senior scientific colleagues in the Atomic Physics and Condensed Matter communities that our group has been subjected to egregious levels of harassment and defamation by Cornell. I would like the University to answer the questions I have posed below. None of the questions should be assumed rhetorical.

1) At the outset, I note that you asked for this meeting stating that "I'd like to follow up on our conversations last semester" and that "I just wanted to discuss the status of your previously expressed concerns." The conversation you had with me, however, did not pertain to my previously expressed concerns. They centered wholly around a Facebook post in which I attempted to clarify the true nature of our group to prospective students. There was no need to willfully mislead me when setting up our meeting, more so despite my explicit question regarding what the meeting was about. My willingness to meet with you will never change simply because you are being honest. Please extend me the courtesy of being honest in our future communications. That is the least a student can expect from his/her Dean.

2) In our conversations, you referred to the alleged power supply incident, which you read about in Prof. Gibbons' document. You kept reiterating that this alleged incident is a "he said - she said" case. (Just to put on record, I know that Mukund has categorically denied that such an incident ever took place.) It is not a "he said - she said" case. The University has desperately tried to pretend that this is an allegation that cannot be disproved. There is ample evidence that the alleged incident never happened. Moreover, by now, the alleging ex-student, ████████, has at least four or fiver different versions of the alleged incident. The problem has not been a lack of evidence showing this incident never happened. The problem has been that the University has tried to

2

cover its mistakes by refusing to seek or acknowledge this evidence.

There is also ample evidence that the alleging ex-student ▇▇▇▇▇▇ has repeatedly lied and has no credibility. Our scientific community has recognized on its own that this ex-student has no credibility. By hedging its bets on a person who has no credibility, Cornell has facilitated her attempts to sabotage our careers and has put itself in an extraordinarily difficult situation. This is only making Cornell look more incompetent and prejudiced in the eyes of the scientific community.

3) In our conversations, with regard to the alleged power supply incident, I was making the point that no adjudication is possible without evidence. I was making the point that an accusation that something happened cannot be held as evidence, especially when the accusation is by a disgruntled vindictive student without credibility. To which, you said, and I quote, "If you [Yogesh] come to me and tell me that somebody called you terrible names, racial and ethnic slurs, if they used name calling and labeling. I would say the evidence is - you were there and you were called those names. That is the evidence. I wouldn't say you got to produce a tape recording, or that you got to find graffiti that this person scratched on a wall."

What kind of a ludicrous internal justice system is the University running?

As many of our senior scientific colleagues have repeatedly said, this is a Kafkaesque situation. If I were a pathological liar, and I claimed that you had used racial slurs against me in one of our meetings early this year, and there were "no witnesses", would you be prepared to lose your job and reputation based purely on my claims? If some student were to claim that Dean Ritter threw an ink pot at her, and that there were no witnesses, would the University terminate Dean Ritter's employment? There is such a thing as due process and an objective investigation. For the University to pretend that this is not the case is not just arrogant, but illegal.

I also want to note the clear contrast between your statements above and the University's response to my grievance against Prof. Parpia and Prof. Gibbons. In our meetings with the DGS, Prof. Gibbons, in July 2014, I and Srivatsan Chakram talked with Prof. Gibbons, without other witnesses. Then we learned that he had fabricated the summary of those meetings and misrepresented our testimony. Dean Burns has even acknowledged that Prof. Gibbons' document had a severely adverse impact on Mukund's tenure review. We filed a grievance about Prof. Gibbons' misconduct early this year, and the University has given us the runaround for almost a year, and clearly does not intend to take any action. According to the adjudication protocol that you stated above, isn't our presence during the meetings enough evidence that Prof. Gibbons has lied? Moreover, in contrast to ▇▇▇▇▇▇ allegations, I and Srivatsan Chakram have provided the University hard evidence that Prof. Gibbons and Prof. Parpia have fabricated tenure documents and willfully misled the University. Yet there has been no action taken.

Should I take your statements above, and the contrasting treatment of complaints pointed out above, as an acknowledgement by the University of what I have suspected all along? That a certain set of rules and protocols applies to white students and faculty, and a completely different set of rules applies to students and faculty of color?

4) We have repeatedly brought to the University's attention the fact that the ex-student ▇▇▇▇▇▇ has spread a lot of malicious rumors and lies about our group among prospective and current graduate students, both within Cornell and outside. In fact, the various false claims she has apparently made in her tenure letter is a clear and documented instance of academic misconduct. Have you or anyone in the University had a conversation with this student asking her to consider the ramifications of her actions and/or stop? Or is this another case of having different rules for white female students and colored students?

3

5) You stated that "it" is a personnel issue and has nothing to do with our group. That is almost a delusional point of view. The University is trying to pretend that "it" is a personnel issue. Based on our conversations with senior faculty in the scientific community, who are chairs of departments, regents' professors and Deans, and who we approached for advice, the actual circumstances are very clear. The real issue is that the Cornell Physics Department and the College jumped to conclusions by taking ████████ words at face value. Because of that, the Department and the College came up with a false and ludicrous assessment of our group. Since then, ample evidence has poured in, demonstrating that our group is immensely successful and that the Department and the College made huge mistakes in the tenure review process. The honest approach would have been for the Department and Dean Ritter to acknowledge and rectify these mistakes. Instead, they desperately tried to cover their tracks by launching repeated witch-hunts against our group and our PI, and by ignoring any and all evidence pointing to ████████ repeated fabrications. By now it is clear to our senior scientific colleagues that there have been several serious procedural and policy violations, and that senior administrators at Cornell are fighting for their jobs by trying to deflect the attention from their mistakes.

It is very sad and pitiable that a few dishonest, incompetent administrators have dug, and continue digging, a deeper hole for themselves and the University. Even now, the honest course of action for the University is to acknowledge that it was misled into making a false assessment of our group, and then begin to address those mistakes.

6) Your statement that the group's students will be looked after even if Mukund leaves the University shows a complete lack of the University's understanding of our situation, and about what we have accomplished in our labs. Firstly, Mukund is the only faculty in the University who can advise our research. Thankfully, as I informed you, Mukund has assured us that he is not going anywhere and that he is prepared to fight for our group's careers, and our reputation. Secondly, the huge and uber-complicated machines we have painstakingly built cannot be transported. Our careers will be set back by many years if Cornell continues to perpetuate this injustice. Why should my right to work on the machines we built be taken away? That too right after we finished building them and right when the machines are producing results. Why should our careers suffer unjustly because of the University's disinclination to acknowledge mistakes? We students came to Cornell to do research, and the University is making it very hard for us to pursue our educational goals. We students have no intention of, nor should we be threatened into, keeping quiet about of the injustice we face.

7) You stated that someone from the Cornell University's (CU) legal Counsel's office called you and claimed that I had used "irresponsible, unprofessional, and very extreme" language in a Facebook post. You also stated that you yourself had not seen or read the Facebook post. How can you possibly have a conversation with me regarding a Facebook post without having seen or read it? That too when you acknowledged, in our meeting, that I have always been professional and pleasant, and that we have always had pleasant conversations in your office, including Friday's conversations? Would you not consider it your duty to check the facts before acting on an accusation? If I were to call you today, and tell you that student X has used "unprofessional" language in a blog, would you call a meeting with X, under a false pretense, for a discussion about the blog, without having read the blog, when all your previous interactions with X have been professional?

8) Your statements about the Facebook post were as follows. "As you complete your degree, as you look for postdoc or faculty positions, and/or something in industry, if people learn about what you posted, what will they think you were trying to do ..." and "What if this doesn't end the way you want it to end? And it turns out that what you knew, what you've said, what you've expressed, turns out to be not true? And then, you've opened yourself up to appearing more than unprofessional ... open you up to charges of slander, defamation..." I stand by the facts I state. Your implication that the University's judgments can render these facts untrue is both bigoted, and arrogant. Facts do not become untrue just because the University doesn't want to acknowledge

4

CU002962

them.

9) Your assertion that I may be trying to impact the Appeals committee by what I post on Facebook is a completely ludicrous allegation. If I want to "impact" the Appeals committee, I will approach them directly. I have at their behest met with them already. I do not need Facebook to get facts to the the Appeals committee. I have also explicitly informed you that the Facebook post is a result of following Prof. Gibbons' (the DGS) advice, who said that we, the students of the group, should just stand up and let people know that what they are hearing about our labs is false.

I perceive your statements as threats of retaliation against me and my group for pointing the facts of our circumstances - circumstances that the University has created. If any more such threats are made against me or any of my lab members, our next step would be to make documentation and evidence of our grievances, Cornell's harassment of our group, and the various violations of University policies available, not only on Facebook, but also on other public forums. The facts have always been on our side, and we have nothing to hide.

Yours sincerely,
Yogesh Patil,
and on behalf of all other members of the Vengalattore group -
Ajay Bhat, Huiyao Chen, Harry F H Cheung, Minwoo Jung,
Ivaylo Madjarov, Jacob Rabinowitz, Airlia Shaffer, Joshua Squires,
Ke Wang, Zoe Wellner
Amulya Bhagat, Srivatsan Chakram, Laura Chang, Eli Fox,
Shannon Harvey, Chandler Kemp, Benjamin Nosarzewski, Seong Oh,
Samuel Roland

Yogesh Patil,   Graduate Student (Physics)   Ultracold Atoms Lab   Cornell University

Tel:  (+001) 607 255 3681
Web: http://ultracold.lassp.cornell.edu
Add: B 13, Clark Hall,
        142 Physical Sciences Drive,
        Cornell University,
        Ithaca, 14853, NY, USA.
Principal Investigator: Prof. Mukund Vengalattore

---

On Thu, Oct 8, 2015 at 4:56 PM, Jan E. Allen <jan.allen@cornell.edu> wrote:

Hi, Yogesh,

5

CU002963



**Cornell University
Law School**

Lawyers in the Best Sense

KEVIN M. CLERMONT

[illegible address lines]

APPENDIX 6 : Letter from Kevin Clermont, Ziff Professor of Law at Cornell Law School, to the Lead University Counsel and Cornell President. Professor Clermont has carefully followed Cornell's discriminatory and retaliatory actions against me. Professor Clermont notes that these actions against me "raise to the stratosphere of injustice". In this letter, he also notes the pervasive procedural abuses against me, the weaponization of false allegations, continued retaliatory actions against me etc. Lastly, he also notes the growing evidence that Cornell's de novo tenure review process was a sham process that was designed to terminate my employment in contempt of the existing Court order.

May 8, 2017

Madelyn F. Wessel, University Counsel
Cornell University
Ithaca, N.Y. 14853

Dear Ms. Wessel:

Welcome aboard, again. I wrote to you on February 20, 2017. You replied that my letter to you concerning a particular case was premature, and that I should address people already in place at Cornell. I routed the letter to our acting University Counsel, but received no response. Thus, I renew the letter to you. We have reached the point where further delay in righting this shameful injustice is becoming its own injustice.

To repeat, I am the Ziff Professor of Law at Cornell, specializing in procedural law. I am also the advisor to the Judicial Codes Counselors (https://jccoffice.cornell.edu/), in which role I have seen a fair number of what I considered to be miscarriages of justice. But in a completely unofficial capacity, not representing or even knowing either party, I have recently encountered one that is so outrageous as to leave me ashamed of Cornell.

The case involves a male physics professor. A female grad student accused him of sexual assault under Policy 6.4. See https://hr.cornell.edu/sites/default/files/documents/faculty_policy64procedures.pdf. I will not go into the merits, except to say that the evidence was she-said/he-said. And that the evidence was very inconclusive. The WPLR investigators found the 6.4 complaint time-barred and unproven, but switched to a theory of violation of Cornell's Romance Policy. See https://blogs.cornell.edu/deanoffaculty/files/2013/11/ROMANTIC-xa6ury.pdf. They recommended a finding of his guilt, by a preponderance of the evidence, of having a year-long sexual relationship with her. See https://drive.google.com/file/d/0B_QuvknI9J1SSKd tLWE5cje2OUU/view. He totally denies that relationship. See

https://drive.google.com/file/d/0B_QnXnl9LjSRXh0aXI_OJ2IZVIk/view. We cannot now know with certainty what happened between them, of course, but there was a telling absence of direct proof such as e-mails, texts, or witnesses. Although I know that rearguing the merits is hopeless, I cannot resist saying that a reasonable person would not find guilt, even by a preponderance, unless that person made the amateurish mistake of ignoring the probative value of the absence of direct evidence after an incredibly exhaustive investigation. (The result is a career and a physics lab in shambles, but that is another story.)

Yet it is not the facts that raise this case to the stratosphere of injustice, it is the procedural path. It is not even the litany of procedural abuses by the investigators: their refusal to give him basic information, to allow him to supplement the record or to challenge credibility, to afford him any rights at all. (Incidentally, the professor waived no rights, as he strenuously objected to the farce all along.)

Instead, the basic flaw is that Cornell followed no procedure at all. As you can see in the above-cited Policy 6.4, a charge under it gives a faculty member, at least, all sorts of rights, including a real evidentiary hearing before neutrals, and even requires proof by clear and convincing evidence. So the investigators switched to the Romance Policy in order to sanction him. But as you can read, the Romance Policy is just a statement of principle, without a word about procedures or time limitations or sanctions. As a result, the administrators felt free to make up a procedure, which comprised solely a star-chamber investigators' report and some strange kind of "review" by Dean Ritter.

Let me repeat, because Policy 6.4 was unavailable to them due to a time bar, the administrators concluded that the professor had no procedural rights at all. Claiming that the inapplicability of Policy 6.4 relieved Cornell of providing any procedural protections for a serious allegation is such a preposterous position that at first I could not believe that Cornell was relying on it. I still cannot believe that anyone but ideologues who have lost their bearings would defend it.

Another part of this professor's case has already resulted in a New York State judge's finding Cornell's behavior to be arbitrary and capricious, a court decision rendered before Dean Ritter recently imposed the Romance Policy sanction. That court's unprecedented holding in reviewing a tenure decision, see http://web.archive.org/web/20170101184346/http://www.fleischmanlawfirm.com/wp-content/uploads/2016/12/decision-order.pdf, has not yet received any publicity. It is nonetheless my sincere belief that Cornell risks true public embarrassment, perhaps well deserved, in connection with its handling of this whole case.

There is no appeal allowed from the Romance Policy outcome, there being no procedure whatsoever. The court, before whom that outcome will come as a consequence, would never let it stand. I think the Romance Policy outcome and its retaliatory nature are scheduled to be heard by the court on June 23.

Shifting now to hearsay, my understanding is that Ms. Tarlow of your office said to the professor's lawyers that Cornell was willing to retract the Romance Policy finding and sanction, but she thereafter withdrew that offer. That action speaks volumes. Also, evidence grows that the

University is making moves to turn the renewed tenure review into a sham, including using the romance "fact" against him and thus undermining the court's order. In fact, Cornell is acting as if the court order did not exist. I understand the no-holds-barred strategy of throwing everything against the wall. But I do not understand why a university would follow that strategy against a community member.

I trust in you to set the administrators and counsel straight. Their Romance Policy finding and sanction will somehow be vacated, and in my view you have the duty to take the lead in doing so immediately.

Very truly yours,

Kevin M. Clermont

APPENDIX 6  Letter from Keith Schwab, Professor of Applied Physics at Caltech. Prof. Schwab notes that Cornell's purported excuses for the denial of my tenure are entirely false and unsupported by facts. He also notes the extended period of discrimination and retaliation against me  and notes that the de novo tenure review was likely in retaliation against me in response to my complaints against the Cornell administrators

## CALIFORNIA INSTITUTE OF TECHNOLOGY
### Thomas J. Watson Laboratory of Applied Physics
### Pasadena, California 91125

From:   Prof. Keith Schwab
        Applied Physics, Caltech

Re:     Evaluation of Prof. Mukund Vengalattore

Dear Mukund,

I have recently learned that the Department of Physics at Cornell has unfortunately voted to deny your tenure. The reasons which were cited were related to research productivity, group leadership and mentoring, and teach quality.  It is my opinion that all of these reasons are not valid and do not accurately represent your qualities and value as a scientist, teacher, and group leader. I have evaluated many young faculty for tenure, and the package you submitted would have yielded tenure at Caltech in either the Applied Physics or Physics departments.

How Cornell has treated you, I find to be very troubling.  For instance, the department which has nearly unanimously voted against your tenure in 2017, voted in favor of your tenure in the fall of 2014.  None of the reasons cited in 2017 were mentioned in the 2014 favorable report.  Your midterm tenure review in ~2012 was very favorable. How Dept. of Physics went from evaluating you as worthy of tenure to nearly unanimously against, belies reason and clearly shows some sort of bias against you. I believe this likely to be retaliation for your successful lawsuit showing mishandling of your tenure case by the Dean of Arts and Sciences, your internal complaints showing bias and mishandling of your case, and your ongoing Title IX complaints.  I don't understand why your colleagues, who I know well, did not rally behind you while you defended yourself against false claims and was mishandled by the Dean.

Below I provide my own assessment of your tenure package. I have to say that I find it amazing that you have been able to function as an academic scientist while you have endured the nightmare of false allegations and defending your professional and personal reputation. I know that Cornell attempted to close your lab in the summer of 2016 and only through a court order where you able to continue your research.  I can't fathom how you have been able to teach, write grants, write papers, keep your students motivated…all while defending yourself against a huge billion-dollar university.  What you have done is heroic in my opinion, and I believe most of your colleagues at Cornell would have been absolutely crushed if placed in similar circumstances.

**Overall:** I have known you since 2008 and was part of the committee at Cornell which hired you (while I was a professor in the Dept of Physics at Cornell). Here is what I have found to be true. *You are truly an excellent and world-class physicist, in all respects.* You have a deep understanding of quantum physics, atomic physics, and your experimental craft.  Your work is creative, sophisticated, and at the cutting edge in your field. Within your group of peers, I would place you easily in the top 10%.  You are after significant results with depth.  I know of peers of yours which make cludgy attempts at physical effects, generate some very sketchy data, and run to *Nature* and *Science*; this is clearly not your approach. You are truly an excellent group leader and mentor; your students tell me this first hand.  Your mentorship of fledgling undergraduates is amazing and so obviously impactful; your undergraduates have raved to me first hand about their experiences with you in your lab.

**Research:**  In one of your latest manuscripts, you and your team demonstrate sensitivity beyond the Heisenberg Limit with an interferometer utilizing two parametrically coupled mechanical modes; I find this result (how to beat quantum limits of noise) to be very interesting and illustrates your important contributions to the field of optomechanics. As an expert in quantum optomechanics, I was not aware of the SU(1,1) interferometer and the possible noise benefits. Using your knowledge of quantum optics and cold atom physics, you have made real an important analogue in the mechanical domain.  This result is timely as there is a lot of effort in the area of noise squeezing of mechanical motion.

I find the research direction which you have described in the paper "Atom-based coherent quantum-noise cancellation in optomechanics" to be your unique contribution: the physics of coupling cold

atoms to mechanical motion, through a quantum optical field. This is a fascinating direction where the systems which are so clearly quantum (cold atoms and optical fields) can be directly coupled to a large mechanical system. This is going to be a very rich direction. The quantum optical field has many advantages: each optical mode is a quantized oscillator which strongly couples to atoms and to motion. The optical field is computable and the quantum dynamics is well understood as are the theoretical computational tools. The cold atom system allows access to a more complex level structure, breaking from the linear oscillators in the mechanical and optical system. You are one the only researchers in the world who can conceive, compute and realize such a complex quantum system, at the forefront of quantum science and engineering.

During the your time at Cornell you have produced 12 refereed publications, with two more on the ArXiv. Three of these articles have been published in *Physical Review Letters* which is the gold-standard journal in the physics community (one has been cited 56 times in 3 years, another 40 times in two years, and another 23 times in two years). This is an excellent citation rate which demonstrates relevance. You have also published a number of theoretical studies: 6 papers in *Physical Review A*. This demonstrates your skills not only as an experimentalist, but as a physicist capable of sophisticated theoretical analysis. All of this productivity while you had to defend your professional and personal reputation. This productivity would have easily crossed the bar for tenure at any of the most prominent research universities in the US.

**Teaching:** I have not had a chance to observe you in the classroom. However, I have had the chance to hear your lecture many times at conferences and meetings. I have always found you to be a very organized and clear speaker and have no doubt that your teaching would be far above average at Cornell. I would also like to point out that your teaching does not end in the classroom. You have a track record of working with undergraduates in your laboratory. I have spoken to these students and they LOVE the experience they have had working with you. Many of them became so interested in your work in atomic physics that they are now pursuing phds at world class institutions (Stanford, Harvard, Caltech, JILA, MIT.) Many of these undergraduate students have won prizes within the Department of Physics for their research conducted in your lab. It is shocking to me that none of this is mentioned in your tenure decision. You are unique in the way your work directly with undergraduates in your laboratory. I don't know of any other professor in the Dept. of Physics at Cornell who spends more time teaching undergraduates than you do; truly unique opportunity for these students.

**Mentorship:** Over the past 9 years, I have had the opportunity to meet with all of your phd students. Largely, you are admired by your students for the depth of your scientific knowledge and passion for your work. You are known to be fair and a balanced mentor. What I have found is that the students who gave you a poor review, could not live up to the work and skill which is required to do atomic physics at a world class level (Lauren Aycock and Collin Reynolds): in my opinion, I found them to be amateurs and blamed you for their inadequacies. I do not believe these students would not have survived in the other high profile research groups at Cornell. Since their departure, you have formed an amazing team of dedicated and talented phd students. I have spoken to each of them privately and find that they all express admiration for you as a scientist and group leader. It is not unusual for a new young professor to have trouble with the first students who join the group.

Please use this letter in any way you wish. I hope that this information will be useful for the pursuit of a new position.

Best wishes,

*[signature]* 5 Jan 2018

Keith Schwab

Prof. of Applied Physics
Caltech
Pasadena, CA 91125
5 January 2018