MANDATE

### UNITED STATES COURT OF APPEALS
### FOR THE
### SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of June, two thousand twenty-two,

Before:     Amalya L. Kearse,
            José A. Cabranes,
            Rosemary S. Pooler,
                    *Circuit Judges.*

_____

Dr. Mukund Vengalattore,

                Plaintiff-Appellant,

        v.

Cornell University, Miguel Cardona, Secretary of Education, U.S. Department of Education, and U.S. Department of Education,

                Defendants-Appellees.

_____

**JUDGMENT**

Docket No. 20-1514

The appeal in the above captioned case from a judgment of the United States District Court for the Northern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED to the extent that it dismissed the Title IX claim against Cornell for failure to state a claim and to the extent that the court declined to exercise supplemental jurisdiction over Vengalattore's state-law claim for defamation. The matter is REMANDED for discovery and such further proceedings as may be appropriate. The judgment is in all other respects AFFIRMED. Each side shall bear its own costs of this appeal.

                        For the Court:
                        Catherine O'Hagan Wolfe,
                        Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 07/27/2022

20-1514
Vengalattore v. Cornell University



1    UNITED STATES COURT OF APPEALS

2    FOR THE SECOND CIRCUIT

3    - - - - - -

4    August Term, 2020

5    (Argued: April 14, 2021                    Decided: June 2, 2022 )

6    Docket No. 20-1514

7    _____

8    DR. MUKUND VENGALATTORE,

9                        *Plaintiff-Appellant*,

10   - v. -

11   CORNELL UNIVERSITY, MIGUEL CARDONA, Secretary of
12   Education, U.S. Department of Education, and U.S. DEPARTMENT
13   OF EDUCATION,

14                        *Defendants-Appellees*.[*]

15   _____

_____

[*]    Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Secretary
       Miguel Cardona is automatically substituted as a defendant for
       former Secretary Betsy DeVos. The Clerk of Court is instructed to
       amend the official caption to conform with the above.

1    Before:  KEARSE, CABRANES, and POOLER, *Circuit Judges*.

2                Appeal by former faculty member from a judgment of the United States

3    District Court for the Northern District of New York, Gary L. Sharpe, *Judge*,

4    dismissing (A) claims against the university principally for violation of his right to

5    due process, and for gender and national-origin discrimination in violation of,

6    respectively, Title IX of the Education Amendments of 1972 and Title VI of the Civil

7    Rights Act of 1964; and (B) claims that documents issued by the United States

8    Department of Education violated the Administrative Procedure Act and the

9    Spending Clause of the Constitution and caused or contributed to the university's acts

10   of discrimination.  The district court granted the university's motion for judgment on

11   the pleadings and/or summary judgment on the grounds that the university is not a

12   state actor, that Title IX does not authorize a private right of action for discrimination

13   in employment, and that the complaint failed to state a claim for national-origin

14   discrimination under Title VI.  The court granted the United States defendants'

15   motion to dismiss the claims against them for lack of standing.  We find merit only

16   in plaintiff's contention that Title IX allows a private right of action for a university's

1    intentional gender-based discrimination against a faculty member, sufficiently alleged

2    herein.  We thus vacate the judgment in part, and remand for further proceedings.

3                    Affirmed in part; vacated and remanded in part.

4                    Judge Cabranes concurs in the judgment and opinion of the Court, and

5    files a separate opinion.

6                                CALEB KRUCKENBERG, Washington, DC (Margaret A.
7                                    Little, Richard A. Samp, New Civil Liberties Alliance,
8                                    Washington, DC, on the brief), *for Plaintiff-Appellant*.

9                                MICHAEL L. BANKS, Philadelphia, Pennsylvania  (Emily
10                                   Reineberg, Morgan Lewis & Bockius, Philadelphia,
11                                   Pennsylvania; Wendy E. Tarlow, Office of University
12                                   Counsel, Cornell University, Ithaca, New York, on
13                                   the brief), *for Defendant-Appellee Cornell University*.

14                               KAREN FOLSTER LESPERANCE, Assistant United States
15                                   Attorney, Albany, New York (Antoinette T. Bacon,
16                                   Acting United States Attorney for the Northern
17                                   District of New York, William Larkin, Assistant
18                                   United States Attorney, Albany, New York, on the
19                                   brief), *for Defendants-Appellees Miguel Cardona and*
20                                   *U.S. Department of Education*.

3

1     KEARSE, *Circuit Judge*:

2          Plaintiff Mukund Vengalattore, a former Assistant Professor at defendant

3     Cornell University ("Cornell" or the "University"), appeals from a judgment of the

4     United States District Court for the Northern District of New York, Gary L. Sharpe,

5     *Judge,* dismissing his amended complaint ("Complaint") alleging principally (A) that

6     in disciplining him in response to his student assistant's allegation that he had an

7     inappropriate relationship with her, Cornell discriminated against him on the basis

8     of gender and national origin in violation of, respectively, Title IX of the Education

9     Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), and Title VI of the Civil

10     Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"); and (B) that defendants United

11     States Department of Education and its Secretary (the "federal defendants") violated

12     the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Spending

13     Clause of the Constitution in issuing guidance documents that caused or contributed

14     to Cornell's gender discrimination.  The district court granted Cornell's motion for

15     judgment on the pleadings and/or summary judgment, ruling principally that Title

16     IX does not authorize a private right of action for discrimination in employment, and

1    that the Complaint lacked sufficient allegations of national origin discrimination to

2    state a claim under Title VI.  The court granted the federal defendants' motion to

3    dismiss the claims against them for lack of standing.  The court also dismissed a claim

4    by Vengalattore against Cornell under 42 U.S.C. § 1983 for denial of due process,

5    ruling that Cornell is not a state actor; and it declined to exercise pendent jurisdiction

6    over a state-law claim against Cornell for defamation.   Vengalattore challenges these

7    rulings on appeal.

8            For the reasons that follow, we conclude that Title IX affords a private

9    right of action for a university's intentional gender-based discrimination against a

10   faculty member, and that the Complaint sufficiently asserts such a claim; we thus

11   vacate and remand for further proceedings on Vengalattore's Title IX claim.  We

12   therefore also vacate the discretionary dismissal of his state-law claim for defamation.

13   We affirm the dismissal of the Title VI and due process claims against Cornell, as well

14   as the dismissal of the claims against the federal defendants.

1          I.  BACKGROUND

2          Cornell's motion to dismiss requested judgment on the pleadings

3    "and/or" summary judgment, and the district court stated that the motion was

4    granted.  Given that the court "did not purport to . . . make factual findings,"

5    assessed the Complaint's allegations, rather than any proffered evidence, "all of the

6    facts alleged in [plaintiff's] complaint[] must be taken as true for purposes of review,"

7    *Cannon v. University of Chicago*, 441 U.S. 677, 680 n.2 (1979).  We also "consider . . .

8    documents incorporated into the complaint by reference."  *Tellabs, Inc. v. Makor Issues*

9    *& Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs*").  The principal factual allegations of

10   the 846-paragraph Complaint, taken as true, are summarized below.

11   A.  *An Overview of the Complaint's Allegations as to the Events*

12         Vengalattore is a male of Indian descent.  He became a tenure-track

13   Assistant Professor of Physics in Cornell's College of Arts and Sciences in 2009.  In

14   that position, with the aid of assistants, he designed and conducted laboratory

1    experiments.   One assistant, a graduate student--called "Jane Roe" in this

2    litigation--worked on a Vengalattore experiment from 2009 until late 2012. She, *inter*

3    *alia*, struggled with her lab assignments and often took professional criticism

4    personally; was somewhat unprofessional in her language and conduct; falsely

5    accused others of breaking lab equipment; and objected to "work[ing] long hours" as

6    she stated would be expected of "Indians." (*See* Complaint ¶¶ 203, 211, 253-257, 260,

7    396, 407.) Roe withdrew from Vengalattore's project in November 2012. In the Spring

8    of 2013, she told a professor who collaborated in Vengalattore's research "if I have my

9    way, [Dr. Vengalattore] will have a hard time getting tenure." (*Id*. ¶ 292.)

10         In May 2014, during the Physics Department's consideration of

11   Vengalattore's request for tenure, Roe sent the tenure review committee a letter

12   alleging that Vengalattore had once angrily thrown a five-pound piece of equipment

13   at her. In September 2014, two days after learning that the committee had

14   recommended that tenure be granted, Roe told Physics Professor Ritchie Patterson

15   that Vengalattore had engaged in sexual misconduct with her. That accusation was

7

1    relayed to Alan Mittman, Director of Cornell's Office of Workforce Policy and Labor

2    Relations.

3              Dean Gretchen Ritter, responsible for approval of tenure decisions in the

4    College of Arts and Sciences, was informed of Roe's accusation while she was

5    considering Vengalattore's tenure request.  Mittman proceeded to conduct numerous

6    informal interviews of Roe, keeping the Dean informed of Roe's allegations;

7    Vengalattore was not similarly informed.  (*See, e.g., id*. ¶¶ 321, 327, 332-334, 340, 361.)

8    On February 13, 2015, Dean Ritter denied Vengalattore's request for tenure.  (*See*

9    *id*. ¶¶ 336, 342.)

10             One business day later, Mittman, with Sarah Affel, Cornell's Title IX

11   coordinator (the "investigators"), conducted the first interview with Roe that was

12   recorded.  In that February 16, 2015 interview, Roe told the investigators that she had

13   been raped by Vengalattore in late 2010, and that she thereafter had a secret

14   consensual sexual relationship with him until December 2011.  (*See, e.g., id*. ¶¶ 344,

15   349, 351.)

1        On February 27, 2015, Vengalattore, still unaware of Roe's accusations,

2   appealed to the University appeals committee, challenging the denial of his request

3   for tenure.  On the next business day, March 2, Mittman summoned him to appear

4   at the Title IX office on March 3 "to 'review [an] alleged romantic relationship with a

5   student under [his] supervision in or around the 2011 calendar year.'"  (Complaint

6   ¶ 363.)

7        In the March 3 interview, Vengalattore was informed of Roe's allegation

8   that he and she had had a consensual sexual relationship.  Vengalattore denied it.

9   Toward the end of the three-hour interview, he was informed that Roe also accused

10  him of rape.  He responded by asking for the assistance of counsel; the investigators

11  told him that was not necessary, and continued with the interview.  (*See*

12  *id*. ¶¶ 369-370.)  Vengalattore throughout denied having had any sexual, romantic,

13  or other unprofessional relationship with Roe.

14       As described in Part I.C.1. below, the Complaint alleged that the

15  investigation was conducted in a manner that was designed to support Roe's

16  accusation.  For example, Roe had told the investigators that the sexual relationship

9

1    began during the final week of the Fall 2010 semester, on a day when Vengalattore

2    had not come to the lab and she went to his house at 7 p.m. to check on him.  She said

3    he invited her in and began kissing her; that she initially resisted but then agreed to

4    have sex with him; that she considered this to be rape; that she spent the night with

5    him and went with him to the lab the following morning; and that they then had a

6    secret consensual sexual relationship until December 2011. (*See* Complaint

7    ¶¶ 344-351.)  When Vengalattore asked on what date Roe claimed he had raped her,

8    the investigators refused to answer.  Instead they asked Vengalattore to take a blank

9    December 2010 calendar and mark off for them the days he had been in town.  (*See*

10   *id*. ¶¶ 438-439.)

11         As described in Part I.C.2. below, the investigators' eventual written

12   report to the Dean, while recommending that Vengalattore not be found to have

13   raped Roe, stated their conclusion that Roe's allegation of their consensual sexual

14   relationship was supported by a preponderance of the evidence.  Without a hearing,

15   Dean Ritter adopted the investigators' report and found that Vengalattore had had

16   an inappropriate sexual relationship with Roe; she also found that he had lied to the

1    investigators.  As a result, Dean Ritter imposed a two-week suspension without pay,

2    which Vengalattore served in June 2017 after the denial of tenure had become final.

3    His academic appointment employment at Cornell ended in June 2018.

4               "Cornell's decision to deny tenure is not at issue in this lawsuit"

5    (Vengalattore brief on appeal at 13), that matter having been resolved by a 2018 ruling

6    by the New York Supreme Court, Appellate Division, that "the sexual misconduct

7    allegations raised by" Roe had "no[t] . . . improperly influenced the tenure decision,"

8    and "that Cornell had not acted arbitrarily or capriciously during the tenure review

9    process" (Complaint ¶¶ 645-646).  Instead, Vengalattore asserts here that, despite his

10   significant achievements and his having been awarded several million dollars of grant

11   money, he has been denied academic appointment or laboratory access at other

12   universities.  (*Id*. ¶¶ 649, 654, 657.)  He attributes this, on information and belief, to

13   Cornell's knowing communication of false findings that he had a sexual relationship

14   with a student and lied about it.  (*See id*. ¶¶ 654-657; *see also id*. ¶¶ 713, 725-729.)

1    B.  *Allegations of Gender Bias and National Origin Bias*

2              The Complaint alleged that there were both overt and implicit

3    manifestations of bias against Vengalattore on the basis of his gender or national

4    origin.  With respect to gender, the Complaint includes the following allegations as

5    to conduct and statements by Roe or by Cornell officials who were advisors to

6    decisionmakers.

7              Airlia Shaffer-Moag, an undergraduate student, joined Vengalattore's lab

8    in 2012.  In connection with Vengalattore's appeal of Dean Ritter's February 2015

9    denial of his tenure request, Shaffer-Moag sent a letter to the tenure appeals

10   committee in August 2015 stating that in 2012 she had witnessed Roe attempting to

11   have undergraduate men denied the opportunity to join Vengalattore's lab, while

12   advocating the acceptance of women with equivalent or lesser credentials.  (*See, e.g.*,

13   Complaint ¶¶ 271, 565-566, 570.)  In that regard, Shaffer-Moag cited her own personal

14   experience.   When she and two undergraduate men were applying to join

15   Vengalattore's lab, Roe attempted to bar the two men.  (*See id*. ¶¶ 271-273, 570-572.)

16   Yet "Shaffer-Moag, by her own reckoning, had a 'much weaker background in physics

1  than did the two men, so there was no reason to try to bar them from the lab without

2  barring' her as well." (*Id*. ¶ 274; *see id*. ¶ 573.)

3          Shaffer-Moag, after joining the lab, became friendly with Roe.  In her

4  letter to the appeals committee she said that "Roe had told her in 2012 that [Roe] was

5  'sexist against men.'" (*Id*. ¶ 569; *see id*. ¶ 270.)

6          The University appeals committee in December 2015 upheld

7  Vengalattore's appeal from the denial of tenure, leading to consideration of his tenure

8  application by a new committee; the new committee recommended that tenure be

9  granted.  (*See* Complaint ¶¶ 626-627.)  On February 16, 2016, however, Dean Ritter

10  formally overruled the new committee's recommendation and again denied

11  Vengalattore tenure.  (*See id*. ¶ 628.)  On February 26, 2016, Vengalattore met with

12  Professor Saul Teukolsky, the Physics Department's interim chair who "had been

13  involved in the tenure review process." (*Id*. ¶ 629.)  "During that meeting, Professor

14  Teukolsky told Dr. Vengalattore that *the faculty had considered Roe's accusations to have*

15  *been false and malicious, but* also said that *the faculty would take no action*, saying, 'Can

16  *you imagine what would happen if we took action against a blonde, female student?*  Twitter

13

1    would explode and the entire department would be labeled bullies.  We don't want

2    that.'"  (Complaint ¶ 630 (emphases ours).)

3              With respect to Vengalattore's claim under Title VI, the Complaint

4    alleged that there were national-origin-related statements by Roe and one by a

5    member of a faculty committee considering his request for tenure.  According to

6    graduate student Yogesh Patil, who worked with Roe in Vengalattore's lab, Roe made

7    "racial comments" such as "telling Dr. Vengalattore in front of the other students, 'You

8    are all Indians.  Of course you stick together.'"  (Complaint ¶ 409.)  She also told Patil

9    that he, Vengalattore, and graduate student Srivatsan Chakram "could be expected

10   to work long hours because 'they are Indians, who are hardworking like Chinese.'"

11   (*Id*.)

12             As to the comment by a faculty committee member, the Complaint

13   alleged that after two faculty committees had considered Vengalattore's request for

14   tenure (*see, e.g., id*. ¶¶ 322-323), "yet another faculty committee, the Faculty Advisory

15   Committee on Tenure Appointments (FACTA), was convened to review" the tenure

16   request "[f]ollowing Dean Ritter's recommendation" that tenure be denied (*id*. ¶ 337).

14

1    FACTA recommended denying tenure.  (*See id*. ¶ 338.)  In its report, one member,

2    Professor Paulette Clancy of Cornell's College of Engineering, wrote,

3             "I found [Dr. Vengalattore's] interactions with the graduate
4             students to be unacceptable and unsupportable by a major
5             research university like Cornell.  *Clearly the only students who are*
6             *prepared to take the abuse he dishes out are both men and they are both*
7             *from the Indian subcontinent, where perhaps the culture between advisor*
8             *and protégé is different*."

9    (Complaint ¶ 339 (quoting FACTA report (emphasis in Complaint)).)

10    C.  *Cornell's Processing of Roe's Accusations*

11          The Complaint alleged that until 2012, complaints of sexual misconduct

12    had been governed by Cornell's Campus Code of Conduct ("Campus Code" or

13    "Code").  The Code allowed investigation of complaints as to alleged misbehavior

14    "that had occurred within one year of the complaint being filed."  (Complaint ¶ 106.)

15    A person accused of misconduct was entitled to have the assistance of an advisor at

16    all stages; and prior to the filing of formal charges "the Judicial Administrator" could

17    not interview the accused without giving him written notice of the matter to be

18    discussed and his relationship to it.  (*See id*. ¶¶ 108-109, 111.)  The accused was also

1    entitled, *inter alia*, to have an adversarial hearing before a board comprising three

2    faculty members, one student, and one nonfaculty employee; and the burden was on

3    claimants to prove their claims by clear and convincing evidence. (*See id*. ¶¶ 116-128.)

4          Since 1996 Cornell had had a policy on "Romantic and Sexual

5    Relationships Between Students and Staff" (or "Romance Policy") which was not part

6    of the Campus Code but rather was set out in the Faculty Handbook (*see* Complaint

7    ¶¶ 174, 176).  The Romance Policy "generally provided that a faculty member 'should'

8    not 'simultaneously be romantically or sexually involved with a student whom he or

9    she teaches, advises, coaches, or supervises in any way' because a 'conflict of interest

10   arises when an individual evaluates the work or performance of a person with whom

11   he or she is engaged in a romantic or sexual relationship.'" (*Id*. ¶ 175 (quoting

12   Romance Policy)); *see also id*. ¶ 577.)  Cornell's "Committee on Professional Status" was

13   given "exclusive jurisdiction over the romantic relationships policy." (*Id*. ¶¶ 177-178.)

14   That "Committee was to be a group of faculty" and it "was required to establish

15   review procedures, which '*must* comport with the precepts of due process.' (emphasis

16   in original)." (*Id*. ¶¶ 179-180.)

16

1            In 2012, Cornell amended the Campus Code to adopt a new set of

2    procedures required by defendant United States Department of Education ("DoE")

3    (*see*, *e.g.*, Complaint ¶¶ 703-709), called "Policy 6.4." (*id*. ¶ 129).  As discussed in Part

4    I.D. below, the Complaint alleged that Policy 6.4 curtailed many of the rights that had

5    been afforded to an accused by the Campus Code.  For example, rather than the

6    Campus Code's clear-and-convincing-evidence standard (*see id*. ¶ 128), under Policy

7    6.4 the investigator was to apply a "preponderance of the evidence standard"

8    (*id*. ¶ 158); in addition, "[n]o party had a burden of proof" (*id*. ¶ 159).  Also "Policy 6.4

9    did not require that the investigator disclose evidence favorable to the accused to

10    anyone, at any stage of the investigation" (*id*. ¶ 163); and it provided that if the

11    accused refused to discuss the matter, the refusal "could result in an adverse finding"

12    (*id*. ¶ 143).

13            Policy 6.4's time limit for a student's filing a complaint against a

14    supervisory faculty member was the earlier of one year after the student was no

15    longer under the faculty member's supervision or three years from the date of the

16    alleged acts.  (*See* Complaint ¶ 140.)  The investigators acknowledged--and had

1     alerted Dean Ritter--that Roe's complaint against Vengalattore "'was time-barred by

2     Policy 6.4.'" (*Id*. ¶ 581; *see, e.g., id*. ¶¶ 582, 454.)

3           The Complaint alleged that Cornell's processing of Roe's accusations

4     against Vengalattore employed a hybrid process (*see id*. ¶ 577) by applying some

5     standards favorable to Roe that were permitted only by Policy 6.4--which the Dean

6     and the investigators knew was inapplicable because of the time bar--and that the

7     inquiry was conducted without regard to impartiality, reliability, or due process.

8         1. *The Investigation*

9           Mittman had been informed as early as September 2014 of Roe's

10     allegation that she and Vengalattore had been involved in a sexual relationship. (*See*

11     Complaint ¶¶ 324-326.) Although Vengalattore was not informed of that allegation

12     until March of 2015 (*see id*. ¶¶ 361-363), Mittman "told Roe" in December 2014 "that

13     Cornell was working 'very aggressively to address issues of access, prevention and

14     culture change' 'under Title IX'" (*id*. ¶ 335). Through mid-February 2015, Mittman

15     proceeded to have numerous unrecorded conversations with Roe; he shared Roe's

18

1    allegations with Dean Ritter while she considered Vengalattore's request for tenure;

2    and he assured Roe that her concerns had been relayed to Dean Ritter. (*See id*. ¶¶ 361,

3    327, 332-334, 340-341.)

4         When Vengalattore was interviewed by the investigators, he objected

5    that it was unfair to place on him the burden of proving that, 4-5 years earlier, an

6    alleged event had not occurred; the investigators did not dispute that they viewed

7    him as having that burden. (*See id*. ¶¶ 446-447.) When Vengalattore asked whether

8    Roe could be disciplined for making false accusations against him, Mittman

9    responded only by suggesting that her accusations were not false. (*See*

10   *id*. ¶¶ 457-458.) The investigators determined that her allegation of a sexual

11   relationship with Vengalattore, which first surfaced in 2014, could not be viewed as

12   a recent fabrication because she had "no reason to lie" about her sexual activity in 2011

13   (*id*. ¶ 599)--*i.e.*, "no apparent motive to lie" (*id*. ¶ 469).

14        For evaluation of Roe's accusations and her possible motivation for

15   fabricating them, Vengalattore asked the investigators to pose certain questions to

16   Roe and to interview certain other persons who were knowledgeable; but his requests

1     were largely ignored.  For example, he provided the names of more than a dozen

2     persons--professors, close collaborators, or assistants--who were familiar with his

3     experiments, with the atmosphere in his lab, and with Roe's work and conduct there.

4     (*See* Complaint ¶¶ 375, 514.)  The investigators did not contact most of them.  They

5     did, however, contact another professor whom they "encouraged . . . to share any

6     'rumors' he had heard" about Vengalattore.  (*Id*. ¶¶ 481-482.)

7             Vengalattore also alleged that the investigators' procedures violated his

8     right to due process.  He was informed orally of allegations against him, and initially

9     was told only part of the accusation.  (*See id*. ¶¶ 362-363, 367-368, 461-462.)  When he

10     was eventually informed that Roe was accusing him of rape, he asked to have

11     assistance of counsel; Mittman and Affel told him that was not necessary (*see*

12     *id*. ¶¶ 369-370), but the investigators thereafter asked him for information he clearly

13     would have been advised not to provide, including essentially, as described in Part

14     I.A. above, a tabulation of the December 2020 days on which Roe could plausibly say

15     the alleged rape had occurred (*see id*. ¶¶ 438-439).  In contrast, the Complaint alleged

16     that Cornell provided Roe with counsel, and that the investigators' final report to the

1     Dean indicated that Vengalattore had been represented by counsel although in fact

2     he had not.  (*See id*. ¶¶ 365, 382, 586.)

3          Vengalattore also was not allowed to question Roe or any of the persons

4     who told the investigators that Roe had told them, before 2014, of a sexual

5     relationship with Vengalattore.  And the investigators allowed Roe and those persons

6     to confer with each other before and after their interviews and subsequently to have

7     the investigators alter the notes as to what they had said.  (*See* Complaint ¶¶ 418,

8     422-424.)

9          2.  *The Investigators' Report and the Dean's Findings*

10          Mittman and Affel reported the results of their investigation to Dean

11     Ritter on September 25, 2015 ("Mittman-Affel Report" or "Report"), recommending a

12     finding that Vengalattore had violated Cornell's 1996 policy against Romantic and

13     Sexual Relationships Between Students and Staff (*see* Complaint ¶¶ 576-577).  The

14     Report stated that "[a]lleged violations of the policy are reviewed under the

15     '*preponderance* of the evidence' standard.  This is the standard of proof applied by the

1    investigators and the dean, *not a burden of proof borne by either the student or faculty*

2    *member.*" (*Id.* ¶ 579 (quoting Mittman-Affel Report (emphases ours)).) The Report

3    "determined that *the lack of evidence* supporting a year-long romantic relationship

4    *actually supported Roe's allegations*, because '[c]ommon sense experience is that

5    secretive relationships carried out by faculty members and students *can be* carried out

6    without others, including other students and colleagues, becoming aware.'"

7    (Complaint ¶ 616 (quoting Report (emphases ours)).)

8         The Report also concluded that Roe had no motive to fabricate any

9    sexual misconduct by Vengalattore. The Complaint alleged that the investigators

10   disregarded evidence from Dr. Swati Singh and other colleagues or associates of

11   Vengalattore that, *inter alia*, Roe's work on Vengalattore's projects was viewed as

12   subpar and Roe acknowledged she was having difficulties (*see, e.g.*, Complaint

13   ¶¶ 203-204, 275, 669(c)(ii)); that Roe was viewed as being less dedicated and hard-

14   working, and far less knowledgeable, than her lab colleagues (*see id.* ¶¶ 212-215); and

15   that Roe had made inappropriate ethnic comments to her colleagues, ranting about

16   "Indians" (*id.* ¶¶ 259-260). The Report credited testimony by Roe's sister and friend

1     that Roe had told them in 2011 that she was involved with Vengalattore; the

2     investigators found it implausible to suggest that Roe had begun to fabricate a false

3     accusation against him so far in advance of his eligibility to request tenure.

4         The Complaint alleged that the investigators gave inadequate weight to

5     the testimony of witnesses such as "Dr. Bhave, Chakram, Patel [*sic*], Saha and Dr.

6     Singh--who had described Roe as being untrustworthy and not credible, because the

7     investigators perceived that these witnesses were Indian."  (Complaint ¶ 693(g)(vii).)

8     And while the Report listed some two dozen persons whom the investigators had

9     interviewed, it did not mention that Vengalattore had asked them to interview 10

10     others (*see id*. ¶ 584) whom they did not contact at all.  Those 10 included

11     Shaffer-Moag, who had first-hand evidence as to Roe's own gender bias and who in

12     fact, some two months prior to the investigators' delivery of their Report, gave such

13     evidence to the tenure appeals committee (*see id*. ¶¶ 267-274, 565-566, 569-574).

14         On October 6, 2015, Dean Ritter adopted the Mittman-Affel

15     recommendation and wrote to Vengalattore in part as follows:

16         "I find that a preponderance of evidence supports the claim that
17         you were involved in a sexual relationship with your former

23

1                        graduate student over a period of several months while also
2                        serving as her graduate advisor.  As a result, I find that you have
3                        violated the university's 'Romantic and Sexual Relationships'
4                        policy by engaging in such conduct.  I also find that there is not
5                        significant evidence to support the claim that the initial sexual
6                        encounter between you and the graduate student involved a
7                        sexual assault. . . .  Given the finding of an inappropriate sexual
8                        relationship, I also find that in your denial of a sexual relationship
9                        you have lied to the investigators in this case."

10 (Complaint ¶ 622.)  The Dean stated that "she 'intend[ed] to impose significant

11 sanctions on' Dr. Vengalattore," although those sanctions would be postponed until

12 the conclusion of his tenure appeal.  (*Id*. ¶ 623.)  As indicated in Part I.A. above, the

13 sanction she imposed was a two-week suspension without pay, which Vengalattore

14 served in June 2017.  (*See id*. ¶ 638.)

15 D.  *Claims Against the Federal Defendants*

16          The Complaint asserted nine claims against the federal defendants,

17 alleging that when Cornell adopted Policy 6.4 in 2012 and eliminated many of the

18 Campus Code's prior procedural protections for disciplinary investigations and

19 proceedings, it did so because of coercion by the DoE.  (*See* Complaint ¶¶ 130, 133,

135-136, 703-709.)  The DoE, charged with implementing and enforcing statutes related to higher education, including Title IX, had issued a series of guidance documents advising schools to "prevent unwelcome sexual advances by faculty toward students" (*id.* ¶ 31), and stating that DoE's Office of Civil Rights ("OCR") would apply a presumption that all sexual contact between faculty and students was nonconsensual (*id.* ¶ 33).

In 2011, OCR published a "Dear Colleague Letter" that, *inter alia*, "directed schools to take immediate action to eliminate harassment, prevent its recurrence, and address its effects" (Complaint ¶ 38 (internal quotation marks omitted).)  It required that schools use "a preponderance of the evidence standard of proof" when investigating allegations of sexual misconduct (*id.* ¶ 39), and it "strongly discourage[d] schools from allowing the parties personally to question or cross-examine each other during [a] hearing" (*id.* ¶ 46 (internal quotation marks omitted)).  The 2011 Dear Colleague Letter also warned that, while OCR will "seek[] to obtain voluntary compliance from recipients," it "may initiate proceedings to

1    withdraw Federal funding" when "a recipient does not come into compliance

2    voluntarily." (*Id*. ¶ 48 (internal quotation marks omitted).)

3              In 2014, OCR created a public list of schools that it was investigating for

4    potentially violating "their obligation to comply with Title IX in the implementation

5    of prompt and equitable sexual misconduct grievance procedures." (*Id*. ¶ 61.) "In

6    May 2015, OCR added Cornell to the list." (*Id*. ¶ 65.) Since then, "Cornell has become

7    the target of six more OCR investigations." (*Id*. ¶ 66.)

8              The Complaint alleged that Cornell's elimination of prior due process

9    protections for persons accused of sexual misconduct was the result of coercion by

10   the DoE through inclusion of Cornell on DoE lists of schools viewed as lax in

11   preventing sexual misconduct and through the threat of withdrawing federal funding

12   for Cornell's education programs. (*See id*. ¶¶ 703-709; *id*. ¶ 709 ("Cornell was coerced

13   to deny Plaintiff Dr. Vengalattore due process rights by Defendant [DoE] for fear of

14   being subject to an enforcement action.").)

15             The Complaint alleged, *inter alia*, that the coercive nature of DoE's 2011

16   Dear Colleague Letter and guidance documents (collectively "Title IX Guidance")

26

1    violated the Spending Clause of the Constitution; and that the guidance had been

2    issued in violation of the notice-and-comment provisions of the APA and was

3    arbitrary and capricious.

4    E. *The Decision of the District Court*

5          Vengalattore commenced the present action in 2018, principally asserting

6    that gender bias and national origin bias were motivating factors in the manner in

7    which Cornell conducted its investigation into Roe's allegations, made false findings

8    that he had engaged in a sexual relationship with Roe and lied about it, and, based

9    on those findings, disciplined him. He asserted claims against Cornell under

10    (1) Title IX, which prohibits gender discrimination in an education program that

11    receives federal funds; (2) Title VI, which prohibits discrimination on the basis of

12    national origin by any program or activity receiving federal financial assistance;

13    (3) 42 U.S.C. § 1983 for denial of his constitutional right to due process; and (4) state

14    law for defamation, alleging that Cornell knowingly communicated false findings to

15    other universities, and requesting as relief, *inter alia*, a judgment "declaring that" his

1    "reputation should be restored" (Complaint Prayer for Relief ¶ (v)(ii)).  Vengalattore

2    also asserted claims against the federal defendants as described in Part I.D. above.

3            Cornell moved for judgment on the pleadings under Fed. R. Civ. P. 12(c)

4    and/or for summary judgment dismissing the claims against it on various grounds.

5    It argued principally that Title IX does not authorize a private right of action for

6    discrimination in employment, and that in any event, the Complaint was insufficient

7    to state a claim; that the Complaint lacked sufficient allegations of national origin

8    discrimination to state a claim under Title VI; and that the Complaint failed to state

9    a claim under § 1983 because Cornell is not a state actor.  The federal defendants

10   moved under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss Vengalattore's claims

11   against them for lack of Article III standing or for failure to state a claim.

12           In a Memorandum-Decision and Order dated May 1, 2020, the district

13   court dismissed the Complaint.  *See Vengalattore v. Cornell University*, 3:18-cv-1124,

14   2020 WL 2104706 (N.D.N.Y. May 1, 2020) ("District Court Opinion").  First, the court

15   granted the federal defendants' Rule 12(b)(1) motion to dismiss for lack of standing.

16   Noting that in order to have Article III standing, a plaintiff must allege that he

17   suffered an injury that is traceable to conduct of the defendant and that can be

28

1    redressed by a favorable decision, *see* District Court Opinion, 2020 WL 2104706, at *3

2    (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)), the court found that

3    the Complaint both failed "to plausibly allege any causal connection between [DoE's]

4    Guidance Documents and Vengalattore's injuries," and failed to show that his injuries

5    would be redressed by a judgment against the federal defendants, District Court

6    Opinion, 2020 WL 2104706, at *4.  The district court rejected as purely speculative

7    Vengalattore's suggestions that Cornell would not have found him in violation of the

8    Romantic and Sexual Relationships Between Students and Staff policy absent the DoE

9    Title IX Guidance documents, or that his reputation would be salvaged by a judgment

10   against the federal defendants.  *See id*. at *4-*5.

11          The district court, without reference to Cornell's answer or to evidence

12   that might support summary judgment, granted the motion to dismiss each of

13   Vengalattore's federal claims against Cornell for failure of the Complaint to state a

14   claim.  As to the Title IX claim of gender discrimination, the court found that Title IX

15   does not authorize a private right of action for an employee.  It noted that although

16   this Court had not addressed the question, "[a]n overwhelming majority of district

29

1    courts in this Circuit have found that an implied private right of action does not

2    exist[] under Title IX for employees alleging gender discrimination in the terms and

3    conditions of their employment." District Court Opinion, 2020 WL 2104706, at *5

4    (internal quotation marks omitted).

5           As to the Title VI claim, the court found that the Complaint failed to set

6    out facts from which the court could "plausibly infer that the decisionmakers at

7    Cornell intentionally discriminated against [Vengalattore] on the basis of his race in

8    resolving Roe's complaints about him." *Id.* at *7. It noted that, of the two references

9    to Vengalattore's national origin cited in the Complaint, one was by Roe and the other

10    was by a member of a faculty committee considering Vengalattore's request for

11    tenure, "neither of whom are alleged to have been decisionmakers in Cornell's

12    resolution of Roe's allegations against Vengalattore." *Id.* The court found that even

13    if "[Dean] Ritter, the alleged final decisionmaker, . . . was aware of these statements,

14    the court cannot plausibly infer that they were a substantial or motivating factor--or

15    any factor at all--in resolving Roe's complaints against Vengalattore." *Id.*

30

1    The district court dismissed Vengalattore's § 1983 due process claim that

2    Cornell's investigation and discipline violated his right to due process, concluding the

3    Complaint lacked sufficient factual allegations to show that Cornell, a private

4    institution, was a state actor. *See id*. at *8. And, having dismissed all of Vengalattore's

5    federal claims, the district court also dismissed his state-law claim for defamation,

6    declining to exercise supplemental jurisdiction over that claim. *See id*.

7    This appeal followed.


8                              II.  DISCUSSION


9    On appeal, Vengalattore contends principally that the district court erred

10   (1) in ruling that Title IX, dealing with gender discrimination in education, does not

11   afford a private right of action to a school employee, and (2) in ruling that the

12   Complaint did not allege sufficient facts to state a claim under Title VI for

13   discrimination on the basis of national origin.  He contends that the court erred in

14   dismissing on the pleadings his due process claim against Cornell, arguing that

1    discovery is required in order to determine whether Cornell is a state actor.  He

2    challenges the dismissal of his claims against the federal defendants on the ground

3    of lack of Article III standing, arguing that the district court misunderstood "the

4    nature of [his] injuries."  (Vengalattore brief on appeal at 51.)  For the reasons that

5    follow, we conclude that Title IX allows a private right of action for a university's

6    intentional gender-based discrimination against a faculty member and that the

7    Complaint sufficiently stated such a claim; we therefore vacate the dismissal of the

8    Title IX claim.  We affirm the dismissal of his other federal claims.


9    A.  *Standard of Review as to Sufficiency*

10          A decision that a statute does not authorize a private right of action is of

11   course a purely legal ruling, which we review *de novo*.  The matter of whether a

12   complaint states a claim on which relief can be granted is likewise a question of law

13   that we consider *de novo*, whether raised by motion to dismiss under Rule 12(b)(6), *see,*

14   *e.g.*, *Menaker v. Hofstra University*, 935 F.3d 20, 29-30 (2d Cir. 2019) ("*Menaker*"); *Doe v.*

15   *Columbia University*, 831 F.3d 46, 53 (2d Cir. 2016) ("*Doe v. Columbia*"); *Littlejohn v. City*

32

1    *of New York*, 795 F.3d 297, 306 (2d Cir. 2015) ("*Littlejohn*"); *Rothstein v. UBS AG*, 708

2    F.3d 82, 90 (2d Cir. 2013) ("*Rothstein*"), or by a motion for judgment on the pleadings

3    pursuant to Rule 12(c), *see, e.g., Lively v. WAFRA Investment Advisory Group, Inc.*, 6

4    F.4th 293, 301 (2d Cir. 2021); *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

5            To survive such a motion, "'a complaint must contain sufficient factual

6    matter, accepted as true, to "state a claim to relief that is plausible on its face."'"  *Id.*

7    at 74 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*") (quoting *Bell Atlantic*

8    *Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*"))).

9            A claim has facial plausibility when the plaintiff pleads factual
10           content that allows the court to draw the reasonable inference that
11           the defendant is liable for the misconduct alleged.  [*Twombly*, 550
12           U.S.] at 556.  The plausibility standard is not akin to a "probability
13           requirement," but it asks for more than a sheer possibility that a
14           defendant has acted unlawfully.  *Ibid.*

15   *Iqbal*, 556 U.S. at 678.  Further, we

16           must consider the complaint in its entirety, as well as other
17           sources courts ordinarily examine when ruling on Rule 12(b)(6)
18           motions to dismiss, in particular, documents incorporated into the
19           complaint by reference, and matters of which a court may take
20           judicial notice.

1    *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) ("*Kaplan*")

2    (quoting *Tellabs*, 551 U.S. at 322) (other internal quotation marks omitted).  "The

3    proper question is whether there is a permissible relevant inference from '*all* of the

4    facts alleged, taken collectively,' not whether an inference is permissible based on 'any

5    individual allegation, scrutinized in isolation.'"  *Kaplan*, 999 F.3d at 854 (quoting

6    *Tellabs*, 551 U.S. at 323 (emphasis in *Tellabs*)).

7             "When there are well-pleaded factual allegations, a court should assume

8    their veracity and then determine whether they plausibly give rise to an entitlement

9    to relief." *Iqbal*, 556 U.S. at 679.  "Determining whether a complaint states a plausible

10   claim for relief . . . [is] a context-specific task that requires the reviewing court to draw

11   on its judicial experience and common sense." *Id*.  "If the facts alleged are ambiguous,

12   the applicable substantive law defines the range of inferences that are permissible."

13   *Kaplan*, 999 F.3d at 854; *see, e.g.*, *Iqbal*, 556 U.S. at 675.

1    B. *The Substantive Framework*

2           Title IX, enacted as part of the Education Amendments of 1972, provides

3    that

4           [n]o person in the United States shall, *on the basis of sex*, be
5           excluded from participation in, be denied the benefits of, or be
6           subjected to discrimination under any education program or
7           activity receiving Federal financial assistance.

8    20 U.S.C. § 1681(a) (emphasis added).  Title IX's prohibition was patterned after that

9    in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which provides that

10          [n]o person in the United States shall, *on the ground of race, color, or*
11          *national origin*, be excluded from participation in, be denied the
12          benefits of, or *be subjected to discrimination under any program or*
13          *activity receiving Federal financial assistance.*

14   42 U.S.C. § 2000d (emphases added).

15          While Title VI, applying to "any" program receiving federal financial

16   assistance, specifies race, color, and national origin as prohibited bases for

17   discrimination, and Title IX, dealing with such programs in education specifies only

18   sex as a prohibited basis, the goals of both of those Title IX and Title VI prohibitions

19   are to prevent, on any basis specified, discrimination by an entity receiving federal

1    government funding.  The provisions are otherwise identical in scope and thrust, and

2    they "use identical language to describe the benefited class," *i.e.*, "persons." *Cannon*,

3    441 U.S. at 695.  Thus, cases brought under Title IX are generally to be analyzed in the

4    same way as cases under Title VI.  *See, e.g., id*. at 694-98; *Barnes v. Gorman*, 536 U.S.

5    181, 185 (2002) (the Supreme Court has "interpreted Title IX consistently with

6    Title VI"); *Zeno v. Pine Plains Central School District*, 702 F.3d 655, 665 n.9 (2d Cir. 2012)

7    ("Historically, the Supreme Court has applied parallel analyses to claims brought

8    under Title IX and Title VI.").

9            Further, all of the bases of discrimination prohibited by Title IX and

10    Title VI are among the bases of discrimination prohibited in Title VII of the Civil

11    Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*.  Title VII

12    provides that

13            *[i]t shall be an unlawful employment practice for an employer*
14            *.  .  .  to discharge any individual, or otherwise to*
15            *discriminate against any individual with respect to his*
16            *compensation, terms, conditions, or privileges of*
17            *employment, because of such individual's race, color, religion,*
18            *sex, or national origin.*

1    42 U.S.C. § 2000e-2(a)(1) (emphases added).  Thus, with respect to employment issues,

2    Title VII's provisions--which are not limited to federally funded programs but apply

3    generally to employers having 15 or more employees and affecting interstate

4    commerce, *see id*. § 2000e(b)--prohibit employers from discriminating on any of the

5    invidious bases specified in Title VI and Title IX.

6           Because Title VII's discrimination prohibition overlaps Title IX's

7    prohibition against sex discrimination in education programs, and because

8    employment discrimination claims often have much in common with claims under

9    Title IX, we "have . . . long interpreted Title IX 'by looking to . . . the caselaw

10   interpreting Title VII,'" *Menaker*, 935 F.3d at 31; *see, e.g., Yusuf v. Vassar College*, 35 F.3d

11   709, 714-15 (2d Cir. 1994) ("*Yusuf*"); *see generally Doe v. Columbia*, 831 F.3d at 55-56

12   ("Title VII cases provide the proper framework for analyzing Title IX discrimination

13   claims."); *id*. at 55 (citing *Yusuf*, 35 F.3d at 714; *Weinstock v. Columbia University*, 224

14   F.3d 33, 42 n.1 (2d Cir. 2000); *Murray v. New York University College of Dentistry*, 57

15   F.3d 243, 248-49 (2d Cir. 1995); *Papelino v. Albany College of Pharmacy of Union

16   University*, 633 F.3d 81, 89 (2d Cir. 2011)).

37

1    Accordingly, we have analyzed Title IX claims under the burden-shifting

2    framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)--a Title VII

3    case. *See*, *e.g.*, *Doe v. Columbia*, 831 F.3d at 55-56. Under this analysis, and given the

4    plausibility requirements of *Iqbal*, in order to survive a Rule 12(b)(6) motion to dismiss

5    a claim under Title IX, a complaint showing that the plaintiff was within the protected

6    class, was qualified for the position, and was subjected to an adverse action, need

7    only "alleg[e] facts giving rise to a plausible minimal inference of bias" on the basis

8    of sex. *Id*. at 48; *see id*. at 54 (facts even "minimal[ly] . . . suggesting an inference that

9    the employer acted with discriminatory motivation" suffice to "raise a temporary

10   'presumption' of discriminatory motivation" (quoting *Littlejohn*, 795 F.3d at 307)).

11   Given that we apply the same analyses to claims brought under Title IX

12   and Title VI, this standard for pleading discriminatory intent will govern our

13   consideration of Vengalattore's Title VI claim as well as his claim under Title IX. And,

14   recognizing that some facts may give rise to an inference of bias without necessarily

15   revealing its provenance, we consider the two claims individually in assessing the

16   sufficiency of the Complaint to meet the minimal burden of showing plausibility to

1    infer that his treatment by Cornell was motivated by sex, as prohibited by Title IX,

2    and/or by national origin, as prohibited by Title VI.

3    C. *Vengalattore's Title IX Claim*

4           It is now well settled that, while Title IX does not itself provide for a

5    private cause of action to enforce its requirements, a private right of action is implied

6    in a variety of circumstances.  In 1979, in *Cannon v. University of Chicago*, 441 U.S. 677,

7    the Supreme Court held that a person applying to be a student at a university that

8    receives federal assistance can bring a private action under Title IX on the ground that

9    the university rejected her application on the basis of her gender.  The Court reasoned

10   that (1) "Title IX explicitly confers a benefit on persons discriminated against on the

11   basis of sex, and [the applicant] is clearly a member of that class for whose special

12   benefit the statute was enacted"; (2) "Congress intended to create Title IX remedies

13   comparable to those available under Title VI and [Congress] understood Title VI as

14   authorizing an implied private cause of action for victims of the prohibited

15   discrimination"; (3) "[t]he award of individual relief to a private litigant who has

39

1     prosecuted her own suit is . . . fully consistent with--and in some cases even necessary

2     to--the orderly enforcement of the statute"; and (4) "the subject matter [does not]

3     involve[] an area basically of concern to the States."  *Id*. at 688-709.  The Court

4     therefore concluded that "[n]ot only the words and history of Title IX, but also its

5     subject matter and underlying purposes, counsel implication of a cause of action in

6     favor of private victims of discrimination."  *Id*. at 709.

7          In *North Haven Board of Education v. Bell*, 456 U.S. 512 (1982) ("*North

8     *Haven*"), the Court ruled that "employment discrimination comes within the

9     prohibition of Title IX."  *Id*. at 530.  In that case, two school boards challenged federal

10    regulations that "prohibit federally funded education programs from discriminating

11    on the basis of gender with respect to employment," contending that "employment

12    practices of educational institutions" were not within the intended reach of Title IX.

13    *Id*. at 514, 517.  The Court rejected that contention, ruling that the United States

14    Department of Education had not erred in interpreting Title IX's "broad directive that

15    'no person' may be discriminated against on the basis of gender" to prohibit

16    discrimination in employment.  *Id*. at 520.  The Supreme Court stated that § 1681(a)

1    which prohibits discrimination against "person[s]," "appears, on its face, to include

2    employees as well as students," *id*.; and the fact that Title IX does not expressly refer

3    to employees does not indicate that Congress "meant somehow to limit the expansive

4    language of § [1681]," *id*. at 522.  It noted that prior opinions of the "Court repeatedly

5    ha[d] recognized that Congress has provided a variety of remedies, at times

6    overlapping, to eradicate employment discrimination."  *Id*. at 536 n.26.

7            In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 74-75 (1992), the

8    Supreme Court ruled that the implied right of action under Title IX encompasses

9    claims for monetary damages for intentional violations of Title IX, although not for

10    unintentional violations.  *See also Gebser v. Lago Vista Independent School District*, 524

11    U.S. 274, 290-91 (1998) (Title IX's private right of action allows suit for a school's

12    deliberate indifference to a teacher's sexual harassment of a student); *Davis v. Monroe*

13    *County Board of Education*, 526 U.S. 629, 643 (1999) (Title IX's private right of action

14    allows suit for a school's deliberate indifference to a student's sexual harassment of

15    another student).

1        In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the

2    Supreme Court held that a physical education teacher and coach of the girls'

3    basketball team had a right to bring suit under Title IX to claim that he was fired in

4    retaliation for complaining that there was gender discrimination in the school's

5    athletic program.  The focus by this time was not on whether or not Title IX afforded

6    a private right of action to an employee--a right the *Jackson* Court noted had been

7    established by *Cannon* more than a quarter-century earlier, *see id*. at 173.  Rather, the

8    issues were whether retaliation is a form of discrimination prohibited by Title IX, and,

9    if so, whether the private right of action under Title IX extends to an "indirect

10    victi[m]," *i.e.*, a plaintiff who had complained about gender discrimination but was

11    not the person discriminated against on the basis of gender.  Noting that its "repeated

12    holdings constru[ed] 'discrimination' under Title IX broadly," *id*. at 174; *see id*.

13    at 174-79, the *Jackson* Court held that "[w]here the retaliation occurs because the

14    complainant speaks out about sex discrimination, the 'on the basis of sex' requirement

15    is satisfied.  The complainant is himself a victim of discriminatory retaliation,

16    regardless of whether he was the subject of the original complaint," *id*. at 179.

1               Most of our Sister Circuits that have considered the question of whether

2     an employee has an implied private right of action under Title IX have answered that

3     question in the affirmative and have noted the applicability of Title VII principles in

4     addressing procedural and overlapping substantive issues.  *See, e.g., Doe v. Mercy*

5     *Catholic Medical Center*, 850 F.3d 545, 559-65 (3d Cir. 2017) ("*Mercy*"); *Ivan v. Kent State*

6     *University*, No. 94-4090, 1996 WL 422496 (6th Cir. July 26, 1996); *Preston v. Virginia ex*

7     *rel. New River Community College*, 31 F.3d 203, 206 (4th Cir. 1994); *Lipsett v. University*

8     *of Puerto Rico*, 864 F.2d 881, 895-97 (1st Cir. 1988); *contra Lakoski v. James*, 66 F.3d 751,

9     758 (5th Cir. 1995) ("We are not persuaded that Congress offered Title IX to

10    employees of federally funded educational institutions so as to provide a bypass to

11    Title VII's administrative procedures.").

12              In *Mercy*, the most recent of these cases, having the benefit of all of the

13    Supreme Court decisions discussed above, the Third Circuit reversed the ruling of the

14    district court which had concluded that Title IX could not apply to a hospital's

15    medical residents, as they "already have a degree, don't pay tuition, and are paid for

43

1     their services and protected by labor laws."  850 F.3d at 554.  The Court of Appeals

2     noted, *inter alia*, that

3              [b]ecause § 1681(a) "neither expressly nor impliedly excludes
4              employees from its reach," we're to interpret it as "covering and
5              protecting these 'persons,'" for Congress easily could have
6              substituted "'student' or 'beneficiary' for the word 'person' if it had
7              wished to restrict" § 1681(a)'s scope,

8     *id*. at 562 (quoting *North Haven*, 456 U.S. at 521).

9          We agree with *Mercy* that given the Supreme Court's Title IX rulings in

10    *Cannon* and *North Haven*, we must honor the breadth of Title IX's language.  We thus

11    hold that Title IX allows a private right of action for a university's intentional gender-

12    based discrimination against a faculty member, and that Vengalattore's Title IX claim

13    should not have been dismissed on the ground that he complained of such

14    discrimination with respect to employment.   And as to the issue of whether

15    Vengalattore was subjected to "the imposition of university discipline" because of his

16    gender, *Doe v. Columbia*, 831 F.3d at 56, we will hold, in keeping with *Iqbal*, *Menaker*,

17    *Littlejohn*, and *Doe v. Columbia*, that his pleading is "sufficient with respect to the

18    element of discriminatory intent, like a complaint under Title VII, if it pleads specific

1    facts that support a minimal plausible inference of such discrimination," *Doe v.*

2    *Columbia*, 831 F.3d at 56.

3            In *Doe v. Columbia*, we vacated the Rule 12(b)(6) dismissal of a student's

4    Title IX claim that his university had disciplined him as a result of false allegations

5    that he had sexually assaulted a female student.  The complaint alleged, *inter alia*, that

6    Doe informed the investigator that his encounter with the accuser had been

7    consensual and that there were witnesses who could support his claim; that the

8    investigator, in an atmosphere of public pressure on the university to react more

9    swiftly and severely to sexual misconduct claims by females against males, had failed

10   to follow up with regard to Doe's proposed witnesses in any way; and that the

11   university had failed to inform him of many of the rights to which an accused was

12   entitled under university procedures.  *See* 831 F.3d at 49-52.  In *Menaker*, we vacated

13   the Rule 12(b)(6) dismissal of a gender discrimination claim brought under Title VII

14   by a tennis coach alleging that he had been fired by his former university in response

15   to a female student's baseless accusation of sexual harassment.  His complaint, like

16   that in *Doe v. Columbia*, alleged that his university had faced public and internal

45

1    criticism for its handling of claims of male sexual misconduct, *see Menaker*, 935 F.3d

2    at 26 (referring to the "now-famous 'Dear Colleague' letter to colleges and

3    universities"); that the university had failed to interview relevant witnesses whom he

4    had brought to the investigators' attention; and that it had disregarded the

5    procedures set out in its own written policies. *See id*. at 26-29.

6          Our decisions in these two cases make clear that where a complaint

7    claiming gender discrimination in violation of Title IX or Title VII alleges (a) that the

8    university "fail[ed] to act in accordance with [u]niversity procedures designed to

9    protect accused students," (b) that the university "fail[ed] to seek out potential

10   witnesses [whom the accused] had identified as sources of information favorable to

11   [the accused]," (c) that the defendant university had been criticized for not seriously

12   addressing complaints by female students of sexual misconduct by males, and (d) that

13   the university made findings against the accused male that were "incorrect and

14   contrary to the weight of the evidence," we have found it "plausible that the

15   university was motivated to 'favor the accusing female over the accused male' in

16   order to demonstrate its commitment to protecting female students from male sexual

46

1    assailants." *Menaker*, 935 F.3d at 31-32 (quoting *Doe v. Columbia*, 831 F.3d at 57 (other

2    internal quotation marks omitted)).  Given that "procedural irregularity alone" may

3    suggest some form of bias, when there are "clear procedural irregularities in a

4    university's response to allegations of sexual misconduct" we have concluded that

5    "even minimal evidence of sex-based pressure on the university is sufficient" to

6    permit a plausible inference that the "bias [was] on account of sex." *Menaker*, 935 F.3d

7    at 33 & n.48.

8        The facts alleged in the Complaint here, taken as true as they must be in

9    assessing a Rule 12(b)(6) motion, easily meet this plausibility standard with respect

10    to Vengalattore's claim under Title IX.  To begin with, as set out in greater detail in

11    Part I.C. above, the procedures followed by Cornell in dealing with Roe's allegations

12    were fundamentally skewed.  First, Policy 6.4, adopted by Cornell in 2012, provided

13    explicit time limits for a student's claim of sexual misconduct by a supervisory faculty

14    member; and when the investigators informed Dean Ritter that Roe's claim was time-

15    barred under Policy 6.4, Dean Ritter instructed them to proceed instead under

16    Cornell's Romance Policy.  However, the Faculty Handbook placed alleged violations

1    of the Romance Policy exclusively within the jurisdiction of Cornell's Committee on

2    Professional Status, a faculty committee.  Mittman, Director of the Office of Workforce

3    Policy and Labor Relations, and Affel, the Title IX Office coordinator, lacked

4    jurisdiction to investigate Roe's allegations of violation of the Romance Policy.

5              Second, the Faculty Handbook provided that investigations into alleged

6    violations of the Romance Policy "'*must* comport with the basic precepts of due

7    process.' (emphasis in original)."  (Complaint ¶ 180.)  Instead, the investigators

8    summoned Vengalattore to respond to Roe's allegations on one day's notice, without

9    a written statement of the charges or identification of the complainant; they

10   interviewed him for several hours before they revealed that Roe was accusing him not

11   just of a consensual relationship but also of rape; and when Vengalattore then asked

12   to have assistance of counsel in response to hearing the rape accusation for the first

13   time, they denied his request and continued their questioning.

14             Third, notwithstanding the inapplicability of Policy 6.4, the investigators

15   followed some of its procedures that lessened protections for the person accused.  In

16   particular, the investigators, in their Report to Dean Ritter, stated that the

48

1    preponderance-of-the-evidence standard of proof was to be applied by investigators

2    and the dean, but that neither party has a burden of proof.

3            Further, as described in Part I.C.1., the Complaint alleged that the

4    investigators rejected numerous requests by Vengalattore that they interview certain

5    witnesses or ask certain questions that could have produced information favorable

6    to him.  It listed 10 persons whom the investigators did not interview, including

7    Shaffer-Moag who, while the Mittman-Affel investigation was ongoing, gave the

8    University's tenure appeals committee first-hand evidence that Roe had both

9    proclaimed and exhibited bias against men, evidence the committee cited in its

10   decision favorable to Vengalattore.  That evidence was not part of the investigators'

11   Report.

12           In addition, the investigators declined to explore certain statements Roe

13   made in 2010-2011 about her relationships with other men, which cast doubt on her

14   claim to have been in a sexual relationship with Vengalattore.  For example, around

15   the end of December 2010 Roe told a friend that after her relationship with fellow

16   student Mohammad Hamidian ended in November 2010, she attempted to reunite

17   with another former boyfriend (*see* Complaint ¶ 249); and she told the investigators

49

1    that at about that time she had started to see her high school boyfriend on some

2    weekends.  The investigators, despite requests by Vengalattore, did not seek further

3    information about such other relationships.  (*See id*. ¶¶ 356-357, 515, 597.)  Similarly,

4    on December 30, 2010, Roe sent an email to Shannon Harvey, a student assistant in

5    Vengalattore's lab from January to August 2010 who had become and remained a

6    close friend of Roe; the investigators interpreted the email as indicating that Roe had

7    just entered into a romantic relationship.  But when they interviewed Harvey, they

8    asked no questions relating to that email.  (*See id*. ¶¶ 492, 592.)  The Complaint alleged

9    that instead of asking Harvey whether Roe disclosed with whom she had just become

10    involved--and indeed instead of objectively seeking any information as to the success

11    of Roe's admitted attempts to reunite with past partners--the investigators only

12    "asked Dr. Vengalattore who Roe had sex with, if not him" (*id*. ¶ 443).

13          Nor did the investigators follow up on evidence they received from

14    Hamidian that more directly cast doubt on Roe's claimed relationship with

15    Vengalattore.  Hamidian told them of a conversation he had with Roe in early 2011,

16    noting that it was during the period she claimed to have been in a sexual relationship

50

1    with Vengalattore.  In that conversation, Roe indicated that she had not entered into

2    any new relationship.  The investigators neither asked Roe about that conversation

3    nor mentioned this part of their interview of Hamidian in their Report.  (*See*

4    Complaint ¶¶ 412-416.)

5            The accuracy of the investigators' recommended finding that

6    Vengalattore had a sexual relationship with Roe--and of Dean Ritter's acceptance of

7    that recommendation--is plausibly called into question not only in light of the

8    investigators' rejections of Vengalattore's requests to pursue evidence that could have

9    supported his denial of a sexual relationship with Roe, but also in light of rationales

10   proffered by the investigators for certain conclusions.  For example, the Report

11   "determined that *the lack of evidence* supporting a year-long romantic relationship

12   *actually supported Roe's allegations*" that such a relationship existed, reasoning that

13   "'[c]ommon sense experience is that secretive relationships carried out by faculty

14   members and students *can be* carried out without others, including other students and

15   colleagues, becoming aware.'"  (Complaint ¶ 616 (quoting Report (emphases ours)).)

16   Although the lack of such evidence could support a claim of secrecy, the lack of

51

1    evidence that a relationship existed does not support the proposition that it existed.

2    Testimonial evidence on both sides leaves issues of credibility; but the absence of

3    other evidence does not weigh on the existence side of the preponderance scale.

4            In sum, the Complaint's factual allegations as to Cornell's (a) using parts

5    of a policy that was known to be inapplicable, (b) purporting to use a different policy

6    while disregarding both the entity that had exclusive jurisdiction and that policy's

7    mandate for consistency with due process, (c) avoiding inquiries that might support

8    Vengalattore's denial of a sexual relationship with Roe, and (d) choosing to believe

9    that the very lack of evidence of such a relationship's existence was evidence that it

10   existed, made it plausible that the outcome of the investigation was the result of bias.

11           The allegation that that bias was based on gender is plausible in light of

12   additional factual allegations described in Part I.D. above, including DoE's Title IX

13   Guidance advising schools to "prevent unwelcome sexual advances by faculty toward

14   students" (Complaint ¶ 31) and warning that noncompliance could result in loss of

15   federal funding (*see id*. ¶ 48); DoE's publication of a list of schools suspected of failing

16   to adopt prompt and equitable sexual misconduct grievance procedures (*see id*. ¶ 61);

1    its addition of Cornell to that list (*see id*. ¶ 65); and Mittman's statement to "Roe that

2    Cornell was working 'very aggressively to address issues of access, prevention and

3    culture change' 'under Title IX.'" (*Id*. ¶ 335.)

4         Given this context, the Complaint plausibly alleged that the bias inferable

5    from the procedural irregularities in the processing of Roe's claims against

6    Vengalattore was bias on the basis of gender.  We conclude that Vengalattore's

7    Title IX claim was not dismissible for failure to state a claim.


8    D. *Vengalattore's Title VI Claim*

9         Although the Complaint presented a plausible claim of discrimination

10   on the basis of gender, it did not state sufficient facts to render it plausible that

11   Cornell's disciplining of Vengalattore was also motivated, in violation of Title VI, by

12   the fact that he was Indian.  The decisionmaker with regard to both the denial of

13   tenure and the imposition of discipline was Dean Ritter.  While at one point the

14   Complaint described Dean Ritter as merely making a "recommendation" that tenure

15   be denied (Complaint ¶ 337), it plainly characterized her as the person who made the

1    tenure decision (*see id*. ¶ 321 (the Physics faculty recommendation that Vengalattore

2    be granted tenure "was forwarded to Gretchen Ritter, Dean of the College of Arts and

3    Sciences, for her final determination"); *id*. ¶ 342 ("[o]n February 13, 2015, Dean Ritter

4    overruled the original faculty vote and denied Dr. Vengalattore's promotion to

5    tenured professor"); *id*. ¶ 628 ("[o]n February 16, 2016, Dean Ritter formally overruled

6    this newest recommendation and again denied Dr. Vengalattore tenure"); *id*. ¶ 631

7    (the provost "upheld Dean Ritter's denial of tenure")).

8            As to discipline, the Complaint likewise alleged that Dean Ritter was the

9    decisionmaker. Thus, in her October 2015 decision finding that Vengalattore had

10    engaged in sexual misconduct and had lied about it, Dean Ritter stated that "she

11    'intend[ed] to impose significant'"--albeit delayed--"'sanctions'" (*id*. ¶ 623); in February

12    2017 she "inform[ed] Dr. Vengalattore . . . that 'it [wa]s time to follow through o[n]

13    [her] earlier commitment to impose additional sanctions,' based on her October 6,

14    2015 findings" (*id*. ¶ 637); and ultimately, "Dean Ritter imposed [the] sanction"

15    (*id*. ¶ 638).

1          The Complaint did not allege that Dean Ritter harbored any national

2   origin bias.  And notwithstanding its reference to two persons who commented on

3   Vengalattore's ethnicity--Roe and Professor Clancy--the Complaint did not plausibly

4   allege that Dean Ritter was influenced by those statements or that the ethnic views

5   of either Roe or Clancy played a meaningful role in her decisions.  As to Roe's

6   "inappropriate racial comments" about Vengalattore and some of his assistants as

7   "Indians" (Complaint ¶ 409), there is no indication that Dean Ritter was aware of

8   them.   Though Roe's statements would have occurred in or before 2012, the

9   Complaint alleged that the investigators learned of them when Affel interviewed

10  Vengalattore's lab assistant Patil.  Patil was interviewed on March 20, 2015 (*see*

11  *id*. ¶¶ 401, 409); Dean Ritter had "denied Dr. Vengalattore's promotion to tenured

12  professor" five weeks earlier, "[o]n February 13, 2015" (*id*. ¶ 342).  And while Dean

13  Ritter had not yet delivered her decision to discipline Vengalattore, the Complaint did

14  not suggest that the investigators, after learning in March 2015 of Roe's racial

15  comments, conveyed that information to Dean Ritter; rather, the Complaint alleged

16  that the investigators "[i]gnor[ed]" that information (*id*. ¶ 693(g)(i)).  In sum, the

1    Complaint provides no basis for a plausible inference that Roe's supposed bias

2    against Indians would in any way have been a factor in Dean Ritter's decision to

3    discipline Vengalattore.

4          The Complaint also points to the statement of Professor Clancy opposing

5    tenure for Vengalattore and surmising that his harsh treatment of his lab assistants--

6    and their tolerance for abuse--could be ascribed to an "Indian subcontinent . . .

7    culture" (*id*. ¶ 339).  While it is inferable that Professor Clancy's statement was read

8    by Dean Ritter, given that it was part of the FACTA committee report, the Complaint

9    provides no support for the argument--advanced in Vengalattore's brief on appeal--

10   that "[t]he *fact* that *Dean Ritter followed the recommendation of Professor Clancy* without

11   comment raises at least a 'minimal' inference that she shared Professor Clancy's views

12   about those 'from the Indian subcontinent'" (Vengalattore brief on appeal at 42

13   (emphases added)).  The Complaint itself does not suggest--even on information and

14   belief--that Dean Ritter "followed" the recommendation of Professor Clancy, and the

15   factual allegations in the Complaint indicate otherwise.  First, Clancy wrote her

16   quoted statement as a member of FACTA, a tenure review committee, and there is no

1    allegation that that committee was also to consider discipline.  Second, FACTA "was

2    convened" "[f]ollowing Dean Ritter's recommendation" that tenure be denied.

3    (Complaint ¶ 337 (emphasis added).)   Her "recommendation" could not have

4    followed a statement that had not yet been made.

5            As to discipline, although the Complaint contains a conclusory allegation

6    that Clancy wrote her comment "before the Policy 6.4 investigation had commenced"

7    (Complaint ¶ 693(b)), the more detailed allegations in the Complaint belie that

8    sequence as well.  Mittman had been contacted about Roe's allegations as early as

9    September 24, 2014 (see id. ¶¶ 324-326), a date on which Dean Ritter had "formed a

10   faculty committee to make a recommendation regarding a final tenure decision" on

11   the Physics Department's tenure recommendation (id. at 323 (emphasis added); see

12   id. ¶¶ 320-321).  Mittman had a series of communications with Roe (see id. ¶¶ 327,

13   332), which he shared with Dean Ritter "pending her review of the tenure

14   recommendation" (id. ¶ 333).  FACTA was not the committee formed on September

15   24, but rather was, as the Complaint emphasized, "yet another faculty committee"

16   (id. ¶ 337); and, as discussed above, FACTA was not convened until after Dean Ritter

57

1    had concluded that tenure should be denied.  Thus, Mittman's investigation, with

2    Dean Ritter kept informed before she reached that conclusion, was ongoing before the

3    FACTA report--with Clancy's statement--existed.

4            Although the Complaint also repeatedly alleged that "Cornell" or the

5    "investigators" themselves took, or declined to take, various actions "because of" or

6    "on the basis of [Vengalattore's] race, color [and/] or national origin" (*see*, *e.g.*,

7    Complaint ¶¶ 686, 690, 691, 693(a) and (g)), it ascribed that motivation to them

8    without asserting any facts to show its plausibility.  For example, while alleging that

9    the investigators failed to interview 10 persons identified by Vengalattore as having

10    valuable evidence (*see id*. ¶ 584), the Complaint does not specify their national origin

11    or suggest that all or even most of them were Indian.  The Complaint concedes that

12    the investigators spoke with a number of Indian witnesses; and according to the

13    Mittman-Affel Report's chronological list of the two dozen witnesses interviewed,

14    after the investigators spoke to Professor Patterson, Patil and Chakram were the first

15    witnesses they interviewed.  Although the Complaint alleged that the investigators

16    gave "inadequate weight to the testimony of" Patil, Chakram, and three others

1    "because the investigators perceived that these witness were Indian," (Complaint

2    ¶ 693(g)(vii)), that assertion, absent supporting factual allegations, is speculative and

3    conclusory.

4            Finally, we cannot conclude that Vengalattore's claim of national origin

5    discrimination was made plausible by the allegation that in February 2016 Professor

6    Teukolsky, then-interim chair of the Physics Department, said that the faculty, though

7    believing Roe's accusations to be false and malicious, feared that Twitter would brand

8    them "bullies" if they were to take "'action against a blonde, female student'"

9    (Complaint ¶ 630).  The Complaint alleged that this conversation occurred in the

10   wake of Dean Ritter's final denial of tenure, because Professor Teukolsky "had been

11   involved in the tenure review process."  (*Id*. ¶¶ 628-629.)  As indicated above,

12   Vengalattore is not here challenging the denial of tenure; and the Complaint contains

13   no allegation that Teukolsky--or the Physics Department faculty--was involved in

14   determining whether, or to what extent, Vengalattore should be disciplined.

15           In sum, while the Complaint is sufficient to state a plausible claim of

16   discrimination on the basis of gender (*see* Part II.C. above), its few factual allegations

59

1    concerning persons of Indian ethnicity fail to reach even the minimal level needed to

2    support a plausible inference that Vengalattore's discipline was also motivated by his

3    national origin.  The district court did not err in dismissing, for failure to state a claim,

4    so much of the Complaint as purported to allege discrimination in violation of

5    Title VI.


6    E.  *Vengalattore's Other Claims Against Cornell*

7                 The Complaint's other federal claim against Cornell was one for denial

8    of due process, brought under § 1983.  That statute provides, in pertinent part, that

9                 [e]very *person* who, under color of any statute, ordinance,
10                regulation, custom, or usage, *of any State* . . . subjects, or causes to
11                be subjected, any citizen of the United States or other person
12                within the jurisdiction thereof to the deprivation of any rights,
13                privileges, or immunities secured by the Constitution and laws,
14                shall be liable to the party injured . . . .

15   42 U.S.C. § 1983 (emphases added).  The district court dismissed the due process

16   claim on the ground that the Complaint failed to allege sufficiently that Cornell, a

17   private university, was a state actor.  Vengalattore argues that there is state action

18   where "there is such a close nexus between the State and the challenged action that

60

1    seemingly private behavior may be fairly treated as that of the State itself," and that

2    "[w]hether the nexus between the State of New York and Cornell's adoption of Policy

3    6.4 is sufficiently close to justify deeming the latter 'state action' is a fact-bound issue

4    that can only be determined after discovery."  (Vengalattore brief on appeal at 48

5    (internal quotation marks omitted).)  Vengalattore's argument fails for two reasons.

6           First, the Complaint described § 1983 as providing a civil right of action

7    to redress constitutional deprivations "under color of law" (Complaint ¶ 700), not, as

8    that section provides, under color of the law "of a[] State," 42 U.S.C. § 1983.  While the

9    Complaint alleged that "Cornell operates under New York Education Law" (*id*. ¶ 702),

10   nowhere did it allege that Cornell, in disciplining Vengalattore, was operating under

11   State law.  Instead, the Complaint devoted nearly 200 paragraphs to alleging that

12   Cornell was in fact coerced to adopt Policy 6.4 by the federal government (*see*, *e.g.*,

13   Complaint ¶¶ 13-81, 703-710)--not by New York State--and asserting nine causes of

14   action against the federal defendants on that premise (*see*, *e.g.*, *id*. ¶¶ 734-846).  For

15   example, having defined the United States Department of Education as "ED"

16   (Complaint ¶ 8), the Complaint alleged:

61

1           708. Defendant Cornell *was acting at the behest of Defendant*
2           *ED* when it applied its disciplinary process against [Plaintiff] Dr.
3           Vengalattore.

4           709.  Defendant *Cornell was coerced* to deny Plaintiff Dr.
5           Vengalattore due process rights *by Defendant ED* for fear of being
6           subject to an enforcement action.

7           710.  Defendant Cornell was *thus acting under color of law*
8           during its investigation and discipline of Plaintiff Dr.
9           Vengalattore.

10  (Complaint ¶¶ 708-710 (emphases added).)  Thus, while the Complaint alleged that

11  Cornell was "acting under law," that "law" was not once alleged to be State law.

12        Second, if Cornell were in fact sufficiently close to New York State that

13  its conduct should be deemed "that of the State itself" (Vengalattore brief on appeal

14  at 48 (internal quotation marks omitted)), Vengalattore's due process claim was

15  properly dismissed for failure to state a claim simply because a State, having

16  immunity from suit under the Eleventh Amendment, is not considered to be a

17  "person" suable under § 1983.  *See, e.g., Howlett v. Rose*, 496 U.S. 356, 365 (1990); *Will*

18  *v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989).

1          Vengalattore's remaining claim against Cornell, a state-law claim for

2   defamation, was not dismissed for any flaw in the pleading; rather, the district court,

3   having dismissed all of his federal claims, declined as a matter of its discretion to

4   exercise supplemental jurisdiction.  Because the dismissal of Vengalattore's claim

5   under Title IX is being vacated, we also vacate the dismissal of his claim for

6   defamation.

7   F.  *Lack of Standing for Claims Against the Federal Defendants*

8          The district court granted the federal defendants' motion to dismiss the

9   claims against them for lack of Article III standing, finding the Complaint deficient

10   for failure to allege plausibly that there was a causal connection between the DoE

11   guidance and Vengalattore's injuries and that those injuries would be redressable by

12   a judgment against the federal defendants.  Vengalattore challenges this ruling,

13   arguing that the court misunderstood the nature of his injuries.

14          To have Article III standing, (1) the plaintiff must "have suffered an

15   injury in fact," (2) there must be "a causal connection between the injury and the

16   conduct complained of," and (3) it must be "likely, as opposed to merely speculative,

1    that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61

2    (internal quotation marks omitted).    These are the "irreducible constitutional

3    minimum" prerequisites for Article III standing, *id*. at 560, and their satisfaction

4    "depends considerably upon whether the plaintiff is himself an object of the [conduct]

5    . . . at issue," *id*. at 561.

6        We review a district court's dismissal for lack of standing *de novo*. *See*,

7    *e.g.*, *Rothstein*, 708 F.3d at 90.  At the pleading stage a plaintiff must "allege facts that

8    affirmatively and plausibly suggest that [he] has standing to sue," and we assume that

9    all well-pleaded factual allegations in the complaint are true "unless [they are]

10    contradicted by more specific allegations or documentary evidence." *Amidax Trading*

11    *Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).

12        In the present case, we conclude that plausible allegations of

13    redressability are lacking.  We agree with the district court's conclusion that it is

14    implausible to suggest that a judgment against the federal defendants with regard to

15    the challenged Title IX guidance would provide Vengalattore with any relief.

16    Vengalattore has already sought in New York Supreme Court--and has been denied--

1    expungement of Cornell's finding that he had engaged in sexual misconduct and lied

2    about it.  *See Vengalattore v. Cornell University*, No. 2016-119 (N.Y. Sup. Ct. Schuyler

3    Co., Decision and Order on Motion, August 21, 2017, at 1-2) (noting that Vengalattore

4    in his Article 78 proceeding against Cornell requested, *inter alia*, that Cornell be

5    ordered "to specifically expunge" Dean Ritter's "October 6, 2015 finding of

6    misconduct"; concluding that "there was no ambiguity in" the court's "not granting

7    that specific request for expungement of the finding"; and declining to modify the

8    denial of the expungement request).  It is entirely speculative to suggest that Cornell,

9    having twice defeated Vengalattore's direct attempts to compel it to expunge the

10    record of his misconduct, would choose to expunge that record--or to undo the

11    discipline imposed--because of a judgment against the federal defendants.  And we

12    think it even less likely that a judgment ruling that the federal defendants violated the

13    Administrative Procedure Act or the Spending Clause of the Constitution would have

14    a material effect on Vengalattore's reputation.  While it is certainly possible that

15    reputational injuries could be sufficiently redressable to satisfy this element of

16    Article III standing, *see Meese v. Keene*, 481 U.S. 465, 476-77 (1987); *Gully v. National*

1    *Credit Union Administrative Board*, 341 F.3d 155, 162-63 (2d Cir. 2003), the DoE

2    guidance challenged by Vengalattore said nothing about his case or the allegations

3    of sexual misconduct raised against him.  The suggestion that a judgment ruling that

4    the DoE guidance was issued unlawfully would remove, even partially, the stain on

5    Vengalattore's reputation is far too speculative to support constitutional standing.


6                                              CONCLUSION


7                    In sum, we conclude that:

8                    (1)  Title IX allows a private right of action for a university's

9         intentional gender-based discrimination against a faculty member.

10                   (2)  The Complaint contains sufficient factual assertions to permit

11        a plausible inference that Vengalattore was disciplined following

12        irregular investigative procedures in circumstances permitting a

13        plausible inference of bias on the basis of gender in violation of Title IX.

14                   (3)  Vengalattore's Title VI claim, viewed within the same

15        analytical framework as that applicable to his Title IX claim, lacks

1     sufficient factual assertions to permit a plausible inference that

2     Vengalattore was disciplined in whole or in part on the basis of his

3     national origin in violation of Title VI.

4         (4)  Vengalattore's claim against Cornell for denial of due process

5     was properly dismissed for failure to state a claim under 42 U.S.C.

6     § 1983.

7         (5)   As to allegations that the United States Department of

8     Education and its Secretary issued administrative guidance in violation

9     of the Administrative Procedure Act and the Spending Clause of the

10     Constitution, Vengalattore's claims against the federal defendants were

11     properly dismissed for lack of Article III standing.

12         (6)  As the dismissal of Vengalattore's Title IX claim is vacated, the

13     discretionary dismissal of his state-law claim for defamation is likewise

14     vacated.

15         We have considered all of Vengalattore's contentions on this appeal and,

16   except to the extent indicated above, have found them to be without merit. The

17   judgment of the district court is vacated to the extent that it dismissed the Title IX

1    claim against Cornell for failure to state a claim and to the extent that the court

2    declined to exercise supplemental jurisdiction over Vengalattore's state-law claim for

3    defamation.  The matter is remanded for discovery and such further proceedings as

4    may be appropriate.  The judgment is in all other respects affirmed.

5                 Each side shall bear its own costs of this appeal.

*Vengalattore v. Cornell Univ.*, No. 20-1514

JOSÉ A. CABRANES, *Circuit Judge*, concurring:

I concur in the judgment of the Court and in Judge Kearse's comprehensive opinion. I pause briefly to comment, in my own name, that, as alleged, this case describes deeply troubling aspects of contemporary university procedures to adjudicate complaints under Title IX and other closely related statutes. In many instances, these procedures signal a retreat from the foundational principle of due process, the erosion of which has been accompanied — to no one's surprise — by a decline in modern universities' protection of the open inquiry and academic freedom that has accounted for the vitality and success of American higher education.[1]

This growing "law" of university disciplinary procedures, often promulgated in response to the regulatory diktats of government, is controversial and thus far largely beyond the reach of the courts because of, among other things, the presumed absence of "state action" by so-called private universities. Thus insulated from review, it is no wonder that, in some cases, these procedures have been compared unfavorably to those of the infamous English Star Chamber.[2]

Vengalattore's allegations, if supported by evidence, provide one such example of the brutish overreach of university administrators at the expense of due process and simple fairness. His allegations, if corroborated, would reveal a grotesque miscarriage of justice at Cornell University. As

---

[1] See generally Richard Hofstadter & Walter P. Metzger, The Development of Academic Freedom in the United States (1955); and the related volumes Richard Hofstadter, Academic Freedom in the Age of the College (1961) and Walter P. Metzger, Academic Freedom in the Age of the University (1961). There are, fortunately, some notable exceptions — principal amongst them the University of Chicago, which in 2015 reaffirmed its "commitment to a completely free and open discussion of ideas." The Chicago Principles: Report on the Committee on Freedom of Expression, University of Chicago, available at https://provost.uchicago.edu/sites/default/files/documents/reports/FOECommitteeReport.pdf.

[2] *See* American Association of University Professors, *The History, Uses, and Abuses of Title IX* (June 2016), at 87, available at https://www.aaup.org/file/TitleIXreport.pdf.

alleged, Cornell's investigation of Vengalattore denied him access to counsel; failed to provide him with a statement of the nature of the accusations against him; denied him the ability to question witnesses; drew adverse inferences from the absence of evidence; and failed to employ an appropriate burden of proof or standard of evidence. In other cases and other universities the catalogue of offenses can include continuing surveillance and the imposition of double jeopardy for long-ago grievances.[3]

There is no doubt that allegations of misconduct on university campuses — sexual or otherwise — must, of course, be taken seriously; but any actions taken by university officials in response to such allegations must also comport with basic principles of fairness and due process. The day is surely coming — and none too soon — when the Supreme Court will be able to assess the various university procedures that undermine the freedom and fairness of the academy in favor of the politics of grievance.

In sum: these threats to due process and academic freedom are matters of life and death for our great universities. It is incumbent upon their leaders to reverse the disturbing trend of indifference to these threats, or simple immobilization due to fear of internal constituencies of the "virtuous" determined to lunge for influence or settle scores against outspoken colleagues.

---

[3]    Elsewhere, I have criticized the "specialized inquisitorial procedures that universities have developed for sexual-misconduct cases." José A. Cabranes, *For Freedom of Expression, for Due Process, and for Yale: The Emerging Threat to Academic Freedom at a Great University*, 35 Yale L. & Pol'y Rev. 345, 353 (2017). These procedures can deprive the accused of various rights, including the right to a public hearing or the complete record of a private hearing, the right to have counsel speak on the accused's behalf, the right to friendly witnesses, the right to confront and cross-examine adverse witnesses, and the right to the presumption of innocence until proven guilty. *Id.* at 355; *see also* José A. Cabranes, *The New 'Surveillance University,'* Washington Post (Jan. 11, 2017) (describing the adoption of university surveillance and reporting regimes which can be used as "tool[s] for policing the teaching and research of the professoriate"). Even short of formal discipline, such lack of due process may inflict reputation harm, particularly where rules of "confidentiality" make it effectively impossible for an accused to respond publicly to damaging pronouncements by managers of the university grievance system.