## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. MUKUND VENGALATTORE,<br><br>*Plaintiff*,<br><br>v.<br><br>CORNELL UNIVERSITY<br><br>*Defendant*. | CIVIL ACTION NO. 3:18-CV-1124 |

### DECLARATION OF DR. MUKUND VENGALATTORE

**Dr. Mukund Vengalattore,** pursuant to 28 U.S.C. § 1746, declares as follows:

1. I submit this declaration in support of Plaintiff's Memorandum of Law in Opposition to Cornell University's Motion for Summary Judgment, Plaintiff's Response to the Statement of Material Facts, and the Counter-Statement of Additional Material Facts that Preclude a Grant of Summary Judgment. The information contained herein is based on my personal knowledge.

2. I received a Bachelor of Science from Massachusetts Institute of Technology ("MIT") in 1999 and a PhD in physics from MIT in 2005. After obtaining my PhD, I worked as a postdoctoral associate at the University of California, Berkeley. As an atomic physicist, my focus was within the field of Atomic, Molecular, and Optical Physics ("AMO") and, in particular, the study of ultracold quantum gases. I am well-published in this field.

3. A true and correct copy of my current curriculum vitae is attached as **Exhibit A**.

4. Prior to my current role at the Defense Advanced Research Projects Agency ("DARPA"), I spent over nine years at Cornell University ("Cornell") as an Assistant Professor in the Department of Physics within Cornell's College of Arts and Sciences.

1

5. Prior to my start at Cornell in January of 2009, Cornell's Physics Department had no group, laboratories, or experiments relating to AMO physics. Cornell hired me as its first AMO physicist. I subsequently created the Physics Department's new AMO group.

6. During my time at Cornell, I developed and constructed Cornell's first cold atom laboratories—three laboratories involving ultracold materials. Between 2009–2017, on top of teaching classes, publishing articles, and attending professional seminars, I also procured seven research grants, totaling approximately $6.1 million, to fund the costly, highly technical lab equipment and the novel AMO experiments that my students and I conducted. These experiments yielded a number of high-profile discoveries and publications.

7. On September 10, 2010, the Chair of the Physics Department, Professor Saul Teukolsky, nominated me for a Sloan Fellowship. A true and accurate copy of his nomination letter is attached as **Exhibit B**.

8. A review I received from the Physics Department in December 2011 was very positive and encouraging. This review noted the Physics Department's assessment that I had made an excellent start to my faculty career across the review categories of teaching, research, and service. The review also noted that the Physics Department was likely to make a positive recommendation for tenure if I continued this level of success.

9. Attached as **Exhibit C** is a true and accurate list of materials I submitted for my 2014 tenure review, a curriculum vitae, research statement, advising statement, teaching statement, and a list of recent publications.

10. My prospects of being granted tenure at Cornell appeared very likely until the Spring of 2014, when a former graduate student, Jane Roe (Ms. Roe), began a campaign against me.

11. In the Spring of 2014, I learned that Ms. Roe, who had left my lab group in 2012, had begun making false allegations against me, which ultimately culminated in unsubstantiated claims of sexual assault and harassment.

12. By January of 2009, shortly after I had started at Cornell, Ms. Roe had not yet become a member of any research group.

13. Ms. Roe had no experience in atomic physics prior to working in my laboratory.

14. In 2009, Ms. Roe began assisting in the lab and I provided training in atomic physics.

15. By the fall semester of 2009, I felt that some of the undergraduates in my lab were outpacing Ms. Roe.

16. At various times, I concluded that Ms. Roe was possessive because she was the first graduate student hired in the lab; that she broke equipment and blamed other individuals for it; that she viewed her first fellow graduate student in the group as a competitor; that she wrongly accused him of smoking pot in the lab; and that at times she was not getting along with her fellow graduate students.

17. I noted that Ms. Roe would repeatedly call attention to the fact that she was the only female graduate student in the group and to the lack of women in science in general.

18. The project that Ms. Roe was working on in 2011 and 2012, prior to her departure from the group, was not going well.

19. In October of 2012, Ms. Roe decided to leave the lab at Cornell and to complete her work at the University of Maryland.

20. In May of 2014, Ms. Roe wrote a letter to the committee reviewing my tenure application. Ms. Roe's letter was replete with unfounded, scathing remarks and false allegations.

21. Ms. Roe's allegations that I degraded and humiliated my students, produced a "poisonous effect on the academic environment[,]" was disinterested in helping my students become serious scientists, threw a power supply at her, and called her "emotionally fragile," are all false.

22. On or about July 24, 2014, I learned that I would be asked to confront Ms. Roe's allegations as part of my tenure case.

23. I viewed Ms. Roe's letter and other actions she had taken as acts of deceit, manipulation, and sabotage.

24. Following awareness of some of her false allegations circulating within the Physics Department, I shared evidence of self-contradictory assertions made by Ms. Roe in relation to her power supply allegation with Erich Mueller, a member of my tenure committee. Dr. Mueller promised me that a full investigation would be conducted prior to the tenure vote, and that Ms. Roe would be censured and, if warranted, expelled from the doctoral program due to her attempts to sabotage the tenure process with false allegations.

25. Despite the Physics Department's promises to conduct a full investigation of Ms. Roe's false claims, no investigation was conducted. Through the litigation process I have learned that Dean Ritter denied the Physics Department's request to investigate Ms. Roe's initial non-Title IX claims as mandated by University Policy.

26. Through the tenure process and litigation, I have learned that in September 2014, shortly after Cornell's Physics Department voted to recommend me for tenure despite her letter, Ms. Roe claimed that I sexually assaulted her in the form of allegedly engaging in sex without her consent.

27. I did not ever have a sexual or romantic relationship or a sexual encounter with Ms. Roe.

28. In or around October 2014, shortly after Dean Ritter issued a denial of my tenure application, I was strongly encouraged by Professor McEuen (a member of the tenure committee), along with other senior members of the department, to appeal Dean Ritter's tenure denial and to point out the contradictions in Dean Ritter's reasoning to justify her decision. Professor McEuen specifically told me to include the following statements in my rebuttal: "My only interpretation is that either (i) The documentation and evidence I have submitted in my dossier have not been properly assimilated into the review process, or (ii) there are other charges that the department has not made me aware of. In the latter case, I have the right to be made aware of these, and the right to defend myself. This assumes even more importance especially in the light of the false allegations that have been allowed to influence the review. It speaks of a highly irregular, inappropriate and negligent process where my career and my reputation are judged on the basis of innuendo, inconsistencies, contradictions and outright falsehoods."

29. I was not informed of Ms. Roe's sexual assault/harassment allegation until March 3, 2015.

30. During my March 3, 2015 interrogation by Mr. Mittman and Ms. Affel, after they informed me of Ms. Roe's sexual assault allegation, I immediately asked whether I needed the assistance of an attorney. Mr. Mittman told me that was not necessary and continued the interrogation.

31. On May 28, 2015, I provided Mr. Mittman and Ms. Affel with eleven additional witnesses to contact whom I believed could provide information supportive of my denial of Roe's allegations. In the May 28, 2015 email, I informed Mr. Mittman and Ms. Affel that one of the

proposed witnesses, Airlia Shaffer-Moag, could provide unique information regarding Jane Roe and my interactions with Roe and other members of my lab group. Ms. Shaffer-Moag had joined the lab group in 2012, a time that overlapped with Roe, and could thus provide her first-hand observations. Mr. Mittman and Ms. Affel declined to interview Ms. Shaffer-Moag.

32. On August 10, 2015, Ms. Shaffer-Moag submitted a letter to the Dean of Faculty, Joseph Burns, and the Tenure Appeals Committee supporting my tenure. Ms. Shaffer-Moag provided a copy of that letter to one of our co-workers. A true and correct but redacted copy of this letter is attached at **Exhibit D**.

33. Despite my sense that Cornell's investigation was biased (because I am male), and contrary to applicable Cornell Policies and Procedures, such as Policy 6.4, I was always truthful with Cornell's Title IX investigators.

34. Mr. Mittman had previously expressed that he had no issue with the absences of cross-examination in Title IX investigations, because he found no evidence that an attorney in an adversarial system is more effective at discovering the truth than an independent investigator. *See* [Burden of Proof Lowered for Sexual Assault Cases - The Cornell Daily Sun (cornellsun.com)](Burden of Proof Lowered for Sexual Assault Cases - The Cornell Daily Sun (cornellsun.com)).

35. While the Tenure Appeals Committee was considering my appeal of the denial of my tenure, I never informed that committee of the investigation into Ms. Roe's allegation of a sexual relationship. I expected that the matters would be kept separate.

36. On or about February 26, 2016, I consulted with Professor Teukolsky regarding Dean Ritter's refusal to abide by the recommendations of the Tenure Appeals Committee and the ad hoc committee. Professor Teukolsky informed me that various of the faculty believed that Roe was fabricating allegations, but the Physics Department would not advocate for me. He said or said words to the effect of, "Can you imagine what would happen if we took action against a

blonde, female student? Twitter would explode and the entire department would be labeled bullies. We don't want that."

37. Another physics professor reiterated his sentiment, claiming, "Teukolsky is right—Twitter would explode. Do you really expect us to come out and say we don't believe this person? This is an explosive issue. No one wants to touch it." Attached as **Exhibit N** is an extract of a document I previously submitted to a New York agency documenting these comments of the Cornell Professors.

38. After it appeared that Dean Ritter would not follow the recommendations of the Tenure Appeals Committee, I wrote a letter to John Guckenheimer, head of the Committee, and Michael Fontaine, Acting Dean of the University Faculty, on March 2, 2016, correcting deficiencies in the record. A true and correct copy but redacted of this letter is attached as **Exhibit E**.

39. In June 2016, I filed an action in the New York Supreme Court challenging Cornell's denial of my tenure application due to the arbitrary process Cornell followed.

40. The documents attached as **Exhibits F, G, and H** are true and accurate (but redacted as appropriate) copies of documents that Cornell produced to me during the New York State Court proceeding.

41. The documents attached as **Exhibits I and J** are true and correct copies of documents Cornell attached to filings in the New York State Court proceeding.

42. After Dean Ritter notified me that she intended to impose a two-week unpaid suspension as a sanction for the alleged violation of the Romantic and Sexual Relationship Policy ("RSR Policy"). I consulted with CAFPS about appealing the suspension.

7

43. A true and correct copy of a May 21, 2017 response that I received from the Chair of the Committee on Academic Freedom and Professional Status ("CAFPS"), refusing to consider my appeal, is attached as **Exhibit K**.

44. A true and correct copy of a May 21, 2017 response that I received from Bruce Van Dover, a senior member of the CAFPS, informed me that it appeared "that the procedure [Dean Ritter] followed was that for a 'severe sanction,'" but that the CAFPS "would only have standing if the action taken by Dean Ritter were a 'minor sanction,'" so the CAFPS "[did] not have standing" to hear my appeal is attached as **Exhibit L**.

45. A true and correct but redacted copy of a May 24, 2017 email that I sent to Cornell administrators asking for reconsideration of Dean Ritter's imposition of a suspension is attached as **Exhibit M**.

46. Professor Flanagan states in his Declaration that his decision to include Dean Ritter's letter in *the de novo* dossier created in 2017 was made "in consultation with the Senior Associate Dean for Math and Science of the College of Arts and Sciences, the Senior Vice Provost for Academic Affairs, and the University Counsel's Office." The Senior Associate Dean at the relevant time was Barbara Baird, the Senior Vice Provost was John Siliciano, and Cornell counsel involved in my case at this time was Wendy Tarlow—all individuals who had been in close coordination with Dean Ritter throughout proceedings.

47. On June 1, 2017, I requested that the New York State Court hold Cornell in contempt, in part for refusing to provide me with a hearing regarding Ms. Roe's allegations.

48. On August 23, 2017, my counsel wrote to Cornell's counsel demanding that the grievance procedure before CAFPS be implemented. In November of 2017, I sought assurance

from CAFPS that my appeal process would not repeat the same failings as the other Cornell procedures. No such assurances were provided.

49. Following Cornell's destruction of my reputation among my peers and other academics in the scientific community, my position at Cornell was terminated in 2018. Since then, I have been unable to secure employment with any other university or academic institution, despite my efforts otherwise.

50. Since my departure from Cornell in June of 2018, my loss in salary exceeds $550,000, as I remained unemployed from July 2018–June 2022.

Executed: March 12, 2024   /s/ Mukund Vengalattore

   Mukund Vengalattore