UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DR. MUKUND VENGALATTORE,

                         Plaintiff,

v.

CORNELL UNIVERSITY,

                         Defendant.

_____

3:18-CV-1124
(GTS/TWD)

APPEARANCES:

NEW CIVIL LIBERTIES ALLIANCE
  Counsel for Plaintiff
1225 19th Street NW, Suite 450
Washington DC, DC 10174

BOND SCHOENECK & KING, PLLC
  Counsel for Defendant
One Lincoln Center
Syracuse, NY 13202

CORNELL UNIV. OFFICE OF COUNSEL
  Co-Counsel for Defendant
300 CCC Building
235 Garden Avenue
Ithaca, NY 14853

OF COUNSEL:

KAITLYN D. SCHIRALDI, ESQ.
KATHERINE B. NORMAN, ESQ.
ZHONETTE M. BROWN, ESQ.


COLLIN MICHAEL CARR, ESQ.
JONATHAN B. FELLOWS, ESQ.
SUZANNE M. MESSER, ESQ.


VALERIE L. DORN, ESQ.
WENDY E. TARLOW, ESQ.
CONRAD R. WOLAN, ESQ.

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment civil rights action brought by Dr.

Mukund Vengalattore ("Plaintiff" or "Vengalattore") against Cornell University ("Defendant"

or "Cornell") asserting claims of gender discrimination and defamation, is Cornell's motion for

summary judgment. (Dkt. No. 112.)  For the reasons stated below, Cornell's motion is granted

in part and denied in part.

## I.      RELEVANT BACKGROUND

### A.      Relevant Procedural History

Vengalattore commenced this action on September 18, 2018, against Secretary of Education Betsy Devos, the U.S. Department of Education (collectively "the Federal Defendants"), and Cornell.  (Dkt. No. 1 [Compl.].)  The Federal Defendants moved to dismiss (Dkt. No. 21), and Cornell answered and moved for judgment on the pleadings under Fed. R. Civ. P. 12(c) (Dkt. Nos. 22, 23).  In response, Vengalattore filed an Amended Complaint as of right.  (Dkt. No. 31.)

Thereafter, the Federal Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (Dkt. No. 36), and Cornell moved for judgment on the pleadings under Fed 12(c) and/or for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 41).  The Court granted both the Federal Defendants' and Cornell's motions and dismissed Vengalattore's Amended Complaint.  (Dkt. No. 59.)  Vengalattore appealed the Court's Decision and Order. (Dkt. No. 61.)

On June 2, 2022, the Court of Appeals for the Second Circuit vacated the Court's Decision and Order to the extent that it dismissed the Title IX claim against Cornell for failure to state a claim and to the extent that the Court declined to exercise supplemental jurisdiction over Vengalattore's state-law claim for defamation, and affirmed the dismissal of the Title VII and due process claims against Cornell, as well as the dismissal of the claims against the Federal

Defendants.[1]  (Dkt. No. 66, at 6.)[2]  Accordingly, the matter was remanded for discovery and further proceedings as appropriate.  (*Id.*)

Thereafter, with the permission of the Court, Vengalattore filed a Second Amended Complaint.  (Dkt. Nos. 77, 79.)  In the Second Amended Complaint, Vengalattore asserted claims of violation of Title IX and defamation.  (Dkt. No. 77.)  On January 31, 2024, Cornell filed its second motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 112.)

### B.    Undisputed Material Facts

Unless otherwise indicated, the following facts have been asserted and supported with accurate record citations by Defendant in its Statement of Material Facts (Dkt. No. 112, Attach. 1) and either expressly admitted, or denied without a supporting record citation, by Plaintiff in his Response to that Statement (Dkt. No. 117, Attach. 1).

Vengalattore was employed as an Assistant Professor in the Department of Physics at Cornell from 2009 until 2018.  (Dkt. No. 117, Attach. 1, at ¶ 1.)  After several years at Cornell, Vengalattore was considered for a promotion to tenured professor, but his tenure application was ultimately denied.[3]  (*Id.* at ¶¶ 105, 118-19.)

---

[1]    Specifically, the Second Circuit concluded that "Title IX affords a private right of action for a university's intentional gender-based discrimination against a faculty member, and that the [amended complaint] sufficiently assert[ed] such a claim."  (Dkt. No. 66, at 6.) Consequently, the discretionary dismissal of Vengalattore's defamation claim was vacated, as his Title IX claim was reinstated.  (*Id.*)

[2]    Page citations in this Decision and Order refer to the screen numbers on the Court's Case Management / Electronic Case Filing ("CM/ECF") System, not to the page numbers stated on the documents contained therein.

[3]    The denial of Vengalattore's tenure became the subject of an Article 78 Proceeding in New York State Supreme Court in Schuyler County.  (Dkt. No. 117, Attach. 1, at ¶ 121.)  Cornell argues that the Article 78 decision, and the related proceedings, are irrelevant to

Jane Roe was a graduate student at Cornell and worked in Vengalattore's laboratory from 2009 until 2012.  (*Id.* at ¶ 3.)  In May 2014, shortly after Vengalattore's tenure review began, Roe sent a letter to the tenure review committee, alleging that Vengalattore "'constantly degrades students in a harassing and humiliating way' . . . , 'did not respect boundaries' . . . , had picked up a power supply and thrown it at [Roe] and that he had called her 'emotionally fragile.'"  (*Id.* at ¶¶ 7-8.)  Roe also complained that Vengalattore "listed her name on a publication in [a] manner that had a sexual connotation."  (*Id.* at ¶ 9.)

According to Cornell, on or around November 2, 2014, "Roe informed Professor Ritchie Patterson . . . that she had been involved in a consensual romantic and sexual relationship with . . . Vengalattore from December 2010 until December 2011"; however, according to Vengalattore, Roe "conveyed her allegation to . . . Patterson *before* November 2, 2014 [and, indeed, as early as approximately September 24, 2014], and . . . the allegation included a claim that Roe and Vengalattore had engaged in sex after she told him no."  (*Compare* Dkt. No. 112, Attach. 1, at ¶ 5 *with* Dkt. No. 117, Attach. 1, at ¶ 5 [emphasis added].)[4]  Patterson informed Alan Mittman, Cornell's then-Title IX Deputy Coordinator and Director of Workforce Policy and Labor Relations ("WPLR"), of Roe's allegations.  (Dkt. No. 117, Attach. 1, at ¶¶ 6-7.)

_____

this matter because the decision to deny Vengalattore tenure is not at issue here.  (*Id.* at ¶ 120; Dkt. No. 128, Attach. 2, at 4.)  However, as is discussed in more detail below, although this Court is not reviewing the procedure or outcome of Cornell's decision to deny Vengalattore tenure, the tenure issue is intertwined with the issues before this Court and, for some purposes, is relevant.

[4]      The discrepancy regarding the date and extent of Roe's complaint to Patterson is material because Gretchen Ritter, Dean of the College of Arts and Sciences, preliminarily denied Vengalattore's tenure application on October 29, 2014; more specifically, whether Ritter knew of the allegation by October 29, 2014 (such that her decision could be influenced by it) is material.  (Dkt. No. 117, Attach. 1, at ¶ 6.)

Mittman met with Vengalattore on November 25, 2014; however, he did not inform Vengalattore about Roe's allegations of a romantic relationship. (Dkt. No. 117, Attach. 1, at ¶¶ 12-14.)

On February 4, 2015, Roe sent Mittman an email purporting to provide a "summary" of topics they had discussed during a telephone call, including an accusation that, in December 2010, Vengalattore had raped her and that she and Vengalattore, thereafter, had carried on "'a very power imbalanced, secret relationship . . . until December 2011.'" (*Id.* at ¶¶ 17-19; Dkt. No. 112, Attach. 25.) Mittman informed Ritter of Roe's allegations, and Ritter "indicated that she wanted the complaint to be investigated by WPLR." (Dkt. No. 117, Attach. 1, at ¶¶ 38-39.) Accordingly, Mittman and his colleague Sarah Affel (collectively, "the investigators") began to investigate Roe's allegations, first by interviewing Roe five times and then by arranging to meet with Vengalattore. (*Id.* at ¶¶ 40-41.) Mittman emailed Vengalattore at 1:23 p.m. on March 2, 2015, to schedule a meeting for the following day at 2:45 p.m., providing approximately twenty-five hours notice. (*Id*. at ¶ 41; Dkt. No. 112, Attach. 26, at 2.)

During meeting of the March 3, 2015, the investigators "informed [Vengalattore] that they were investigating allegations that he had engaged in a romantic and sexual relationship with . . . Roe."[5] (Dkt. No. 117, Attach. 1, at ¶ 42.) Vengalattore denied that he and Roe had had a romantic or sexual relationship. (*Id.* at ¶ 43.) In addition to the interviews of Roe and

---

[5]     Vengalattore admits that the meeting of March 3, 2015, pertained to the alleged romantic and sexual relationship; however, he asserts that this paragraph of Cornell's Statement of Material Facts (i.e., Paragraph 42) contains a material omission: the fact that, "at the end of the three-hour meeting, the investigators informed . . . Vengalattore for the first time that Ms. Roe alleged that he [had] raped her." (Dkt. No. 117, Attach. 1, at ¶ 42.) In addition, Vengalattore cites admissible record evidence in support of that assertion. (Dkt. No. 112, Attach. 28, at 12.)

Vengalattore, "the investigators interviewed twenty-four . . . witnesses and collected email communications and text messages."  (*Id.* at ¶ 46.)  Vengalattore provided the investigators with the names of additional witnesses to interview.  According to Cornell, it interviewed ten of thirteen witnesses identified by Vengalattore; however, according to Vengalattore, Cornell did not interview "at least" eleven of the "at least" twenty witnesses he had offered.[6]  (*Compare* Dkt. No. 112, Attach. 1, at ¶¶ 46-51 *with* Dkt. No. 117, Attach. 1, at ¶¶ 46-51.)

In September 2015, a final written report from the investigation ("the report") was issued, "recommend[ing] that the Dean find that a preponderance of the credible evidence supports the conclusion that [Vengalattore] . . . had a romantic or sexual relationship with [Roe], a student he directly supervised," but "that no specific finding be made as to whether the first sexual encounter rises to the level of sexual assault as defined by Policy 6.4," which is Cornell's Title IX policy.  (Dkt. No. 117, Attach. 1, at ¶ 83.)  The report was submitted to Ritter and she adopted the recommendations therein, finding that Vengalattore had violated Cornell's "Romantic and Sexual Relationships" (or "RSR") Policy and that Vengalattore had lied to the investigators when he denied having a sexual relationship with Roe.  (*Id.* at ¶¶ 85-87.)  Based on Ritter's findings, Vengalattore was suspended, without pay, for a two-week period, effective June 1, 2017.  (*Id.* at ¶ 97.)

Vengalattore continues to deny that any romantic or sexual relationship occurred between Roe and himself.  (Dkt. No. 118, at ¶ 27.)  Vengalattore's "appointment as a faculty

---

[6]      Vengalattore has not made clear the exact number of witnesses he asserts that Cornell refused to interview; however, the table of contents of Appendix A to the final written investigation report lists eleven witnesses, identified solely by Vengalattore, who were not interviewed.  (Dkt. No. 112, Attach. 27, at 64.)

member at Cornell ended on June 30, 2018." (Dkt. No. 117, Attach. 1, at ¶ 134.)

## II.     GOVERNING LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Id.* at 255.  In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

"Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become

---

[7]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[8]  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1(b).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[9]

Moreover, the "principles governing admissibility of evidence do not change on a

---

[8]     *Cusamano v. Sobek*, 604 F.Supp.2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[9]     Among other things, Local Rule 56.1(a) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1(a).

motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).

III.    ANALYSIS

   A.    **Doctrine of Judicial Estoppel**

   As an initial matter, Cornell argues that Vengalattore is judicially estopped from arguing now (i.e., following remand from the Second Circuit) that Cornell should have resolved Roe's allegation regarding the alleged romantic and sexual relationship under Policy 6.4, because that argument "is directly at odds with what [Vengalattore] told the Second Circuit earlier in this case": that Policy 6.4 was inapplicable (an assertion on which the Second Circuit relied). (Dkt. No. 128, Attach. 2, at 6-7.)

   "[S]everal factors typically inform the decision whether to apply the doctrine [of judicial estoppel] in a particular case:" (1) the party's new position is "'clearly inconsistent'" with its earlier position; (2) the party seeking to assert this new position previously persuaded a court to accept its earlier position; and (3) the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). However, "the Supreme Court has made clear that these factors do not constitute 'inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel,' and that '[a]dditional considerations may inform the doctrine's application in specific factual contexts.'" *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir.

2012) (citing *New Hampshire*, 532 U.S. at 751.)  As a result, even when the requisite factors are

satisfied, before finding that a litigant is judicially estopped, a court must inquire into whether

the particular factual circumstances of a case "tip the balance of equities in favor" of doing so.

*New Hampshire*, 532 U.S. at 751.

The Second Circuit has "'further limit[ed] judicial estoppel to situations where the risk

of inconsistent results with its impact on judicial integrity is certain.'"  *Intellivision*, 484 F.

App'x at 619.  The doctrine of judicial estoppel also requires "a true inconsistency between the

statements in the two proceedings;" in other words, "if the statements can be reconciled there is

no occasion to apply an estoppel."  *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72-73 (2d

Cir.1997).

Here, after carefully considering the matter, the Court finds that judicial estoppel is not

appropriate, because Vengalattore has not taken positions that are "*clearly* inconsistent"

(emphasis added).  Granted, in his response to Cornell's motion for judgment on the pleadings

and first motion for summary judgment, Vengalattore argued that Cornell proceeded under

Policy 6.4; but he also asserted alternative arguments regarding whether Policy 6.4 was in fact

applicable, whether that policy was unfair, and whether Cornell deviated from or disregarded

that policy in a discriminatory way.  (Dkt. No. 52, at 8, 17-18 & n.8.)  In portions of his

appellate brief (which regarded the allegations of the Amended Complaint), Vengalattore

argued, among other things, that Policy 6.4 was inapplicable to the investigation into Roe's

allegations, but also that Cornell disregarded Policy 6.4 when doing so "served Cornell's

purposes," including for the purpose of discriminating against Vengalattore.  (*See Vengalattore

v. Cornell Univ.*, No. 20-1514, Appellant's Opening Brief, at 23-25 and 53-57 [2d Cir. filed

Aug. 21, 2020] [attaching pages "16" through "18," and "46" through "50"].)  Now, having had

the benefit of (Second Circuit-ordered) discovery, Vengalattore argues that, although Policy 6.4

was indeed the policy that was applicable to Roe's sexual assault claim, Cornell disregarded that

policy and proceeded under its less-rigorous Romantic and Sexual Relationships ("RSR")

Policy, departing from proper procedure in a discriminatory manner, and, further, that both the

RSR Policy and Policy 6.4 violate Title IX, even when applied properly.  (Dkt. No. 117, at 9-15,

27.)

    Although the arguments Vengalattore presented to this Court in earlier stages of

litigation and to the Second Circuit on appeal are certainly not identical to those he advances

now, his arguments are generally of the same ilk: Cornell used an improper (and inadequate)

procedure to investigate Roe's allegations and bent its own rules for the purpose of

discriminating against him.  Therefore, despite their variations, Vengalattore's positions "can be

reconciled" and, accordingly, are not "clearly inconsistent," meaning "there is no occasion to

apply the estoppel." *Simon*, 128 F.3d at 72-73.

### B.    Plaintiff's Title IX Claim

    Cornell next argues that it is entitled to summary judgment on Vengalattore's Title IX

claim because "there is no evidence of an erroneous outcome motivated by gender bias."  (Dkt.

No. 112, Attach. 90, at 5.)  For the reasons that follow, the Court disagrees.

    "Title IX provides, in relevant part, that '[n]o person . . . shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving [f]ederal financial assistance.'" *Doe v. Syracuse

Univ.*, 457 F. Supp. 3d 178, 193 (N.D.N.Y. 2020) (citing 20 U.S.C. § 1681[a]), *reconsidered on*

*other grounds*, 17-CV-0787, 2020 WL 3453500 (N.D.N.Y. June 24, 2020).  As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities.  *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999).  Furthermore, Title IX should be construed to give "[s]chool administrators . . . the flexibility they require" to initiate a reasonable disciplinary response.  *Davis,* 526 U.S. at 648.

"In the context of university discipline, the Second Circuit has recognized two categories of Title IX claims: (1) claims of an erroneous outcome from a flawed proceeding, and (2) claims of selective enforcement."  *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 [2d Cir. 1994]).  Here, the parties appear to agree that Vengalattore's Title IX claim is of the "erroneous outcome" category.  (Dkt. No. 112, Attach. 90, at 5; Dkt. No. 117, at 6-8, 13.)

"To prevail on an erroneous outcome claim, [a plaintiff] must demonstrate (1) articulable doubt [as to] the accuracy of the outcome of the disciplinary proceeding, and (2) that gender bias was a motivating factor behind the erroneous finding."  *Syracuse Univ.*, 457 F. Supp. 3d at 200 (internal quotation marks omitted) (citing *Doe v. Colgate Univ.*, 760 F. App'x. 22, 30 (2d Cir. 2019) [summary order]).

## 1.    Articulable Doubt

Cornell argues that Vengalattore cannot establish articulable doubt, because it complied with its procedures when investigating Roe's allegations, and "interviewed all but two of the witnesses identified by . . . Vengalattore."  (Dkt. No. 112, Attach. 90, at 6-15.)  After carefully considering the matter, the Court disagrees.

"To establish such an 'articulable doubt,' the [p]laintiff must point to evidence of

12

'particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge.'" *Syracuse Univ.*, 457 F. Supp. 3d. at 200 (quoting *Yusuf*, 35 F.3d at 715). "A plaintiff can also point to 'particular procedural flaws affecting the proof." *Id.* (citing *Yusuf*, 35 F.3d at 715).

Here, Vengalattore has marshaled evidence that Cornell deviated from its procedures during its investigation of Roe's allegations. For example, Vengalattore has presented admissible record evidence that Cornell did not apply Policy 6.4 and, instead, investigated Roe's allegations solely under the RSR Policy. Specifically, the parties agree that "Policy 6.4 was implicated by Roe's allegation that the first sexual encounter between her and . . . Vengalattore, which allegedly occurred at his home in December 2010, was not consensual." (Dkt. No. 117, Attach. 1, at ¶ 28.) Indeed, John Siliciano, Cornell's designated representative, testified that, if an allegation regarding a relationship between a faculty member and a student "triggers *any* of the conduct covered by [Policy] 6.4," then Policy 6.4 would be the applicable policy. (Dkt. No. 121, Attach. 3, at 29-30 [attaching pages "92" and "93"].) However, Cornell admits that it used the RSR Policy. (Dkt. No. 112, Attach. 90, at 6-10 [arguing that use of the RSR Policy was proper].)

Cornell argues that, because it ultimately determined that the relationship was consensual, its investigation of Roe's allegations under the RSR Policy, which provides less protections to the accused party, was proper. (Dkt. No. 128, Attach. 2, at 7; Dkt. No. 117, at 12-13 [explaining the additional procedural safeguards provided during a Policy 6.4 investigation].) However, not only is such post-hoc rationalization improper but it appears to contradict the

testimony of Cornell's designated representative. *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 37 (2d Cir. 2019) ("An employer cannot escape its promise of procedural protections by recharacterizing accusations of sexual misconduct in more generic terms.  Nor can it deny an inference of procedural irregularity through *post-hoc rationalization*.") (emphasis added).  (Dkt. No. 121, Attach. 3, at 29-30 [attaching pages "92" and "93," testifying, "My testimony is that if the relationship triggers any of the conduct covered by 6.4, in this case triggered sexual harassment because it either created a hostile environment or involved a quid pro quo situation as defined in those first two bullets, it would trigger 6.4.  Under similar but somewhat different facts, it was purely consensual and didn't involve that, it would be treated under the consensual relationships policy"].)

In addition, Vengalattore has presented admissible record evidence that Cornell's assertion that it could not pursue Roe's allegations under Policy 6.4 because they were untimely is inconsistent with the language of Policy 6.4 itself.  (Dkt. No. 117, at 9-11; Dkt. No. 117, Attach. 1, at ¶¶ 29-31.)  Cornell asserts that "it could not pursue" Roe's allegations under Policy 6.4 because "the conduct fell outside the time limitations set forth" therein.  (Dkt. No. 112, Attach. 1, at ¶¶ 30-31.)  However, the decision to dismiss such a complaint as untimely is discretionary; Policy 6.4 states that the "investigator[s] *may* dismiss a complaint and close the case where the complaint: [i]s not reported or filed in a timely manner."  (Dkt. No. 112, Attach. 22, at 22 [Policy 6.4] [emphasis added].)  Furthermore, in the event that investigators determine a complaint should be dismissed, "the complainant will be informed of that decision, and given an opportunity to submit a written response to the reviewer within ten working days."  (*Id.*)  As Vengalattore points out, the record is devoid of evidence that Cornell informed Roe of its

14

decision that her complaint was untimely—the procedure it would have been required to follow if it had indeed rendered that decision.  (Dkt. No. 117, at 11.)  Simply stated, construing these facts in the light most favorable to Vengalattore, a genuine dispute of material fact exists regarding whether Cornell departed from proper procedure when analyzing and determining whether Roe's allegations were untimely under Policy 6.4.

Furthermore, Vengalattore has presented admissible record evidence that Cornell did not properly "adhere to Section 4.3 of the Faculty Handbook," its Dismissal/Suspension Policy. (Dkt. No. 117, at 13-16.)  The Dismissal/Suspension Policy states, in relevant part, as follows:

> When [a] complaint from any source is made against a [faculty member] which *might* lead to his or her dismissal or to suspension for the period of one semester or more, the dean of his or her college . . . shall inform the faculty member of the complaint against him or her, investigate the case, and if the faculty member is willing, consult with him or her regarding it.  The dean shall thereafter report to the provost the results of the investigation together with his or her recommendations.  The provost shall cause the faculty member to be furnished with a written and detailed statement of the charges against him or her and the suggested disciplinary action if, after receiving the dean's report and making such independent investigation as may seem appropriate to the provost, it is the opinion of the provost that further proceedings are warranted.

(Dkt. No. 112, Attach. 64, at 2 [Dismissal/Suspension Policy] [emphasis added]). However, Ritter testified that she "is not familiar with [the Dismissal/Suspension Policy]."  (Dkt. No. 121, Attach. 5, at 25-26 [attaching pages "145" and "146"].)

Cornell argues that, in any event, Ritter's actions complied with the Dismissal/Suspension Policy, because the policy "specifically authorized the Dean to impose suspensions of less than a semester."  (Dkt. No. 112, Attach. 90, at 4-5.)  Cornell reasons that,

because Ritter ultimately determined to sanction Vengalattore for only two weeks, Ritter did not

have to follow the more-rigorous process contemplated by the Dismissal/Suspension Policy,

involving the provost.  (Dkt. No. 112, Attach. 90, at 9.)  However, not only does such reasoning

employ an improper post-hoc rationalization[10] but it does not comply with the

Dismissal/Suspension Policy.

The Dismissal/Suspension Policy is prospective in nature, requiring that, if the complaint

"*might* " result in dismissal or suspension of one semester or more, then the dean is required to

report her findings to the provost; it does not contemplate that the dean may disregard the

Dismissal/Suspension Policy so long as, at the end of the investigation, the sanction *is* lesser

than a suspension of one semester.  (Dkt. No. 112, Attach. 64, at 2.)  An accusation of rape is

certainly serious, and a reasonable juror could conclude that a student's accusation that a faculty

member raped her *might* result in a suspension of one semester or more, or dismissal.[11]  Here, as

Vengalattore argues, the record is devoid of evidence that Ritter either handed the investigation

over to the provost with a recommendation, or actually made a determination that Roe's

accusations *could not* result in a suspension of one semester or more.  (Dkt. No. 117, at 15.)

Moreover, Vengalattore has presented admissible record evidence that Ritter may have

improperly entangled the investigation into Roe's allegations with Vengalattore's separate

---

[10]    *See Menaker*, 935 F.3d at 37 ("An employer cannot . . . deny an inference of
procedural irregularity through post-hoc rationalization.").

[11]    In September 2015, Mittman himself proposed a revision to the RSR Policy to
provide that consensual relationships between a faculty member and a student could "lead to
discipline up to and including termination." (Dkt. No. 123, Attach. 10.)  If (during the time in
question) one of the investigators explicitly considered a *consensual* relationship to be potential
grounds for termination, a reasonable juror could conclude that an accusation of *non*-consensual
sexual interaction between a faculty member and student could have resulted in termination.

tenure appeal.  Cornell argues that it "undertook to maintain the confidentiality of the

investigation and to separate the investigation from . . . Vengalattore's tenure appeal."  (Dkt. No.

112, Attach. 90, at 15, n.3.)  However, Vengalattore has cited admissible record evidence

(specifically, an email message from Ritter dated July 7, 2015) that Roe's allegations had not

been kept confidential during his tenure appal and that, instead, the Tenure Appeal Committee

(or "TAC") had been informed that "serious" accusations had been made against Vengalattore

and that "[p]reliminary evidence indicates that these complaints are not frivolous."  (Dkt. No.

117, Attach. 2, at ¶ 304.)[12]  When viewing it in the light most favorable to Vengalattore, a

reasonable jury could conclude that Ritter's communication of her opinion of the investigation

to the TAC, while the investigation was still ongoing, was a departure from Policy 6.4, which

required Cornell to take "reasonable measures" to protect the confidentiality of the investigation.

(Dkt. No. 112, Attach. 22, at 13 ["[N]o one participating in the procedures under this policy may

reveal any information learned in the course of so doing . . . .  The university will take

reasonable measures to protect the confidentiality of the testimony and records produced in the

---

[12]     Cornell objects to the Court's consideration of Vengalattore's "Counter-Statement
of Additional Material Facts" (Dkt. No. 117, Attach. 2), because the Local Rules do not
contemplate such a counter-statement.  (Dkt. No. 128, Attach. 2, at 5, n.1.)  However, as Cornell
acknowledges, the Local Rules do permit the non-movant to submit a "Statement of Additional
Facts in Dispute."  N.D.N.Y. L.R. 56.1(b).  Despite the fact that Vengalattore has labeled his
so-called "Counter-Statement of Additional Material Facts" inconsistently with the text of Local
Rule 56.1(b), the Court will consider it to the extent that it complies with the purpose of the
Rule—which is to allow the non-movant an opportunity to provide additional facts that he or
she claims are in dispute, with citation to the record where such facts are established.  *Id*.  As
the Court has previously explained, it will not "turn a blind eye" to evidence of a genuine
dispute of material fact that it should happen to come across.  *See, e.g., Coulter v. Barbeque
Integrated, Inc.*, 20-CV-0533, 2022 WL 3444953, at *2, n.2 (N.D.N.Y. Aug. 17, 2022);
*Binghamton-Johnson City Joint Sewage Bd. v. Am. Alternative Ins. Corp.*, 12-CV-0553, 2014
WL 4715618, at *9 (N.D.N.Y. Sept. 22, 2014); *Walker v. Young Life Saranac Village*, 10-CV-
1578, 2012 WL 5880682, at *3, n.20 (N.D.N.Y. Nov. 21, 2012).

procedures under this policy."].)

Finally, Vengalattore has presented admissible record evidence of evidentiary weaknesses in Cornell's findings. Specifically, although Cornell claims to have interviewed ten of thirteen witnesses identified by Vengalattore, Vengalattore has adduced evidence that Cornell did not interview "at least" eleven of the "at least" twenty witnesses he offered. (*Compare* Dkt. No. 112, Attach. 1, at ¶¶ 46-51 *with* Dkt. No. 117, Attach. 1, at ¶¶ 46-51.) Moreover, Vengalattore has adduced evidence that Airlia Shaffer-Moag, a witness whom the investigators declined to interview, submitted a letter to the TAC (during Vengalattore's separate tenure appeal) in which she stated that Roe claimed to be "sexist against men." (Dkt. No. 118, Attach. 4, at 2.) Because the investigators did not interview Shaffer-Moag, this statement was not part of the report; in particular, no mention is made of it in the section "Motive to Lie and Other Issues of Credibility," wherein the report purports to analyze Roe's credibility. (Dkt. No. 112, Attach. 27, at 56-60 [The Report].) Cornell argues that it had no reason to interview Shaffer-Moag because she, and other undergraduate students that Vengalattore requested be interviewed, would offer merely duplicative testimony. (Dkt. No. 128, Attach. 2, at 11-12.) However, Vengalattore argues that such evidence, had it been available to consider, would have had bearing on Roe's credibility. (Dkt. No. 117, at 22.) Viewing this evidence in the light most favorable to Vengalattore, the Court agrees that it raises a genuine dispute of material fact regarding whether there were evidentiary weaknesses in Cornell's findings.

"[A]bsent flawed process *and* gender discrimination," the Court cannot "second-guess" Cornell's credibility determinations or its factual conclusions, *Xiaolu Peter Yu*, 97 F. Supp. 3d at 462 (emphasis in original); however, drawing all reasonable inferences and resolving all

factual disputes in Vengalattore's favor, the Court finds that Vengalattore has presented

sufficient evidence of an articulable doubt as to the outcome of the disciplinary proceeding to

survive Defendant's motion for summary judgment on this issue.

### 2.     Gender Bias

Cornell next argues that Vengalattore cannot establish gender bias, because his

"allegations of outside pressure are wholly speculative," and Cornell's determination that

Vengalattore "engaged in a romantic or sexual relationship with Roe was supported by a

preponderance of the evidence." (Dkt. No. 112, Attach. 90, at 15-23.)  Again, after carefully

considering the matter, the Court disagrees.

"To demonstrate gender bias as a motivating factor in the disciplinary decision, a

plaintiff must produce evidence of 'particular circumstances suggesting that gender bias was a

motivating factor behind the erroneous filing.'"  *Syracuse Univ.*, 457 F. Supp. 3d at 201

(quoting *Yusuf*, 35 F.3d at 715).  Such evidence of gender bias may consist of "'statements by

members of the disciplinary tribunal, statements by pertinent university officials, or patterns of

decision-making that also tend to show the influence of gender.'"  *Xiaolu Peter Yu*, 97 F. Supp.

3d at 474-75 (quoting *Yusuf*, 35 F.3d at 715).[13]

_____

[13]     It appears that Vengalattore relies, in part, on statistics of sexual misconduct
investigations and the results thereof as a form of direct evidence of gender bias.  (Dkt. No. 117,
at 27.)  However, because there is no expert testimony regarding the significance of this
statistical data, such evidence does not tend to support an inference of gender bias.  *See Doe v.
Trs. of Hamilton Coll.*, No. 6:22-CV-214, 2024 WL 1675130, at *7 n.10 (N.D.N.Y. Apr. 18,
2024) ("[A]bsent expert testimony opining on the significance of this statistical data, it is
unclear how this evidence can be used to demonstrate a pattern of gender bias at the university.
Further, the Second Circuit has not spoken on the use of statistical evidence like this when
resolving summary judgment motions on an erroneous outcome claim . . . .  The Sixth and
Tenth Circuits have analyzed similar statistical data as circumstantial evidence and determined
that this kind of evidence is insufficient to create an inference of gender bias on its own . . . .

Alternatively, a plaintiff can establish an inference of gender bias by showing "a combination of (1) procedural irregularities that show a biased process, and (2) surrounding circumstances that suggest that 'this bias was likely a sex-based bias.'" *Doe v. Rochester Inst. of Tech.*, 21-CV-6761, 2024 WL 1051953, at *10 (N.D.N.Y. Mar. 11, 2024) (quoting *Menaker*, 935 F.3d at 31). The Second Circuit has enumerated certain indicia that are sufficient to infer gender bias and satisfy the second prong: such indicia include an "'atmosphere of public pressure'" to suggest that the university was motivated to "'act based on invidious stereotypes,'" and "'statements by members of the disciplinary tribunal [or] statements by pertinent university officials'" that disclose a discriminatory intent. *Rochester Inst. of Tech*, 2024 WL 1051953, at *11 (quoting *Menaker*, 935 F.3d at 31, 33 and *Yusuf*, 35 F.3d at 715). Evidence of pressure from the federal government on a university to unfairly and "aggressively pursue complaints of sexual misconduct against male respondents" is sufficient to show gender bias, if such pressure is coupled with evidence of procedural irregularities. *Doe v. Trs. of Hamilton Coll.*, No. 6:22-CV-214, 2024 WL 1675130, at *8 (N.D.N.Y. Apr. 18, 2024). "It is precisely because procedural irregularity alone *already* suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex." *Menaker*, 935 F.3d at 33, n.48.[14]

_____

Therefore this evidence, even if viewed in a light most favorable to plaintiff does not tend to support an inference of gender bias.") (internal citations omitted).

[14]   *See also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106-07 (2d Cir. 2022) ("Given that 'procedural irregularity alone' may suggest some form of bias, when there are 'clear procedural irregularities in a university's response to allegations of sexual misconduct' we have concluded that 'even minimal evidence of sex-based pressure on the university is sufficient' to permit a plausible inference that the 'bias [was] on account of sex.'").

Although the "necessary factual showing is not high," *Rochester Inst. of Tech.*, 2024 WL 1051953, at *11, here the parties "have reached the summary judgment stage and [Vengalattore] must demonstrate a genuine dispute of material fact, not merely allegations of a plausible inference of gender bias." *Doe v. Colgate Univ.*, No. 5:15-CV-1069, 2017 WL 4990629, at *12 (N.D.N.Y. Oct. 31, 2017), *aff'd*, 760 F. App'x 22 (2d Cir. 2019) (quoting *Doe v. Trs. of Boston Coll.*, No. 15-CV-10790, 2016 WL 5799297, at *25 n.7 [D. Mass. Oct. 4, 2016]).

The Second Circuit has held that Title IX claims are subject to the *McDonnell Douglas* burden shifting framework. *Doe v. Columbia Univ.*, 831 F.3d 46, 55-56 (2d Cir. 2016). To that end, Cornell has offered a legitimate, non-discriminatory reason for suspending Vengalattore: that a preponderance of the evidence obtained during the investigation demonstrated that he had violated the RSR policy by engaging in a romantic and sexual relationship with a student. (Dkt. No. 112, Attach. 90, at 16-23.) Therefore, the question on summary judgment is whether Vengalattore has marshaled evidence from which a rational fact-finder could conclude that Cornell's reason for discipline was pretext for intentional discrimination against him. *Columbia Univ.*, 831 F.3d at 54.

Based on the current record, a reasonable jury could infer anti-male gender bias from the combined force of Vengalattore's evidence of procedural irregularities and external pressure on Cornell to correct its perceived tolerance of sexual misconduct. As previously stated, when the evidence is viewed in the light most favorable to him, Vengalattore has identified genuine disputes of material fact as to whether there were one or more procedural irregularities during the investigation of Roe's complaint. *See, supra,* Part III.B.1. of this Decision and Order. Furthermore, Vengalattore has identified genuine disputes of material fact as to whether Cornell

21

"aggressively" responded to external pressure "to reduce protections for males accused of sexual misconduct."  (Dkt. No. 117, at 23-30.)

    In particular, Vengalattore points to admissible record evidence of external pressure from the Department of Education ("DOE"), including (1) the 2011 "Dear Colleague Letter" ("the 2011 DCL"), which encouraged colleges to reduce procedural safeguards when investigating sexual misconduct claims, as well as (2) additional DOE guidance, issued in April 2014, which specified that the DOE expected colleges to apply a "strong presumption" that sexual activity between an adult student and a faculty member was not consensual.  (Dkt. No. 121, Attach. 11; Dkt. No. 121, Attach. 12, at 11.)  In addition, Vengalattore points to admissible record evidence that Cornell faced targeted pressure from the DOE: the fact that, in May 2015, during the investigation into Roe's allegations (Dkt. No. 112, Attach. 27, at 31), the DOE added Cornell to the list of schools under investigation for failure to adequately address sexual assault or harassment claims (Dkt. No. 117, Attach. 2, at ¶¶ 78, 91 [citing page of government website]).

    Moreover, Vengalattore points to admissible record evidence of Cornell's "aggressive[]" response to this external pressure.[15]  For example, Cornell's designated representative identified the 2011 DCL as an "instigating cause" of revisions to Cornell's policies regarding sexual misconduct allegations. (Dkt. No. 121, Attach. 3, at 4 [attaching page "11"].)  Granted, an "effort to comply with the 2011 DCL, standing alone, is not evidence of gender bias."  *Colgate*

---

[15]    (Dkt. No. 123, Attach. 8 [attaching emailed dated Dec. 11, 2014, from Mittman to Roe stating, in part, that Cornell's Council on Sexual Violence Prevention has been "operating *very aggressively* to address issues of access, prevention, and culture change"] [emphasis added].)

*Univ.*, 2017 WL 4990629, at *13.  However, here, Cornell's efforts to comply with the 2011

DCL do not stand alone; Vengalattore points also to evidence that the pressure from the DOE in

2011, 2014, and 2015 (some of which, again, was directed specifically at Cornell) caused

Cornell to alter its policies, such as by reducing the burden of proof for complainants and the

ability of respondents to cross-examine their accusers.  (*See, e.g.,* Dkt. No. 117, Attach. 2, at

¶¶ 62-75 [citing record evidence]; Dkt. No. 112, Attach. 22, at 20.)

  Finally, Vengalattore has presented at least "minimal" evidence of statements that tend

to show anti-male bias during the time that such policy revisions were implemented: in March

2014, the "Faculty/Staff Education and Outreach Subgroup" ("the subgroup"), of which

Mittman was a member, issued a report recommending that Cornell "go above and beyond the

law" with regard to sexual misconduct allegations, and which characterized the subgroup's

mission as the following: "'Identify and support best practices and evidence-based strategies

regarding prevention of sexual violence as well as the intersection of related issues such as . . .

masculinity . . . .'"  (Dkt. No. 123, Attach. 5, at 1.)  This statement by a member "of the

disciplinary tribunal [and] . . . pertinent university officials . . . tend[s] to show the influence of

gender'" on the revisions to and application of Cornell's policies.  *Xiaolu Peter Yu*, 97 F. Supp.

3d at 474-75 (quoting *Yusuf*, 35 F.3d at 715).

  Simply stated, drawing all reasonable inferences in Vengalattore's favor, a rational jury

could credit his evidence of procedural irregularities, and consider it together with his evidence

of external pressure on Cornell and a statement of a pertinent university official tending to show

of anti-male gender bias, to reasonably infer that Cornell's decision to sanction Vengalattore

was motivated, at least in part, by gender bias.  *See Trs. of Hamilton Coll.*, 2024 WL 1675130,

at *8 ("A rational jury could credit plaintiff's evidence of procedural flaws coupled with evidence of a pattern of anti-male gender bias and external pressure on Hamilton and infer that defendant's decision to expel plaintiff was motivated in part by gender bias."); *cf. Columbia Univ.*, 831 F.3d at 58 n.11 ("A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.").

For all of these reasons, Cornell's motion for summary judgment on Vengalattore's Title IX erroneous outcome claim is denied.

### C.    Plaintiff's Defamation Claim

Plaintiff's defamation claim is another matter.  Cornell argues that Vengalattore's defamation claim must be dismissed, because Vengalattore has presented no admissible record evidence that Cornell published Ritter's determination to third parties, and because "Vengalattore himself published . . . Ritter's determination" when he publicly filed an Article 78 petition.  (Dkt. No. 112, Attach. 90, at 23-32.)  Vengalattore responds that the record evidence creates a genuine dispute of material fact regarding whether Cornell published Ritter's determination, which must be resolved by a jury, and that his self-publication, via the Article 78 petition, is protected by privilege because it was done in the course of a judicial proceeding. (Dkt. No. 117, at 30-35.)  After carefully considering the matter, the Court agrees with Cornell.

"The gravamen of an action alleging defamation is an injury to reputation."  *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000).  "Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and

24

concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019); *see Sheindlin v. Brady*, 597 F. Supp. 3d 607, 623-31 (S.D.N.Y. 2022) (discussing each element of a defamation claim in-depth). "Under New York defamation law, 'publication is a term of art . . . .   A defamatory writing is not published if it is read by no one but the one defamed.  Published it is, however, as soon as read by any one else.'" *Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001) (quoting *Ostrowe v. Lee*, 256 N.Y. 36, 38 [N.Y. 1931]).

Certain privileges shield an individual from liability for defamation.  *See Stega v. N.Y. Downtown Hosp.*, 31 N.Y.3d 661, 669 (N.Y. 2018) ("'Courts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether.'") (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 457 [N.Y. 1992]).  "[F]or example, statements uttered in the course of a judicial proceeding are absolutely privileged, 'as long as such statements are material and pertinent to the questions involved' in the proceeding."  *Stega*, 31 N.Y.3d at 669 (quoting *Wiener v. Weintraub*, 22 N.Y.2d 330, 331 [N.Y. 1968]).  Such privilege, referred to as "[t]he common law litigant's privilege[,] offers a shield to one who publishes libelous statements in a pleading or in open court for the purpose of protecting litigants' zeal in furthering their causes."  *Sheindlin*, 597 F. Supp. 3d at 629 (internal quotation marks omitted).

Moreover, New York law does not "recognize a claim for defamation where the plaintiff himself voluntarily republishes the alleged defamatory words."  *Weintraub v. Phillips, Nizer, Benjamin, Krim, & Ballon*, 172 A.D.2d 254, 255 (N.Y. App. Div., 1st Dep't 1991); *see also*

*Weber v. Multimedia Ent., Inc.*, No. 97 CIV. 0682, 2000 WL 526726, at *7 (S.D.N.Y. May 2, 2000) ("It is, however, well-established under New York law that 'there is no publication,' and therefore no liability, 'if the defamatory statement is exposed to a third party by the person claiming to be defamed.'") (quoting *Church of Scientology of Cal., Inc. v. Green*, 354 F. Supp. 800, 804 [S.D.N.Y.1973]).

Here, Vengalattore claims that Cornell defamed him when it "re-published" Ritter's false determination of October 6, 2015, that Vengalattore was "involved in a sexual relationship" with Roe ("the determination of October 6, 2015") to third-parties (outside Cornell).  (Dkt. No. 77, at ¶¶ 162-63 [2d Am. Compl.].)[16]  Vengalattore admits, however, that he cannot provide

---

[16]     To the extent that Vengalattore now argues Cornell defamed him because it "published" the determination of October 6, 2015, to persons *within* Cornell, such publication theory was not plausibly alleged in the Second Amended Complaint and has been introduced for the first time in Vengalattore's response to Cornell's motion for summary judgment.  (Dkt. No. 77, at ¶¶ 140-44, 161-72 [alleging Cornell re-published the statement of October 6, 2015, to ten other universities, with no allegation of publication internally at Cornell].)  Vengalattore cannot now, at this late stage of litigation, substantially broaden his defamation theory: the allegation that Cornell made defamatory statements to professors at *other* universities is plainly different than an allegation that Cornell defamed him because Cornell professors discussed the conclusion of the investigation *internally*.  Therefore, the Court will not consider Vengalattore's arguments to the extent they pertain to publication of the determination of October 6, 2015, internally at Cornell.  *See Wellner v. City of New York*, No. 16-CV-7032, 2019 WL 1511022, at *1-2 (S.D.N.Y. Mar. 22, 2019) (denying reconsideration of order granting summary judgment on defamation claim where plaintiff "attempted to broaden her defamation  theory in response to the defendants' motion for summary judgment by arguing" that police officers relayed allegedly defamatory statements to an assistant district attorney, when the amended complaint alleged that the defamatory statements were published to the media); *Isaac v. City of New York*, 701 F. Supp. 2d 477, 491 (S.D.N.Y. 2010) ("Plaintiff may not use his submission in opposition to summary judgment as a back door means to amend the complaint.") (citing cases); *Matiyn v. Allen*, 06-CV-1503, 2010 WL 3880510, at *4 & n. 9 (N.D.N.Y. Sept. 28, 2010) (Suddaby, J.) ("Simply stated, permitting Plaintiff to drastically change the landscape of his claims at such a late stage of the action . . . would unduly prejudice Defendants, who spent the time and expense of filing two comprehensive and lengthy motions for summary judgment on the claims asserted in Plaintiff's Complaint, and who would not have the benefit of conducting discovery on such new claims before trial.") (collecting cases).

direct evidence that Ritter published the determination of October 6, 2015, to third parties. (Dkt. No. 117, Attach. 1, at ¶ 135.)  Instead, Vengalattore argues that Cornell defamed him when it "re-published" the determination of October 6, 2015, or parts thereof, to "external faculty reviewers at a number of universities," during the *"de novo* tenure review process"  that necessarily began after November 25, 2016.  (*Id.*)  The *"de novo* tenure review process" that Vengalattore references was commenced after the New York State Supreme Court in Schuyler County granted Vengalattore's Article 78 petition, in an order dated November 25, 2016.  (Dkt. No. 112, Attach. 72, at 8 [vacating the prior tenure determination of Vengalattore, and returning the matter to Cornell "for a de novo review in accord with this order"].)

However, Vengalattore admits that he referred to, and directly quoted from, the determination of October 6, 2015, in the Article 78 petition that he filed on June 7, 2016.  (Dkt. No. 117, Attach. 1, at ¶¶ 123-24; Dkt. No. 117, at 34-35.)  Therefore, as Cornell argues, Vengalattore himself published the alleged defamatory statements on June 7, 2016 (before Cornell republished them after November 25, 2016).  (Dkt. No. 112, Attach. 90, at 28-29; Dkt. No. 128, Attach. 2, at 16-17.)

Attempting to circumvent the chronology of the publications, Vengalattore argues that his publication of the allegedly defamatory statement, as part of the Article 78 petition, "does not invalidate his [defamation] claim," because the publication was protected by the common law litigant's privilege.  (Dkt. No. 117, at 34-35.)  However, Vengalattore misapprehends the privilege; New York's common law litigant's privilege protects an individual "from *liability*" for defamation.  *Sheindlin*, 597 F. Supp. 3d at 629 (emphasis added); *Galland v. Kutner,* 14-CV-

0370, 2014 WL 5017834, at *2 (S.D.N.Y. Sept. 29, 2014) (emphasis added).  It is a "shield,"[17] not a sword that can somehow  nullify Plaintiff's own publication of theretofore unpublished statements.  In other words, the privilege belongs to a defamation defendant, not the plaintiff, and, accordingly, does not apply here.[18]

Therefore, because Vengalattore voluntarily published the alleged defamatory statements months before he alleges Cornell did, Vengalattore's defamation claim must be dismissed.  *See Weintraub*, 172 A.D.2d at 255 ("New York law [does not] recognize a claim for defamation where the plaintiff himself voluntarily republishes the alleged defamatory words."); *Stephens v. Trump Org. LLC*, 205 F. Supp. 3d 305, 311 (E.D.N.Y. 2016) ("Stated simply, words voluntarily disseminated to the world by the party alleged to be aggrieved cannot by definition be found defamatory under New York law.").

**ACCORDINGLY**, it is

**ORDERED** that Cornell's motion for summary judgment (Dkt. No. 112) is **GRANTED in** and **DENIED in part** such that Vengalattore's defamation claim is **DISMISSED**, and

---

[17]    *See Sheindlin*, 97 F. Supp. 3d at 629 (explaining that the common law litigant's privilege operates to "*shield* an individual from liability for defamation") (emphasis added); *Bridge C.A.T. Scan Assocs. v. Ohio–Nuclear, Inc.*, 608 F.Supp. 1187, 1195 (S.D.N.Y.1985) (explaining that the common law litigant's privilege  "offers a *shield* to one who publishes libelous statements . . .") (emphasis added); *Williams v. Williams*, 298 N.Y.S.2d 473, 480 (N.Y. 1969) (Burke, J., concurring) (explaining that the common law litigant's privilege "offers a *shield* to the one who in legal proceedings publishes a libel . . .") (emphasis added).

[18]    Vengalattore appears to deny that he is relying on a theory that he was *forced* to publish the determination of October 6, 2015.  (Dkt. No. 117, at 34 ["Vengalattore is not resting on an allegation that Cornell forced him to self-publish."].)  In any event, to the extent that Vengalattore's theory could be interpreted to be that he was forced to publish the determination of October 6, 2015, in his Article 78 petition, such a theory is untenable, because "New York does not recognize defamation via compelled self-publication."  *Phillip v. Sterling Home Care, Inc.*, 103 A.D.3d 786, 787 (N.Y. App. Div., 2d Dep't 2013).

Vengalattore's Title IX claim **<u>SURVIVES</u>** this Decision and Order; and it is further

> **ORDERED** that this case is deemed ready for trial, and a pretrial conference shall be scheduled, at which counsel shall appear with settlement authority.

Dated: September 10, 2024
Syracuse, New York

Glenn T. Suddaby
U.S. District Judge